Ralph R. Mabey (#2036)
Adelaide Maudsley (#8791)
KIRTON MCCONKIE P.C.
50 East South Temple, Suite 400
Salt Lake City, UT  84111
Telephone:  801-328-3600
Facsimile:  801-212-2013
Email: rmabey@kmclaw.com
       amaudsley@kmclaw.com

Pedro A. Jimenez (admitted *pro hac vice*)
Paul C. Huck, Jr. (admitted *pro hac vice*)
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL  33131
Telephone: 305-714-9700
Email: pjimenez@jonesday.com
       paulhuck@jonesday.com

*Counsel for Plaintiffs*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re CS Mining, LLC,<br><br>　　　　Debtor, | Chapter 11 Case No. 16-24818-WTT |
| WATERLOO STREET LIMITED, a British Virgin Islands limited company, and PACNET CAPITAL (U.S.), LIMITED, a Delaware limited liability company,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>DAVID RICHARDS, LLC, an Ohio limited liability company d/b/a WESTERN US MINERAL INVESTORS, LLC, SKYE MINERAL INVESTORS, LLC, an Ohio limited liability company; DAVID J. RICHARDS, individually; CLARITY COPPER, LLC, a California limited liability company; CLINTON C. WALKER, individually; and DAVID C. MCMULLIN, individually,<br><br>　　　　Defendants. | Adv. No:<br><br><br>**COMPLAINT** |

4835-8440-6069.v2

WATERLOO STREET LIMITED ("Waterloo"), and PACNET CAPITAL (U.S.), LIMITED ("PacNet"), by and through undersigned counsel, hereby bring this action against Defendants DAVID RICHARDS, LLC, d/b/a WESTERN US MINERAL INVESTORS, LLC ("Richards LLC"), an Ohio limited liability company; SKYE MINERAL INVESTORS, LLC ("Skye Investors"), an Ohio limited liability company; DAVID J. RICHARDS ("Richards"), individually, CLARITY COPPER, LLC ("Clarity Copper"), a California limited liability company; CLINTON W. WALKER ("Walker"), individually; and DAVID C. McMULLIN ("McMullin"), individually.  In support of their claims, Waterloo and PacNet state as follows:

## INTRODUCTION

1. For the better part of a year, the Defendants have manipulated their majority position in CS Mining, LLC ("CS Mining") in order to artificially preserve their purported secured loan to CS Mining, a company that owns and operates a copper mine in Beaver County, Utah.  Richards LLC, which is controlled by Richards and Walker, extended a loan facility of $20.5 million to CS Mining, which it secured with liens against CS Mining's assets.

2. CS Mining subsequently required additional financing in order to build a new processing facility, and Richards LLC entered into an intercreditor agreement (the "Intercreditor Agreement") with CS Mining's new lender, Noble Americas Corporation ("Noble").  That Intercreditor Agreement obligated Richards LLC to convert its loan to equity and to release its liens once CS Mining drew down the full amount of the Noble Loan.

3. In February, 2016, CS Mining drew down the final installment of the Noble Loan. Richards LLC, however, has refused to convert its debt to equity.  Instead, the Defendants have engaged in a concerted effort to shield Richards LLC from complying with its obligation to

convert its debt to equity. Richards and Walker entered into an illicit side agreement with CS Mining's CEO, David McMullin, to avoid drawing down the final installment of the Noble Loan so that the conversion obligation would not be triggered. Richards and Walker also tried to create an artificial default under the Noble Loan to relieve Richards LLC from its conversion obligation under the Intercreditor Agreement.

4. The Plaintiffs have been harmed by the Defendants' scheme. Waterloo is a secured creditor – it purchased the loan previously extended to CS Mining by Noble. The Noble Loan, now fully drawn, places Waterloo in a senior secured status, with a first priority lien in and to all of CS Mining's assets. Richards LLC, with the assistance of Richards, Walker, McMullin, and the other defendants, has refused to convert its loan, jeopardizing Waterloo's probability of a full recovery. The blatant attempts by the Defendants to manipulate Richards LLC's position, as described more fully below, warrants the equitable subordination of the Richards Loan to any and all amounts due under the Noble Loan or, alternatively, the recharacterization of the Richards Loan to equity.

5. PacNet has been similarly harmed. In addition to holding a membership interest in the parent company to CS Mining, PacNet loaned CS Mining $5 million on an unsecured basis when CS Mining faced an additional liquidity crisis. At the time PacNet made its loan, CS Mining was in serious financial difficulty, and PacNet was the only creditor willing to lend money to the company. PacNet fully expected that Richards LLC would honor its obligation to convert its loan to equity, which would have meant that PacNet would stand to recover the $4.825 million that has been drawn down from the $5 million loan. The Defendants have continued to manipulate their position to avoid conversion, and now with CS Mining in

bankruptcy, PacNet's ability to recover its loan is in serious jeopardy. As a result, the Richards Loan should be either subordinated to any and all amounts due under the PacNet loan or recharacterized as equity.

## JURISDICTION AND VENUE

6. This adversary proceeding arises out of the proceedings currently pending before this Court in Case No. 16-24818-WTT.

7. This Court has jurisdiction pursuant to 11 U.S.C. § 510 and 28 U.S.C. § 1334.

8. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## THE PARTIES

10. Plaintiff Waterloo is a British Virgin Islands limited company. Waterloo is a secured creditor of CS Mining through its acquisition of a loan made to CS Mining by Noble.

11. Plaintiff PacNet is a Delaware limited liability company. PacNet is a member of Skye Mineral Partners, LLC ("Skye Partners") and is also an unsecured creditor of CS Mining.

12. Defendant Richards LLC is an Ohio limited liability company. Richards LLC purports to be a secured creditor of CS Mining.

13. Defendant Skye Investors is an Ohio limited liability company. Skye Investors is a member of Skye Partners.

14. Defendant Richards is a citizen of Ohio. Richards is a member of both CS Mining's and Skye Partners' Board of Managers. Richards controls Defendants Skye Investors and Richards LLC.

15. Defendant Clarity Copper is a Delaware limited liability company. Clarity Copper is a member of Skye Partners.

16. Defendant Walker is a citizen of California. Walker is a member of both CS

4

Mining's and Skye Partners' Board of Managers. Walker controls Defendants Clarity Copper and Richards LLC.

17. Defendant McMullin is a citizen of Utah. McMullin is CS Mining's President and Chief Executive Officer.

## FACTUAL ALLEGATIONS

**A.  CS Mining and Skye Partners**

18. In 2011, Richards and Walker formed Skye Partners and CS Mining.

19. CS Mining owns and operates a copper mine in Milford, Utah.

20. Skye Partners is a limited liability company that owns an approximately 98% majority interest in CS Mining.

21. Skye Investors and Clarity Copper are members of Skye Partners. Through their respective control of Skye Investors and Clarity Copper, Richards and Walker control 71.94% of Skye Partners' voting interest.

**B.  Richards and Walker Solicit Investments in CS Mining**

22. In 2011, Richards and Walker solicited investors to invest in CS Mining's operations in Utah.

23. As a result of Richards's and Walker's solicitation, PacNet and an affiliate, DXS Capital (U.S.), Limited ("DXS"), invested in Skye Partners. DXS invested $11.97 million in November 2011, and PacNet made aggregate equity investments of approximately $20 million from 2012 through 2015.

24. As a result of their investments, DXS and PacNet together hold a 28.06% voting interest in Skye Partners.

**C.  Richards and Walker Lend $20.5 Million to CS Mining Through Richards LLC**

5

25. In addition to their controlling interest in Skye Partners, Richards and Walker control a majority stake of Richards LLC.

26. On or about August, 10, 2012, CS Mining entered into a Loan and Security Agreement with Richards LLC (the "Richards Loan"). The Richards Loan provided for Richards LLC to lend money to CS Mining to fund operations and/or make capital investments. The Richards Loan also gave Richards LLC a senior lien over substantially all of CS Mining's real estate, mining and other assets.

27. Initially, Richards LLC loaned $3.5 million to CS Mining. Between 2012 and 2014, Richards LLC continuously increased the amount lent and borrowed under the Richards Loan. Upon information and belief, Richards LLC lent CS Mining an aggregate amount of $20.5 million.

28. On or about May 14, 2013, Richards LLC obtained the right to convert the debt owed under the Richards Loan, including any accrued interest, into equity of Skye Partners, pursuant to a the Fourth Amendment to the Richards Loan.

**D.   Noble Agrees to Lend CS Mining $30 Million As Long As Richards LLC Converts Its Debt to Equity and Releases Its Liens on CS Mining's Assets.**

29. In mid-2014, CS Mining determined that it needed to build a new ore processing facility in order to more efficiently process the metal ore generated by its mining operations. The projected cost of this new processing facility was at least $45 million.

30. As part of its efforts to raise the capital necessary to construct the new processing facility, CS Mining was introduced to Noble.

31. Noble was interested in lending CS Mining approximately $30 million, but the senior lien held by Richards LLC on CS Mining's assets under the Richards Loan was an obstacle to Noble lending CS Mining these funds.

32. To address Noble's concerns and as a material inducement to get Noble to lend,

6

Richards LLC agreed to subordinate certain of the liens it held against CS Mining's assets to the liens that Noble would acquire in connection with its loan to CS Mining.

33. In addition, Richards LLC agreed that once Noble advanced the $30 million, Richards LLC would convert its debt into equity in Skye Partners, thus freeing CS Mining's assets from all of Richards LLC's liens and leaving Noble as CS Mining's senior secured creditor. On or about August 12, 2014, CS Mining, Richards LLC, and Noble memorialized this understanding and its obligations in the Loan and Security Agreement between CS Mining and Noble (the "Noble Loan"), and in the Intercreditor Agreement between CS Mining, Richards LLC and Noble.

34. The Noble Loan provides that Noble would lend $15 million to CS Mining initially, and an additional $15 million (for a total of $30 million) if and when CS Mining was able to raise $15 million in matching equity financing. The Noble Loan and the proposed equity financing together would raise the $45 million projected as needed for the new processing facility.

35. Because substantially all of CS Mining's assets had been pledged to secure the earlier Richards Loan, the Intercreditor Agreement provides that Richards LLC would subordinate liens it held on CS Mining's assets to the liens that Noble was to acquire under the Noble Loan, while retaining a senior lien on other assets.

36. The Intercreditor Agreement also provides that in the event that Noble lends to CS Mining the full $30 million pursuant to the Noble Loan, Richards LLC agrees to "promptly (but in any event within 5 business days) convert" the Richards Loan in full into the equity of Skye Partners and to release all liens held by Richards LLC in and against CS Mining's assets.

4835-8440-6069.v2

**E.     Richards and Walker Concoct Their Scheme to Avoid Converting the Richards Loan to Equity.**

37. Noble lent the initial $15 million to CS Mining on or about August 12, 2014.

38. CS Mining then attempted to secure the $15 million in matching equity financing that would trigger its ability to draw down the second $15 million from Noble. Drawing that final $15 million from Noble would trigger, in turn, Richards LLC's mandatory obligation under the Intercreditor Agreement to convert its debt to equity and release its liens.

39. In April 2015, PacNet, Clarity Copper, and Skye Investors agreed to contribute additional equity to Skye Partners in the aggregate amount of $15 million (the "Equity Financing").

40. By June 2015, the Equity Financing was complete, and CS Mining now had the ability to draw down the remaining $15 million under the Noble Loan to proceed with the construction of the new processing facility.

41. Richards and Walker, however, were determined to circumvent the conversion of their debt to equity in order to maintain the secured and senior position of the Richards Loan.

**1.     Richards and Walker Purposely Delay Construction of the New Processing Facility to Avoid Converting the Richards Loan to Equity**

42. After the parties completed the Equity Financing, it became evident that CS Mining would need more than the $45 million that had been budgeted to complete the new processing facility.

43. As early as July 2015, CS Mining's management informed the Board of Managers, including Richards and Walker, that there would be a significant budget shortfall, and that CS Mining would require substantial additional cash to complete construction of the new processing facility. By August 2015, CS Mining's management had warned Richards and Walker repeatedly that $10 million was urgently needed to avoid a substantial delay in construction of the new processing facility.

44. Not only would such a delay have serious adverse consequences on CS Mining's revenues, as the new processing facility was necessary for CS Mining to become profitable, but it also would have significant consequences under the terms of the Noble Loan. Two covenants in the Noble Loan agreement required that: (i) CS Mining complete the new processing facility by November 30, 2015; and (ii) CS Mining begin making payments on the Noble Loan starting in October, 2015. If CS Mining was unable to meet these deadlines, it would be in violation of these covenants and in default under the terms of the Noble Loan.

45. Richards and Walker knew that if CS Mining defaulted under the Noble Loan, it would relieve Richards LLC of its obligation to convert its debt to equity. Richards and Walker therefore proceeded to obstruct CS Mining from raising the capital necessary to complete the new processing facility prior to the deadlines in the Noble Loan. They did this in order to protect the secured, senior position Richards LLC held on CS Mining's assets.

46. Indeed, after learning of CS Mining's budget shortfall and the need to raise additional capital, PacNet repeatedly offered to make additional funding available to CS Mining that could be used to complete the new processing facility. It was Richards's and Walker's goal to obstruct and delay any such capital infusion until after the Noble Loan had gone into default in order to prevent the Richards Loan from converting to equity. To this end, they used their position as members of the board of Skye Partners controlling over 70% of its voting interests to block any funding proposals until after the relevant deadlines under the Noble Loan had passed.

47. First, on or about September 13, 2015, PacNet sent Richards and Walker a written proposal offering to make an additional equity investment of up to $8 million in Skye Partners that would be used to complete construction of the new processing facility. Richards and Walker rejected this offer.

48. Next, on or about October 8, 2015, PacNet sent Richards and Walker a written offer to make an additional equity investment of $2.6 million and to make another $6 million in

9

financing available in the form of a secured loan. Richards and Walker rejected this offer.

49. Finally, on or about October 29, 2015, PacNet sent Richards and Walker a written proposal to make an additional equity investment of $22.4 million and to make another $10 million available in the form of an unsecured loan. PacNet proposed that this additional capital be used to pay off the Richards Loan and that the remainder of the funds be used to complete the new processing facility. Richards and Walker rejected this offer.

50. Notwithstanding Richards's and Walkers' intransigence, PacNet continued to put forth proposals for financing. For example, on November 5, 2015, PacNet offered to invest $9.75 million in Skye Partners which would be used to complete the new processing facility. Although Richards and Walker ultimately agreed to terms for financing in late November 2015, they continued to delay the financing so that it would not occur until after the Noble Loan deadlines had passed. As a result, financing was not completed until December 11, 2015.

51. While Richards and Walker were blocking the needed funding, CS Mining's financial and operational capacities continued to degrade. By preventing PacNet from making the proposed investments, however, Richards and Walker attempted to guarantee that the new processing facility would not be completed on time and, as a result, Richards LLC would not be required to convert its loan to equity.

**2. Richards and Walker Enter into a Secret Agreement with McMullin to Avoid Drawing Down the Noble Loan In Order to Avoid Converting the Richards Loan to Equity.**

52. Unbeknownst to PacNet, Richards and Walker entered into a side-agreement with CS Mining's CEO, McMullin. Under this agreement, McMullin agreed not to draw down the full $30 million available under the Noble Loan until he obtained Richards LLC's consent to do so. Richards LLC withheld that consent until certain events of default under the Noble Loan had accrued. As discussed above, if the Noble Loan was fully drawn down while CS Mining was in default, it might relieve Richards LLC of its obligation to convert its debt to equity.

10

53. Richards, Walker, and McMullin hid this unauthorized side agreement from PacNet's representative to the CS Mining and Skye Partners boards.

54. In furtherance of this scheme, McMullin caused CS Mining to draw down up to $29.75 million of the $30 million Noble Loan facility, but he left $250,000 untapped – despite the fact that CS Mining's financial position was increasingly bleak, the company needed to move forward with construction of the new processing facility, and the Richards Loan continued to accrue interest at a high rate. Richards and Walker, with the assistance of McMullin, engaged in this scheme to maintain the substantial economic advantages Richards LLC enjoyed through its senior lien on CS Mining's assets, thereby injuring Waterloo and PacNet.

**3. Richards and Walker Renege on the Modification of the Noble Loan.**

55. Because Richards and Walker blocked PacNet's supplemental round of funding until after the original deadlines in the Noble Loan had passed, CS Mining was in default on its obligations under the Noble Loan.

56. To remedy that default, on December 4, 2015, CS Mining and Noble amended the Noble Loan to extend the deadlines to complete construction of the new processing facility and to begin repaying the Noble Loan. As a result of this amendment, the Noble Loan was no longer in default.

57. Prior to this, Noble had decided to exit from the mining sector in the United States. As part of that strategy, Noble solicited third parties to purchase the Noble Loan and Intercreditor Agreement. Both Richards and Waterloo, an affiliate of PacNet and DXS, were involved in a competitive bidding process for the Noble Loan, as Walker informed CS Mining's Board of Managers. Richards also separately confirmed that he had made an offer to purchase the Noble Loan.

58. On or about December 31, 2015, Waterloo executed a Purchase and Sale Agreement with Noble under which Waterloo acquired Noble's interests and obligations under

11

the Noble Loan and the Intercreditor Agreement. At the time it purchased the Noble Loan, Waterloo knew that CS Mining and Noble had remedied CS Mining's default, and Waterloo reasonably expected that the terms of the Noble Loan and the Intercreditor Agreement would be honored and that it would become CS Mining's senior secured creditor.

59. Realizing that the Noble Loan was no longer in default and that Waterloo, not Richards, was the successful bidder for the Noble Loan, Richards and Walker informed the CS Mining Board of Managers that they "withdrew" their consent to the December 4, 2015 amendment to the Noble Loan, hoping that this would somehow place the Noble Loan back in default.

60. Richards and Walker claimed that they sought to "withdraw" their consent because they had just learned that Noble was going to sell the Noble Loan to Waterloo. Richards, however, had bid for the Noble Loan, and Walker had informed CS Mining's Board of Managers of that fact. Richards's and Walker's excuse was nothing more than a pretext for their attempt to manufacture after-the-fact protection for Richards LLC's secured position against CS Mining.

**F.   CS Mining's Situation Worsens, and PacNet Lends the Company $5 Million on an Unsecured Basis.**

61. Because no other member or third party was willing to invest or lend money to CS Mining, PacNet agreed to lend CS Mining $5 million on an unsecured basis. On January 20, 2016, CS Mining and PacNet entered into a loan agreement for $2 million. On January 29, 2016, Skye Partners' and CS Mining's Boards of Members approved a second loan agreement for an additional $3 million.

62. At the time PacNet made its loans, it anticipated that because of CS Mining's deteriorating liquidity, CS Mining would have to draw down the remaining $250,000 of the Noble Loan shortly thereafter, as that was one of the only remaining sources of financing

12

available to the company. Once that occurred, CS Mining's debt burden would be reduced by over $20.5 million, leaving PacNet in a much better position if CS Mining's financial situation did not stabilize.

### G. CS Mining Draws Down the Remaining Amount of the Noble Loan, but Richards LLC Refuses to Acknowledge Conversion of its Debt to Equity and to Release its Liens.

63. On February 3, 2016, Waterloo sent a letter to CS Mining informing the company that, to the extent any defaults existed under the Noble Loan, Waterloo had waived them.

64. On or about February 4, 2016, CS Mining drew down the last $250,000 in principal available to it under the Noble Loan, bringing the total amount borrowed to $30 million.

65. Under the Intercreditor Agreement, Richards LLC was then obligated to convert its loan to equity and to release its liens on CS Mining's assets. Richards LLC, however, has refused to do either, claiming that Richards's and Walker's purported "withdrawal" of their approval of the Noble Loan amendment revived CS Mining's defaults under the Noble Loan – defaults which Richards and Walker themselves manufactured - and thereby excused Richards LLC from its mandatory obligations to convert to equity.

66. Richards LLC then declared the entire Richards Loan due and owing, and initiated foreclosure on its purported liens against CS Mining.

<u>COUNT I</u>
EQUITABLE SUBORDINATION
(ALL DEFENDANTS)

67. Plaintiffs incorporate the allegations in paragraphs 1-66 as if fully set forth herein.

68. Richards and Walker are members of Skye Partners' and CS Mining's Board of Managers, and they also hold more than 20% of the voting power of Skye Partners. Richards and Walker also control Richards LLC. Richards LLC is therefore an "insider" of CS Mining.

69. Richards LLC purports to be a secured creditor of CS Mining holding liens

against CS Mining's assets. Those assets are part of CS Mining's bankruptcy estate.

70. Richards, Walker, McMullin, Skye Investors, Clarity Copper and Richards LLC engaged in unfair and inequitable conduct intended to benefit Richards LLC, including, but not limited to, the following:

a) Richards and Walker entered into an unauthorized and undisclosed side agreement with McMullin to prevent CS Mining from drawing down on the entire $30 million available under the Noble Loan so that Richards LLC could avoid its obligation to convert its debt to equity and release its liens against CS Mining's assets;

b) Richards, Walker, and Richards LLC refused to convert the Richards Loan debt to equity and to release its liens against CS Mining's assets as required by the Intercreditor Agreement;

c) Richards, Walker and Richards LLC affirmatively sought to enforce invalid liens on CS Mining's assets;

d) Richards and Walker used Skye Investors and Clarity Copper to obstruct PacNet's efforts to provide necessary equity contributions to CS Mining so that CS Mining would default under the Noble Loan and thereby relieve Richards LLC of its obligation to convert its debt to equity and release its liens against CS Mining's assets; and

e) Richards and Walker used Skye Investors and Clarity Copper to purportedly withdraw consent to the amendment to the Noble Loan in an attempt to place CS Mining back in default so that Richards LLC would not have to convert its debt to equity and release its liens against CS Mining's assets.

71. The Defendants engaged in this activity in an effort to artificially and improperly maintain Richards LLC as a secured senior creditor of CS Mining and to obtain an unfair

advantage over Waterloo and PacNet.  Waterloo purchased the Noble Loan and PacNet lent money to CS Mining on the reasonable expectation that Richards LLC would convert its debt to equity and release its liens against CS Mining's assets.  Neither would have done so if they knew that the Defendants would engage in a scheme to avoid Richards LLC's obligations under the Intercreditor Agreement.

72. Pursuant to §§ 510(c) and 105(a) of the Bankruptcy Code:

   a) Richards LLC's claims against CS Mining should be subordinated to Waterloo's and PacNet's claims as such is consistent with the provisions of the Bankruptcy Code, which authorizes subordination of claims where there is unfair or inequitable conduct on the part of a claimant; and

   b) to the extent that Richards, Walker, Skye Investors, Clarity Copper or McMullin have claims against CS Mining, those claims should be subordinated to Waterloo's and PacNet's claims as such is consistent with the provisions of the Bankruptcy Code, which authorizes subordination of claims where there is unfair or inequitable conduct on the part of a claimant.

73. Waterloo and PacNet request entry of a judgment subordinating the Defendants' claims to Waterloo's and PacNet's claims and awarding such other relief as the Court deems just and proper.

**COUNT II**
**RECHARACTERIZATION OF DEBT AS EQUITY**
**(RICHARDS LLC)**

74. Plaintiffs incorporate the allegations in paragraphs 1-66 as if fully set forth herein.

75. This Court has the authority to determine whether a claim characterized as debt is more properly characterized as equity.

76. On or about August 10, 2012, CS Mining and Richards LLC executed the Richards Loan agreement, which provided for Richards LLC to lend money to CS Mining to

fund operations and make capital investments. The Richards Loan also gave Richards LLC a senior lien over substantially all of CS Mining's assets.

77. On or about August 12, 2014, CS Mining, Richards LLC and Noble entered into the Intercreditor Agreement, which affirmatively mandates conversion of Richards LLC's debt to equity in Skye Partners and release of its liens against CS Mining's assets when one of two conditions occur: (i) CS Mining drew down the entire $30 million of credit available under the Noble Loan agreement; or (ii) Project Completion (as defined in the Noble Loan agreement) is reached.

78. On or about February 4, 2016, CS Mining drew down on the final $250,000 under the Noble Loan, thereby satisfying one of the conditions of the Intercreditor Agreement and triggering Richards LLC's obligation to convert its debt to equity and release its liens.

79. Richards LLC refuses to comply with the clear and unambiguous requirements of the Intercreditor Agreement.

80. Consistent with the intent of all parties to the Intercreditor Agreement, the debt owed by CS Mining to Richards LLC should be recharacterized as an equity interest in the company.

81. Waterloo and PacNet request entry of a judgment recharacterizing Richards LLC's debt as equity and awarding such other relief the Court deems just and proper.

## COUNT III
## TORTIOUS INTERFERENCE
## (RICHARDS, WALKER, SKYE INVESTORS, CLARITY COPPER, AND MCMULLIN)

82. Plaintiff Waterloo incorporates the allegations in paragraphs 1-66 as if fully set forth herein.

83. On or about August 12, 2014, CS Mining and Noble entered into the Noble Loan agreement.

84. Also on or about August 12, 2014, CS Mining, Noble, and Richards LLC entered

16

Case 16-24818    Doc 84    Filed 07/21/16    Entered 07/21/16 10:05:13    Desc Main
Document      Page 17 of 20

into the Intercreditor Agreement.

85. The Noble Loan agreement and the Intercreditor Agreement created a contractual or economic relationship between Noble and CS Mining.

86. On or about December 31, 2015, Waterloo executed a Purchase and Sale Agreement with Noble under which Waterloo acquired Noble's interests and obligations under the Noble Loan agreement and the Intercreditor Agreement.

87. Waterloo's acquisition of Noble's interest and obligations under the Noble Loan agreement and Intercreditor Agreement created a contractual or economic relationship between Waterloo and CS Mining.

88. McMullin, Richards, Walker, Skye Investors, and Clarity Copper were aware of the contractual or economic relationship between Waterloo and CS Mining.

89. McMullin, CS Mining's President and CEO, used his position to disrupt and interfere with certain obligations arising out of that contractual or economic relationship.

90. For example, notwithstanding McMullin's duty to act at all times in CS Mining's best interest, McMullin intentionally and improperly delayed CS Mining's draw down of the final $250,000 under the Noble Loan.

91. McMullin knew that CS Mining's draw down on the final $250,000 would trigger mandatory conversion of Richards LLC's debt to equity and would require Richards LLC to release its liens on CS Mining's assets. McMullin also knew that drawing down the final $250,000 under the Noble Loan would provide CS Mining access to a badly needed cash infusion and would reduce CS Mining's debt burden by over $20 million.

92. Instead of using his position to effectuate the final draw down—which would have been in CS Mining's best interest—McMullin entered into an improper side agreement with Richards and Walker to delay or prevent the drawdown of the final $250,000 under the Noble Loan.

4835-8440-6069.v2

93. McMullin knew there was no lawful justification for preventing or delaying the draw down on the final $250,000 under the Noble Loan and that refusing to effectuate the draw down was contrary to established business practices.

94. McMullin's intentional and wrongful delay of CS Mining's draw down of the final $250,000 under the Noble Loan directly interfered with Waterloo's contractual or economic relationship with CS Mining. For example, McMullin's unnecessary delay purportedly triggered certain events of default under the Noble Loan, and Richards LLC relied on those purported defaults to justify its refusal to convert its debt to equity and release its liens on CS Mining's assets.

95. Richards, Walker, Skye Investors and Clarity Copper also directly interfered with Waterloo's contractual or economic relationship with CS Mining. For example, Richards and Walker used Skye Investors and Clarity Copper to obstruct PacNet's efforts to provide necessary capital to CS Mining so that CS Mining would default under the Noble Loan. Richards, Walker, Skye Investors, and Clarity Copper manufactured this purported default in an effort to relieve Richards LLC of its obligation to convert its debt to equity and release its liens on CS Mining's assets.

96. To remedy that purported default, on December 4, 2015, CS Mining and Noble amended the Noble Loan to extend the deadlines to complete construction of the new processing facility and to begin repaying the Noble Loan. As a result of this amendment, the Noble Loan was no longer in default.

97. Richards and Walker then used Skye Investors and Clarity Copper to further interfere with Waterloo and CS Mining's economic or contractual relationship. More specifically, Richards and Walker used Skye Investors and Clarity Copper to purportedly withdraw consent to the amendment to the Noble Loan in an attempt to place CS Mining back in default so that Richards LLC would not have to convert its debt to equity and release its liens

4835-8440-6069.v2

against CS Mining's assets.

98. Had the Defendants not engaged in this unjustified and improper conduct, Waterloo would be CS Mining's senior secured creditor and would hold liens on almost all of CS Mining's assets. Instead, because of the Defendants' tortious interference, Waterloo's position as the senior secured creditor of CS Mining has been substantially and negatively impaired, and Waterloo has had to seek relief through this action to enforce its rights under the Noble Loan and the Intercreditor Agreement.

99. As a direct and proximate result of the Defendants' wrongful conduct, Waterloo has suffered and continues to suffer damages.

100. Waterloo seeks an award of damages, prejudgment and postjudgment interest, and such other relief this Court deems just and proper.

**WHEREFORE,** Plaintiffs request entry of judgment as follows:

(a) On Count I, entry of a judgment subordinating the Defendants' claims to Waterloo's and PacNet's claims, and awarding such other relief as the Court deems just and proper;

(b) On Count II, entry of a judgment recharacterizing Richards LLC's debt as equity and awarding such other relief the Court deems just and proper; and

(c) On Count III, entry of a judgment awarding damages, prejudgment and postjudgment interest, and such other relief this Court deems just and proper.

Dated this 21st day of July, 2016.

By:   /s/ Adelaide Maudsley
Ralph R. Mabey (#2036)
Adelaide Maudsley (#8791)
Kirton McConkie
50 East South Temple, Suite 400
Salt Lake City, UT  84111
Telephone:  801-328-3600
Email: rmabey@kmclaw.com

19

        amaudsley@kmclaw.com

    Pedro A. Jimenez
    (admitted *pro hac vice*)
    Paul C. Huck, Jr.
    (admitted *pro hac vice*)
    JONES DAY
    600 Brickell Avenue, Suite 3300
    Miami, FL  33131
    Telephone: 305-714-9700
    Email: pjimenez@jonesday.com
           paulhuck@jonesday.com

4835-8440-6069.v2