David E. Leta (1957)

Troy Aramburu (10444)

Jeff Tuttle (14500)

**SNELL & WILMER L.L.P.**

15 W South Temple, Suite 1200

Salt Lake City, Utah 84101

Telephone: 801-257-1900

Facsimile: 801-257-1800

Email: dleta@swlaw.com

      taramburu@swlaw.com

      jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)

Francis J. Lawall, Esq. (admitted *pro hac vice*)

John H. Schanne, II (admitted *pro hac vice*)

**PEPPER HAMILTON LLP**

Hercules Plaza, Suite 5100

1313 N. Market Street

Wilmington, DE 19899-1709

Telephone: (302) 777-6500

Facsimile: (302) 656-8865

E-mail: detweild@pepperlaw.com

      lawallf@pepperlaw.com

      schannej@pepperlaw.com

*Counsel for CS Mining, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC,**<br><br>    Debtor. | Bankruptcy Case No. 16-24818<br><br>(Chapter 11)<br><br>Judge William T. Thurman |

**MOTION OF DEBTOR FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF THE ESTATE'S ASSETS, (B) APPROVING EXPENSE REIMBURSEMENT, (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE PROPOSED SALE, AND (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (II) AN ORDER (A) APPROVING THE SALE, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

CS Mining, LLC, as debtor and debtor-in-possession ("Debtor"), by and through its undersigned counsel, hereby moves (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (a) approving bidding and auction procedures (collectively, the "Bidding Procedures"), a copy of which is attached hereto as **Exhibit B**, in connection with the potential sale(s) of all, or substantially all, assets (the

25089457

"Purchased Assets") of Debtor's estate (the "Estate"), free and clear of all liens, claims (as

defined in section 101(5) of the Bankruptcy Code), encumbrances, or interests of any kind or

nature whatsoever (collectively, "Claims and Interests"), except to the extent identified in a

Successful Bidder's (as defined below) asset purchase agreement; (b) approving an Expense

Reimbursement (as defined below) to be granted at Debtor's discretion; (c) approving the form

and manner of sale notices (the "Notice Procedures"); (d) scheduling an auction (the "Auction")

if, subject to the Bidding Procedures, Debtor receives more than one Qualified Bid (as defined

below), and setting a date and time for a sale hearing (the "Sale Hearing") for the sale (the

"Sale") of the Purchased Assets; and (e) granting certain related relief.

Subject to the results of the Auction and the Bidding Procedures, at the Sale

Hearing, Debtor will seek entry of an order, substantially in the form attached hereto as

**Exhibit C** (the "Sale Order"): (i) approving and authorizing the Sale of the Purchased Assets

free and clear of all Claims and Interests except to the extent set forth in a Successful Bidder's

asset purchase agreement; and (ii) authorizing the assumption and assignment of certain

agreements.

This Motion is based upon the points and authorities included herein, the relevant

papers and pleadings on file with the Court in this matter, and such evidence as may be

introduced by Debtor at any hearing on the Bidding Procedures portion of this Motion, and all

additional papers, pleadings and evidence to be offered in support of the Sale prior to and at the

Sale Hearing.  In support of this Motion, Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue of this

proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

### BACKGROUND

**A.      Bankruptcy Case Background**

3.      On August 4, 2016 (the "<u>Relief Date</u>"), the Court entered the Order for Relief (Docket No. 130) under chapter 11 of the Bankruptcy Code.  Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

4.      On August 12, 2015, the United States Trustee (the "<u>US Trustee</u>") appointed the Official Committee of Unsecured Creditors (the "<u>Committee</u>") pursuant to Bankruptcy Code section 1102 (Docket No. 181).

**B.      Debtor's Business**

5.      Debtor owns or controls a number of high-grade copper ore deposits located in the Milford Mineral Belt in Beaver County, Utah.  The aggregated mining properties consist of a flotation mill and 60,000 acres that has significant measured and indicated reserves of copper, gold and silver resources.  The large property contains additional promising targets.

6.      Additional information about Debtor's business operations, about its capitalization and prepetition indebtedness, as well as the events leading to Debtor's chapter 11 filing, can be found in the Declaration of David McMullin in Support of Chapter 11 Petition and Motions for First Day Relief (the "<u>First Day Declaration</u>") (Docket No. 144).  Debtor relies on the First Day Declaration in seeking the relief requested herein and incorporates the First Day Declaration herein by reference.

25089457

C.      **Final DIP Financing Order**

7.      On October 11, 2016, the Court entered the Final Order Pursuant to

Sections 105, 361, 362, 363, 364, 365 and 507 of the Bankruptcy Code (I) Authorizing Debtor to

Obtain Superpriority Secured Debtor-In-Possession Financing, (II) Authorizing Debtor to Use

Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties and (V)

Granting Related Relief (the "Final DIP Financing Order") (Docket No. 352).

8.      Pursuant to the Final DIP Financing Order, Wellington Financing

Partners, LLC ("Wellington"); Broadbill Partners, L.P. ("Broadbill") and St. Cloud Capital

Partners II, L.P.  ( "St. Cloud" and collectively with Wellington and Broadbill, the "Final DIP

Lenders"), provided to Debtor a secured superpriority debtor-in-possession financing facility (the

"DIP Facility") in the aggregate principal amount of $7,675,000, subject to increase in amount

for payment of interest and certain other allowed costs (any such amounts outstanding, the "DIP

Loan Amount").  The DIP Facility provided Debtor the liquidity necessary to maintain its

operations while seeking to formulate a chapter 11 bankruptcy plan, including funding a going-

concern, value-maximizing sale process.

9.      The Final DIP Financing Order includes milestones (the "Exit

Milestones") with respect to the Sale of the Purchased Assets, which Exit Milestones govern the

timeframe for the requested Bidding Procedures and Sale Process (as defined below).

D.      **Anticipated Sale Process**

10.      Debtor intends to sell the Purchased Assets pursuant to a competitive sale

process under Bankruptcy Code section 363(b) (the "Sale Process").  The Purchased Assets

include all, or substantially all, of the Estate's assets.  Debtor will consider bids for all of the

Purchased Assets and bids for any subset thereof.

11.     Debtor, with approval of the Court (Docket No. 206), has retained FTI

Consulting, Inc.("FTI") and Michael Buenzow, David J. Beckman and Randy Davenport as

Chief Restructuring Officers (each of Messrs. Buenzow, Beckman and Davenport individually, a

"CRO" and collectively, the "CROs") to, among other things, assist Debtor with the marketing

and sale of the Purchased Assets, which application was approved by order of the Court (Docket

No. 293).

12.     Debtor, with the assistance of FTI and CROs, intends to implement a Sale

Process that will be competitive and result in maximum value for the Estate.  FTI and CROs

have and will, among other things, (a) assist Debtor in determining any potential for value

enhancement of the Purchased Assets, (b) advise on appropriate pricing for the Sale of the

Purchased Assets, (c) assist Debtor in identifying, contacting and screening potential purchasers

of the Purchased Assets, (d) prepare marketing materials designed to enhance the value of the

Sale, (e) assist Debtor in preparing a due diligence data room and in coordinating the due

diligence investigations of potential purchasers, and (e) use its best efforts in the marketing of the

Purchased Assets.

13.     Parties seeking access to the electronic data room established by Debtor to

review due diligence materials will be required to sign the form confidentiality agreement (the

"Confidentiality Agreement") attached as **Exhibit D** hereto.

14.     Although Debtor has initiated a robust marketing process for the

Purchased Assets, Debtor has not reached an agreement with any party to serve as the stalking

horse bidder (the "Stalking Horse Bidder") for the Purchased Assets.  Debtor continues to seek

an appropriate Stalking Horse Bidder, and the Bidding Procedures allow for the selection of the

25089457

Stalking Horse Bidder and provision of an Expense Reimbursement in the exercise of Debtor's discretion.

15.    In addition to the sale teaser and confidential information necessary for potential bidders to perform due diligence in connection with the Sale, the electronic data room will include a form of asset purchase agreement (the "Purchase Agreement") prepared by Debtor, substantially in the form attached hereto as **Exhibit G**.  In order to be considered for selection as the Stalking Horse Bidder, Potential Bidders (as defined below) will be required to submit Qualified Bids (as defined below, except that the Bid Deadline for parties wishing to be selected as the Stalking Horse Bidder shall be December 1, 2016) to Debtor using a form of agreement substantially similar to the Purchase Agreement, together with a marked copy of such agreement to identify any changes to the standard form Purchase Agreement, no later than December 1, 2016.  Debtor will select the Stalking Horse Bidder (if any) no later than December 8, 2016 (the "Stalking Horse Selection Date"), and on such date will file with the Court a notice of the selection of the Stalking Horse Bidder (the "Stalking Horse Notice"), and a copy of the Stalking Horse Bidder's Purchase Agreement (the "Stalking Horse Bidder's Purchase Agreement").  Debtor will serve the Stalking Horse Notice upon (i) the Office of the U.S. Trustee; (ii) counsel for Final DIP Lenders; (iii) counsel for Committee; (iv) known parties having asserted an Interest in the Purchased Assets; (vii) any other parties known by Debtor to have expressed an interest in a transaction with respect to all or part of the Purchased Assets; and (viii) parties having requested notices pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Debtor may, as set forth on the Final DIP Financing Order, extend or reduce the Stalking Horse Selection Date once or successively but is not obligated to do so.  Debtor shall promptly notify all Potential Bidders if it amends the Stalking Horse Selection Date.

16.     Debtor, in consultation with its professionals, has determined to proceed with an auction process for the Purchased Assets as outlined herein.  Through the auction process, Debtor will consider a sale of all of the Purchased Assets and for any subset thereof to one or more purchasers.  The competitive auction process will allow Debtor to realize the maximum value for the Purchased Assets, which will inure to the benefit of Debtor's Estate and the creditors thereof.

17.     In Debtor's business judgment, the best course of action is to seek a sale as expeditiously as possible, due to the limited period and amount of financing under the DIP Facility.

### E.     The Bidding Procedures

18.     Debtor, with the guidance of FTI, CROs, and counsel, has devised a competitive bidding process (the "<u>Bidding Process</u>") intended to generate the highest and best value for the Purchased Assets.  The Bidding Procedures include the following provisions:[1]

a.      **Potential Bidders.**  To participate in the Bidding Process, each interested person or entity must (i) deliver to Debtor an executed copy of the Confidentiality Agreement and (ii) be deemed by Debtor to be reasonably likely to be able to fund and complete the consummation of the proposed transaction on terms no less favorable in the aggregate than the terms contained in the Purchase Agreement (or, if there is a Stalking Horse Bidder's Purchase Agreement, on terms no less favorable in the aggregate than the terms contained in the Stalking Horse Bidder's Purchase Agreement) and within the time frame acceptable to Debtor.  As promptly as reasonably possible, Debtor will determine and notify the interested person or entity if such person or entity is acceptable and deem such person or entity a "<u>Potential Bidder</u>."

b.      **Qualified Bids.**  A proposal ("<u>Bid</u>") received from a Potential Bidder is a "<u>Qualified Bid</u>" if it:

i.      is received by the Bid Deadline (as defined below);

---

[1] In the event of any inconsistencies between the description of the Bidding Procedures contained in this Motion and the language of the Bidding Procedures themselves, in the form attached as <u>Exhibit B</u> to the Bidding Procedures Order, the language of the Bidding Procedures themselves shall govern.

25089457

ii.   provides for the purchase of all or some portion of the Purchased Assets by the Potential Bidder on an "as is, where is" basis;

iii.   includes a copy of a definitive purchase agreement in form and substance substantially similar to the Purchase Agreement (or, if there is a Stalking Horse Bidder's Purchase Agreement, on terms no less favorable in the aggregate than the terms contained in the Stalking Horse Bidder's Purchase Agreement), signed by an authorized representative of such Potential Bidder, in addition to a marked copy of such agreement to reflect the Potential Bidder's modifications to the Purchase Agreement or the Stalking Horse Bidder's Purchase Agreement, as the case may be;

iv.   is not subject to any due diligence or financing contingency, or board or other approval (excluding any necessary regulatory approval that would follow the execution of definitive documentation for such a transaction);

v.   is accompanied by a cash deposit of not less than 5% of the proposed purchase price (the "Required Deposit");

vi.   includes written evidence of an unconditional commitment for financing (by a creditworthy bank or financial institution that shall provide such financing without alteration of conditions or delays) or other evidence of ability, as determined in the reasonable business judgment of Debtor, to consummate the transaction;

vii.   includes a designation of contracts and/or leases to be assumed and assigned to the Potential Bidder and evidence of the Potential Bidder's ability to perform future obligations under such agreements;

viii.   is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined below), within a timeframe acceptable to Debtor; and

ix.   is irrevocable until the earlier of: (a) sixty (60) days after the Court authorizes and approves the Successful Bid, and (b) the closing date of the transaction with Successful Bidder or Alternate Bidder (as defined below).

A Potential Bidder that makes a Qualified Bid is a "Qualified Bidder." Debtor, in its reasonable business judgment, shall determine whether the Bid of a Potential Bidder meets the foregoing requirements to become a Qualified Bid.

c.   **Credit Bid**. Final DIP Lenders, either together or individually, shall have the right to credit bid all or a portion of its claim in an amount not to exceed the DIP Loan Amount, should Final DIP Lenders submit a Qualified Bid. No other party or parties shall be permitted to credit bid.

**Due Diligence.**  Debtor may in its reasonable business judgment, and subject to competitive and other business concerns, afford each Potential Bidder (until the date of the Auction) with such access to due diligence materials concerning the Purchased Assets as Debtor deems appropriate.  Due diligence access may include access to electronic data rooms, on-site inspections, and other matters that a Potential Bidder may reasonably request and as to which Debtor, in its reasonable business judgment, may agree.

d.      **Bid Deadline.**  A Potential Bidder that desires to make a Bid must deliver written copies of its Bid, via hand delivery or overnight mail, to (i) Debtor, CS Mining, LLC, PO Box 608, 1208 South 200 West, Milford, UT  84751 (Attn: David McMullin); (ii) co-counsel to Debtor, Pepper Hamilton, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, DE 19801 (Attn: Donald J. Detweiler, Esq.); (iii) co-counsel to Debtor, Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547 (Attn: David E. Leta, Esq.), (iv) CRO of Debtor, c/o FTI Consulting, Inc., 1001 17th St #1100, Denver, CO 80202 (Attn: David Beckman) and (v) Committee, c/o its counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn: Martin J. Brill, Esq.), so that the Bid is actually received by 4:00 p.m. (MST) **on December 15, 2016** (the "Bid Deadline").  Debtor may extend the Bid Deadline once for a period of not more than sixty (60) days in the aggregate, but is not obligated to do so, in accordance with the terms of the Final DIP Financing Order.  If Debtor extends the Bid Deadline, it shall promptly notify all Potential Bidders of such extension.

e.      **No Qualified Bids.**  If Debtor does not receive any Qualified Bids, Debtor shall report the same to the Court and declare the Auction a "failed auction."

f.      **Only One Qualified Bid.**  In the event that there is no Stalking Horse Bidder and Debtor receives only one Qualified Bid, Debtor will not hold the Auction and may instead seek approval of such Qualified Bid and the associated Purchase Agreement at the Sale Hearing.  However, in the event that only one Qualified Bid is received, Debtor may determine in its reasonable business judgment that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."

g.      **Auction Procedure.**  If at least one Qualified Bid other than a Stalking Horse Bidder's Qualified Bid is received, Debtor shall conduct the Auction on December 19, 2016, at the offices of Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547 at 9:00 a.m. (MST), or such later time or other place as Debtor shall notify all Qualified Bidders.  Only Final DIP Lenders, Committee, and Qualified Bidders shall be permitted to attend the Auction.  Only Qualified Bidders (including each Final DIP Lender that is a Qualified Bidder) shall be eligible to participate in the Auction and only Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.  Debtor shall not consider a particular Bid unless the bidding party has submitted a Qualified Bid and attends the Auction and the

25089457

Qualified Bidder's representative at the Auction has authority to bind the Qualified Bidder.

Prior to the start of the Auction, Debtor, in consultation with its advisors and the Committee, shall evaluate all Qualified Bids, as well as the Stalking Horse Bidder's Purchase Agreement, and shall determine which Qualified Bid constitutes the best offer for the Purchased Assets (the "Starting Auction Bid"). Debtor shall announce the Starting Auction Bid at the start of the Auction.

Debtor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent Qualified Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code or any order of the Court, and (ii) disclosed to each Qualified Bidder at the Auction.

h.   **Minimum Overbids.**  The minimum initial overbid and any subsequent overbids must be in increments of at least $100,000 in cash consideration (which amount Debtor may modify at the Auction in the exercise of its reasonable business judgment) until Debtor declares a Successful Bidder.  Any overbid made in response to the bid of the Stalking Horse Bidder must exceed the Stalking Horse Bidder's Bid not only by the above figure of $100,000, but also by the amount of any applicable Expense Reimbursement.

i.   **Successful Bidder.**  At the conclusion of the Auction, Debtor shall, in consultation with the Committee, (i) review the Stalking Horse Bidder's Purchase Agreement or any Qualified Bid of the Stalking Horse Bidder, and shall review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummation of the Qualified Bid and (ii) identify the best bid (the "Successful Bid") and the bidder making such Bid (the "Successful Bidder").  In determining Successful Bidder, Debtor shall consider the Expense Reimbursement (if applicable).

If Debtor receives at least one Qualified Bid in addition to the Stalking Horse Bidder's Qualified Bid, then, at the Sale Hearing, Debtor will seek approval of the Successful Bid, and, at Debtor's election, may also seek approval of the next best Qualified Bid (the "Alternate Bid" and, the bidder making such Alternate Bid, the "Alternate Bidder").  Debtor's presentation to the Court of the Successful Bid and, if applicable, the Alternate Bid will not constitute Debtor's acceptance of either of such Qualified Bids until such Qualified Bids are approved by the Court at the Sale Hearing.  Following approval of the Sale to Successful Bidder, if Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and Debtor will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court.  The Alternate Bid shall remain open until the earlier of (a) sixty (60) days following

-10-

the entry of the Sale Order or (b) the consummation of the Sale to Successful Bidder.

On the third business day following the selection of Successful Bidder, Debtor will file with the Court a notice of the selection of Successful Bidder and the Alternate Bidder (the "Auction Notice"), copies of Successful Bidder's Purchase Agreement and the Alternate Bidder's Purchase Agreement, and affidavits of Debtor and Successful Bidder in support of the sale of the Purchased Assets to Successful Bidder. Debtor will serve the Auction Notice upon the Notice Parties.

j.   **Return of Deposits.** All Required Deposits, but excluding the Required Deposits of Successful Bidder and Alternate Bidder (which, in the case of the Required Deposit of the Alternate Bidder, shall be returned within three (3) business days of the closing of the Sale to Successful Bidder), shall be returned to Qualified Bidders within five (5) business days after the date of the Auction.

k.   **Sale Hearing.** Debtor shall request that the Court schedule the Sale Hearing for on or before December 30, 2016, at which Debtor shall seek entry of the Sale Order, among other things, authorizing and approving the proposed transaction with Successful Bidder, as determined by Debtor and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Successful Bid. The Sale Order shall be in form and substance acceptable to Debtor and Successful Bidder.

19.   Based on the foregoing and upon approval of the Bidding Procedures, the

following timeline would be established:

(i)   Issuance of Notice of Auction and Sale Hearing - within three (3) business days following entry of the Bidding Procedures Order

(ii)   Issuance of Cure Notice (as defined below) - within three (3) business days following entry of the Bidding Procedures Order

(iii)   Stalking Horse Selection Date – on or before December 8, 2016

(iv)   Issuance of Stalking Horse Notice – on or before December 8, 2016

(v)   Bid Deadline - December 15, 2016 at 4:00 p.m. (MST)

(vi)   Auction - December 19, 2016 at 9:00 a.m. (MST)

(vii)   Auction Notice Deadline – December 22, 2016

(viii)   Sale and Cure Objections Deadline - December 23, 2016 at 4:00 p.m. (MST)

-11-

25089457

(ix)      Proposed Sale Hearing – December 30, 2016

**F.      The Notice Procedures**

20.      Debtor proposes the following Notice Procedures in connection with the

Auction and Sale:

a.      **Notice.**  Debtor will give notice (the "Notice of Auction and Sale Hearing") within three (3) business days after the entry of the Bidding Procedures Order of the Bidding Procedures, the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending a notice, substantially in the form attached hereto as **Exhibit E**, to the Notice Parties.

b.      **Objections.**  The Notice of Auction and Sale Hearing will specify that objections to the relief requested by this Motion, including objections relating to the assumption or assignment of any unexpired lease or executory contract, shall be set forth in writing and specify with particularity the grounds for such objections or other statements of position, and shall be filed with the Court and served so as to be actually received **by 4:00 p.m. (MST) on the date that is seven (7) days prior to the Sale Hearing** (the "Objection Deadline"), on: (i) Debtor, CS Mining, LLC, PO Box 608, 1208 South 200 West, Milford, UT  84751 (Attn: David McMullin); (ii) co-counsel to Debtor, Pepper Hamilton, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, DE 19801 (Attn: Donald J. Detweiler, Esq.); (iii) co-counsel to Debtor, Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547 (Attn: David E. Leta, Esq.), (iv) Committee, c/o its counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn: Martin J. Brill, Esq.), and (v) the Office of the U.S. Trustee, Ken Garff Bldg., 405 South Main St., Suite 300, Salt Lake City, UT 84111(Attn: Laurie Cayton) (collectively, the "Objection Service Parties").  Debtor requests that the Court order that the failure to file and serve objections by the Objection Deadline and in accordance with the foregoing procedure shall be deemed a waiver of such objections and the objecting party shall be forever barred from asserting such objections with respect to the consummation and closing of the Sale, including, without limitation, any objections relating to the proposed assumption and assignment of any agreement.  The Notice of Auction and Sale Hearing will further state that any objections filed and served in accordance with the foregoing procedure will be heard by the Court at the Sale Hearing, except that an objection to the assumption and assignment of a particular contract or contracts may be adjourned by agreement of the objecting contract counterparty, Debtor, and Successful Bidder.

-12-

25089457

### G.      Credit Bidding

21.      In connection with a sale under Bankruptcy Code Section 363(b), the

holder of a secured claim may, under certain circumstances, credit bid its secured claim.  *See* 11

U.S.C. § 363(k) ("such holder may offset such claim against the purchase price of such

property").  Here, the DIP Facility provided Debtor the liquidity necessary to maintain its

operations while seeking to formulate a chapter 11 bankruptcy plan, including funding a going-

concern, value-maximizing sale process.  To secure the DIP Loan Amount extended pursuant to

the DIP Facility, Final DIP Lenders were provided valid, enforceable, perfected, and non-

avoidable first priority liens on and security interests in the DIP Collateral.  Pursuant to

Bankruptcy Code section 363(k), Final DIP Lenders may credit bid their undisputed and Court

approved claims.  Accordingly, Final DIP Lenders, either together or individually, should be

afforded the right to credit bid all or a portion of their claim in an amount not to exceed the DIP

Loan Amount, should Final DIP Lenders otherwise submit a Qualified Bid.

22.      As set forth in the Final DIP Financing Order, there are a variety of

purportedly secured prepetition claims that have been asserted against Debtor, some of which is

subject to pending (and stayed) litigation.  Debtor has disputed the validity of the secured

prepetition debt asserted against it and the Final DIP Financing Order expressly reserves the right

of Debtor and other parties to challenge the purported prepetition secured indebtedness.  *See,*

*e.g.,* Final DIP Financing Order, Para O - No Stipulations Relating to the Prepetition Secured

Indebtedness.[2]  The secured claim holder's ability to credit bid is not an absolute, unfettered

right, and the right is predicated on holding a secured claim in the first instance.  At a minimum,

---

[2] Which states:  "For the avoidance of doubt, nothing in this Financing Order shall be deemed as a
stipulation by the Debtor or any other party as to the nature, extent, validity, or priority of the Prepetition Liens or
Other Prepetition Liens, and any and all rights, defenses, causes of action, claims and challenges with respect to the
Prepetition Liens and Other Prepetition Liens are hereby preserved to the fullest extent."

25089457

a purportedly secured claim must be an allowed secured claim in order to form the basis for a

credit bid.  Because the prepetition secured indebtedness remains subject to active review and

challenge, Debtor submits that none of those purported claims can form a basis for a credit bid.

*See, e.g., In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) ("The law

leaves no doubt that the holder of a lien the validity of which has not been determined, as here,

may not bid its lien.")

> **H.    Assumption and Assignment of Executory Contracts and/or
> Unexpired Leases**

23.    In conjunction with the Sale, at the Sale Hearing Debtor will seek to

assume and assign to Successful Bidder certain agreements identified in the Successful Bid.  In

connection therewith, within three (3) business days after entry of the Bidding Procedures Order,

Debtor shall file and serve upon counterparties to Debtor's executory contracts and unexpired

leases (the "Counterparties") a notice substantially in the form attached hereto as **Exhibit F** (the

"Cure Notice"), informing Counterparties that Debtor's executory contracts and unexpired leases

may be assumed and assigned, and setting forth what Debtor's records show to be the applicable

cure amounts, if any (the "Cure Amounts").

24.    All objections to the relief sought at the Sale Hearing, including objections

to the Cure Amounts and objections to the proposed assumption and assignment of the

agreements identified in any bid, must: (i) be in writing; (ii) state with specificity the nature of

such objection (with appropriate documentation in support thereof); (iii) comply with the

Bankruptcy Rules and the Local Rules; and (iv) be filed with this Court and served upon (so as to

be received by) the Objection Service Parties on or before the Objection Deadline.

25.    A party failing to file and serve a timely objection, on or before the

Objection Deadline, to the Cure Amounts and/or the assumption and assignment of any

25089457

executory contract or unexpired lease shall be forever barred from objecting to the Cure

Amounts and/or assumption and assignment, and will be deemed to consent to the Cure Amounts

and/or assumption and assignment.  In the event that a timely objection to the Cure Amounts

and/or assumption and assignment of any executory contract or unexpired lease is filed, and the

parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection

will be determined at the Sale Hearing or such other date and time as may be fixed by this Court,

and any such dispute can be adjourned by agreement of the objecting contract counterparty,

Debtor, and Successful Bidder without deferring Court approval of the Sale at the Sale Hearing.

## RELIEF REQUESTED

26.     Through this Motion, Debtor seeks entry of the Bidding Procedures Order:

(a) approving the Bidding Procedures, (b) approving an Expense Reimbursement, to be granted

to the Stalking Horse Bidder at Debtor's discretion, (c) scheduling the Auction and Sale Hearing,

(d) approving the Notice Procedures, and (e) granting certain related relief.

27.     In addition, at the conclusion of the Sale Hearing, Debtor will seek entry

of the Sale Order:  (i) authorizing the sale of the Purchased Assets to Successful Bidder,

(ii) authorizing the assumption and assignment of any designated executory contract(s) and/or

unexpired lease(s), and (iii) granting certain related relief.

## BASIS FOR REQUESTED RELIEF

### A.     The Bidding Procedures Should Be Approved.

28.     The Bidding Procedures are designed to generate the highest and best bid

for the Estate's assets by facilitating a competitive Bidding Process in which all Potential

Bidders are encouraged to participate and submit competing Qualified Bids.

29.     This Motion provides Potential Bidders with significantly more than the

twenty-one (21) days' notice of the Sale Hearing required by Bankruptcy Rule 2002, and

25089457

provides Potential Bidders with sufficient opportunity to acquire the information necessary for submission of a timely and informed Qualified Bid.

30.    Debtor, with the assistance of FTI and CROs, has begun the solicitation process and is familiar with many of the parties that may have an interest in bidding for the Purchased Assets. Debtor believes that in light of the groundwork established and continuing by Debtor in support of the Sale Process, the requested timeframe set forth herein will provide a sufficient period of time in which to generate the highest and best offer for the Purchased Assets, especially in light of the fact that Debtor maintains the right to extend the period for up to sixty (60) days if, in its business judgment after consultation with the Final DIP Lenders, such an extension is necessary, among other reasons, to maximize value or improve the prospects of the Sale Process.

**B.    The Expense Reimbursement Should Be Approved.**

31.    Although Debtor does not presently have a Stalking Horse Bidder, Debtor remains hopeful that that one will emerge. Debtor believes, in the exercise of its business judgment and based on consultation with its advisors and CROs, that having the ability to offer a reasonable expense reimbursement in an amount equal to $250,000 (the "Expense Reimbursement") to a Stalking Horse Bidder prior to the Auction may assist Debtor in generating the highest and best offer for the benefit of the Estate. Debtor may elect not to grant any Expense Reimbursement, but seeks the authority to grant an Expense Reimbursement in Debtor's discretion in the exercise of its business judgment in order to facilitate obtaining a Stalking Horse Bidder and the value such a bidder provides to the bidding process. Debtor is requesting this authority at this time to avoid the potential uncertainty, cost and delay of negotiating expense reimbursement protections with a potential Stalking Horse Bidder and then

incurring the expense and uncertainty attendant to seeking relief through another noticed hearing.[3]

32.    An expense reimbursement or break-up fee is "designed to compensate the unsuccessful bidder for the risk and costs incurred in advancing the competitive bidding process." AgriProcessors, Inc. v. Fokkena (In re Tama Beef Packing, Inc.), 321 B.R. 496, 497-98 (B.A.P. 8th Cir. 2005). In the context of an asset sale, expense reimbursements and break-up fees are presumptively appropriate under the business judgment rule. See, In re Integrated Resources Inc., 135 B.R. 746, 751 (Bankr. S.D.N.Y. 1992), aff'd 147 B.R. 650 (S.D.N.Y. 1992).

33.    An Expense Reimbursement of $250,000 here is well within the range which courts typically find to be reasonable. Tama Beef, 321 B.R. at 498 ("break-up fees are, as the bankruptcy court correctly concluded, usually limited to one to four percent of the purchase price"); see, e.g., Integrated Resources, 135 B.R. at 662 (3.3% cited as the industry standard in New York cases).

34.    The Expense Reimbursement would allow Debtor to have the discretion to grant such protections, if necessary, to incentivize a potential Stalking Horse Bidder without incurring the additional cost and delay of having to prosecute an additional motion.

35.    Debtor should be permitted, in the exercise of its business judgment, to offer the Expense Reimbursement to a Stalking Horse Bidder in order to preserve the value of the Estate, promote more competitive bidding, and maximize the value of the Purchased Assets. Accordingly, Debtor requests that the Court authorize it to provide, in Debtor's discretion, the Expense Reimbursement to a Stalking Horse Bidder.

---

[3] Although not requested herein, Debtor reserves the right to seek break-up fee protections in connection with selection of a potential Stalking Horse Bidder.

25089457

**C.     The Assumption and Assignment of the Executory Contracts and/or
Unexpired Leases Should Be Approved.**

36.     In conjunction with the Sale, at the Sale Hearing Debtor will seek the

assumption of executory contracts and/or unexpired leases.  Bankruptcy Code section 365(a)

provides that a debtor, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  The standard governing bankruptcy court approval of

a debtor's decision to assume or reject an executory contract or unexpired lease is whether the

debtor's reasonable business judgment supports assumption or rejection.  See, e.g., Sharon Steel

Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); In re Stable Mews Assoc. Inc.. 41 B.R. 594, 596

(Bankr. S.D.N.Y. 1984).  The business judgment test "requires only that the trustee demonstrate

that [assumption or] rejection of the executory contract will benefit the estate." Wheeling-

Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R.

845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews Assoc, 41 B.R. at 596).  Any more

exacting scrutiny would hinder the administration of the estate and increase costs.  See

Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

37.     In order to assign an executory contract, a debtor must first assume it.  In

order to assume a contract, a debtor must "cure, or provide adequate assurance that [he] will

promptly cure," any default, including compensation for any "actual pecuniary loss" relating to

such default. 11 U.S.C. § 365(b)(1).  Here, Debtor proposes to circulate the Cure Notice to the

Counterparties within three (3) days following the entry of the Bidding Procedures Order, which

will provide Counterparties with sufficient opportunity to assess the proposed Cure Amounts and

assert any objections.

38.     Once an executory contract is assumed, the debtor may then seek to assign

the contract.  Pursuant to Bankruptcy Code section 365(f), a debtor may assign an assumed

25089457

contract only if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and wherewithal to manage the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

39.     In response to any objection to Successful Bidder's ability to perform under any executory contract and/or unexpired lease, in addition to the affidavits to be filed by Debtor and Successful Bidder, Debtor will present facts at the Sale Hearing demonstrating the financial wherewithal of Successful Bidder, and its willingness and ability to perform under the executory contract(s) or unexpired lease(s) in question.  The Sale Hearing, therefore, will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance.

**D.     The Sale Should Be Approved Pursuant to 11 U.S.C. § 363(b) and (d).**

40.     At the Sale Hearing, Debtor will seek approval of the Sale.  Bankruptcy Code section 363(b)(l) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  A court should approve a

-19-

debtor's sale or use of assets outside of the ordinary course of business if the debtor demonstrates

a sound business justification for the proposed transaction.  See, e.g., In re Martin. 91 F.3d 389,

395 (3d Cir. 1996); In re Abbott's Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986).  Once the

debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption

that in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the

company.'" In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. 111. 1995); In re Integrated

Res., Inc.. 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16

(Bankr. S.D.N.Y. 1986) ("A presumption of reasonableness attaches to a debtor's management

decisions").  A sale is appropriate where the debtor demonstrates (1) that a sound business reason

exists for the sale; (2) there has been adequate and reasonable notice to interested parties,

including full disclosure of the sale terms and the debtor's relationship with the buyer; (3) that

the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith.

In re Medical Software Solutions, 286 B.R. 431, 439-440 (Bankr. D. Utah 2006).

      41.     Here, if the Sale Process is not approved on the proposed time frame,

Debtor will lose access to the DIP Facility and would likely need to shut down any and all

operations, which cause an inordinate plummeting of the value of the Estate to the detriment of

its creditors.  See, e.g., Medical Software Solutions, 286 B.R. at 441 (good business reason exists

for sale where the assets' value was decreasing rapidly).  Debtor simply does not have access to

capital sufficient to continue operations indefinitely and the Sale Process is the best opportunity

to maximize value under the circumstances.  There can be no doubt that the a sound business

reason exist, that the Bidding Procedures will provide adequate and reasonable notice, that the

competitive auction process will ensure that any resulting sale price is fair and reasonable, and

that any buyer will be required to proceed in good faith as a prerequisite to approval of a Sale.

42.     Debtor has a sound business justification for selling the Purchased Assets

at this time and in the proposed manner.  The fairness and reasonableness of the consideration to

be paid for the Purchased Assets, as may be declared at the Sale Hearing, will be conclusively

demonstrated by exposure to the marketplace through a robust marketing and auction process.

Debtor has proposed a fair and open Sale Process for attracting the highest and best value for the

Purchased Assets.

43.     Due to the limited funding provided under the DIP Facility and the

impending Exit Milestones, and the need to proceed to sell the Purchased Assets before the

unnecessary erosion of value through a protracted process, Debtor submits that moving forward

with the Sale Process as expeditiously as possible is apposite here.  Debtor's proposed Sale

Process demonstrates sound business judgment, and represents the best path to providing

maximum value for the Estate and the creditors thereof.

44.     Moreover, the Sale of the Purchased Assets will be subjected to a

competitive Bidding Process, enhancing Debtor's ability to receive the highest and best offer for

the Purchased Assets.  Consequently, the fairness and reasonableness of the consideration to be

received by Debtor and the Estate will ultimately be demonstrated through a fulsome auction

process established by the Bidding Procedures, which will ensure that what Debtor receives for

the Purchased Assets is the highest and best consideration.

45.     In addition, Debtor's service of the Notice of Auction and Sale Hearing,

the Stalking Horse Notice (if any), and the Auction Notice is reasonably calculated to provide

timely and adequate notice to the Estate's major creditor constituencies, those parties most

25089457

interested in this case, those parties potentially interested in bidding on the Purchased Assets, and others whose interests are potentially affected by the proposed Sale.

46.     Accordingly, establishing the Sale Process and consummating the Sale expeditiously and in the manner proposed by Debtor is in the best interest of the Estate and the creditors thereof.

**E.     The Sale Should be Made Free and Clear of Claims and Interests Pursuant to 11 U.S.C. § 363(f).**

47.     In conjunction with the Sale, at the Sale Hearing Debtor will seek approval of the Sale free and clear of all Claims and Interests.  Bankruptcy Code section 363(f) permits a debtor to sell assets free and clear of all Claims and Interests (with any such Claims and Interests attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

48.     Under section 363(f), a debtor may sell all or any part of the debtor's property fee and clear of any and all liens, claims, or interests in such property if: (1) such a sale is permitted under applicable non-bankruptcy law; (2) the party asserting such a lien, claim, or interest consents to such sale; (3) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (4) the interest is the subject of a bona fide dispute; or (5) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

49.     As section 363(f) is written in the disjunctive, a debtor need only meet one of the five conditions of section 363(f).  Debtor will be able to demonstrate at the Sale Hearing that one or more of these conditions will be satisfied with respect to each party holding a lien on

-22-

or security interest in any of the Purchased Assets.  At a minimum, Debtor expects that the second and fifth of these requirements will be satisfied.[4]

### F.    Successful Bidder Should Receive the Protections of 11 U.S.C. § 363(m).

50.    In conjunction with the Sale, at the Sale Hearing Debtor will seek a good faith determination.   Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007).

51.    In response to any objection, in addition to the affidavits filed by Debtor and Successful Bidder, Debtor will present facts at the Sale Hearing demonstrating that any Successful Bidder for the Purchased Assets has negotiated at arm's-length, and that all parties were represented by their own counsel.

52.    Accordingly, the Sale Order includes a provision that Successful Bidder for the Purchased Assets is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m).  Debtor believes that providing any Successful Bidder with such protection will ensure that the Estate will receive the maximum possible price for the Purchased Assets.

### G.    Relief from Bankruptcy Rule 6004(h) and 6006(d) is Warranted.

53.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after the entry of the order, unless

---

[4] Further, courts concluding that Bankruptcy Code section 363(f) does not empower them to convey assets free and clear of claims have found that Bankruptcy Code section 105(a) provides the requisite authority.  See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of liens does not prevent such a sale, as the court's authority to permit such a sale is implicit in the court's equitable power when necessary to carry out the provisions of the Bankruptcy Code).

the court orders otherwise." Bankruptcy Rule 6006(d) provides that an "order authorizing the

trustee to assign and executory contract or unexpired lease . . . is stayed until the expiration of 14

days after the entry of the order, unless the court orders otherwise." Debtor requests that the

Court waive these 14-day stays and provide for the Bidding Procedures Order and Sale Order be

effective immediately upon entry.

54.     The purpose of Rule 6004(h) and 6006(d) is to provide sufficient time for

an objecting party to appeal before an order can be implemented. See Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h). Although Rule 6004(h) and 6006(d) and the Advisory

Committee Notes are silent as to when a court should "order otherwise" and waive the 14-day

stays, the leading bankruptcy treatise suggests that the 14-day stay period should be eliminated to

allow a sale or other transaction to close immediately "where there has been no objection to the

procedure." 10 COLLIER ON BANKRUPTCY 16th Ed. Rev., ¶ 6004.11 at 6004-20 (2014). The

treatise further suggests that if an objection is filed and overruled, and the objecting party

informs the court of its intent to appeal, the stay may be reduced to the amount of time actually

necessary to file such appeal.

55.     As described above, time is of the essence. Debtor may not have

sufficient access to funds to maintain the Purchased Assets significantly beyond the

contemplated time frame for this Sale Process. Accordingly, Debtor needs to move as

expeditiously as possible in order to prevent deterioration in the value of the Estate's assets.

Consequently, a waiver of the Bankruptcy Rule 6004(h) and 6006(d) stays are in the best interest

of the Estate.

## NOTICE

Notice of this Motion is being given to the Notice Parties. In light of the nature of

the relief requested, Debtor respectfully submits that no further notice is necessary.

25089457

WHEREFORE, Debtor respectfully requests that the Court enter the Bidding

Procedures Order substantially in the form attached hereto as **Exhibit A**: (i) approving the

Bidding Procedures, (ii) scheduling the Auction and Sale Hearing, (iii) approving the Notice

Procedures, (iv) approving the Expense Reimbursement, and (v) granting related relief; and after

a Sale Hearing, enter the Sale Order substantially in the form attached hereto as **Exhibit C**:

(i) approving the sale of the Purchased Assets to Successful Bidder, (ii) authorizing the

assumption and assignment of any designated agreements, and (iii) granting certain related relief

and such other relief as the Court may deem appropriate.

Dated: October 21, 2016                           Respectfully submitted,

                                                  /s/  *David E. Leta*
                                                  David Leta (1937)
                                                  Troy Aramburu (10444)
                                                  Jeff Tuttle (14500)
                                                  **Snell & Wilmer L.L.P.**
                                                  15 W South Temple, Suite 1200
                                                  Salt Lake City, Utah 84101
                                                  Email: dleta@swlaw.com
                                                  taramburu@swlaw.com
                                                  jtuttle@swlaw.com

                                                  -and-

                                                  Donald J. Detweiler
                                                  Francis J. Lawall
                                                  John H. Schanne, II
                                                  **Pepper Hamilton LLP**
                                                  Hercules Plaza, Suite 5100
                                                  1313 N. Market Street
                                                  Wilmington, DE 19899-1709
                                                  E-mail: detweild@pepperlaw.com
                                                  lawallf@pepperlaw.com
                                                  schannej@pepperlaw.com

                                                  *Counsel to CS Mining, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2016, I electronically filed the foregoing document with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system. I further certify that the parties of record in this case as identified below, are registered CM/ECF users and will be served through the CM/ECF system.

- Troy J. Aramburu    taramburu@swlaw.com, nharward@swlaw.com;docket_slc@swlaw.com
- Vivian Ban    vivian.ban@hoganlovells.com
- John D. Beck    john.beck@hoganlovells.com, ronald.cappiello@hoganlovells.com;vivian.ban@hoganlovells.com
- Darwin H. Bingham    dbingham@scalleyreading.net, cat@scalleyreading.net
- Kyle A. Brannon    kbrannon@nexsenpruet.com
- Scott S Bridge    sbridge@keslerrust.com
- Martin J. Brill    mjb@lnbyb.com
- Mona Lyman Burton    mburton@hollandhart.com, ckelly@hollandhart.com;intaketeam@hollandhart.com;slclitdocket@hollandhart.com
- Kenneth L. Cannon    kcannon@djplaw.com, khughes@djplaw.com
- Laurie A. Cayton tr    laurie.cayton@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Patricia W. Christensen    pchristensen@parrbrown.com
- Joseph M.R. Covey    calendar@parrbrown.com
- P. Matthew Cox    bankruptcy_pmc@scmlaw.com
- Timothy D. Ducar    tducar@azlawyers.com
- Philip A. Gasteier    pag@lnbyb.com
- Christopher Grivakes    cg@agzlaw.com
- M. Darin Hammond    dhammond@smithknowles.com, astevenson@smithknowles.com
- George B. Hofmann    ghofmann@cohnekinghorn.com, dhaney@cohnekinghorn.com;jthorsen@cohnekinghorn.com
- Paul C. Huck    paulhuck@jonesday.com
- David W. Hunter    davidh@fisherhunterlaw.com
- Evan L. James    elj@cjmlv.com, kbc@cjmlv.com;ljw@cjmlv.com
- Pedro A. Jimenez    pjimenez@jonesday.com
- Michael R. Johnson    mjohnson@rqn.com, docket@rqn.com;dburton@rqn.com
- Peter J. Kuhn tr    Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Brian R. Langford    brian@mhmlawoffices.com, brian@mhmlawoffice.com
- David H. Leigh    dleigh@rqn.com, dburton@rqn.com;docket@rqn.com
- David E. Leta    dleta@swlaw.com, wkalawaia@swlaw.com;csmart@swlaw.com
- Andrew C. Lillie    andrew.lillie@hoganlovells.com
- Jessica Black Livingston    jessica.livingston@hoganlovells.com
- Ralph J. Mabey    rmabey@kmclaw.com
- Adelaide Maudsley    amaudsley@kmclaw.com, tslaughter@kmclaw.com
- Steven J. McCardell    smccardell@djplaw.com, khughes@djplaw.com
- Scott O. Mercer    som@keslerrust.com

25089457

- Krikor J. Meshefejian    kjm@lnbyb.com
- Elijah L. Milne    emilne@djplaw.com, pbricker@djplaw.com
- Matt Munson    matt@mamunsonlaw.com, clientservices@mamunsonlaw.com
- Sherilyn A. Olsen    solsen@hollandhart.com, slclitdocket@hollandhart.com;intaketeam@hollandhart.com;ckelly@hollandhart.com;cfr ies@hollandhart.com
- Lester A. Perry    lap@hooleking.com, apb@hooleking.com
- David L. Pinkston    bankruptcy_dlp@scmlaw.com
- George W. Pratt    gpratt@joneswaldo.com
- Adam H Reiser    areiser@cohnekinghorn.com
- John H. Schanne    schannej@pepperlaw.com, henrys@pepperlaw.com
- Chris L. Schmutz    chrisschmutz.pc@gmail.com, hillaryschmutz@yahoo.com
- Ronald J. Silverman    ronald.silverman@hoganlovells.com
- Jeremy C. Sink    jsink@mbt-law.com
- Stephen Styler    steve@stylerdaniels.com
- Richard C. Terry    richard@tjblawyers.com, cbcecf@yahoo.com
- Jeff D. Tuttle    jtuttle@swlaw.com, jpollard@swlaw.com;docket_slc@swlaw.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Jessica P Wilde    jwilde@joneswaldo.com
- Mark W Williams    mwilliams@shermanhoward.com, dfouts@shermanhoward.com;efiling@sah.com;bmcalister@shermanhoward.com
- Kim R. Wilson    bankruptcy_krw@scmlaw.com
- Laura J. Wolff    ljw@cjmlv.com
- P. Matthew x2Cox    bankruptcy_pmc@scmlaw.com
- Gale K. x6Francis    txbk13@utah.gov

**By U.S. mail** – I further certify that on October 21, 2016, I caused the foregoing document to be sent by United States mail, first class postage prepaid, to the following at the addresses set forth below:

Donald J. Detweiler
Pepper Hamilton, LLP
Hercules Plaza, Suite 5100
1313 North Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

Epiq Bankruptcy Solutions, LLC
777 Third Avenue, 12th Floor
New York, NY  10017

FTI Consulting, Inc.
1001 17th St. #1100
Attn: David Beckman
Denver, CO 80202

25089457

Francis J. Lawall
Pepper Hamilton
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd.
Suite 1700
Los Angeles, CA 90067

/s/      *Wendy H. Kalawaia*

25089457

# EXHIBIT A

## BIDDING PROCEDURES ORDER

*Form of Order Submitted by*:

David Leta (1937)
Troy Aramburu (10444)
Jeff Tuttle (14500)
**SNELL & WILMER L.L.P.**
15 W South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: 801-257-1900
Facsimile: 801-257-1800
Email: dleta@swlaw.com
        taramburu@swlaw.com
        jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)
Francis J. Lawall, Esq. (admitted *pro hac vice*)
John H. Schanne, II (admitted *pro hac vice*)
**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 656-8865
E-mail: detweild@pepperlaw.com
        lawallf@pepperlaw.com
        schannej@pepperlaw.com

*Counsel for CS Mining, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re **CS MINING, LLC** | Bankruptcy Case No. 16-24818 |
| Debtor. | (Chapter 11) |
| | Judge William T. Thurman |

**ORDER GRANTING DEBTOR'S MOTION FOR ENTRY OF AN ORDER
(A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF
SUBSTANTIALLY ALL OF THE ESTATE'S ASSETS, (B) APPROVING EXPENSE
REIMBURSEMENT, (C) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER THE PROPOSED SALE, AND (D) APPROVING THE FORM
<u>AND MANNER OF NOTICE THEREOF</u>**

This matter comes before the Court upon consideration of Debtor's Motion for Entry of

(I) an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of

the Estate's Assets, (B) Approving Expense Reimbursement, (C) Scheduling an Auction and

Hearing to Consider the Proposed Sale and (D) Approving the Form and Manner of Notice

Thereof; (II) an Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment

of Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief (the "Bid

Procedures Motion")[1] seeking, among other things, entry of an order: (i) approving the Bidding

Procedures in connection with the Sale, (ii) approving the Expense Reimbursement, (iii)

scheduling an Auction and hearing to approve the Sale, (iv) approving the form and manner of

notice thereof, and (v) granting related relief.  After due deliberation and having determined that

the relief requested in the Bid Procedures Motion regarding the Sale Process is in the best

interest of the Estate, and sufficient cause appearing therefor,

## THE COURT HEREBY FINDS THAT:[2]

A.      The Court has jurisdiction over the Bid Procedures Motion pursuant to 28 U.S.C.

§ 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States

Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9006, and

9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Notice of the Bid Procedures Motion, having been given to the Notice Parties, is

sufficient in light of the circumstances and the nature of the relief requested in the Bid

Procedures Motion.

---

[1] All capitalized terms used, but not otherwise defined, in this Order shall have the meanings given in the
Bid Procedures Motion.

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of
law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To
the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Bid Procedures Motion regarding the Sale Process, including without limitation, (i) approval of the Bidding Procedures and the Expense Reimbursement; and (ii) approval of, and authorization to serve, the Notice of Auction and Sale Hearing and the Cure Notice.

D.      The Expense Reimbursement, if applicable, to be paid under the circumstances described in the Bid Procedures Motion to a Stalking Horse Bidder is (i) an actual and necessary cost and expense of preserving the Estate, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) commensurate to the real and substantial benefit conferred upon the Estate by a Stalking Horse Bidder, (iii) reasonable and appropriate, in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by a Stalking Horse Bidder, and (iv) necessary to induce a Stalking Horse Bidder to continue to pursue the Sale and to continue to be bound by the Stalking Horse Bidder's Purchase Agreement.

E.      The Expense Reimbursement, if applicable, is a material incentive to a potential Stalking Horse Bidder to submit a bid that will serve as a minimum or floor bid.  A Stalking Horse Bidder will provide a material benefit to the Estate by increasing the likelihood that the best possible price under the circumstances for the Purchased Assets will be received. Accordingly, the Bidding Procedures and the Expense Reimbursement are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Estate.

F.      The Notice of Auction and Sale Hearing and the service thereof, and the service of the Cure Notice on the Counterparties, are calculated to provide all interested parties with timely and proper notice of the Sale, the Sale Hearing, the Auction, and the Cure Amounts.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.       The Bidding Procedures, substantially in the form attached hereto as **<u>Exhibit A</u>**, are hereby approved and fully incorporated into this Order.  Debtor is authorized to undertake any and all actions necessary or appropriate to implement the Bidding Procedures.

2.       Objections, if any, to the relief requested in the Bid Procedures Motion that have not been withdrawn, waived, or settled are hereby overruled.

3.       Debtor is authorized to designate a Stalking Horse Bidder and offer the Expense Reimbursement in accordance with the terms of the Bid Procedures Motion.  No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fees, "topping," termination or other similar fee or payment.

4.       The Notice of Auction and Sale Hearing, substantially in the form attached hereto as **<u>Exhibit B</u>**: (i) is hereby approved; and (ii) shall be served, together with a copy of this Order, within three (3) business days of entry of this Order upon each of the Notice Parties.

5.       Subject to the Bidding Procedures, if Debtor does not receive any Qualified Bids, Debtor shall report the same to the Court and declare the Auction a "failed auction."  In the event that there is no Stalking Horse Bidder and Debtor receives only one Qualified Bid, Debtor will not hold the Auction and may instead seek approval of such Qualified Bid and the associated Purchase Agreement at the Sale Hearing.  However, in the event only one Qualified Bid is received, Debtor may determine in its reasonable business judgment that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."  As further described in the Bidding Procedures, in the event that Debtor timely receives at least one Qualified Bid other than the Stalking Horse Bidder's Qualified Bid, Debtor shall conduct the Auction on **<u>December 19, 2016 at 9:00 a.m. (MST)</u>** (the

#41073979 v2

"Auction Date") at the offices of Snell and Wilmer LLP, 15 W South Temple, Suite 1200, Salt Lake City, Utah 84101, or such later time or other place as Debtor shall notify all Qualified Bidders.

6.      Any person wishing to submit a higher or better offer for the Purchased Assets must do so in accordance with the terms of the Bidding Procedures.

7.      All bidders submitting a Qualified Bid are deemed to have submitted to exclusive jurisdiction of the Court and waive any right to a jury trial with respect to all matters related to the Auction and the terms and conditions of the transfer of the Purchased Assets.

8.      Debtor is hereby authorized to conduct the Sale without complying with any state or local bulk transfer law or requirements.

9.      Within three (3) days after entry of this Order, Debtor shall file and serve the Cure Notice upon the Counterparties, which notice shall set out the applicable Cure Amounts, if any. The Cure Notice shall be in substantially the form attached hereto as **Exhibit C**, which form is hereby approved.

10.     Objections, if any, to Debtor's proposed Cure Amounts, and to the assumption and assignment of any executory contract and/or unexpired lease, must: (i) be in writing; (ii) state with specificity the grounds for such objection (with appropriate documentation in support thereof); (iii) comply with the Bankruptcy Rules; and (iv) be filed with this Court and served upon the Objection Service Parties so as to be actually received by _____, 2016 at _____ p.m. (MST) (the "Objection Deadline").

11.     Any party failing to timely file an objection, on or before the Objection Deadline, to the Cure Amounts and/or assumption and/or assignment of any executory contract or unexpired lease shall be forever barred from objecting to the Cure Amounts and/or to such

-5-

assumption and/or assignment, and will be deemed to consent to the Cure Amounts and/or

assumption and assignment of such executory contract or unexpired lease.  Objections, if any, to

the Cure Amounts and assumption and/or assignment of executory contracts or unexpired leases

shall be heard at the Sale Hearing, except that any the hearing on any such objection can be

adjourned by the agreement of the objecting Counterparty, Debtor, and Successful Bidder.

12.     The Sale Hearing is scheduled to be held on _____, 2016 at

_____:____ ___.m. (MST) before the Honorable William T. Thurman, U.S. Bankruptcy Judge,

at the United States Bankruptcy Court located at 350 South Main Street, Room 376, Salt Lake

City, Utah 84101.  Debtor will seek the entry of the Sale Order at the Sale Hearing approving

and authorizing the Sale to Successful Bidder or Alternate Bidder, on terms and conditions

consistent with the Purchase Agreement of Successful Bidder or Alternate Bidder, as the case

may be, as may be amended and/or modified by agreement between Debtor and Successful

Bidder or Alternate Bidder.  The Sale Order shall be in form and substance acceptable to Debtor

and Successful Bidder.

13.     Objections, if any, to the relief requested in the Bid Procedures Motion as it

relates to the Sale must: (i) be in writing and filed with this Court; (ii) comply with the Federal

Rules of Bankruptcy Procedure; and (iii) be filed and served upon the Objection Service Parties

so as to be actually received by the Objection Deadline.

14.     The failure of any person or entity to timely file an objection, on or before the

Objection Deadline, to the Bid Procedures Motion shall be a bar to the assertion, at the Sale

Hearing or thereafter, of any objection to the Sale of the Purchased Assets to Successful Bidder

or Alternate Bidder.

#41073979 v2

15.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or

6006(d), this Order shall be immediately effective and enforceable upon its entry.

16.     All time periods set forth in this Order shall be calculated in accordance with

Bankruptcy Rule 9006(a).

17.     To the extent that any provisions of this Order may be inconsistent with the Bid

Procedures Motion, the terms of this Order shall control.

---

**END OF ORDER**

#41073979 v2

**<u>Exhibit A</u>**

**Bidding Procedures**

A-1

## **Exhibit B**

**Notice of Auction and Sale Hearing**

B-1

## <u>Exhibit C</u>

## Cure Notice

## EXHIBIT B

## BIDDING PROCEDURES

## Bidding Procedures

CS Mining, LLC, as debtor and debtor-in-possession ("Debtor"), in a bankruptcy proceeding presently pending in the United States Bankruptcy Court for the District of Utah (the "Court"), captioned *In re CS Mining, LLC*, Case No. 16-24818 (WTT), contemplates the sale (the "Sale") of all, or substantially all, assets (the "Purchased Assets") of Debtor's estate (the "Estate") to one or more purchasers pursuant to section 363 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.* as amended, the "Bankruptcy Code").

In connection with the Sale, these bidding procedures (the "Bidding Procedures") were approved by order of the Court dated _____, 2016 (the "Bidding Procedures Order").  The proposed Sale is subject to approval by the Court.

## The Bidding Process

These Bidding Procedures describe, among other things, the manner in which prospective bidders may gain access to due diligence materials concerning the Purchased Assets, the manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids (as defined below), respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined below), the ultimate selection of the Successful Bidder and Successful Bid (each as defined below), and the Court's approval thereof (collectively, the "Bidding Process").

In the exercise of its reasonable business judgment, Debtor may amend these Bidding Procedures in writing or orally at the Auction, so as to better promote the goals of the Bidding Process, so long as such changes are not inconsistent with any Court order, including the Bidding Procedures Order.

## "As Is, Where Is"

The sale of the Purchased Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind by Debtor or its agents.

## Free and Clear of Any and All Claims and Interests

All of the right, title, and interest of Debtor's Estate in and to the Purchased Assets, or any portion thereof, to be acquired, will be sold free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, or interests of any kind or nature whatsoever (collectively, "Claims and Interests"), with such Claims and Interests to attach to the net proceeds of the sale of such Purchased Assets, except, with respect to a Successful Bidder, to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder.

## Participation Requirements

Unless otherwise ordered by the Court, in order to participate in the Bidding Process each person (such person or entity, a "Potential Bidder"), must

(i)     deliver to Debtor an executed Confidentiality Agreement (to be delivered prior to the distribution of any confidential information by Debtor to such person); and

     (ii)      be deemed by Debtor to be reasonably likely to be able to fund and complete the consummation of the proposed transaction on terms no less favorable in the aggregate than the terms contained in the Purchase Agreement (or, if there is a Stalking Horse Bidder's Purchase Agreement, on terms no less favorable in the aggregate than the terms contained in the Stalking Horse Bidder's Purchase Agreement) and within the time frame acceptable to Debtor.

As promptly as reasonably possible, Debtor will determine and will notify the interested person or entity if such person or entity is acceptable and deem such person or entity a "Potential Bidder."

## Due Diligence

Debtor may in its reasonable business judgment, and subject to competitive and other business concerns, afford each Potential Bidder (until the date of the Auction) with such access to due diligence materials concerning the Purchased Assets as Debtor deems appropriate.  Due diligence access may include access to electronic data rooms, on-site inspections, and other matters that a Potential Bidder may reasonably request and as to which Debtor, in its reasonable business judgment, may agree.

Each Qualified Bidder shall be deemed to acknowledge, and shall represent in any Purchase Agreement, that it has had an opportunity to inspect and examine the Purchased Assets and to conduct any and all due diligence prior to making its offer, that it has relied solely upon its own independent reviews, investigations, and/or inspections in submitting its Bid, and, that it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection with the Bidding Process.

## Possible Selection of Stalking Horse Bidder

Debtor is seeking to identify an appropriate party to serve as the stalking horse bidder (the "Stalking Horse Bidder") for the Purchased Assets.  Debtor has established an electronic data room, which will include, among other information, a form of Purchase Agreement prepared by Debtor, in consultation with its advisors.  In order to be considered for selection as the Stalking Horse Bidder, Potential Bidders will be required to submit Qualified Bids to Debtor using a form of agreement substantially similar to the form Purchase Agreement posted to the data room, together with a marked copy of such agreement to identify any changes to the standard form Purchase Agreement, no later than **December 1, 2016.**  Debtor will select the Stalking Horse Bidder (if any) no later than **December 8, 2016** (the "Stalking Horse Selection Date").

Debtor may extend or reduce the Stalking Horse Selection Date once or successively but is not obligated to do so.  Debtor shall promptly notify all Potential Bidders if it amends the Stalking Horse Selection Date.  On the Stalking Horse Selection Date, Debtor will file with the Court a notice of selection of the Stalking Horse Bidder and a copy of the Stalking Horse Bidder's Purchase Agreement.

#41059422 v3

## Bid Deadline

A Potential Bidder that desires to make a Bid must deliver written copies of its Bid, via hand delivery or overnight mail, to (i) Debtor, CS Mining, LLC, PO Box 608, 1208 South 200 West, Milford, UT  84751 (Attn: David McMullin); (ii) co-counsel to Debtor, Pepper Hamilton, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, DE 19801 (Attn: Donald J. Detweiler, Esq.); (iii) co-counsel to Debtor, Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547 (Attn: David E. Leta, Esq.), (iv) CRO of Debtor, c/o FTI Consulting, Inc., 1001 17th St #1100, Denver, CO 80202 (Attn: David Beckman) and (v) Committee, c/o its counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn: Martin J. Brill, Esq.), so that the Bid is actually received by 4:00 p.m. (MST) **on December 15, 2016** (the "Bid Deadline").

Debtor may extend the Bid Deadline for a period of not more than sixty (60) days in the aggregate, but is not obligated to do so, in accordance with the terms of the Final DIP Financing Order.  If Debtor extends the Bid Deadline, it shall promptly notify all Potential Bidders of such extension.

## Qualified Bid Requirements

A proposal (a "**Bid**") received from a Potential Bidder is a **"Qualified Bid"** if it:

(i)     is received by the Bid Deadline;

(ii)    provides for the purchase of all or some portion of the Purchased Assets by the Potential Bidder on an "as is, where is" basis;

(iii)   includes a copy of a definitive purchase agreement in form and substance substantially similar to the Purchase Agreement (or, if there is a Stalking Horse Bidder's Purchase Agreement, on terms no less favorable in the aggregate than the terms contained in the Stalking Horse Bidder's Purchase Agreement), signed by an authorized representative of such Potential Bidder, in addition to a marked copy of such agreement to reflect the Potential Bidder's modifications to the Purchase Agreement or the Stalking Horse Bidder's Purchase Agreement, as the case may be;

(iv)    is not subject to any due diligence or financing contingency, or board or other approval (excluding any necessary regulatory approval that would follow the execution of definitive documentation for such a transaction);

(v)     is accompanied by a cash deposit of not less than 5% of the proposed purchase price (the "Required Deposit");

(vi)    includes written evidence of an unconditional commitment for financing (by a creditworthy bank or financial institution that shall provide such financing without alteration of conditions or delays) or other evidence of ability, as

#41059422 v3

determined in the reasonable business judgment of Debtor, to consummate the transaction;

(vii)   includes a designation of contracts and/or leases to be assumed and assigned to the Potential Bidder and evidence of the Potential Bidder's ability to perform future obligations under such agreements;

(viii)   is reasonably likely (based on availability of financing, regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined below), within a timeframe acceptable to Debtor; and

(ix)   is irrevocable until the earlier of: (a) sixty (60) days after the Court authorizes and approves the Successful Bid, and (b) the closing date of the transaction with the Successful Bidder or Alternate Bidder (as defined below).

A Potential Bidder that makes a Qualified Bid is a "Qualified Bidder."  Debtor, in its reasonable business judgment, shall determine whether the Bid of a Potential Bidder meets the foregoing requirements to become a Qualified Bid.

## Credit Bid

Final DIP Lenders, either together or individually, shall have the right to credit bid all or a portion of its claim in an amount not to exceed the DIP Loan Amount, should Final DIP Lenders submit a Qualified Bid.  No other party or parties shall be permitted to credit bid.

## No Qualified Bids

If Debtor does not receive any Qualified Bids, Debtor shall report the same to the Court and declare the Auction a "failed auction."  If Debtor does not receive any Qualified Bids, Debtor shall report the same to the Court and declare the Auction a "failed auction."

## Only One Qualified Bid

In the event that there is no Stalking Horse Bidder and Debtor receives only one Qualified Bid, Debtor will not hold the Auction and may instead seek approval of such Qualified Bid and the associated Purchase Agreement at the Sale Hearing.  However, in the event that only one Qualified Bid is received, Debtor may determine in its reasonable business judgment that such Qualified Bid is insufficient, and shall have the right to either postpone the Auction and Bid Deadline or declare the Auction a "failed auction."

## Auction

If at least one Qualified Bid other than the Stalking Horse Bidder's Qualified Bid is received, Debtor shall conduct the Auction on **December 19, 2016 at 9:00 a.m. (MST)** at the offices of Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547, or such later time or other place as Debtor shall notify all Qualified Bidders.  Only Final DIP Lenders, Committee, and Qualified Bidders shall be permitted to attend the Auction.  Only Qualified Bidders (including each Final DIP Lender that is a Qualified

Bidder) shall be eligible to participate in the Auction and only Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction. Debtor shall not consider a particular Bid unless the bidding party has submitted a Qualified Bid and attends the Auction and the Qualified Bidder's representative at the Auction has authority to bind the Qualified Bidder.

Prior to the start of the Auction, Debtor, in consultation with its advisors, and the Committee, shall evaluate all Qualified Bids, as well as the Stalking Horse Bidder's Purchase Agreement, and shall determine which Qualified Bid constitutes the best offer for the Purchased Assets (the "Starting Auction Bid"). Debtor shall announce the Starting Auction Bid at the start of the Auction.

Debtor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent Qualified Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code or any order of the Court, and (ii) disclosed to each Qualified Bidder at the Auction.

The minimum initial overbid and any subsequent overbids must be in increments of at least $100,000 in cash consideration (which amount Debtor may modify at the Auction in the exercise of its reasonable business judgment) until Debtor declares a Successful Bidder. Any overbid made in response to the bid of the Stalking Horse Bidder must exceed the Stalking Horse Bidder's Bid not only by the above figure of $100,000, but also by the amount of any applicable Expense Reimbursement.

At the conclusion of the Auction, Debtor shall, in consultation with the Committee (i) review the Stalking Horse Bidder's Purchase Agreement or any Qualified Bid of the Stalking Horse Bidder, and shall review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummation of the Qualified Bid and (ii) identify the best bid (the "Successful Bid") and the bidder making such Bid (the "Successful Bidder"). In determining Successful Bidder, Debtor shall consider the Expense Reimbursement (if applicable).

If Debtor receives at least one Qualified Bid in addition to the Stalking Horse Bidder's Qualified Bid, then, at the Sale Hearing, Debtor will seek approval of the Successful Bid and, at Debtor's election, may also seek approval of the next best Qualified Bid (the "Alternate Bid" and, the bidder making such Alternate Bid, the "Alternate Bidder"). Debtor's presentation to the Court of the Successful Bid and, if applicable, the Alternate Bid will not constitute Debtor's acceptance of either of such Qualified Bids until such Qualified Bids are approved by the Court at the Sale Hearing. Following approval of the Sale to Successful Bidder, if Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid will be deemed to be the Successful Bid and Debtor will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bidder without further order of the Court. The Alternate Bid shall remain open until the earlier of (a) sixty (60) days following the entry of the Sale Order or (b) the consummation of the Sale to Successful Bidder.

On the third business day following the selection of Successful Bidder, Debtor will file with the Court a notice of the selection of Successful Bidder and the Alternate Bidder (the

#41059422 v3

"Auction Notice"), copies of Successful Bidder's Purchase Agreement and the Alternate Bidder's Purchase Agreement, and affidavits of Debtor and Successful Bidder in support of the sale of the Purchased Assets to Successful Bidder. Debtor will serve the Auction Notice upon the Notice Parties.

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Qualified Bidder's proposed purchase agreement.

## The Sale Hearing

A hearing is presently scheduled to take place on _____, 2016 at __:__ _.m. (MST) (the "Sale Hearing"). At the Sale Hearing, Debtor shall seek entry of the order approving the Sale (the "Sale Order"), among other things, authorizing and approving the proposed transaction with Successful Bidder, as determined by Debtor and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Successful Bid. The Sale Order shall be in form and substance acceptable to Debtor and Successful Bidder.

All Required Deposits, but excluding the Required Deposits of Successful Bidder and Alternate Bidder (which, in the case of the Required Deposit of the Alternate Bidder, shall be returned within three (3) business days of the closing of the Sale to Successful Bidder), shall be returned to Qualified Bidders within five (5) business days after the date of the Auction.

## Reservation of Rights

Debtor reserves the right, in the exercise of his fiduciary obligations and in the exercise of its reasonable business judgment, to: (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; (b) reject, at any time, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or any other orders applicable to the Estate or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Estate; and (c) modify the Bidding Procedures, including, without limitation, by (1) extending any of the deadlines set forth above for the Bidding Process, (2) modifying bidding increments, (3) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without prior notice, (4) withdrawing from the Auction the Purchased Assets at any time prior to or during the Auction, and/or (5) canceling the Auction, and rejecting all Qualified Bids if, in Debtor's business judgment, no such bid is for a fair and adequate price.

#41059422 v3

## EXHIBIT C

**SALE ORDER**

#41073999 v2

*Form of Order Submitted by*:

David Leta (1937)
Troy Aramburu (10444)
Jeff Tuttle (14500)
**SNELL & WILMER L.L.P.**
15 W South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: 801-257-1900
Facsimile: 801-257-1800
Email: dleta@swlaw.com
            taramburu@swlaw.com
            jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)
Francis J. Lawall, Esq. (admitted *pro hac vice*)
John H. Schanne, II (admitted *pro hac vice*)
**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 656-8865
E-mail: detweild@pepperlaw.com
            lawallf@pepperlaw.com
            schannej@pepperlaw.com

*Counsel for CS Mining, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC** | Bankruptcy Case No. 16-24818 |
| Debtor. | (Chapter 11) |
| | Judge William T. Thurman |

## ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ESTATE'S ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF

This matter is before the Court on Debtor's Motion for Entry of (I) an Order

(A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estate's

Assets, (B) Approving Expense Reimbursement, (C) Scheduling an Auction and Hearing to

Consider the Proposed Sale and (D) Approving the Form and Manner of Notice Thereof; (II) an

Order (A) Approving the Sale, (B) Authorizing the Assumption and Assignment of Executory

Contracts and Unexpired Leases, and (C) Granting Certain Related Relief (the "Sale Motion"),[1]

seeking, among other things: (a) approval of the Purchase Agreement, as such agreement may

have been amended (the "Final Purchase Agreement"), attached hereto as Exhibit A;

(b) authority to sell the Purchased Assets as set forth in the Final Purchase Agreement free and of

all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, or

interests of any kind or nature whatsoever (collectively, "Claims and Interests"), (c) authority to

assume and assign the Contracts identified as Purchased Assets in the Final Purchase Agreement

(the "Acquired Contracts") to Purchaser, and (d) related relief; and this Court, in furtherance of

the Sale Motion, having entered an order on _____, 2016 (the "Bidding Procedures

Order")(Docket No.__) approving, among other things, the Bidding Procedures and the Notice

Procedures; and Debtor having determined that _____ (the

"Purchaser") has submitted the highest and best offer for the Purchased Assets; and adequate and

sufficient notice of the Bidding Procedures, the Final Purchase Agreement, and all transactions

contemplated thereunder and in this Order having been given in the manner directed by the Court

in the Bidding Procedures Order; and all interested parties having been afforded an opportunity

to be heard with respect to the Sale Motion and all relief related thereto; and the Court having

reviewed and considered the Sale Motion and all relief related thereto, and noting that no

objections were filed thereto, and having held a hearing regarding the Sale Motion on ____

---

[1] Unless otherwise defined in this Order, all capitalized terms shall have the meanings provided in the Final Purchase Agreement and the Sale Motion, and to the terms as defined in the Final Purchase Agreement shall govern to the extent of any inconsistencies in those two documents.

#41073999 v2

_____, 2016 (the "Sale Hearing"); and it appearing that the Court has jurisdiction over this

matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at

the Sale Hearing establish just cause for the relief granted herein; and after due deliberation; and

good and sufficient cause appearing,

**THE COURT HEREBY FINDS AND DETERMINES THAT**:[2]

**Jurisdiction, Final Order, and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to

28 U.S.C. § 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Sale Motion are Bankruptcy

Code sections 105, 363, 365, 503, and 507, Bankruptcy Rules 2002, 6004, 6006, and 9007, and

Local Rule 6004-1.

C.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under

Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by

Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the

implementation of this Order.

**Notice of the Sale and Auction**

D.      Actual written notice of the Sale Motion was provided to the Notice Parties.

---

[2] These findings and conclusions constitute the Court's findings of fact and conclusions of law pursuant to
Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact
and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby
incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact
constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law
constitute findings of fact, they are adopted as such.

#41073999 v2

E.      The Notice of Auction and Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale, Sale Hearing, and Auction.

F.      As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, Auction, Sale Hearing, Sale, and the transactions contemplated thereby have been provided in accordance with the Bidding Procedures Order, Bankruptcy Code sections 105(a), 363, and 365, and Bankruptcy Rules 2002, 6004, 6006, and 9007.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing, Sale, and assumption and assignment of the Acquired Contracts is or shall be required.

G.      The disclosures made by Debtor concerning the Sale Motion, Auction, Final Purchase Agreement, Sale, assumption and assignment of the Acquired Contracts, and Sale Hearing were good, complete, and adequate.

H.      A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the Acquired Contracts), has been afforded to all interested persons and entities, including but not necessarily limited to the Notice Parties.

**Good Faith of Purchaser**

I.      The Final Purchase Agreement was negotiated, proposed, and entered into by Debtor and Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

J.      Neither Debtor nor Purchaser has engaged in any conduct that would cause or permit the Final Purchase Agreement to be avoided under Bankruptcy Code section 363(n). Specifically, Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among the bidders.

-4-

K.      Purchaser is purchasing the Purchased Assets in good faith and is a good faith buyer within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to all of the protections afforded by that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia:* (a) Purchaser recognized that Debtor was free to deal with any other party interested in acquiring the Purchased Assets; (b) Purchaser complied with the provisions in the Bidding Procedures Order; (c) Purchaser agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (d) Purchaser in no way induced or caused the filing of the Bankruptcy Cases; and (e) all payments to be made by Purchaser in connection with the Sale have been disclosed.

### Highest and Best Offer

L.      Debtor conducted an auction process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order.  The auction process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The auction process was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher and better offer for the Purchased Assets.

M.      The Final Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater benefit for the Estate than would be provided by any other available alternative.  Debtor's determination that the Final Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of Debtor's business judgment.

### No Fraudulent Transfer

-5-

N.      The consideration provided by Purchaser pursuant to the Final Purchase

Agreement (i) is fair and reasonable, (ii) is the highest and/or best offer for the Purchased Assets,

and (iii) constitutes reasonably equivalent value (as those terms are defined in each of the

Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Bankruptcy Code

section 548) and fair consideration under the Bankruptcy Code and under the laws of the United

States, any State, territory, or possession, or the District of Columbia.  No other person or entity

or group of entities has offered to purchase the Purchased Assets for greater value to the Estate

than Purchaser.  Approval of the Sale Motion and the Final Purchase Agreement and the

consummation of the transactions contemplated thereby are in the best interest of the Estate.

O.      Purchaser is not a mere continuation of Debtor or the Estate and no continuity of

enterprise exists between Purchaser and Debtor or the Estate.  Purchaser is not holding itself out

to the public as a continuation of Debtor or the Estate.  Purchaser is not a successor to Debtor or

the Estate and the Sale does not amount to a consolidation, merger, or de facto merger of

Purchaser and Debtor or the Estate.

**Validity of Transfer**

P.      The Final Purchase Agreement was not entered into for the purpose of hindering,

delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United

States, any State, territory, or possession, or the District of Columbia.  Neither Debtor nor

Purchaser is entering into the transactions contemplated by the Final Purchase Agreement

fraudulently for purposes of statutory and/or common law fraudulent conveyance and fraudulent

transfer laws.

Q.      The Estate is the sole and lawful owner of the Purchased Assets.  Subject to

Bankruptcy Code section 363(f), the transfer of the Purchased Assets to Purchaser will be, as of

the Closing Date, a legal, valid, and effective transfer of the Purchased Assets, which transfer

-6-

vests or will vest Purchaser with all right, title, and interest of the Estate to the Purchased Assets

free and clear of all Claims and Interests, relating to, accruing, or arising any time prior to the

Closing Date, with such Claims and Interests to attach to the net proceeds of the sale of such

Purchased Assets.

### Section 363(f) is Satisfied

R.        The conditions of Bankruptcy Code section 363(f) have been satisfied in full;

therefore, Debtor may sell the Purchased Assets free and clear of any Claims and Interests.

S.        Purchaser would not have entered into the Final Purchase Agreement, and would

not consummate the transactions contemplated thereby, if the sale of the Purchased Assets to

Purchaser were not free and clear of all Claims and Interests.  Purchaser shall not be responsible

for any Claims and Interests other than Liabilities which have been expressly assumed by

Purchaser pursuant to the Final Purchase Agreement.

T.        Debtor may sell the Purchased Assets free and clear of all Claims and Interests

against the Estate and/or any of the Purchased Assets because, in each case, one or more of the

standards set forth in Bankruptcy Code section 363(f)(l)-(5) have been satisfied.  Those holders

of Claims and Interests against the Estate or any of the Purchased Assets who did not object, or

who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented

pursuant to Bankruptcy Code section 363(f)(2).  All other holders of Claims and Interests are

adequately protected by having their Claims and Interests, if any, in each instance against the

Estate or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately

attributable to the particular Purchased Assets in which such creditor alleges a Claim and

Interest, in the same order of priority, with the same validity, force and effect that such Claim

and Interest had prior to the Sale, subject to any claims and defenses that the Estate may possess

with respect thereto.

-7-

**Cure/Adequate Protection**

U.      The assumption and assignment of the Acquired Contracts is integral to the Final

Purchase Agreement, is in the best interest of the Estate, and represents a reasonable exercise of

sound and prudent judgment by Debtor.  Purchaser's promise to perform the obligations under

the Acquired Contracts after the Closing Date shall constitute adequate assurance of future

performance within the meaning of Bankruptcy Code section 365(f)(2)(B).

V.      Any objections to the assumption and assignment of the Acquired Contracts are

hereby overruled.

**Compelling Circumstances for a Prompt Sale**

W.      Good and sufficient reasons for approval of the Final Purchase Agreement and the

Sale have been articulated.  The relief requested in the Sale Motion is in the best interest of the

Estate.  Debtor has demonstrated both (i) good, sufficient, and sound business purposes and

justifications, and (ii) compelling circumstances for the Sale other than in the ordinary course of

business, pursuant to Bankruptcy Code section 363(b) in that, among other things, the prompt

consummation of the Sale to Purchaser is necessary and appropriate to maximize the value of the

Estate.  Time is of the essence in consummating the Sale.

X.      Given all of the circumstances of the bankruptcy case and the adequacy and fair

value of the Purchase Price under the Final Purchase Agreement, the proposed Sale of the

Purchased Assets to Purchaser constitutes a reasonable and sound exercise of Debtor's business

judgment and should be approved.

Y.      The consummation of the Sale and the assumption and assignment of the

Acquired Contracts is legal, valid, and properly authorized under all applicable provisions of the

Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and

-8-

365, and all of the applicable requirements of such sections have been complied with in respect

of the Sale.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND**

**DECREED THAT:**

### General Provisions

1.      The relief requested in the Sale Motion is granted and approved as set

forth herein, and the Sale contemplated in the Sale Motion is approved.

2.      All objections to the Sale Motion or the relief requested therein that have

not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by

stipulation filed with the Court, and all reservations of rights included therein, are hereby denied

and overruled with prejudice.

### Approval of the Final Purchase Agreement

3.      The Final Purchase Agreement (and all schedules and exhibits affixed

thereto) and all other ancillary documents, all of the terms and conditions thereof, and the

transactions contemplated therein are hereby approved and authorized.

4.      Pursuant to Bankruptcy Code sections 363(b) and (f), Debtor is authorized

and empowered to take any and all actions necessary or appropriate to:  (i) consummate the Sale

of the Purchased Assets to Purchaser pursuant to and in accordance with the terms and

conditions of the Final Purchase Agreement and this Order; (ii) close the Sale as contemplated in

the Final Purchase Agreement and this Order; and (iii) execute and deliver, perform under,

consummate, implement, and close fully the Final Purchase Agreement, including the

assumption and assignment to Purchaser of the Acquired Contracts, together with all additional

instruments and documents that may be reasonably necessary or desirable to implement the Final

Purchase Agreement and the Sale.  Purchaser shall not be required to seek or obtain relief from

-9-

the automatic stay under Bankruptcy Code section 362 to enforce any of its remedies under the

Final Purchase Agreement or any other Sale-related document.  The automatic stay imposed by

Bankruptcy Code section 362 is modified solely to the extent necessary to implement the

preceding sentence and the other provisions of this Order.

5.      This Order shall be binding in all respects upon Debtor, the Estate, all

creditors of, and holders of equity interests in, Debtor, any holders of Claims and Interests in,

against, or on all or any portion of the Purchased Assets (whether known or unknown), Purchaser

and all successors and assigns of Purchaser, and the Purchased Assets.  This Order and the Final

Purchase Agreement shall inure to the benefit of the Estate and its creditors, Purchaser, and the

respective successors and assigns of each of the foregoing.

**Transfer of the Purchased Assets**

6.      Pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f), Debtor

is authorized to transfer the Purchased Assets to Purchaser on the Closing Date and, upon the

Closing under the Final Purchase Agreement, such transfer shall constitute a legal, valid,

binding, and effective transfer of such Purchased Assets and shall vest Purchaser with title to the

Purchased Assets and, upon Debtor's receipt of the full Purchase Price, shall be free and clear of

all Claims and Interests of any kind or nature whatsoever, including but not limited to, successor

or successor-in-interest liability, with all such Claims and Interests to attach to the net cash

proceeds ultimately attributable to the property against or in which such Claims and Interests are

asserted, subject to the terms thereof, with the same validity, force and effect, and in the same

order of priority, that such Claims and Interests now have against the Purchased Assets.  Upon

the Closing, Purchaser shall take title to and possession of the Purchased Assets.

7.      All persons and entities in possession of some or all of the Purchased

Assets on the Closing Date are directed to surrender possession of such Purchased Assets to

-10-

Purchaser or its assignee at the Closing.  On the Closing Date, each of the Estate's creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Claims and Interests in the Purchased Assets, if any, as such Claims and Interests may have been recorded or may otherwise exist.

8.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Estate's interest in the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Final Purchase Agreement.

9.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record.

10.     If any person or entity that has filed statements or other documents or agreements evidencing secured Claims and Interests in, all or any portion of the Purchased Assets shall not have delivered to Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims and Interests that the person or entity has or may assert with respect to all or any portion of the Purchased Assets, Debtor is hereby authorized and directed, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

11.     This Order is and shall be effective as a determination that, on the Closing Date, all Claims and Interests of any kind or nature whatsoever existing as to the Purchased

Assets prior to the Closing Date, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.  This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Final Purchase Agreement.

### Assumption and Assignment of Acquired Contracts

12.     Debtor is hereby authorized and directed in accordance with Bankruptcy Code sections 105 and 365 to (a) assume and assign to Purchaser, effective upon the Closing of the Sale, the Acquired Contracts free and clear of all Claims and Interests of any kind or nature whatsoever, and (b) execute and deliver to Purchaser such documents or other instruments as Purchaser reasonably deems necessary to assign and transfer the Acquired Contracts.

13.     The counterparties to the Acquired Contracts (the "Counterparties") shall look solely to Purchaser for any amounts payable under the Acquired Contracts from and after the Closing Date.

14.     The Acquired Contracts are executory contracts under Bankruptcy Code section 365.  Debtor may assume the Acquired Contracts in accordance with Bankruptcy Code section 365.  Debtor may assign the Acquired Contracts in accordance with Bankruptcy Code sections 363 and 365.  Any provisions in the Acquired Contracts that purport to prohibit or

-12-

condition the assignment of the Acquired Contracts or allow the Counterparties to terminate, recapture, impose any penalty, or modify any term or condition upon the assignment of the Acquired Contracts, constitute unenforceable anti-assignment provisions that are void and of no force and effect; all other requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by Debtor and assignment to Purchaser of the Acquired Contracts have been satisfied.  The Acquired Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of Purchaser, notwithstanding any provision in the Acquired Contracts (including those of the type described in Bankruptcy Code sections 365(b)(2) and (f)) that purports to prohibit, restrict, or condition such assignment or transfer and, pursuant to Bankruptcy Code section 365(k), the Estate shall be relieved from any further liability with respect to the Acquired Contracts after such assignment to and assumption by Purchaser.  Upon Closing, in accordance with Bankruptcy Code sections 363 and 365, Purchaser shall be fully and irrevocably vested in all rights and title to the Acquired Contracts.

15.     The amounts necessary to cure any defaults existing as of the Closing Date under the Acquired Contracts are the amounts listed on the Cure Notice or, if applicable, such other amount(s) upon which Debtor, Purchaser, and any of the Counterparties may have agreed (the "Cure Amounts").  Purchaser shall pay the Cure Amounts at Closing, or at such later time as may be mutually agreed upon by Purchaser and any of the Counterparties.  No other defaults exist under the Acquired Contracts.  The Counterparties waive, release, and are hereby precluded from asserting any claims against Debtor, or the Estate for any claims arising out of or in connection with the Acquired Contracts.  Purchaser shall pay the Cure Amounts to the

Counterparties in full satisfaction of the Counterparties' claims for defaults that may have arisen under the Acquired Contracts.

### Prohibition of Actions against Purchaser

16.     Except as otherwise provided in this Order or the Final Purchase Agreement, Purchaser shall not have any liability or other obligation to the Estate arising under or related to any of the Purchased Assets.  Without limiting the generality of the foregoing, and except as otherwise provided in this Order or in the Final Purchase Agreement, Purchaser shall not be liable for any Claims and Interests against the Estate, and Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated.

17.     All persons and entities holding Claims and Interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser, its affiliates, its successors or assigns, their property, or the Purchased Assets, such persons' or entities' Claims and Interests in and to the Purchased Assets, including, without limitation, the following actions:  (i) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Purchaser, its successors, assets or properties; (iii) creating, perfecting, or enforcing any Claim and Interest against Purchaser, its successors, assets, or properties; (iv) asserting any

#41073999 v2

setoff, right of subrogation, or recoupment of any kind against any obligation due Purchaser, or

its successors; (v) commencing or continuing any action, in any manner or place, that does not

comply or is inconsistent with the provisions of this Order or other orders of the Court, or the

agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or

failing or refusing to transfer or renew any license, permit, or authorization to operate any of the

Purchased Assets or conduct any of the businesses operated with the Purchased Assets.  On the

Closing Date, each creditor is authorized and directed to execute such documents and take all

other actions as may be necessary to release Claims and Interests in or on the Purchased Assets,

if any, as provided for herein, as such Claims and Interests may have been recorded or may

otherwise exist.

18.     All persons and entities are hereby forever prohibited and enjoined from

taking any action that would adversely affect or interfere with the ability of Debtor to sell and

transfer the Purchased Assets to Purchaser in accordance with the terms of the Final Purchase

Agreement and this Order.

19.     Purchaser has given substantial consideration under the Final Purchase

Agreement for the benefit of the Estate and its creditors.  The consideration given by Purchaser

shall constitute valid and valuable consideration for the releases of any potential Claims and

Interests pursuant to this Order, which releases shall be deemed to have been given in favor of

Purchaser by all holders of Claims and Interests against or interests in the Estate or any of the

Purchased Assets.  The consideration provided by Purchaser for the Purchased Assets under the

Final Purchase Agreement is fair and reasonable and may not be avoided under Bankruptcy Code

section 363(n).

20.     Nothing in this Order or the Final Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Nothing in this Order or the Final Purchase Agreement authorizes the transfer or assignment to Purchaser of any license, permit, registration, authorization, or approval of or with respect to a governmental unit without Purchaser's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

### Other Provisions

21.     The transactions contemplated by the Final Purchase Agreement are undertaken by Purchaser without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and the Sale are duly stayed pending such appeal.  Purchaser is a good faith buyer and, as such, shall have the full protections of Bankruptcy Code section 363(m).

22.     Pursuant to Federal Rules of Bankruptcy Procedure 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and Debtor and Purchaser are authorized to close the Sale immediately upon entry of this Order.

23.     Nothing in this Order or the Final Purchase Agreement approves or provides for the transfer to Purchaser of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Estate.

24.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

-16-

#41073999 v2

25.    The Final Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Estate.

26.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Final Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which Debtor is a party or which has been assigned by Debtor to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to Purchaser; (b) interpret, implement, and enforce the provisions of this Order; (c) protect Purchaser against any alleged Claims and Interests in or against the Purchased Assets of any kind or nature whatsoever; and (d) enter any orders under Bankruptcy Code sections 363 and/or 365 with respect to the Acquired Contracts.

27.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.    The failure specifically to reference any particular provision of the Final Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Final Purchase Agreement is authorized and approved in its entirety; provided, however, that this Order shall govern if any inconsistency exists between the Final Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order.  All of the provisions of this Order are nonseverable and mutually dependent.

-17-

29.     To the extent that this Order is inconsistent with any prior order or

pleading with respect to the Sale Motion, the terms of this Order shall govern.

**END OF ORDER**

#41073999 v2

**Exhibit A**

**Final Purchase Agreement**

## **EXHIBIT D**

**CONFIDENTIALITY AGREEMENT**

_____, 2016

Ladies and Gentlemen:

In connection with consideration of a possible sale transaction, including the potential purchase of all or some of the Company's assets, and/or a potential financial restructuring or recapitalization ("***Transaction***") between CS Mining, LLC, a Delaware limited liability company (the "***Company***") and _____ (the "***Recipient***"), the Company agrees to disclose certain information about the Company. As a condition to furnishing such information to the Recipient and/or its Representatives (as defined below), the Recipient agrees to treat the Confidential Information (as defined below) and any information concerning the Company or the Transaction in accordance with the provisions of this Confidential Agreement (the "***Agreement***"). The term "Confidential Information" includes (i) all information furnished by the Company or any of its Representatives (as defined below), whether furnished before or after the date hereof, whether oral or written, and regardless of the manner in which it is furnished and (ii) reports, analyses, compilations, forecasts, projections, data, studies or other documents prepared by the Recipient or its Representatives (as defined below) containing or based, in whole or in part, on such information. For purposes of this Agreement, the Company and the Recipient are referred to as the "Parties."

As a condition to the Recipient receiving any Confidential Information, the Recipient agrees to treat as confidential any Confidential Information that is furnished by or on behalf of the Company to the Recipient, its subsidiaries, or its or their directors, officers, members, partners, employees, agents, affiliates, representatives or advisors, including, without limitation, attorneys, accountants, consultants, bankers, financial advisors, potential financing sources and any representatives of such advisors (collectively, the "***Representatives***").

The term "Confidential Information" does not include information that (a) was known or possessed by the Recipient or its Representatives prior to the date hereof or prior to its disclosure pursuant to this Agreement from a source that was not prohibited from disclosing such information to the Recipient by a contractual, legal or fiduciary obligation to the Company, (b) was or becomes available to the public other than as a result of a breach of the terms of this Agreement, (c) was or becomes available to the Recipient or its Representatives other than in connection with the Company's disclosure pursuant to this Agreement from a source that was not prohibited from disclosing such information to the Recipient by a contractual, legal or fiduciary obligation to the Company or (d) can be demonstrated to be independently developed by Recipient or its Representatives without reference to any Confidential Information provided hereunder. The term "person" as used in this Agreement shall be interpreted broadly to include, without limitation, any corporation, entity, trust, group, limited liability company, partnership or individual and the term "affiliate" shall have the meaning given such term in Rule 12b-2 of the Securities Exchange Act of 1934, as amended.

The Recipient hereby agrees that, except as may otherwise be permitted herein, the Confidential Information will be used solely in connection with determining the interest of the Recipient in entering into a possible Transaction with respect to the Company (a) be kept confidential using the same degree of care, but no less than a reasonable degree of care, in

handling and safeguarding the Confidential Information that the Recipient uses in handling and safeguarding its own confidential information and (b) not be disclosed by the Recipient or any of its Representatives, in any manner whatsoever, in whole or in part, and shall not be used for any purpose other than in connection with a Transaction, except to the extent that such disclosure or use is

(i)      made to its Representatives who need to know or use such information in connection with a possible Transaction, provided, however, that such Representatives shall have been advised of this Agreement and the confidential nature of the Confidential Information and expressly agreed to maintain such confidentiality; provided, further, however, that any breach of this Agreement caused by any Representative of the Recipient that has received Confidential Information from the Recipient or the Company or the Company's Representatives in connection with this Agreement shall be deemed a breach of this Agreement by the Recipient and the Recipient shall be responsible and liable therefor unless and until such Representative executes a joinder to this Agreement or executes its own confidentiality agreement, in form and substance acceptable to the Company, with the Company;

(ii)     required by applicable law, rule, subpoena, regulation, regulatory authority or other applicable judicial or governmental order or process, or stock exchange rule; provided, however, that unless otherwise prohibited by law, the Recipient will provide the Company with prompt written notice of such request or requirement so that the Company may, at the Company's election and cost, seek a protective order or other appropriate remedy, and the Recipient and its Representatives agree to cooperate with the Company's efforts to obtain the same; provided, further, however, if, absent the entry of such a protective order or other remedy, the Recipient or such Representative is compelled by applicable law, rule or regulation or a court order, subpoena, similar judicial process, regulatory agency or stock exchange rule to disclose Confidential Information, the Recipient or such Representative may make such disclosure without liability under this Agreement, provided that Recipient or its Representative furnishes only that portion of the Confidential Information that is legally required to be disclosed, give the Company written notice of the information to be disclosed as far in advance of its disclosure as practicable, and use its reasonable best efforts to obtain assurance that confidential treatment will be accorded to that portion of the Confidential Information that is being disclosed; or

(iii)    approved in writing by the Company.

Nothing in this Agreement shall obligate the Company to furnish any information, confidential or otherwise, to the Recipient or any of its Representatives.  Further, nothing in this Agreement shall obligate either Party to enter into any further agreement or negotiation with the other, or to refrain from entering into any further agreement or negotiation with any third party, provided that any such further agreement or negotiation does not result in a violation of the provisions of this Agreement.

#41104045 v1

Without the Company's prior written consent, the Recipient shall not publicly announce or disclose to any person (a) the existence of this Agreement; (b) that any Confidential Information has been requested by, or made available to, the Recipient or its Representatives; (c) that discussions or negotiations are taking place concerning a possible Transaction; or (d) any terms or conditions with respect to any such possible Transaction, including the status thereof. The matters contemplated by this paragraph shall be subject to the same exceptions to non-disclosure as if they were Confidential Information for purposes of this Agreement.

All Confidential Information disclosed pursuant to this Agreement, including any copies thereof, shall remain the property of the Company and such Confidential Information is disclosed to the Recipient for use solely in connection with this Agreement or other arrangement in connection with which this Agreement has been entered into by the Parties. Within three (3) business days of written notice by the Company, the Recipient shall, and shall direct its Representatives to, return to the Company or destroy all Confidential Information, without retaining any copies, summaries or extracts thereof. In the event of such request to return or destroy Confidential Information, all documents, analyses, compilations, studies or other materials prepared by Recipient or its Representatives that contain or reflect Confidential Information shall be destroyed and no copy thereof shall be retained. Any Confidential Information that is not returned or destroyed, including without limitation any oral Confidential Information, shall remain subject to the confidentiality obligations set forth in this Agreement during the remaining term hereof. Notwithstanding the foregoing, the Recipient shall not be obligated to return or destroy Confidential Information to the extent it is required to be maintained in accordance with legal or regulatory requirements.

The provisions of this Agreement shall apply to Confidential Information disclosed or received hereunder notwithstanding any proprietary or restrictive legend or statements inconsistent with or less stringent than this Agreement which may be printed on or associated with any Confidential Information disclosed pursuant to this Agreement.

The Recipient acknowledges, on behalf of itself and its Representatives, that neither the Company nor its Representatives makes any representations or warranties, express or implied, as to the accuracy or completeness of the Confidential Information, that neither the Company nor its Representatives shall have any liability whatsoever to the Recipient or its Representatives or any other person as a result of the use or dissemination of the Confidential Information or any errors therein or omissions therefrom by virtue of this Agreement and that the Recipient and its Representatives shall assume full responsibility for all conclusions derived from the Confidential Information.

The Recipient agrees that (a) all communications regarding any possible Transaction, (b) requests for additional information, facility tours, management or similar meetings, and (c) discussions or questions regarding procedures with respect to any possible Transaction, will be submitted or directed to persons expressly designated by the Company. Accordingly, the Recipient will not contact or communicate with any officer, director, employee, or agent of the Company or any affiliate thereof, or with any suppliers, customers or any other person with whom the Company or any of its affiliates has a relationship, without the prior written consent of the Company.

#41104045 v1

The Recipient agrees that for a period of twelve (12) months from the date of this Agreement, it will not, and will cause its affiliates not to, directly or indirectly, without obtaining the prior written consent of the Company, (a) divert or attempt to divert any business or customer of the Company or any of its affiliates, (b) solicit for employment or employ any employee of the Company or any of its affiliates; provided, however, that the foregoing provision shall not preclude the Recipient or its affiliates from conducting generalized searches for employment (including through the use of general advertisements, search firms and internet postings) not targeted towards the Company or its employees or from hiring any person who (i) responds thereto, (ii) contacts the Recipient's or its affiliates on his or her own initiative without any prior solicitation by the Recipient's or its affiliates, or (iii) ceases to be employed by the Company six (6) months prior to the commencement of employment discussions between such person and the Recipient or its affiliates, or (c) acquire, locate, stake or otherwise obtain property or mineral rights in property or mineral holdings located on property adjacent to property owned or leased by Company, provided, however, that Recipient can obtain such property for non-competitive purposes (as determined by Company), such as general residential purposes, recreational purposes and unrelated businesses that are not in the mining or resource sector.

The Parties agree that unless and until a definitive written agreement with respect to any Transaction relating to disclosures under this Agreement shall have been entered into by the Company and the Recipient, neither the Company nor the Recipient or its Representatives shall be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this or any written or oral expression with respect to such a Transaction by any of their Representatives, except, in the case of this Agreement, for the matters specifically agreed to herein. The Recipient acknowledges and agrees that (a) the Company is free to conduct the process leading up to a possible Transaction as the Company, in its sole discretion, may determine (including, without limitation, by negotiating with any prospective interested party and entering into a preliminary or definitive agreement without prior notice to Recipient or any other person) and (b) the Company reserves the right, in its sole discretion, to change the procedures relating to the Recipient's consideration of any possible Transaction at any time without prior notice to Recipient or any other person, to reject any and all proposals made by the Recipient or any of its Representatives with regard to any possible Transaction, and to terminate discussions and negotiations with Recipient at any time and for any reason.

The Parties understand and agree that Confidential Information will be disclosed in reliance upon the agreements made herein.  Any breach of the obligations of the Recipient hereunder by the Recipient or any of its Representatives may cause irreparable harm and damage to the Company.  It is understood and agreed that money damages would not be a sufficient remedy for any breach or threatened breach of this Agreement and that the Company shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach.  The Recipient further agrees to waive any requirement for the security or posting of any bond in connection with such remedy.  The Recipient hereby in advance agrees to the granting of injunctive relief in favor of Company without proof of actual damages.  In the event that such equitable relief is granted, such remedy or remedies shall not be deemed to be the exclusive remedy or remedies for breach or threatened breach of this Agreement but shall be in addition to all other remedies available at law or equity to the Company.

-4-

This Agreement is for the benefit of each of the Recipient and the Company and this Agreement shall be subject to, and construed in accordance with, the laws of Utah, without giving effect to the principles of conflict of laws thereof that would result in the application of the law of another jurisdiction. The Parties agree that any and all causes of action arising under this Agreement shall be brought exclusively in the state or federal court districts in Utah. Any provision of this Agreement which is held by a court of competent jurisdiction to be illegal, invalid, or unenforceable shall not affect the validity of any other provision hereof, and this Agreement shall be deemed to be amended as necessary to delete such illegal, invalid, or unenforceable provision.

The obligations under this Agreement shall terminate on the earlier of (a) written notice by the Company to Recipient of termination, (b) the consummation of a Transaction, or (c) two (2) years from the date hereof.

This Agreement sets forth the entire agreement between the Parties as to the subject matter hereof, and none of the terms of this Agreement may be amended except in a writing signed by each of the Parties. No failure or delay by a Party in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or preclude any other or further exercise of any right hereunder. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

This Agreement may be executed by facsimile and in counterparts, each of which shall constitute one and the same agreement. Please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning to us a copy of this letter.

Very truly yours,

**CS MINING, LLC**

By:_____

Name:_____

Title:_____

Accepted and agreed to as of
the date set forth above:

_____

By:_____

Name:_____

Title:_____

## <u>EXHIBIT E</u>

**NOTICE OF AUCTION AND SALE HEARING**

David Leta (1937)
Troy Aramburu (10444)
Jeff Tuttle (14500)
**SNELL & WILMER L.L.P.**
15 W South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: 801-257-1900
Facsimile: 801-257-1800
Email: dleta@swlaw.com
      taramburu@swlaw.com
      jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)
Francis J. Lawall, Esq. (admitted *pro hac vice*)
John H. Schanne, II (admitted *pro hac vice*)
**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 656-8865
E-mail: detweild@pepperlaw.com
      lawallf@pepperlaw.com
      schannej@pepperlaw.com

*Counsel for CS Mining, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC,**<br><br>      Debtor. | Bankruptcy Case No. 16-24818<br><br>(Chapter 11)<br><br>Judge William T. Thurman |

## NOTICE OF SALE OF ASSETS, AUCTION, AND SALE HEARING

PLEASE TAKE NOTICE OF THE FOLLOWING:

      1.    On _____, 2016, the United States Bankruptcy Court for the District of Utah (the "Court") entered an Order Granting Debtor's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estate's Assets, (B) Approving Expense Reimbursement, (C) Scheduling an Auction and Hearing to Consider the Proposed Sale and (D) Approving the Form and Manner of Notice Thereof (the "Bidding Procedures Order"), which, among other things, establishes bidding procedures (the "Bidding Procedures") that govern the manner in which all or substantially all of the assets (the "Purchased Assets") of CS Mining, LLC ("Debtor") are to be marketed and sold. All capitalized terms used but not defined herein shall have the meanings assigned to them in the Bidding Procedures Order. A copy of the Bidding Procedures Order – which itself attaches the Bidding Procedures – may be obtained free of charge (i) at the website maintained by Epiq Bankruptcy Solutions, LLC ("Epiq"), the claims and noticing agent (the "Claims Agent") to Debtor, in this bankruptcy case (http://dm.epiq11.com/CSMINING or http://dm.epiq11.com/CSM) or (ii) by contacting the undersigned counsel to Debtor.

2.      All interested parties are invited to make offers to purchase all or some portion of the Purchased Assets, in accordance with the terms and conditions of the Bidding Procedures.

3.      Pursuant to the Bidding Procedures, in the event that Debtor receives more than one Qualified Bid (as defined in the Bidding Procedures) Debtor will conduct an auction for the Purchased Assets (the "Auction") on **December 19, 2016 at 9:00 a.m. (MST)** at the offices of Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547, or such later time or other place as Debtor shall notify all Qualified Bidders.

4.      Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.  Any person wishing to participate in the Bidding Process must become a "Qualified Bidder."  The procedures for becoming a Qualified Bidder are contained in the Bidding Procedures.

5.      A Qualified Bidder desiring to make a bid must deliver written copies of its offer, via hand delivery or overnight mail, to (i) Debtor, CS Mining, LLC, PO Box 608, 1208 South 200 West, Milford, UT  84751 (Attn: David McMullin); (ii) co-counsel to Debtor, Pepper Hamilton, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, DE 19801 (Attn: Donald J. Detweiler, Esq.); (iii) co-counsel to Debtor, Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547 (Attn: David E. Leta, Esq.), and (iv) CRO of Debtor, c/o FTI Consulting, Inc., 1001 17th St #1100, Denver, CO 80202 (Attn: David Beckman) and (v) Committee, c/o its counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn: Martin J. Brill, Esq.), so that the Bid is actually received by **4:00 p.m. (MST) on December 15, 2016** (the "Bid Deadline").  Debtor  may extend the Bid Deadline pursuant to the terms of the Bidding Procedures Order, but are not obligated to do so.

6.      A hearing at which Debtor will seek approval and authorization of the Sale to the Successful Bidder (the "Sale Hearing") is scheduled to be held on **_____, 2016 at _____ __.m. (MST),**  unless otherwise continued by Debtor pursuant to terms of the Bidding Procedures Order, before the Honorable William T. Thurman, U.S. Bankruptcy Judge, at the United States Bankruptcy Court located at 350 South Main Street, Room 376, Salt Lake City, Utah 84101.

7.      Within three (3) days after entry of the Bidding Procedures Order, Debtor shall file and serve upon counterparties to Debtor's executory contracts and unexpired leases (the "Counterparties") a notice informing Counterparties that the executory contracts and unexpired leases may be assumed and assigned, and setting forth what Debtor's records show to be the applicable cure amounts, if any (the "Cure Notice").  If any Counterparty wishes to assert an objection or other response to the Cure Notice, it must file and serve such objection or other response upon the parties listed in paragraph 8 so as to be actually received by **_____, 2016 at 4:00 p.m. (MST)** (the "Objection Deadline").

8.      Objections, if any, to the relief requested at the Sale Hearing, including without limitation objections relating to the assumption and assignment of executory contracts

#41075566 v1

and/or unexpired leases, must: (a) be in writing filed with the Court, (b) comply with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and (c) be filed and served on the following parties by the Objection Deadline:  (i) co-counsel to Debtor, Pepper Hamilton, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, DE 19801 (Attn: Donald J. Detweiler, Esq.); (ii) co-counsel to Debtor, Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547 (Attn: David E. Leta, Esq.), (iii) Committee, c/o its counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn: Martin J. Brill, Esq.), and (iv) the Office of the U.S. Trustee, Ken Garff Building, 405 South Main Street, Suite 300, Salt Lake City, UT 84111 (Attn: Laurie A. Cayton, Esq.).

This Notice is qualified in its entirety by the Bidding Procedures Order.

Date: _____, 2016                   Respectfully submitted,


                                              **SNELL & WILMER L.L.P.**


                                              _____
                                              David E. Leta
                                              Troy J. Aramburu
                                              Jeff D. Tuttle

                                              and

                                              **PEPPER HAMILTON LLP**
                                              Donald J. Detweiler
                                              Francis J. Lawall
                                              John H. Schanne, II
                                              Hercules Plaza, Suite 5100
                                              1313 N. Market Street
                                              Wilmington, DE 19899-1709

                                              *Counsel for CS Mining, LLC*

#41075566 v1

## **EXHIBIT F**

### **CURE NOTICE**

David Leta (1937)

Troy Aramburu (10444)

Jeff Tuttle (14500)

**SNELL & WILMER L.L.P.**

15 W South Temple, Suite 1200

Salt Lake City, Utah 84101

Telephone: 801-257-1900

Facsimile: 801-257-1800

Email: dleta@swlaw.com

      taramburu@swlaw.com

      jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)

Francis J. Lawall, Esq. (admitted *pro hac vice*)

John H. Schanne, II (admitted *pro hac vice*)

**PEPPER HAMILTON LLP**

Hercules Plaza, Suite 5100

1313 N. Market Street

Wilmington, DE 19899-1709

Telephone: (302) 777-6500

Facsimile: (302) 656-8865

E-mail: detweild@pepperlaw.com

      lawallf@pepperlaw.com

      schannej@pepperlaw.com

*Counsel for CS Mining, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC,**<br><br>    Debtor. | Bankruptcy Case No. 16-24818<br><br>(Chapter 11)<br><br>Judge William T. Thurman |

## NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED, PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE, IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS, AND THE PROPOSED CURE AMOUNTS

PLEASE TAKE NOTICE OF THE FOLLOWING:

    1.    On _____, 2016, the United States Bankruptcy Court for the District of Utah (the "Court") entered an Order Granting Debtor's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estate's Assets, (B) Approving Expense Reimbursement, (C) Scheduling an Auction and Hearing to Consider the Proposed Sale and (D) Approving the Form and Manner of Notice Thereof (the "Bidding Procedures Order"), which, among other things, establishes bidding procedures (the "Bidding Procedures") that govern the manner in which all or substantially all of the assets (the "Purchased Assets") of CS Mining, LLC ("Debtor") are to be marketed and sold. All capitalized terms used but not defined herein shall have the meanings assigned to them in the Bidding Procedures Order. A copy of the Bidding Procedures Order – which itself attaches the Bidding Procedures – is being served on you concurrently with this Notice.

2.      In accordance with the Bidding Procedures, Debtor hereby files this Notice (this "Cure Notice") identifying: (1) those executory contracts and unexpired leases that may be assumed and assigned to a potential purchaser in connection with the sale of the Purchased Assets (the "Executory Contracts and Unexpired Leases"; and (ii) the proposed cure amount (the "Cure Amount") associated with each Executory Contract and Unexpired Lease.

3.      A list of the Executory Contracts and Unexpired Leases, together with the Cure Amount for each, is attached to this Cure Notice as Exhibit 1.  Debtor's records show that other than the Cure Amount, no other defaults exist under the Executory Contracts and Unexpired Leases.

4.      You have been identified as possibly being a party to an Executory Contract or Unexpired Lease.

5.      **If you wish to assert an objection to the proposed Cure Amount associated with the particular Executory Contract or Unexpired Lease to which you are a party, you must do so in accordance with the instructions in this Cure Notice and must assert such objection so as to be filed and served so as to be actually received by the parties listed in paragraph 6 below by _____, 2016 at 4:00 p.m. (MST) (the "Objection Deadline").**

6.      In order to be considered, an objection (if any) must: (a) be in writing filed with the Court, (b) comply with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Court and (c) be filed and served on the following parties by the Objection Deadline:  (i) co-counsel to Debtor, Pepper Hamilton, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, DE 19801 (Attn: Donald J. Detweiler, Esq.); (ii) co-counsel to Debtor, Snell & Wilmer L.L.P., 15 West South Temple, Suite 1200, Gateway Tower West, Salt Lake City, Utah 84101-1547 (Attn: David E. Leta, Esq.), (iii) Committee, c/o its counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067 (Attn: Martin J. Brill, Esq.), and (iv) the Office of the U.S. Trustee, Ken Garff Building, 405 South Main Street, Suite 300, Salt Lake City, UT 84111 (Attn: Laurie A. Cayton, Esq.).

7.      Timely objections to Debtor's proposed Cure Amounts, if any, will be heard at the Sale Hearing, which is scheduled to be held on_____, **2016 at __:_0 _.m. (MST),** before the Honorable William T. Thurman, U.S. Bankruptcy Judge, at the United States Bankruptcy Court located at 350 South Main Street, Room 376, Salt Lake City, Utah 84101.

8.      **If you do not file and serve a timely objection to a proposed Cure Amount listed on Exhibit 1 to this Cure Notice pursuant to the instructions set out in this Cure Notice, you shall be forever barred from objecting to such Cure Amount, and you shall be deemed to consent to such Cure Amount**.

9.      The presence of a contract or agreement on Exhibit 1 attached hereto does not constitute an admission that such contract or agreement is an executory contract, and does not constitute a representation that such contract or agreement will be assumed and assigned to

any Successful Bidder.  Debtor reserves all of its rights, claims, and causes of action with respect to the contract and agreements listed on <u>Exhibit 1</u> attached hereto.

          10.    This Cure Notice is qualified in its entirety by the Bidding Procedures Order.

Date: _____, 2016          Respectfully submitted,

          **SNELL & WILMER L.L.P.**

          _____

          David E. Leta
          Troy J. Aramburu
          Jeff D. Tuttle

          and

          **PEPPER HAMILTON LLP**
          Donald J. Detweiler
          Francis J. Lawall
          John H. Schanne, II
          Hercules Plaza, Suite 5100
          1313 N. Market Street
          Wilmington, DE 19899-1709

          *Counsel for CS Mining, LLC*

#41075107 v1

<u>Exhibit 1</u>

| Counterparty | Description of contract | Cure Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## **EXHIBIT G**

### **PURCHASE AGREEMENT**

# ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

**_____,**

### as BUYER,

### and

### CS MINING, LLC,

### as SELLER,

### DATED AS OF

### [NOVEMBER \_\_\_\_\_], 2016

# TABLE OF CONTENTS

**Page**

RECITALS ...................................................................................................................1

ARTICLE 1 DEFINITIONS.........................................................................................2

ARTICLE 2 PURCHASE AND SALE of ASSETS ...........................................................10
    Section 2.1.    Purchase and Sale of Assets...........................................10
    Section 2.2.    Excluded Assets .................................................................12
    Section 2.3.    Assigned Contracts ...........................................................14

ARTICLE 3 ASSUMED AND EXCLUDED LIABILITIES .................................................15
    Section 3.1.    Assumed Liabilities ...........................................................15
    Section 3.2.    Excluded Liabilities ...........................................................15
    Section 3.3.    Non-Assignable Purchased Assets.....................................16
    Section 3.4.    Commercially Reasonable Efforts ......................................16

ARTICLE 4 PURCHASE PRICE  AND CONSIDERATION ..............................................17
    Section 4.1.    Purchase Price ...................................................................17
    Section 4.2.    Deposit .............................................................................18
    Section 4.3.    Payment............................................................................18
    Section 4.4.    Payment of Cure Costs......................................................18
    Section 4.5.    Apportionment ..................................................................18
    Section 4.6.    Purchase Price Allocation ..................................................19
    Section 4.7.    Eminent Domain ................................................................20
    Section 4.8.    Casualty............................................................................20
    Section 4.9.    Withholding ......................................................................20

ARTICLE 5 CLOSING ...............................................................................................21
    Section 5.1.    Closing .............................................................................21
    Section 5.2.    Transactions to Be Effected at the Closing..........................21
    Section 5.3.    Possession ........................................................................22
    Section 5.4.    Closing Date......................................................................22

ARTICLE 6 CONDITIONS PRECEDENT TO CLOSING .................................................23
    Section 6.1.    Conditions to Seller's Obligations......................................23
    Section 6.2.    Conditions to Buyer's Obligations.....................................23

ARTICLE 7 SELLER'S REPRESENTATIONS AND WARRANTIES ...............................24
    Section 7.1.    Organization......................................................................24
    Section 7.2.    Due Authorization, Execution and Delivery; Enforceability..............24
    Section 7.3.    No Conflicts; Consents ......................................................24
    Section 7.4.    Assets ...............................................................................25
    Section 7.5.    Material Contracts.............................................................26
    Section 7.6.    Legal Proceedings.............................................................26
    Section 7.7.    Compliance with Laws; Permits.........................................26
    Section 7.8.    Environmental and Health and Safety Matters. ...................27
    Section 7.9.    Employees.........................................................................27
    Section 7.10.    Employee Benefits .............................................................28

#41102296 v8

Section 7.11.    Taxes ......................................................................................28
Section 7.12.    Intellectual Property ..............................................................28
Section 7.13.    Financial Advisors ..................................................................29
Section 7.14.    Reclamation Bonds .................................................................29
Section 7.15.    No Other Representations and Warranties ...........................29

ARTICLE 8 REPRESENTATIONS AND WARRANTIES OF BUYER .............................30
Section 8.1.    Organization ...........................................................................30
Section 8.2.    Due Authorization, Execution and Delivery; Enforceability ..............30
Section 8.3.    No Conflicts; Consents ...........................................................30
Section 8.4.    Financial Advisors ..................................................................30
Section 8.5.    Sufficiency of Funds ..............................................................30
Section 8.6.    Solvency .................................................................................31
Section 8.7.    Legal Proceedings ..................................................................31
Section 8.8.    Independent Investigation ......................................................31
Section 8.9.    Financial Wherewithal ...........................................................31
Section 8.10.    Approvals and Consents .........................................................31
Section 8.11.    "AS IS" Transaction ...............................................................31

ARTICLE 9 COVENANTS ..............................................................................32
Section 9.1.    Conduct of Business Prior to the Closing .............................32
Section 9.2.    Access to Information .............................................................33
Section 9.3.    Notice of Certain Events ........................................................33
Section 9.4.    Confidentiality .......................................................................34
Section 9.5.    Governmental Approvals and Other Third-Party Consents .................34
Section 9.6.    Books and Records .................................................................35
Section 9.7.    Closing Conditions .................................................................35
Section 9.8.    Public Announcements ...........................................................35
Section 9.9.    Further Assurances .................................................................36
Section 9.10.    Taxes ......................................................................................36
Section 9.11.    Assumption of Reclamation Bonds .......................................36
Section 9.12.    Designated Employees ...........................................................37
Section 9.13.    Nature of Transaction .............................................................37
Section 9.14.    Supplements to Schedules ......................................................38
Section 9.15.    Bankruptcy Matters ...............................................................38
Section 9.16.    Assignment of Rights .............................................................40

ARTICLE 10 TERMINATION ............................................................................40
Section 10.1.    Termination by the Parties ......................................................40
Section 10.2.    Effect of Termination .............................................................41

ARTICLE 11 MISCELLANEOUS ......................................................................42
Section 11.1.    Survival ..................................................................................42
Section 11.2.    Expenses .................................................................................42
Section 11.3.    Notices ....................................................................................42
Section 11.4.    Interpretation ..........................................................................43
Section 11.5.    Headings .................................................................................43
Section 11.6.    Severability .............................................................................43
Section 11.7.    Entire Agreement ...................................................................44
Section 11.8.    Successors and Assigns ..........................................................44

#41102296 v8

**Page**

Section 11.9.   No Third-Party Beneficiaries .................................................................44

Section 11.10. Amendment and Modification; Waiver ................................................44

Section 11.11. Governing Law; Submission to Jurisdiction; Venue ...........................44

Section 11.12. Specific Performance ...........................................................................44

Section 11.13. Limitation on Damages ........................................................................45

Section 11.14. Disclosure Schedules ...........................................................................45

Section 11.15. Counterparts .........................................................................................45

-iii-

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of [November _____], 2016 is entered into by and between CS MINING, LLC, a Delaware limited liability company (the "Seller" or the "Debtor") and _____, a _____ (the "Buyer"). Seller and Buyer are referred to collectively in this Agreement as the "Parties."

## RECITALS

A.      **Bankruptcy Case**.  On August 4, 2016 (the "Relief Date"), the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court") entered the Order for Relief (Docket No. 130) under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code"), which is pending under the case caption *In re CS Mining, LLC*, Case No. 16-24818 (the "Chapter 11 Case").  The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

B.      **Debtor's Business**.  Debtor owns or controls a number of high-grade copper ore deposits located in the Milford Mineral Belt in Beaver County, Utah.  The aggregated mining properties consist of a flotation mill and agitated leach and SXEW facility (the "Processing Facilities") and 60,000 acres that have significant measured and indicated reserves of copper, gold and silver resources.  The large property contains additional promising targets.

C.      **Final DIP Financing Order**.  On October 11, 2016, the Bankruptcy Court entered the *Final Order Pursuant to Sections 105, 361, 362, 363, 364, 365 and 507 of the Bankruptcy Code (I) Authorizing Debtor to Obtain Superpriority Secured Debtor-In-Possession Financing, (II) Authorizing Debtor to Use Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties and (V) Granting Related Relief* (the "Final DIP Financing Order") (Docket No. 352).

Pursuant to the Final DIP Financing Order, Wellington Financing Partners, LLC ("Wellington"); Broadbill Partners, L.P. ("Broadbill") and St. Cloud Capital Partners II, L.P. ( "St. Cloud" and collectively with Wellington and Broadbill, the "Final DIP Lenders"), provided to Debtor a secured superpriority debtor-in-possession financing facility (the "DIP Facility") in the aggregate principal amount of $7,675,000, subject to increase in amount for payment of interest and certain other allowed costs (any such amounts outstanding, the "DIP Loan Amount").  The DIP Facility provided Debtor the liquidity necessary to maintain its operations while seeking to formulate a chapter 11 bankruptcy plan, including funding a value-maximizing sale process.

The Final DIP Financing Order includes milestones (the "Exit Milestones") with respect to the sale of the Purchased Assets, which Exit Milestones govern the timeframe for the Bidding Procedures and Sale Process.

D.      **Bidding Procedures and Sale of Assets**.  On November 18, 2016, the Bankruptcy Court entered the Order Granting Debtor's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estate's Assets, (B) Approving Break-Up Fee, (C) Scheduling an Auction and Hearing To Consider

The Proposed Sale; and (D) Approving The Form And Manner of Notice Thereof (the "<u>Bidding Procedures Order</u>") (Docket No. <mark>___</mark>).

Pursuant to the Bidding Procedures Order, the Bankruptcy Court approved bidding and auction procedures (collectively, the "<u>Bidding Procedures</u>") to establish a competitive sale and auction process under Bankruptcy Code section 363(b) (the "<u>Sale Process</u>") for the sale(s) of all, or substantially all, assets of the Debtor's estate.

E.      **Asset Purchase Agreement**.  Upon the terms and subject to the conditions contained in this Agreement, and as authorized under Bankruptcy Code sections 105, 363 and 365, Seller wishes to sell, transfer, and assign to Buyer, and Buyer wishes to purchase, acquire, and assume from Seller, all of the right, title and interest of Seller in the Purchased Assets and to assume from Seller the Assumed Liabilities.

This Agreement for the sale and purchase of the Purchased Assets is entered into by and between the Parties in accordance with the Bidding Procedures Order, and is subject to solicitation of higher or otherwise better bids and approval by the Bankruptcy Court.

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms have the meanings specified or referred to in this Agreement:

"<u>Affiliate</u>" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" has the meaning set forth in <u>Section 4.6</u>.

"<u>Assigned Contracts</u>" means the Contracts in which the Seller has an interest relating to the Business set forth in <u>Schedule 2.1(p)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Assumption Date</u>" has the meaning set forth in <u>Section 2.3(b)</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

#41102296 v8

"<u>Bidding Procedures Order</u>" means the Order Granting Debtor's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Estate's Assets, (B) Approving Break-Up Fee, (C) Scheduling an Auction and Hearing To Consider The Proposed Sale; and (D) Approving The Form And Manner of Notice Thereof (Docket No. ____), entered by the Bankruptcy Court on November 18, 2016, establishing the Bidding Procedures for the conduct of the competitive Sale Process for the Purchased Assets.

"<u>Bonding Collateral</u>" means the cash and other assets pledged as collateral for the Reclamation Obligations.

"<u>Books and Records</u>" means books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, suppliers lists, production data, quality control records and procedures, assay reports, environmental studies, reports and analysis, mine plans, nonproprietary mining and reserve models, sales records, tax records, strategic plans, material and research, including all technical records, files, papers, surveys and plans or specifications.

"<u>Business Day</u>" means any day of the year on which national banking institutions in Utah are open to the public for conducting business and are not required or authorized to close.

"<u>Business</u>" means the business conducted by Seller with respect to the Purchased Assets.

"<u>Buyer</u>" has the meaning set forth in the Preamble.

"<u>Buyer's Deposit</u>" has the meaning set forth in <u>Section 4.2</u>.

"<u>Cash Amount</u>" has the meaning set forth in <u>Section 4.1(a)</u>.

"<u>Chapter 11 Case</u>" has the meaning set forth in the recitals.

"<u>Claims</u>" means any and all liens, claims (as defined in Bankruptcy Code section 101(5)), encumbrances, or interests of any kind or nature whatsoever.

"<u>Closing</u>" has the meaning set forth in <u>Article 5</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Article 5</u>.

"<u>COBRA</u>" means section 4980B of the Code and sections 601 to 608 of ERISA.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Commitment Letter</u>" has the meaning set forth in <u>Section 8.5</u>.

"<u>Confidentiality Agreement</u>" means the Non-Disclosure Agreement dated as of _____, 2016 by and between the Parties.

"<u>Contract</u>" means any agreement, indenture, contract, lease, deed of trust, royalty, license, option, instrument, or other written commitment.

-3-

"Cure Costs" means the amounts which must be paid or otherwise satisfied by Buyer, including pursuant to Bankruptcy Code sections 365(b)(1)(A) and (B), in connection with the assumption and/or assignment of the Assigned Contracts to Buyer as provided herein as those amounts are allowed by the Bankruptcy Court, unless such amounts are otherwise agreed upon by Buyer and the counterparty to the applicable Assigned Contract, including the Cure Costs set forth on Schedule 7.5(c) (as may be supplemented or modified in accordance with Sections 2.3(a) and (b) and Section 9.14).

"Debtors" has the meaning set forth in the Preamble.

"Deposits" has the meaning set forth in Section 2.1(o).

"Designated Employee" means any employee identified on Schedule 9.12.

"Disclosed Litigation" means those actions, suits, claims and legal proceedings set forth in Schedule 7.6.

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement and all references in this Agreement to a particular Schedule are references to Schedules in the Disclosure Schedules and not schedules to this Agreement.

"Dollars" and "$" means the lawful currency of the United States.

"Drop Dead Date" has the meaning set forth in Section 10.1(b)(i).

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3), whether or not ERISA applies), and any profit-sharing, bonus, incentive, stock option, stock purchase, stock ownership, pension, retirement, severance, termination, deferred compensation, excess benefit, supplemental unemployment, post-retirement medical or life insurance, welfare, incentive, sick leave, accrued vacation pay, long-term disability, medical, hospitalization, life insurance, other insurance or employee benefit plan, whether formal or informal, oral or written, that, in each case, is sponsored, maintained or contributed to, or required to be contributed to, by Seller or any ERISA Affiliate or under which Seller have or any ERISA Affiliate has, or may have, any present or future liability.

"Environmental Claim" means any action, suit, claim, investigation or other legal proceeding alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence, Release of, or exposure to, any Hazardous Materials, or (ii) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, Governmental Order or binding agreement with any Governmental Authority: (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata), or (ii) concerning the Release or presence of, exposure to, or the management, manufacture, use,

containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.

"Environmental Notice" means any written directive, notice of violation or infraction, or notice or written communication from a Governmental Authority relating to actual or potential material liability arising under or material non-compliance with any Environmental Law or any material term or condition of any Environmental Permit.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means each entity that is treated as a single employer with any Seller for purposes of Code section 414.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" means any Contract that is not an Assigned Contract.

"Excluded Liabilities" has the meaning set forth in Section 3.2.

"Expense Reimbursement" has the meaning set forth in Section 9.15(c)(i).

"Final DIP Financing Order" means the Final Order Pursuant to Sections 105, 361, 362, 363, 364, 365 and 507 of the Bankruptcy Code (I) Authorizing Debtor to Obtain Superpriority Secured Debtor-In-Possession Financing, (II) Authorizing Debtor to Use Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties and (V) Granting Related Relief entered by the Bankruptcy Court on October 11, 2016 at Docket No. 352.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authorities have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority, and does not mean or include any Permit.

"Hazardous Materials" means: (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws, and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Health and Safety Claim" means any action, suit, claim, investigation or other legal proceeding alleging liability of whatever kind or nature (including liability or responsibility

#41102296 v8

for the costs of enforcement proceedings, investigations, governmental response, personal injuries, medical monitoring, penalties, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence of, or exposure to, any workplace hazard, or (ii) any actual or alleged non-compliance with any Health and Safety Law or applicable implementing plan, agreement, or order.

"Health and Safety Law" means any applicable Law, Governmental Order or binding agreement with any Governmental Authority: (i) relating to workplace human health or safety, or (ii) human exposures, including the Federal Mine Safety and Health Act of 1977, as amended, the Occupational Safety and Health Act of 1970, as amended, implementing regulations, and similar state laws.

"Health and Safety Notice" means any written directive, notice of violation or infraction, or notice or written communication from a Governmental Authority relating to actual or potential liability arising under or non-compliance with any Health and Safety Law.

"Intellectual Property" means any and all of the following in any jurisdiction: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) websites and internet domain name registrations; and (vi) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"Intellectual Property Contracts" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration, other than production royalties or similar consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which a Seller is a party.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Mining Claims" means unpatented mining claims, including any associated royalties, leased by any Seller and held for use in connection with the Business.

"Leased Real Property" means real property (other than unpatented mining claims), including any associated royalties, leased by any Seller and held for use in connection with the Business.

"Loss" or "Losses" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to the business, results of operations, financial condition, or assets of the Business taken as a whole; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions, (ii) conditions generally

#41102296 v8

affecting the industries in which the Business operates, (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates or capital costs or commodity markets, (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof, (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer, (vi) any change in the price of gold or other relevant metals or any change in currency exchange rates, (vii) any changes in applicable Laws or accounting rules, (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Business, (ix) any natural or man-made disaster or acts of God, (x) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided, however, that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded), (xi) any matter of which Buyer is aware on the date hereof, or (xii) the pendency of the Chapter 11 Case and any action approved by, or motion, application or request made before, the Bankruptcy Court.

"Material Contracts" means each Assigned Contract to which any Seller or any of its Affiliates is a signatory that relates to the Business or the Purchased Assets (i) which, if terminated or modified or if it ceased to be in effect, would result in a Material Adverse Effect, (ii) that has annual payment obligations that are in excess of $100,000 and which may not be cancelled on thirty (30) days' prior notice or less, (iii) that relates to indebtedness for borrowed money, whether incurred, assumed, guaranteed or secured by any asset, with an outstanding principal amount in excess of $100,000, (iv) that relates to the acquisition of the business (whether by merger, sale of stock, sale of assets or otherwise), for consideration in excess of $100,000, (v) that materially limits or restricts the operator of the Business from engaging in any line of business, in any geographic area or with any other person, or (vi) that provides for the assumption of any material liability of any other Person by Seller.

"Material Permits" has the meaning set forth in Section 7.7(b).

"Material Taking" has the meaning set forth in Section 4.7.

"Mill Sites" means the mill sites held for use by Seller in connection with the Business.

"Non-Purchased Deposits" – means all cash, cash equivalents, refunds, deposits, rebates, credits or losses that are not being transferred or sold to the Buyer and are identified on Schedule 2.2(e).

"Stalking Horse Notice" means a notice filed by the Debtor designating a Stalking Horse Bidder with respect to the sale and purchase of substantially all of their assets or any portion thereof, which notice shall include a copy of the Stalking Horse Bidder's Purchase Agreement.

"Offer" has the meaning set forth in Section 9.12.

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business consistent with Seller' operation of the Business as of October 1, 2016, unless otherwise agreed by Buyer and Seller.

"Other Allowed Prepetition Secured Claims" means the alleged prepetition secured claims asserted against the Debtor's estate that are to be assumed by the Buyer as an Assumed Liability and that are identified on Schedule 2.3(c).

"Owned Mining Claims" means unpatented mining claims, including any associated royalties, owned by Seller or its Affiliates and held for use in connection with the Business.

"Owned Real Property" means real property (other than unpatented mining claims), including any associated royalties, owned by Seller and held for use in connection with the Business.

"Permits" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities and held for use in connection with the Business.

"Permitted Encumbrances" means: (i) liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, (ii) title of a lessor under a capital or operating lease, (iii) terms and conditions of, and liens and security interests created by, any Assigned Contract, (iv) all covenants, conditions, restrictions, easements, charges, rights-of-way, title defects or other encumbrances on title and similar matters filed of record in the real property records to which they relate or are located in the Utah State Office of the Bureau of Land Management, the Utah Division of Water Resources or the Utah Department of Ecology and that do not materially interfere with the mine development and operation of the Business in the Ordinary Course of Business, (v) such liens, imperfections in title, charges, easements, restrictions, encumbrances or other matters that are due to zoning or subdivision, entitlement, and other land use Laws or regulations, (vi) encumbrances on, or reservations in, title arising by operation of any applicable United States federal, state or foreign securities Law, (vii) liens or encumbrances that arise solely by reason of acts of, or with the written approval of, Buyer, (viii) liens not created by Seller that affect the underlying interest of any Owned Real Property, Leased Real Property, Owned Mining Claims, Leased Mining Claims, Mill Sites or Water Rights and that do not, and would not, materially interfere with the mine development and operation of the Business in the Ordinary Course of Business, (ix) any set of facts an accurate up-to-date survey would show, provided, however, that such facts do not materially interfere with the mine development and operation of the Business in the Ordinary Course of Business, (x) orders or rulings of the Utah State Office of the Bureau of Land Management, the Utah Division of Water Resources, or the Utah Department of Ecology, (xi) royalties or similar interests disclosed on Schedule _____or Schedule _____, and (xii) any Claim from which property cannot be sold free and clear pursuant to Bankruptcy Code section 363(f) or applicable Law.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Purchase Price" has the meaning set forth in Section 4.1(a).

#41102296 v8

"Purchased Assets" has the meaning set forth in Section 2.1.

"Reclamation Bonds" has the meaning set forth in Section 7.14.

"Reclamation Obligations" means all reclamation and similar obligations arising from or relating to any and all reclamation activities required before, during and/or following final cessation of, any exploration, mining or processing activities conducted by or in connection with the Business, or required at or on property utilized by the Business, that are required either by applicable law or by Permit.

"Relief Date" has the meaning set forth in the recitals.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Sale Hearing" means the hearing to be conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order or Orders of the Bankruptcy Court issued pursuant to Bankruptcy Code sections 105, 363, and 365, in substantially the form attached hereto as **Exhibit A**, authorizing and approving, among other things, (a) the sale, transfer and assignment of the Purchased Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Claims (except for Permitted Encumbrances), (b) the assumption and assignment of the Assigned Contracts in connection therewith and (c) that Buyer is a "good faith" purchaser entitled to the protections of Bankruptcy Code section 363(m).

"Seller" has the meaning set forth in the Preamble.

"Stalking Horse" has the meaning set forth in Section 9.15(b).

"Stalking Horse Protections" has the meaning set forth in Section 9.15(c).

"Straddle Period" has the meaning set forth in Section 3.1(b).

"Taking" has the meaning set forth in Section 4.7.

"Tangible Property" means all tangible personal property listed on Schedule __ and to the extent not included therein, any tangible personal property included in the Purchased Assets.

"Tax" or "Taxes" means (i) all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, health and safety, stamp, occupation, premium, property

-9-

(real or personal), real property gains, windfall profits, customs, duties, unclaimed property and escheat obligations, or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, and (ii) any liability for the payment of any amounts of the type described in <u>clause (i)</u> as a result of the operation of Law or any express or implied obligation to indemnify any other Person.

"<u>Tax Return</u>" means any return, document, declaration, report, election, estimated tax filing, claim for refund, declaration of estimated Tax, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Transfer Taxes</u>" has the meaning set forth in <u>Section 9.10(a)</u>.

"<u>Transition Permit</u>" has the meaning set forth in <u>Section 9.5(b)</u>.

"<u>Utilities</u>" has the meaning set forth in <u>Section</u> .

"<u>Water Rights</u>" means water rights owned or leased by Seller or its Affiliates and held for use in connection with the Business.

## ARTICLE 2
## PURCHASE AND SALE of ASSETS

**Section 2.1.**   **<u>Purchase and Sale of Assets</u>.**  At the Closing, and subject to the terms and conditions set forth in this Agreement and in the Sale Order, Seller shall irrevocably sell, assign and transfer to Buyer, and Buyer shall purchase, acquire, accept and receive from Seller, free and clear of all Claims, excluding the Assumed Liabilities and Permitted Encumbrances, all of Seller' right, title and interest in and to the Purchased Assets. "<u>Purchased Assets</u>" shall mean the following assets of Seller (but excluding Excluded Assets) as of the Closing to the extent related to the Business, whether tangible or intangible, real or personal and wherever located and by whomever possessed:

(a)    the Owned Real Property, including all improvements and fixtures located thereon or related thereto, described in <u>Schedule 2.1(a)</u> hereto;

(b)    the Leased Real Property described in <u>Schedule 2.1(b)</u> hereto;

(c)    the Owned Mining Claims described in <u>Schedule 2.1(c)</u> hereto;

(d)    the Leased Mining Claims described in <u>Schedule 2.1(d)</u> hereto;

(e)    the Mineral Claims described in <u>Schedule 2.1(e)</u> hereto;

(f)    the Water Rights described in <u>Schedule 2.1(f)</u> hereto;

(g)    the Processing Facilities described in <u>Schedule 2.1(g)</u> hereto;

(h)    the Furnishings, Equipment and Motor Vehicles, whether owned or leased by Seller, described in <u>Schedule 2.1(h)</u> hereto;

-10-

(i)       the Personal Property, whether owned or leased by Seller, described in Schedule 2.1(i) hereto;

(j)       the Inventory described in Schedule 2.1(j) hereto;

(k)       the Assigned Contracts described in Schedule 2.1(k) hereto;

(l)       the Intangible Property Assets described in Schedule 2.1(l) hereto;

(m)       the Permits described in Schedule 2.1(m) hereto;

(n)       to the extent transferable, the Intangible Property Assets and Intellectual Property, and all software, programs and similar systems (including data and related documentation) owned or licensed by Seller that relates to such Intangible Property Assets and Intellectual Property, described in Schedule 2.1(n);

(o)       all Inventory, including without limitation all minerals, metals, gold, copper or silver that is contained in the Inventory or in any stockpiles, leach pads, process ponds, process equipment, or process systems whether in ore, in solution, on carbon, in slag, in sludge, or doré form;

(p)       any and all interest of Seller (i) as lessee or licensee of equipment, Furnishings and Equipment, or other personal property, tangible or intangible, under any executory contract that is a Personal Property Lease, (ii) as lessee or licensee of real estate, real property, mining claims, and mineral rights, including all improvements and fixtures located thereon or related thereto or minerals and metals located therein and extracted minerals and metals associated therewith, (iii) in, under and to any executory contract related to or incident to the Purchased Assets, and (iv) in, under and to any other Seller's Contract, in each case as is described or set forth on Schedule 2.1(p), and all of Seller's associated rights, title and interests thereto, subject to the right of Buyer under Sections 2.3(a) and 9.14 to designate, in its sole and absolute discretion, any such Contract as an Excluded Contract, in which case any such interest of Seller shall be deemed an Excluded Asset (all such Seller's Contracts not so designated, the "Assigned Contracts");

(q)       all deposits, prepaids, retainers and similar amounts (collectively the "Deposits") made to vendors in connection with any of the Purchased Assets relating to or arising in connection with any of the Assigned Contracts described in Schedule 2.1(q);

(r)       all claims related to the Purchased Assets described in Section 2.1(a) through Section 2.1(q) or the Assumed Liabilities, provided, that (i) the Seller shall retain all claims arising chapter 5 of the United States Bankruptcy Code, including but not limited to, all avoidance, fraudulent transfer or preferential transfer actions and such claims are not being sold, assigned or transferred to Buyer; and (ii) the Seller shall retain the right to assert any rights, claims, offsets, objections or defenses to any the right to assert any such Claims as a defense or objection to proofs of claim asserted against the Seller's bankruptcy estate;

(s)       all rights of Seller to take delivery of all products ordered by Seller before the Closing Date for delivery, which products have not been delivered as of the Closing Date, to the extent the purchase orders for such products are Assumed Liabilities;

(t)       copies of all other books, records and materials of Seller relating to the Purchased Assets and operations of the Business; provided, however, that Buyer agrees that

-11-

the Sale Order will contain a provision reasonably acceptable to the Debtor and Creditors' Committee that requires Buyer to make such records available to the Debtor or other designated representative of the Debtor;

(u)      any other mutually agreeable assets related to the Business described on Schedule 2.1(u) hereto; and

(v)      all royalties on or burdening all or any portion of the Owned Real Property, Leased Real Property, Owned Mining Claims, Leased Mining Claims, whether such royalty is characterized as a net smelter return royalty, overriding royalty, net profit interest, gross proceeds royalty, production payment, streaming transaction, share of mineral production or otherwise. Except as set forth on Schedule 2.3(v), the royalties identified on Schedule 2.3(v) are fully paid and there is no liability for outstanding payment on any such royalty.

Section 2.2.      **Excluded Assets**. Other than the Purchased Assets, Buyer expressly acknowledges and agrees that it is not purchasing or acquiring, and Seller is not selling nor assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "Excluded Assets"). For greater certainty, Excluded Assets include the following assets and properties of Seller:

(a)      all cash and cash equivalents, bank accounts and securities of Seller, including the proceeds of the DIP Financing;

(b)      the Purchase Price identified in Section 4.1 of this Agreement;

(c)      Seller's rights under this Agreement;

(d)      all cash and cash equivalents refunds, deposits, rebates, credits or losses, relating to the Reclamation Bonds and Bonding Collateral described on Schedule 2.2(d);

(e)      all cash, cash equivalents, refunds, deposits, rebates, credits or losses, relating to the Non-Purchased Deposits described on Schedule 2.2(e);

(f)      all accounts, accounts receivables or notes receivable of the Seller and the Business;

(g)      the Excluded Contracts described on Schedule 2.2(g);

(h)      the organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, and any other books and records which such Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(i)      all insurance policies of such Seller and all rights to applicable claims and proceeds thereunder;

(j)      all Tax assets (including Tax refunds, prepayments and net operating losses) of Seller;

-12-

(k)     all rights, claims or causes of action under chapter 5 of the Bankruptcy Code or analogous state statutes including Claims under section 547, 548, 549 or 550 of the Bankruptcy Code;

(l)     all Employee Benefit Plans and all assets and contracts associated with the Employee Benefits Plans;

(m)     the rights which accrue or will accrue to Seller under this Agreement and the documents and instruments delivered in connection herewith; and

(n)     all pending litigation or proceedings and all rights, claims, counterclaims, offsets and causes of action asserted or which could be asserted, including, without limitation, as a defense to any of the proofs of claim filed in the Chapter 11 Case;

(o)     deposits, prepaids, retainers and similar amounts made to vendors in connection with the Business not relating to or arising in connection with any of the Assigned Contracts;

(p)     all intercompany payables and receivables, and all accounts payable and accounts or notes receivable, in each case, in connection with the Business;

(q)     all equipment and property identified on Schedule 2.2(q);

(r)     the assets, properties and rights set forth in Schedule 2.2(r).

(s)     any Deposits of or taken from the Purchase Price set aside for payroll and sales tax or retainers set aside for professionals of Seller;

(t)     the Excluded Contracts, including any refund, credit or payment due to Seller thereunder;

(u)     all Furnishings and Equipment of Seller other than Purchased Furnishings and Equipment;

(v)     all books and records relating to any pre-Closing Period that the Seller is required by law to retain, including, without limitation, (i) Tax Returns, financial statements, and corporate or other entity filings (*provided, however*, that Buyer shall have the right to make, and the Seller shall deliver, copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets), (ii) minute books, stock ledgers, and stock certificates of Seller or of any Affiliates, and (iii) documents relating to proposals to acquire the Business by Persons other than Buyer;

(w)     all securities, whether capital stock or debt, and other ownership interests issued Seller;

(x)     all assets of any Section 401(k) or other employee pension or benefit plan;

(y)     all work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; *provided, however*, so far as legally permissible under applicable data protection, medical confidentiality or similar laws, Buyer

-13-

will be provided the originals of all personnel and medical records of employees of Seller who have accepted employment with Buyer in connection with the sale hereunder, with the prior written consent of such employee or after posted written notice or other appropriate notice to such employees if legally required. If an employee objects to the transfer of personnel or medical records to Buyer, the records will not be provided;

(z)     any and all claims of Seller or (including, without limitation, any claims for loans or advances or claims for breach of fiduciary duty) against any of the officers, directors or shareholders of Seller or Seller's parent company, Skye Mineral Partners; and

(aa)     any other asset that, although included in the definition of Purchased Assets, Buyer notifies Seller in writing not later than seven (7) days prior to the Closing that Buyer does not wish to purchase such asset.

**Section 2.3.     Assigned Contracts**.

(a)     As part of the Bidding Procedures, Seller shall obtain approval from the Bankruptcy Court for the sale, assumption and assignment by Seller to Buyer of the Assigned Contracts, as may be amended in accordance with Section 2.3(b), below. Seller shall serve the Cure Notice (as defined in the Bidding Procedures Order) on all counterparties to all Assigned Contracts along with a notice specifically stating that Seller is or may be seeking the sale, assumption and assignment of such Assigned Contracts and shall notify such parties of the deadline for objecting to the Cure Costs listed in Schedule 7.5 which deadline shall be not less than three (3) calendar days prior to the hearing to approve the Sale Hearing. As part of the Bidding Procedures, Seller shall file with the Bankruptcy Court the list identifying the proposed Assigned Contracts and the amounts necessary to cure defaults under each of such Assigned Contract as determined by Seller in accordance with Schedule 7.5(c) so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible. In cases in which Seller is unable to establish that a default exists, the relevant Cure Cost shall be set at Zero Dollars ($0.00). Buyer acknowledges its obligation under Bankruptcy Code section 365 to provide adequate assurance to all counter-parties to Assigned Contracts.

(b)     On or prior to the date that is fourteen (14) days prior to Closing ("Assumption Date"), Buyer shall have the right, in Buyer's sole and absolute discretion, to designate any Assigned Contract as an Excluded Contract. Any such designation may be made by Buyer by giving notice thereof in accordance with this Agreement on or prior to the Assumption Date. All such designations made by Buyer as of the Assumption Date shall be become final and binding upon Buyer and, except as otherwise set forth below, all Assigned Contracts as to which Buyer has made no such designation shall be deemed a Purchased Asset. Appropriate deletions shall be made to Schedules 2.2(b), 7.5(a) and (c), at the Closing to reflect any Excluded Contracts.

(c)     If first approved by the Bankruptcy Court through the Sale Order or one or more other Final Orders that are no less favorable to Buyer than the provisions of the Sale Order, at Closing, Seller shall assume each Assigned Contract and assign such Assigned Contract to Buyer. At Closing, Buyer shall assume the obligations of Seller under each Assigned Contract assigned to it pursuant to this Agreement.

-14-

# ARTICLE 3
## ASSUMED AND EXCLUDED LIABILITIES

**Section 3.1.**     **Assumed Liabilities.**  Subject to the terms and conditions set forth herein, Buyer shall assume, pay, satisfy, perform and discharge when due only the following liabilities and obligations of Seller with respect to the Purchased Assets and the Business (collectively, the "Assumed Liabilities"):

        (a)     all liabilities and obligations under the Assigned Contracts (including the Cure Costs), Reclamation Bonds (to the extent transferable), Reclamation Obligations, Permits, Environmental Claims and Health and Safety Claims, arising on or after the Closing Date;

        (b)     all liabilities and obligations for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof following the Closing Date (and for this purpose, any Taxes for any Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date on an interim "closing of the books method", provided that any Taxes (such as property Taxes) that are not imposed on income, receipts or otherwise on a transactional basis shall be allocated on a daily basis, with "Straddle Period" meaning any taxable period beginning before and ending after the Closing Date), and (ii) Taxes for which Buyer is liable pursuant to Section 9.10;

        (c)     all liabilities and obligations with respect to the Other Allowed Prepetition Secured Claims, including but not limited to all mechanic's lien claims allowed by the Bankruptcy Court, described on Schedule 3.1(d);

        (d)     all liabilities and obligations arising on or after the Closing Date from or relating to any condition of the Purchased Assets or the Business, whether known or unknown or contingent; and

        (e)     all liabilities listed in Schedule 3.1(f);

        (f)     all liabilities of Seller for Utilities, to the extent (and only to the extent) such items are required to be borne by Buyer;

        (g)     Seller's obligations under the Assigned Contracts and Seller's obligations to be performed under the Purchased Business Permits included in the Purchased Assets that are assigned or otherwise transferred to Buyer pursuant to this Agreement;

        (h)     the Cure Costs for the Assigned Contracts, to the extent that such Cure Costs are not paid at Closing;

        (i)     those Liabilities identified on Schedule 3.1(i);

        (j)     all payments and responsibilities following the Closing Date with respect to any unpaid property taxes or unpaid payroll taxes; and

**Section 3.2.**     **Excluded Liabilities.**  Other than the Assumed Liabilities and Permitted Encumbrances, Buyer shall not assume and shall not be responsible to pay, perform or discharge any debts, liabilities or obligations of any Seller or with respect to the Purchased Assets or the Business, whether known, unknown, direct, indirect, absolute,

-15-

contingent or otherwise, or arising out of facts, circumstances or events in existence on or prior to Closing, including the following (collectively, the "Excluded Liabilities"):

(a)     any liabilities or obligations relating to or arising out of the Excluded Assets;

(b)     all liabilities and obligations resulting from any (i) fine, (ii) penalty, (iii) claim for damages, (iv) health and safety violation, (v) regulatory order or (vi) breach of Law or Contract, in each case, due to any Seller's acts or omissions as the operator or manager of the Business;

(c)     any liabilities or obligations for Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof ending on or prior to the Closing Date (and for this purpose, any Taxes for any Straddle Period shall be allocated in the same manner as Section 3.1(b));

(d)     any liabilities and obligations of Seller set forth in Schedule 3.2(d);

(e)     all liabilities and obligations of Seller to any vendors and suppliers incurred, accrued or otherwise arising from or relating to the Excluded Assets;

**Section 3.3.     Non-Assignable Purchased Assets**.  To the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset would violate any Governmental Order which is in effect, result in a violation of applicable Law or would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), and (i) such consent, authorization, approval or waiver has not been obtained, (ii) the Bankruptcy Court has not entered a final Governmental Order, which may include the Sale Order, providing that such consent, authorization, approval or waiver is not required or that the Purchased Asset subject to such consent, authorization, approval or waiver shall be assigned or transferred regardless of any such necessary consent, authorization, approval or waiver and that there shall be no breach or adverse effect on the rights of Buyer thereunder for the failure to obtain any such consent, authorization, approval or waiver or, (iii) in the case of Permits included in the Purchased Assets, where such consent, authorization, approval or waiver is not ordinarily obtained prior to the Closing, Seller shall not sell and this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery thereof.

**Section 3.4.     Commercially Reasonable Efforts**.

(a)     Following the Closing, Seller and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment required to transfer all of the rights and benefits, and assign or novate all liabilities and obligations under any and all Assigned Contracts, Permits included in the Purchased Assets and other Purchased Assets and Assumed Liabilities, so that Buyer may have the benefit and rights of such Assigned Contracts and Permits and Purchased Assets and be responsible for such Assumed Liabilities from and after the Closing Date; provided, however, that neither Seller nor Buyer shall be required to pay any consideration therefor other than routine filing fees. Once such consent, authorization, approval, waiver, release, substitution or amendment is

-16-

obtained, such applicable Purchased Assets shall be deemed to be transferred or, if required, Seller shall sell, assign, transfer, convey and deliver to Buyer the relevant Purchased Asset to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration.  Applicable sales, transfer and other similar Taxes in connection with such sale, assignment, transfer, conveyance or license shall be paid by Buyer.

(b)     To the extent that any Purchased Asset or Assumed Liability cannot be transferred to Buyer following the Closing, Buyer and Seller shall use commercially reasonable efforts (which shall not obligate Seller to pay any consideration in connection therewith) to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the parties, to the extent permitted under applicable Law, operational equivalent of the transfer of such Purchased Asset or Assumed Liability to Buyer as of the Closing.  To the extent permitted under applicable Law, Buyer shall, as agent or subcontractor for Seller, pay, perform and discharge fully the liabilities and obligations of Seller thereunder from and after the Closing Date and Seller shall, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, such Purchased Asset and all benefits, income, proceeds and other monies received by Seller to the extent related to such Purchased Asset in connection with the arrangements under this Agreement.  Seller shall be permitted to set off against such amounts all direct costs associated with the retention and maintenance of such Purchased Assets.  Notwithstanding anything herein to the contrary, the provisions of this <u>Section</u> shall not apply to any consent or approval required under any antitrust, competition or trade regulation Law.

## ARTICLE 4
## PURCHASE PRICE  AND CONSIDERATION

**Section 4.1.**     <u>**Purchase Price**</u>.

(a)     The aggregate consideration for the Purchased Assets (the "<u>Purchase Price</u>") shall consist of:

(i)     cash in an amount equal to the DIP Financing Facility, $7,923,487.82, plus accrued interest and allowed fees of the DIP Lenders under the DIP Financing Facility; *plus*

(ii)     cash in an amount equal to $1,500,000 to be used for: (A) the payment of any accrued and unpaid administrative expense claims due and owing as of the Closing Date; (B) the payment of the costs and expenses incurred in winding-down the Debtor's bankruptcy case and estate; and, to the extent any excess funds exist after the satisfaction of subsections (A) and (B) of this subpart (ii), for (C) for the payment of, in accordance with the order of priority of payment of allowed claims under the United States Bankruptcy Code, or as may be ordered by the Bankruptcy Court, all claims allowed in the Debtor's bankruptcy case; plus

(iii)     cash in an amount equal to [_____]; plus

(iv)     cash in an amount to pay all Transfer Taxes; *plus*

(v)     cash in an amount to pay all Cure Costs, *plus*

-17-

(vi)    the assumption of the Assumed Liabilities.

The cash amounts identified in subsections (i) through (v) are collectively referred to as the "Cash Amount";

(b)    No later than three (3) Business Days prior to Closing, Seller shall deliver to Buyer a statement indicating wire transfer instructions for Seller.  At the Closing, Buyer shall deliver to Seller by wire transfer an amount equal to the Cash Amount in accordance with such instructions in cash.

**Section 4.2.**    **Deposit**.  Within five (5) days of the execution of this Agreement, Buyer shall deposit, into the trust account of Seller's counsel, Pepper Hamilton, LLP, located at 1313 North Market Street, Suite 5000 Wilmington, DE 19801, cash in the amount of [$_____], which amount is equal to Five Percent (5.0%) of the Cash Amount, as then reasonably estimated by Seller (the "**Buyer Deposit**").  The Buyer's Deposit shall be held by Seller's counsel in escrow pending the Closing.  If Buyer completes the purchase of the Purchased Assets, the Buyer Deposit shall be credited towards the Cash Amount of the Purchase Price.  If Seller materially defaults hereunder or fails to satisfy a closing condition of Seller set forth in Section 6.1 below, and Buyer does not complete the purchase of the Purchased Assets hereunder, then the Buyer Deposit shall be fully refunded and returned to Buyer.  If the Buyer materially defaults hereunder and does not complete the purchase of the Purchased Assets, then the Seller shall be entitled to retain the Buyer Deposit and the receipt by the Seller of the Buyer Deposit shall be a non-exclusive remedy of the Seller and the Seller shall be entitled to any other rights or remedies available hereunder, at law, or in equity; provided, however, if the Seller consummates a sale of the Purchased Assets with a back-up bidder, then retention of the Buyer Deposit shall serve as liquidated damages and shall be the Seller's sole and exclusive remedy against the Buyer

**Section 4.3.**    **Payment**.  The Purchase Price shall be payable on the Closing Date in accordance with the terms of the Sale Order by payment of the Cash Amount, provided, however, that any increase in the Purchase Price by Buyer shall be payable at Closing by check or wire transfer of immediately available funds to an account specified by Seller.

**Section 4.4.**    **Payment of Cure Costs**.  All Cure Costs under any Assigned Contracts shall be the responsibility of Buyer.  Following entry of the Sale Order, upon funding of the Cure Costs by Buyer, Seller shall pay the Cure Costs under any undisputed Assigned Contract at Closing.  Any disputed Cure Costs shall be paid pursuant to the terms by which the Bankruptcy Court directs such payments to be made.  All Cure Costs shall be paid directly to the party to the Assigned Contract and pursuant to the terms by which the Bankruptcy Court directs such payments to be made in the Sale Order or Final Order approving the assumption and assignment of the Assigned Contracts in conjunction with the Sale Order.

**Section 4.5.**    **Apportionment**.  At or about the Closing Date, the Seller and Buyer shall (i) make mutually satisfactory arrangements with respect to, or take readings or other measurements of, gas, water, electricity and other utilities (the "**Utilities**"); (ii) mutually determine all real property Taxes and all charges, fees or other expenses arising out of or relating to any Assumed Contract, other than Cure Costs, which accrued but were not paid by Seller during or in respect of any period prior to Closing or which were paid by the Seller in respect of any period following the Closing, other than any such real property Taxes, charges, fees or expenses that are, under express provision of this Agreement or other agreement or

instrument related hereto, expressly provided to be paid or borne by either Buyer or Seller, or otherwise specifically addressed in this Agreement (the "**Apportionable Operating Expenses**").  Responsibility for the Utilities and Apportionable Operating Expenses are to be apportioned equitably as of the Closing Date, such that Seller shall bear costs and expenses for the period up to the Closing Date and Buyer shall bear such costs and expenses for the period from and including the Closing Date.

Section 4.6.    Purchase Price Allocation.  Buyer shall use its commercially reasonable efforts to deliver to Seller, no later than forty-five (45) days following the Closing Date, a schedule (the "**Allocation Schedule**") allocating the Purchase Price among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local Tax law) or any successor provision. Buyer will prepare the Allocation Schedule in good faith.  Buyer and Seller shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with the Allocation Schedule and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings), provided that subject to applicable law, Buyer may amend the Allocation Schedule if deemed necessary by Buyer and provide Seller with notice thereof.  Buyer and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.  Not later than forty-five (45) days prior to the filing of their respective Forms 8594 (and analogous state law forms) relating to the transactions contemplated under this Agreement, each Party shall deliver to the other Party a copy of its Form 8594 (and such analogous state law forms).  The Allocation Schedule shall be deemed final unless Seller notify Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within thirty (30) days after delivery of the Allocation Schedule to Seller.  In the event of any such objection, Buyer and Seller will work expeditiously and in good faith in an attempt to resolve such dispute within a further period of fourteen (14) days after the date of notification by Seller to Buyer of such dispute, failing which the dispute shall be submitted for determination to an independent national firm of certified public accountants mutually agreed to by Seller and Buyer (and, failing agreement between Seller and Buyer on the firm of certified public accountants within a further period of five (5) Business Days, such independent national firm of certified public accountants shall be _____). The determination of the firm of certified public accountants shall be final and binding upon the parties and shall not be subject to appeal.  The firm of certified public accountants shall be deemed to be acting as experts and not as arbitrators.  The fees and expenses of such accounting firm shall be borne equally by Seller, on the one hand, and Buyer, on the other. Seller and Buyer agree to (a) file their respective IRS Forms 8594 and all federal, state and local Tax Returns in a manner consistent with the Allocation Schedule (as it may be subsequently adjusted) and (b) notify and provide the other party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes or any other filing with a Governmental Authority regarding the appropriate allocation of the Purchase Price among the Purchased Assets.  Notwithstanding the preceding sentence, the parties may settle any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the allocation of the Purchase Price and other applicable items among the Purchased Assets, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging any final Allocation Schedule.  Notwithstanding anything in this Agreement to the contrary, this Section 4.6 shall survive the Closing Date without limitation.  Buyer and Seller acknowledge

-19-

and agree that this Section 4.6 pertains to the allocation of the Purchase Price for Tax purposes.

Section 4.7.    **Eminent Domain**.  If prior to the Closing, Seller receives (i) any written notice of any condemnation proceeding or other proceedings in the nature of eminent domain in connection with any portion of the Owned Real Property or (ii) any notice of a contemplated commencement of such a proceeding (each a "Taking") which after giving affect thereto would prevent Buyer from conducting the Business as contemplated by Seller (such Taking, a "**Material Taking**"), Buyer shall have the right, at its sole option, of terminating this Agreement by written notice to Seller within thirty (30) days after receipt by Buyer of written notice from Seller of the Taking.  If Buyer does not terminate this Agreement pursuant to the provisions of this Section 4.7, at Buyer's option: (i) the total consideration payable for the Owned Real Property under this Agreement shall be reduced by the total of any awards or damages received by the holder of any existing mortgage thereon and by Seller; or (ii) Buyer may require Seller to assign to Buyer all of Seller's right, title and interest in and to any such claims, awards or damages to which Seller may have become entitled or may thereafter be entitled by reason of any exercise of the power of eminent domain or condemnation with respect to the Owned Real Property or any portion thereof.  Buyer shall not have any right to terminate this Agreement for any Taking which is not a Material Taking.  Seller shall not agree to any award or damages or compromise any claim without Buyer's prior written approval.

Section 4.8.    **Casualty**.  Seller shall bear the risk of loss with respect to the Purchased Assets prior to the Closing.  If prior to the Closing, there shall be loss or damage to the Purchased Assets as a result of fire or casualty which after giving affect thereto would prevent Buyer from conducting the Business as contemplated by Buyer or if the cost to restore any such loss or damage is greater than Seven Hundred Fifty Thousand Dollars ($750,000) as determined by Buyer's contractors, Buyer shall have the right, at its sole option, to terminate this Agreement, at which time this Agreement shall be null and of no further force or effect, and, except as otherwise set forth in this Agreement, neither party shall have any further rights, duties or obligations under this Agreement.  If this Agreement is not terminated, Buyer shall be entitled to the proceeds of any insurance paid or payable to Seller on account of any such loss or damage and to an assignment of all proceeds and claims to such proceeds of any insurance policies, and Seller shall execute and deliver to Buyer any and all documents or instruments required before or after the Closing to transfer all interest in such claims or proceeds to Buyer or to whomever Buyer shall direct and shall credit Buyer for deductibles under such policies.  In connection with the foregoing, Seller shall not agree to any award or damages or compromise any claim without Buyer's prior written approval.

Section 4.9.    **Withholding**.  Buyer shall be entitled to withhold from amounts payable to any Seller hereunder amounts of Taxes that are required to be withheld under applicable Law and if any such Taxes are withheld, they shall be remitted by Buyer in accordance with applicable Law.  Buyer shall not deduct or withhold any amount for Taxes under Code section 1445(a) with respect to such Seller.  To the extent that such Taxes are withheld and paid over to the applicable Governmental Authority with respect to amounts payable to a Seller hereunder, such amounts shall be treated for purposes of this Agreement as having been paid to such Seller.

## ARTICLE 5
## CLOSING

**Section 5.1.    Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated herein, including the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing"), shall take place electronically via email or facsimile beginning at 9:00 a.m., Mountain time, on the earlier of (i) the third (3rd) Business Day after the last of the conditions to Closing set forth in Article 6 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), (ii) January 15, 2017, or (iii) at such other time or on such other date or at such other place as Seller and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "Closing Date").

**Section 5.2.    Transactions to Be Effected at the Closing**.  At the Closing:

(a)    Seller shall deliver to Buyer the following, substantially in the applicable form attached hereto as Schedule 5.2(a)(i) through Section 5.2(a)(xiii) below:

(i)    a true and correct copy of the Sale Order;

(ii)    duly executed deeds and assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Owned Real Property or Owned Mining Claims;

(iii)    duly executed deeds or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Leased Real Property or Leased Mining Claims;

(iv)    duly executed deeds or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Mineral Claims;

(v)    duly executed deeds or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Water Rights;

(vi)    duly executed deeds or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are the Processing Facilities;

(vii)    duly executed deeds or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Mill Sites;

(viii)   duly executed deeds, certificates of title, or assignments and bills of sale sufficient to transfer such Seller's right, title and interest in, to and under the Furnishings, Equipment and Motor Vehicles;

(ix)    duly executed deeds, certificates of title or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Personal Property;

#41102296 v8

(x)     duly executed deeds, certificates of title or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Inventory;

(xi)     duly executed assignments sufficient to transfer all of the Purchased Assets that are Assigned Contracts, Bonding Collateral or Permits, in each case, that may be transferred at Closing in accordance with applicable Law;

(xii)     duly executed deeds, certificates of title or assignments sufficient to transfer such Seller's right, title and interest in, to and under all of the Purchased Assets that are Intangible Property or Intellectual Property;

(xiii)    all documents reasonably necessary to deliver certificates of title, duly executed by Seller, or required to convey ownership of any motor vehicles or similar equipment constituting Purchased Assets;

(xiv)     all other agreements, documents, instruments, deeds, certificates or assignments required to be delivered by such Seller at or prior to the Closing pursuant to this Agreement.

(b)     Buyer shall deliver to, or on behalf of Seller the following:

(i)     the Cash Amount, net of the application of the Deposit;

(ii)     the Cure Costs required to be paid by Buyer in accordance with the terms hereof to the counterparties of the applicable Assigned Contracts;

(iii)     duly executed assumption agreements sufficient to assume the Assumed Liabilities; and

(iv)     all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to this Agreement.

**Section 5.3.     Possession**.  Right to possession of the Purchased Assets shall transfer to Buyer on the Closing Date.  Seller shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain occupation and control of the Purchased Assets, and shall also make available to Buyer at a location designated by Buyer at Closing the originals of all documents in Seller's actual possession that are required to be transferred to Buyer by this Agreement.

**Section 5.4.     Closing Date**.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.  Unless provided otherwise herein or agreed otherwise in writing by the Parties, documents delivered at the Closing shall be dated as of the Closing Date.

#41102296 v8

## ARTICLE 6
## CONDITIONS PRECEDENT TO CLOSING

**Section 6.1.**     **Conditions to Seller's Obligations**.  Seller's obligation to make the deliveries required of Seller at the Closing Date and otherwise consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing of each of the following conditions:

(a)     All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects, and Buyer shall have substantially performed or tendered performance of each material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing, and Seller shall have received a certificate by an officer of Buyer, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in this Agreement have been satisfied or waived by Buyer.

(b)     Buyer shall have tendered delivery of all items required to be delivered by Buyer under this Agreement.

(c)     No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Sale of the Purchased Assets, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction; and

(d)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 8 below and the Sale Order shall not have been stayed as of the Closing Date, except for any immaterial modifications, conditions or limitations which do not, individually or in the aggregate, adversely affect Seller.

**Section 6.2.**     **Conditions to Buyer's Obligations**.  Buyer's obligation to make the deliveries required of Buyer at the Closing and otherwise consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver , at or prior to the Closing, of each of the following conditions:

(a)     All of the representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects, and Seller shall have substantially performed or tendered performance of each and every covenant and agreement on Seller's part to be performed which, by its terms, is required to be performed at or before the Closing;

(b)     Buyer shall have received a certificate by officers of Seller, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in this Agreement have been satisfied or waived by Seller;

(c)     Seller shall have tendered delivery of all items required to be delivered by Seller under this Agreement;

(d)     No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to

#41102296 v8

restrain or prohibit the consummation of the transactions contemplated by this agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction;

(e)    The Bankruptcy Court shall have entered the Sale Order;

(f)    Since the date of this Agreement there shall have been no event, condition, change, development or other matter, or any worsening of any existing event, condition, change, development or other matter that, individually or in combination with any other event, condition, change, development or other matter or worsening thereof, has had or could reasonably be expected to have a Material Adverse Effect;

(g)    Seller shall have obtained the Required Consents, in form and substance reasonably satisfactory to Buyer or the Final Order obviating the need for such Required Consents;

## ARTICLE 7
## SELLER'S REPRESENTATIONS AND WARRANTIES

**Section 7.1.    Organization**.  Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware, and is duly qualified to do business as a limited liability company, and is in good standing under the Laws of each jurisdiction that requires such qualification as a consequence of the Business.

**Section 7.2.    Due Authorization, Execution and Delivery; Enforceability**. Subject to the entry of the Sale Order by the Bankruptcy Court, such Seller has the requisite organizational power and authority to enter into this Agreement and the other agreements contemplated hereby, and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery by such Seller of this Agreement, the performance by such Seller of its obligations hereunder and the consummation by such Seller of the transactions contemplated hereby have been duly authorized by all requisite organizational action.  This Agreement has been duly executed and delivered by such Seller and, subject to the entry of the Sale Order by the Bankruptcy Court, constitutes the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms.**No Conflicts; Consents**.  Except as set forth in Schedule 3.3, subject to the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance by such Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) conflict with or result in a violation or breach of any provision of its organizational documents, (b) conflict with or result in a violation or breach of any Governmental Order applicable to such Seller, or (c) require the consent of any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel, any Material Contract.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except (x) as set forth in Schedule 3.3, (y) entry of the Sale Order by the Bankruptcy Court,

-24-

and (z) such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

**Section 7.4.** **Assets.**

(a)     Schedules 2.1(a) through 2.1(v) are a true and complete list of the respective assets being sold to the Buyer;

(b)     Seller, as indicated on the applicable Schedules, owns an undivided interest in and to (i) the Owned Real Property set forth in Schedule 2.1(a), to which it has good record title, (ii) the Leased Real Property set forth in Schedule 2.1(b), to which it has a valid and enforceable leasehold or subleasehold interest, (iii) subject to the paramount title of the United States, the Owned Mining Claims set forth in Schedule 2.1(c), to which it has good record title, (iv) subject to the paramount title of the United States, the Leased Mining Claims set forth in Schedule 2.1(d), to which it has a valid and enforceable leasehold or subleasehold interest, (v) subject to the paramount title of the United States, the Mineral Claims set forth in Schedule 2.1(e), to which it has a valid and enforceable leasehold or subleasehold interest, (vi) the Water Rights set forth in Schedule 2.1(f), to which it has valid title or a valid leasehold interest, as applicable, and (vii) the Processing Facilities set forth in Schedule 2.1(g), to which it has a valid and enforceable interest, in each case, free and clear of all Claims except for Permitted Encumbrances.

(c)     The Purchased Assets represent all of the material assets and property used in carrying on the Business as they are currently conducted and constitute all assets that are necessary for the conduct of the Business in all material respects as they are currently conducted.  Except for Buyer under this Agreement, no Person has any written or oral agreement, option, understanding or commitment, or any right or privilege capable of becoming such for the purchase or other acquisition from Seller of any of the Purchased Assets, other than such rights that have been waived by such Person and other than with respect to Purchased Assets which are obsolete and which individually or in the aggregate do not exceed $500,000.All material assets, properties and rights used in the conduct of the Business are held solely by Seller, and all material Contracts, obligations, expenses and transactions relating to the Business have been entered into, incurred and conducted only by Seller.

(d)     Seller has not sold, assigned, transferred or conveyed any interest in the Purchased Assets, or any right, title or interest therein, to any Person other than the sale to Buyer contemplated hereby, and Seller have not created or consented to any Claim arising by, through or under Seller, other than Permitted Encumbrances and any Claim that will no longer burden any of the Purchased Assets following the entry of the Sale Order by the Bankruptcy Court.

(e)     With respect to the Owned Mining Claims held or used in connection with the Business, all required claim maintenance fees have been paid in the manner required by Law in order to maintain the Owned Mining Claims in good standing through the end of the current assessment year (inclusive of the Closing Date), and proof thereof has been properly and timely recorded and filed in accordance with Law, and with respect to the Leased Mining Claims, to the knowledge of Seller, all required claim maintenance fees have been paid in the manner required by Law in order to maintain the Leased Mining Claims in good standing through the end of the current assessment year (inclusive of the Closing Date), and proof thereof has been properly and timely recorded and filed in accordance with Law.

-25-

(f)     Schedule 2.3(v) set forth a list of all royalties on or burdening all or any portion of the Owned Real Property, Leased Real Property, Owned Mining Claims, Leased Mining Claims, whether such royalty is characterized as a net smelter return royalty, overriding royalty, net profit interest, gross proceeds royalty, production payment, streaming transaction, share of mineral production or otherwise.  Except as set forth on Schedule 2.3(v), the royalties set forth on Schedule 2.3(v) are fully paid and there is no liability for outstanding payment on any such royalty.

(g)     The Tangible Property that is material and used regularly in the conduct of the Business has been maintained in all material respects in the ordinary course consistent with standard industry practice, except where failure to so maintain would not result in a Material Adverse Effect.

(h)     No Affiliate of Seller owns or has any rights in or to any of the Purchased Assets or other properties or rights relating primarily to the Business.

**Section 7.5.     Material Contracts**.

(a)     Schedule 7.5(a) lists all of the Material Contracts.  Schedule 7.5(a) also lists or describes all material written contracts, arrangements, understandings or dealings, including with respect to the provision of any toll-processing or shared services, between Seller, Sky Mineral Partners or other non-arm's length party with respect to the Business or the Purchased Assets (it being acknowledged that these arrangements, understandings or dealings shall not be included in the Purchased Assets).

(b)     Except as disclosed in Schedule 7.5(b), each Material Contract is a legal, valid, binding and enforceable agreement of Seller (or Sky Mineral Partners), and is in full force and effect and will continue to be in full force and effect immediately following the Closing Date.

(c)     Schedule 7.5(c) sets forth Seller' estimate, based on reasonable inquiry, as of the date hereof, of the Cure Costs associated with each Assigned Contract.

**Section 7.6.     Legal Proceedings**.  Except for the Disclosed Litigation in Schedule 7.6, there are no actions, suits, claims or other legal proceedings pending, in each case before a Governmental Authority, or to Seller' knowledge threatened, against Seller relating to the Business, which would reasonably be expected to be material and adverse to Seller in connection with the Business or the Purchased Assets.

**Section 7.7.     Compliance with Laws; Permits**.

(a)     Except as disclosed in Schedule 7.7(a), Seller is in compliance with all Laws applicable to each of the Business, except where the failure to be in such compliance would not be expected to be material and adverse to Seller in connection with the conduct of the Business.

(b)     Schedule 7.7(b) sets forth the material Permits necessary for the operation of the Business as presently being conducted (the "Material Permits").  Except as set forth on Schedule 7.7(b), the Material Permits have been duly obtained and Seller is not in material default or material breach of any such Material Permit.

(c)      None of the representations and warranties contained in this <u>Section 7.7</u> shall relate to or be deemed to relate to environmental matters (which are governed exclusively by <u>Section 7.8</u>), employee matters (which are governed exclusively by <u>Section 7.9</u>), employee benefits matters (which are governed exclusively by <u>Section 7.10</u>), tax matters (which are governed exclusively by <u>Section 7.11</u>) or Intellectual Property matters (which are governed exclusively by <u>Section 7.12</u>).

**Section 7.8.      <u>Environmental and Health and Safety Matters.</u>**

(a)      To Seller' knowledge, the Seller, the Business and the Purchased Assets are in material compliance with all Environmental Laws and Health and Safety Laws, except where the failure to be in such compliance would not be expected to be material and adverse to Seller or the conduct of such Business, and, other than identified on <u>Schedule 7.8(a)</u> Seller has not received any Environmental Notice, Environmental Claim, Health and Safety Notice or Health and Safety Claim relating to the Business or the Purchased Assets, which either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)      <u>Schedule 7.8(b)</u> sets forth each of the material Environmental Permits necessary for the operation of the Business, each of which is in full force and effect.  Seller has obtained and is in material compliance with all Environmental Permits listed in <u>Schedule 7.8(b)</u>.

(c)      To Seller's knowledge, there has been no Release of Hazardous Materials in contravention of Environmental Laws or that would give rise to any material liability or response costs with respect to the Business or the Purchased Assets.

(d)      Seller has not entered into, and the Purchased Assets are not otherwise subject to (i) any consent decree, order, judgment or judicial order relating to compliance with Environmental Laws or Environmental Permits or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Materials, and no litigation is pending with respect thereto, or (ii) any environmental indemnification in connection with any threatened or asserted claim by any third party for any liability under any Environmental Law or relating to any Hazardous Materials.

(e)      Seller has not entered into, and the Purchased Assets are not otherwise subject to (i) any consent decree, administrative order, judgment or judicial order relating to compliance with Health and Safety Laws, or (ii) any indemnification in connection with any threatened or asserted claim by any third party for any liability under any Health and Safety Law.

**Section 7.9.      <u>Employees</u>**.  Seller is not a party to or bound by any collective bargaining agreement, nor has Seller experienced any strike or material grievance, claim of unfair labor practices, or other collective bargaining dispute within the past three (3) years. To Seller' Knowledge, there is no organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of Seller.  Seller is in compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to Seller' employees, except to the extent that any non-compliance would not result in a Material Adverse Effect.  With respect to the transactions contemplated by this Agreement, any notice required under any Law or collective bargaining agreement has been given, and all bargaining obligations with any employee representative have been, or prior to

-27-

the Closing Date will be, satisfied.  Seller is named as a defendant in a class action lawsuit filed in the Bankruptcy Court , which is captioned *Matthew Chenault, on behalf of himself and all others similarly situated v. CS Mining, LLC*, Adv. Pro. No. 16-02095-WTT, pursuant to which plaintiff alleges purported violations of the Worker Adjustment and Retraining Notification Act (29 U.S.C. § 2101, *et seq*., the "WARN Act") on behalf of himself and a putative class of purportedly similarly situated former employees of Debtor.  The representations and warranties set forth in this Section 7.9 are the exclusive representations and warranties made by Seller with respect to employee matters.

Section 7.10.   **Employee Benefits**.

(a)     Except as set forth in Schedule 7.10(a), Seller has not maintained, contributed to, or incurred any obligation or liability under or with respect to any (i) "defined benefit plan", as defined in section 3(35) of ERISA, or (ii) "multiemployer plan", as defined in section 3(37) or 4001(a)(3) of ERISA or section 414(f) of the Code, and there is no basis for any such liability.

(b)     Except as set forth in Schedule 7.10(b), Seller and their ERISA Affiliates have complied with COBRA.

(c)     The representations and warranties set forth in this Section 7.10 are the exclusive representations and warranties made by Seller with respect to employee benefits.

Section 7.11.   **Taxes**.

(a)     Except as set forth in Schedule 7.11(a), (i) all Taxes due and owing by Seller with respect to the Purchased Assets have been duly and timely paid in full, (ii) no Tax deficiencies are being proposed in writing or have been assessed by any Governmental Authority with respect to the Purchased Assets that remain outstanding or unsatisfied, (iii) there are no Tax liens on any of the Purchased Assets for which Seller would be responsible, other than liens for Taxes not yet due and payable, (iv) no federal, state, local or foreign audits or administrative or judicial proceedings are presently pending, or threatened in writing, with regard to any Taxes or Tax Returns with respect to the Purchased Assets, and (v) all Tax Returns required to be filed by Seller have been filed, and all such Tax Returns are true and correct in all material respects.

(b)     Seller is not a "foreign person" as that term is used in Treasury Regulations section 1.1445-2(b).

(c)     Seller has not entered into an agreement with any Governmental Authority requiring it to take action, or refrain from taking action, in order to secure Tax benefits not otherwise available.

(d)     The representations and warranties set forth in this Section 7.11 are the exclusive representations and warranties made by Seller with respect to Taxes.

Section 7.12.   **Intellectual Property**.

(a)     Schedule 2.1(n) lists each patent or registration that has been issued to a Seller with respect to its Intellectual Property, identifies each pending patent application or application for registration that Seller has made with respect to any of its Intellectual Property, and identifies each material Intellectual Property Contract.  Except as would not

-28-

have a Material Adverse Effect, Seller owns or has the right to use all Intellectual Property used or held for use in connection with the Business.  All required filings and fees related to Seller's Intellectual Property have been timely filed with and paid to the relevant Governmental Authorities.

(b)    Except as set forth in Schedule 7.12(b), to Seller' knowledge: (i) the conduct of the Business, each as currently conducted, does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any Person; and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property of Seller.

(c)    The Intellectual Property and the Intellectual Property licensed under the Intellectual Property Contracts, in each case set forth on Schedule 2.1(n), is all of the Intellectual Property necessary to operate the Business as presently conducted.

(d)    There are no actions, suits, claims or other legal proceedings pending, in each case before a Governmental Authority, or to such Seller's knowledge threatened: (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business or (ii) challenging the validity, enforceability, registrability or ownership of Seller's Intellectual Property.

(e)    The representations and warranties set forth in this Section 7.12 are the exclusive representations and warranties made by Seller with respect to Intellectual Property.

**Section 7.13.    Financial Advisors**.  Except for FTI Consulting, Inc. no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 7.14.    Reclamation Bonds**.  Schedule 7.14 sets forth a description of all surety instruments, bonds, letters of credit, guarantees and other instruments or arrangements securing or guarantying performance of obligations with respect to the operation, closure, reclamation or remediation of the Purchased Assets (collectively, the "Reclamation Bonds").  No Governmental Authority has claimed any deficiency with respect to, or called on, any Reclamation Bond.

**Section 7.15.    No Other Representations and Warranties**.  Except for the representations and warranties contained in this Article 7 (including the related portions of the Disclosure Schedules), Seller has not and no Affiliate or Representative of Seller, or any other Person, has made or makes any other express or implied representation or warranty, either written or oral, on behalf of any Seller, including any representation or warranty as to the accuracy or completeness of any information furnished or made available to Buyer and its Representatives (including any projections, information, documents or material made available to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business or any representation or warranty arising from statute or otherwise in law.

#41102296 v8

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

**Section 8.1.     Organization**.  Buyer is a _____ duly organized, validly existing and in good standing under the Laws of the State of _____.

**Section 8.2.     Due Authorization, Execution and Delivery; Enforceability**.  Buyer has the requisite company power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite company action.  This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**Section 8.3.     No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of the organizational documents of Buyer, or (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer.  No consent, approval, Permit, Governmental Order (other than in connection with the Chapter 11 Case), declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

**Section 8.4.     Financial Advisors**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 8.5.     Sufficiency of Funds**.  As of the date of this Agreement, Buyer has received an executed financing commitment dated the date of this Agreement (the "Commitment Letter") from _____, pursuant to which _____ has committed, subject to the terms and conditions set forth therein, to provide to Buyer financing (the "Financing") in cash in an aggregate amount set forth in the Commitment Letter, which Commitment Letter provides that Seller are third party beneficiaries thereof.  A true and complete copy of the fully executed Commitment Letter as in effect on the date of this Agreement has been provided to Seller.  As of the date of this Agreement, the Commitment Letter is valid and in full force and effect and enforceable in accordance with its terms against Buyer and each other party thereto, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar applicable Laws affecting or relating to creditors' rights and remedies generally and to general principles of equity.  There are no conditions precedent or other contingencies related to the Financing as contemplated by the Commitment Letter, other than as expressly set forth in the Commitment Letter, and none of the commitments contained in the Commitment Letter has been withdrawn or rescinded in any respect.  The aggregate proceeds of the Financing contemplated by the Commitment Letter together with the amount deposited pursuant to the Bid Procedures Order will be sufficient for Buyer to complete the transactions contemplated by this Agreement.  As of the date of this Agreement, there is no reason to believe that any of the conditions to the

-30-

Financing within Buyer's control will not be satisfied or that the Financing will not be available to Buyer on the Closing Date.  For the avoidance of doubt, none of the rights and obligations of the Parties, nor the transactions contemplated hereby, are subject to any term or condition providing that Buyer first obtain financing.

Section 8.6.    **Solvency**.  Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities), and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller.  In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 8.7.    **Legal Proceedings**.  There are no actions, suits, claims or other legal proceedings pending against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

Section 8.8.    **Independent Investigation**.  Buyer has conducted its own independent investigation, review and analysis of the each of the Business and the Purchased Assets.  Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied upon its own investigation and the express representations and warranties of Seller (including the related portions of the Disclosure Schedules), and (b) none of Seller, any Affiliate or Representative of Seller or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller.

Section 8.9.    **Financial Wherewithal.**  Buyer has the financial ability or financial commitments to pay all accounts required to be paid by Buyer under this Agreement.

Section 8.10.    **Approvals and Consents**.  No Consent by, or declaration, filing or registration with, any Governmental Body or any other Person is required to be made or obtained by Buyer in connection with the execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated under this agreement, except for Consents by, or declarations or filings with, the Bankruptcy Court.

Section 8.11.    **"AS IS" Transaction.**  Buyer hereby acknowledges and agrees that, except only as expressly provided in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets, including, without limitation, the transferability of the Purchased Assets or any portion thereof, any Assumed Liabilities or the Assigned Contracts, the merchantability or fitness of the Furnishings and Equipment, the Inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof.  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.  Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Buyer deemed necessary or appropriate and that in proceeding with the Contemplated Transactions,

-31-

except for the representations set forth in this Agreement.  Buyer is purchasing the Purchased Assets based upon this Agreement and such independent inspections and investigations. Accordingly, except only for the express representations set forth in this Agreement, Buyer will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

## ARTICLE 9
## COVENANTS

**Section 9.1.**     **Conduct of Business Prior to the Closing**.  From the date hereof until the Closing:

(a)     Seller shall use its commercially reasonable efforts to:

(i)     conduct the Business in the Ordinary Course of Business;

(ii)     maintain and preserve intact the current organization, business and franchise of the Business and to preserve the rights, franchises, goodwill and relationships of the customers, lenders, suppliers, regulators and others having business relationships with the Business;

(iii)     pay all Taxes when due with respect to the Purchased Assets required to be paid by any Seller and not allow the Purchased Assets to become subject to a lien for Taxes required to be paid by any Seller, other than for Taxes not yet due and payable;

(iv)     maintain insurance on the assets used in the conduct of the Business;

(v)     pay all post-Relief Date royalties, claim fees, lease payments and any other property payments on all properties when due; and

(b)     except (i) as expressly required or permitted by this Agreement, (ii) as required pursuant to applicable Laws, (iii) as consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), or (iv) as required to respond reasonably and prudently to an emergency or disaster (including the right to take forthwith any action required to insure the safety and integrity of the Business), Seller shall not:

(i)     acquire any business, other than acquisitions with a purchase price that exceeds $50,000; in the aggregate;

(ii)     sell, transfer, dispose of, lease, encumber, relinquish or abandon any of the Purchased Assets, except (A) with respect to Tangible Property, sales and other dispositions in the Ordinary Course of Business or (B) sales, transfers or dispositions of Tangible Property that do not exceed $25,000 in the aggregate (excluding those sales described in clause (A));

(iii)     enter into any Contract that would reasonably be likely to become an Assigned Contract;

(iv)    incur any indebtedness for borrowed money that will constitute an Assumed Liability other than short-term indebtedness, letters of credit or sureties in the Ordinary Course of Business;

(v)    make any loans or advances that will be a Purchased Asset to any Person or assume or guarantee the liabilities of any Person that will constitute an Assumed Liability other than in the Ordinary Course of Business;

(vi)    settle, offer or propose to settle, compromise, assign or release any material proceeding brought against such Seller in respect of or in connection with the Business or the Purchased Assets;

(vii)    enter into any agreement creating a joint venture or partnership or effecting a business combination or other similar arrangement with another Person in respect of the Business or the Purchased Assets;

(viii)    amend, modify or terminate the Reclamation Bonds; and

(ix)    attempt or agree to do any of the foregoing matters listed in clauses (i) through (viii) above.

**Section 9.2.    Access to Information**.  From the date hereof until the Closing, Seller shall: (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business or the Purchased Assets, (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business or the Purchased Assets as Buyer or any of its Representatives may reasonably request, and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Purchased Assets and the Business; provided, however, that any such investigation shall be conducted at Buyer's sole risk and at Buyer's sole cost and expense during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel, in compliance with all of Seller's health, safety and environmental regulations and procedures, and in such a manner as not to interfere with the normal operations of the Business.  Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would, in Seller's discretion: (x) cause significant competitive harm to Seller and/or the Business if the transactions contemplated by this Agreement are not consummated, (y) jeopardize any attorney-client or other privilege, or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement.  Prior to the Closing, without the prior written consent of Seller, Buyer shall not contact any suppliers to, or customers of, the Business, and Buyer shall have no right to perform invasive or subsurface investigations of any properties.  Buyer shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 9.2.

**Section 9.3.    Notice of Certain Events**.  Seller and Buyer agree that, subject to applicable Law, each shall provide the other prompt notice in writing of:

(a)    any notice or communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

#41102296 v8

(b)     any material notice or communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

(c)     any material proceeding commenced or threatened against it which relates to the consummation of the transactions contemplated by this Agreement, other than the Chapter 11 Case;

(d)     any failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied under this Agreement;

(e)     any changes in the terms of the insurance policies covering any of the assets used in the conduct of the Business; and

(f)     and copies of all documents related thereto, provided that the giving of any such notice shall not in any way change or modify the representations and warranties of the parties or the conditions in their favor contained in this Agreement or otherwise affect the remedies available to Seller and Buyer under this Agreement.

Section 9.4.     **Confidentiality**.  Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 9.4 shall nonetheless continue in full force and effect.  Notwithstanding the foregoing provisions of this Section 9.4, the parties hereto agree and acknowledge that (a) this Agreement and any and all schedules, exhibits and other ancillary documents may be disclosed to third parties and filed with the Bankruptcy Court in connection with the Chapter 11 Case and Seller's efforts to obtain entry of the Sale Order by the Bankruptcy Court and (b) such provisions shall not be construed to prohibit or restrict any party hereto or its Affiliates from making disclosures required by, or in connection with, applicable Laws or stock exchange requirements, rules or regulations.

Section 9.5.     **Governmental Approvals and Other Third-Party Consents**.

(a)     Each Party hereto shall, as promptly as possible, use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement, except for consents, authorizations, orders and approvals with respect to Permits that cannot be obtained until after the Closing.  Each Party shall reasonably cooperate with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.  The Parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)     With respect to the Permits, Buyer will meet with the relevant state and federal agencies with respect to the modification, transfer, replacement or reissuance, as applicable, of such Permits, which shall occur following Closing.  Each party shall use commercially reasonable efforts to cause the modification, transfer, replacement or reissuance, as applicable, of the Permits promptly following Closing, provided that Seller shall not be obligated to pay any consideration in connection therewith and/or to incur any

-34-

third party expenses or reimbursement obligations to Buyer in doing so.  Following the Closing, Seller shall, to the extent permitted by Law, maintain each Permit (each a "Transition Permit") in full force and effect until each such Permit has been modified, transferred, replaced or reissued, as applicable, and Seller shall allow Buyer to own, use, develop and operate the Purchased Assets under each such Transition Permit until such time as each such Transition Permit has been modified, transferred, replaced or reissued, as applicable, provided that Seller shall not be obligated to pay any consideration in connection therewith and/or to incur any third party expenses or reimbursement obligations to Buyer in doing so.  Following the Closing, if Seller receives a notice of violation or of any other Loss under any Transition Permit prior to the transfer or reissuance of such Transition Permit, which is based substantially on or arises substantially out of the activities or operations of Buyer after Closing, Seller will promptly notify Buyer, and Buyer shall be responsible for contesting or curing such violation and for any Loss, obligation or liability associated therewith.  Buyer shall indemnify Seller for any obligations or liabilities associated with any such notice of violation of a Transition Permit or Loss related thereto following Closing; provided that Seller is using commercially reasonable efforts to cause the modification, transfer, replacement or reissuance, as applicable, of the Permits.

(c)     Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents or waivers from, all third parties that are described in this Agreement.

**Section 9.6.     Books and Records**.

(a)     In order to facilitate the resolution of any claims made against or incurred by any Seller prior to the Closing, or for any other reasonable purpose, for a period of seven (7) years after the Closing, Buyer shall: (i) retain the Books and Records (including personnel files) of each of the Business relating to periods prior to the Closing in accordance with Buyer's document retention policies, and (ii) upon reasonable notice, afford the Representatives of such Seller reasonable access (including the right to make, at such Seller's expense, photocopies), during normal business hours, to those portions, and only those portions, of such Books and Records as relate to the Purchased Assets prior to Closing and, if required by Buyer, subject to such Seller executing a non-disclosure agreement with respect to such information, in form and substance acceptable to the parties, acting reasonably.

(b)     Buyer shall not be obligated to provide Seller with access to any books or records (including personnel files) pursuant to this Section 9.6 where such access would violate any Law.

**Section 9.7.     Closing Conditions**.  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in this Agreement for which it is responsible.

**Section 9.8.     Public Announcements**.  Seller and Buyer shall consult with each other prior to issuing any press releases or otherwise making public statements with respect to this Agreement or the transactions contemplated by this Agreement and, to the extent practicable, shall provide the other parties with an opportunity to review and comment on all such press releases or statements prior to the release thereof.  To the extent that any such press release or public statement is required by applicable Law, by a rule of a stock exchange on which a party's shares (or those of any of its Affiliates) are listed or traded or by a

Governmental Authority, the press release or public announcement shall, to the extent practicable, be issued or made after consultation with the other parties and taking into account the other parties' comments, <u>provided</u> that such consultation does not, and reasonably would be expected not to, cause non-compliance with any such Law or rule. If such advance consultation is not reasonably practicable or legally permitted, to the extent permitted by applicable Law, the disclosing party shall provide the other parties with a copy of any written disclosure made by such disclosing party as soon as practicable thereafter.

**Section 9.9.    Further Assurances**.  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to vest title to the Purchased Assets in Buyer, carry out the provisions hereof and give effect to the transactions contemplated by this Agreement, in each case, at the sole cost and expense of the requesting party.  Without limiting the generality of the foregoing, during the thirty (30) day period following the Closing, Buyer shall afford the Representatives of each Seller reasonable access, during normal business hours, to Buyer's property for the purpose of recovering and/or removing any of the Excluded Assets remaining on such property.

**Section 9.10.    Taxes**.

    (a)    **Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any real property transfer Tax and any other similar Tax) (all such Taxes collectively, "<u>Transfer Taxes</u>") shall be borne and paid by Buyer when due.  Buyer shall, at its own expense, timely file any Tax Return with respect to Transfer Taxes (and Seller shall cooperate with respect thereto as necessary).  Each of Buyer and Seller agree to timely sign and deliver (or to cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes.

    (b)    **Tax Cooperation**.  Seller, on the one hand, and Buyer, on the other hand, agree to furnish or cause to be furnished to the other, upon written request, such information and assistance as is reasonably necessary (i) for the filing of any Tax Return with respect to the Purchased Assets or otherwise relating to any of the payments to be made pursuant to this Agreement with respect to Taxes, (ii) for the preparation for any audit or responding to any information document requests (or other requests for information, materials or documents) in connection with any Tax audit with respect to the Purchased Assets, and (iii) for the prosecution or defense of any Tax claim relating to any Tax adjustment or proposed Tax adjustment with respect to the Purchased Assets.  Such assistance shall include making employees available on a mutually convenient basis to provide additional information and explanations of any material provided hereunder.  Buyer and Seller shall retain all books and records of each of the Business with respect to Taxes for a period of at least seven (7) years following the Closing.

**Section 9.11.    Assumption of Reclamation Bonds**.  At least fifteen (15) days prior to Closing, Buyer shall deliver to Seller evidence that Buyer has, subject only to Closing, (a) assumed or replaced all of Seller's and its Affiliates' obligations under the Reclamation Bonds and all obligations relating to the Reclamation Bonds and any liabilities related thereto, other than the payment of any premium or other amounts due under the Reclamation Bonds arising prior to the Closing Date and (b) obtained the full and

-36-

unconditional release of Seller and its Affiliates from all obligations relating to the Reclamation Bonds and any liabilities related thereto, other than the payment of any premium or other amounts due under the Reclamation Bonds arising prior to the Closing Date, and, in each case, has received all consents, approvals and authorizations required in connection with the foregoing.

**Section 9.12.    Designated Employees**.  From the date hereof until the Closing, Seller shall provide reasonable access to Buyer during normal business hours to the Designated Employees as identified on <u>Schedule 9.12</u> in order that Buyer may assess any such Designated Employee and determine whether it intends to make an offer of employment (each an "<u>Offer</u>") to any such Designated Employee on terms and conditions satisfactory to Buyer in its discretion.  Upon Buyer making a final determination to make an Offer to any such Designated Employee, it will provide written notice to Seller, not later than ten (10) days prior to the Closing, that it intends to make an Offer or Offers and the terms and conditions in respect of any such Offers.  Upon written notice being provided by Buyer to Seller and upon consent from Seller, acting reasonably, Buyer shall be entitled to make an Offer to any such Designated Employee on the Closing Date.

**Section 9.13.    Nature of Transaction**.  Subject to the terms of the Sale Order, Seller are selling, and Buyer is acquiring, the Purchased Assets "as is", "where is" and with all faults, limitations and defects (hidden and apparent) and subject only to the representations and warranties contained in Article 8, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for Buyer's intended use or a particular purpose or any use or purpose whatsoever.  Further, except as set forth in this Agreement, neither Seller nor any director, officer, manager, employee, agent, consultant, or Representative of Seller have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Buyer and Seller further acknowledge that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms'-length negotiation.  Buyer has relied, and shall rely, solely upon its own investigation of all such matters and the representations, warranties and covenants contained in <u>Article 8</u>.  Following the Closing, each of the parties hereto hereby agrees and acknowledges that (a) the parties hereto hereby disclaim all Losses and responsibility for any representation or warranty (including any representation or warranty set forth in <u>Article 8</u> or any express or implied warranty, any warranty as to accuracy or completeness or any warranty as to fitness for a particular purposes), omission, agreement, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to any other party hereto or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided, directly or indirectly (including on or by access to any online data room), to any other party hereto or its Affiliates or Representatives by any director, officer, manager, employee, agent, consultant, or Representative of such party); (b) Seller makes no representations or warranties to Buyer regarding the probable success,

-37-

profitability or value of any of the Purchased Assets; and (c) no party hereto shall have any liability with respect to, and no party hereto shall be permitted nor shall it assert any indemnification claim, liability or Loss with respect to, the foregoing matters, whether pursuant to this Agreement, common law, or otherwise.

**Section 9.14.    Supplements to Schedules**.  Prior to the Closing Date, Seller shall have the right from time to time to supplement, modify or update the Disclosure Schedules upon written notice to Buyer; provided, however, that no such supplement, modification or update shall be deemed to supplement, modify or update the Disclosure Schedules unless Buyer shall have consented thereto in writing.

**Section 9.15.    Bankruptcy Matters**.

(a)    **Bidding Procedures Order**.  Pursuant to the Bidding Procedures Order, Seller is authorized, among other things, to conduct a competitive Sale Process and solicit bids for the sale and purchase of substantially all of its assets or any portion thereof, and, in the event more than one qualified bid is received for any assets of Seller in accordance with such approved procedures, Seller will conduct an auction for such assets.  This Agreement and transactions contemplated hereby are subject to the Bidding Procedures Order and the approved Sale Process, any auction conducted in connection with such approved Sale Process, and the ultimate selection of this Agreement and the transactions contemplated hereby by the Debtor as the highest and best bid for the Purchased Assets following the completion of the approved sale process and auction.

(b)    [**Stalking Horse Designation**.  Pursuant to the Bid Procedures Order, Seller hereby designates Buyer as a stalking horse purchaser (the "Stalking Horse") with the respect to the Purchased Assets and will file a Stalking Horse Notice with the Bankruptcy Court as soon as practicable following the execution of this Agreement disclosing such designation and the Stalking Horse Protections authorized pursuant to the Bidding Procedures Order.]

(c)    **Stalking Horse Protections**.  Pursuant to the Bid Procedures Order, Seller hereby grants Buyer the following stalking horse protections (the "Stalking Horse Protections") to the extent authorized by the Bid Procedures Order:

(i)    **Expense Reimbursement Fee**.  Seller shall pay to Buyer cash in an amount equal to $250,000 (the "Expense Reimbursement Fee") only in the event that Seller consummate a sale or transfer of all or any material portion of the Purchased Assets in a single transaction or a series of related or unrelated transactions to one or more third parties whose bid(s) was or were (A) selected by the Debtor as higher and better through the approved Sale Process pursuant to the Bidding Procedures Order and (B) approved by the Bankruptcy Court.  In the event that the Expense Reimbursement Fee is payable pursuant to the preceding sentence, (1) the Expense Reimbursement Fee shall be paid out of the cash sale proceeds received from a sale of Purchased Assets to such third party, and (2) no lien of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement Fee.  If the Expense Reimbursement Fee becomes due and payable, it shall be paid to Buyer within fourteen (14) days of the Closing of the higher and better transaction(s), and shall be treated as an allowed administrative expense claim in the Bankruptcy Cases.  The obligation to pay the Expense Reimbursement Fee shall be subject to (x) the Carve-Out (as defined in the Final DIP Financing Order) and (y) shall be senior to all liens, security interests, superpriority claims and other forms of adequate protection granted

-38-

pursuant to the Final DIP Financing Order.  The provisions of this <u>Section 9.15(c)(i)</u> shall survive any termination of this Agreement.  If the Expense Reimbursement Fee becomes due and payable, the Expense Reimbursement Fee and expense reimbursement shall constitute Buyer's liquidated damages and shall be Buyer's sole and exclusive remedy.

(ii)      **Bidding Increments**.  In the event more than one qualified bid is received by Seller in accordance with the procedures approved by the Bid Procedures Order for the Purchased Assets or any portion thereof, and an auction is held with respect to the Purchased Assets or any portion thereof, bids during the auction must be in increments of at least One Hundred Thousand Dollars ($100,000) greater than the existing bid for such assets, with the first such bid having to (A) include cash in an amount equal to the Expense Reimbursement Fee and amount required to be paid as expense reimbursement under this Agreement, plus (B) an overbid of at least One Hundred Thousand Dollars ($100,000).

(d)      **Compliance**.

(i)      Seller shall comply with all of the obligations under the Sale Order (after the entry of such Governmental Order by the Bankruptcy Court).

(ii)      Seller shall use efforts to comply with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement.  Seller shall serve a copy of this Agreement, Bidding Procedures Order, and exhibits thereto on (i) the Office of the U.S. Trustee; (ii) counsel for Final DIP Lenders; (iii) counsel for Committee; (iv) known parties having asserted an Interest in the Purchased Assets; (vii) any other parties known by Debtor to have expressed an interest in a transaction with respect to all or part of the Purchased Assets; and (viii) parties having requested notices pursuant to Bankruptcy Rule 2002.

(iii)      Seller shall serve the Cure Notice on counterparties to the Assigned Contracts in accordance with the Bidding Procedures Order.

(e)      **Environmental Matters**.  Nothing in the Sale Order or this Agreement releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to any Governmental Authority that any Person would be subject to as the owner or operator of the Purchased Assets after the Closing Date.  Nothing in the Sale Order shall authorize the transfer or assignment to Buyer of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy Law governing such transfers or assignments.  Notwithstanding the foregoing sentence, nothing in the Sale Order shall: (A) be interpreted to deem Buyer as the successor to the Debtor under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the Closing Date or for liabilities relating to off-site disposal of waste by the Debtor prior to the Closing Date; (B) create for any Governmental Authority any substantive right that does not already exist under Law; or (C) be deemed or construed to be an admission of liability by the Debtor. Nothing in the Sale Order shall be construed to guarantee that any Water Right is in good standing or otherwise bind the State of Utah Division of Water Resources and the Utah State Engineer to any interpretation of the terms and conditions of any Water Right which conflict with the official records maintained by the State of Utah Division of Water Resources with respect to each Water
Right permit.

#41102296 v8

(f)     **Sale Order**.  This Agreement and the transactions contemplated hereby are contingent upon and subject to Buyer (i) being selected as the highest and best bid for the Purchased Assets following the conclusion of the approved bidding and auction process and (ii) receiving approval of the Bankruptcy Court through the entry of a Sale Order. The Sale Order shall be in a form reasonably acceptable to the Parties and in substantially the form attached hereto as **Exhibit A**, authorizing and approving, among other things, (a) the sale, transfer and assignment of the Purchased Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Claims (except for Permitted Encumbrances), (b) the assumption and assignment of the Assigned Contracts in connection therewith and (c) that Buyer is a "good faith" purchaser entitled to the protections of Bankruptcy Code section 363(m).

(i)     If the Sale Order is appealed, Buyer and Seller shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

(g)     Each Seller further covenants and agrees that the terms of any plan of reorganization or liquidation, or any order of dismissal, submitted to the Bankruptcy Court by such Seller shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

**Section 9.16.     Assignment of Rights**.  If, in connection with the auction or sale referred to in the Sale Procedures Order, Seller or any of its Affiliates enter into confidentiality or similar agreements with any Person, Seller shall assign all rights under those agreements to the extent relating to the Business to Buyer at the Closing.

**ARTICLE 10**
**TERMINATION**

**Section 10.1.     Termination by the Parties**.  This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer by written notice to Seller if:

(i)     the Closing has not occurred on or prior to January 31, 2017 or such other date that may be extended by the mutual agreement of the Buyer and Seller (the "Drop Dead Date"), except that the right to terminate this Agreement under this Section 10.1(b)(i) shall not be available to Buyer if Buyer's failure to fulfill any of Buyer's covenants or obligations or if the breach of any of Buyer's representations and warranties under this Agreement, as applicable, has been the cause of, or resulted in, the failure of the Closing to occur by the Drop Dead Date;

(ii)     any of the conditions set forth in Articles 6, 7 or 8 shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that Buyer is not then in breach of this Agreement so as to cause any of the conditions in Articles 6, 7 or 8 not to be satisfied;

-40-

(iii)    the Sale Order, once entered, is changed in a manner that is materially adverse to Buyer without the consent of Buyer in its sole discretion; or

(iv)    Seller seeks to have the Bankruptcy Court enter an order dismissing the Chapter 11 Case of such Seller or converting it to a case under chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Chapter 11 Case of Seller or converting the Chapter 11 Case of Seller to a case under chapter 7 of the Bankruptcy Code, or appoints a trustee in Seller's Chapter 11 Case or an examiner with enlarged powers relating to the operation of such Seller's Business, and such dismissal, conversion or appointment is not reversed or vacated within three (3) Business Days after the entry thereof; or

(c)    by Seller by written notice to Buyer if:

(i)    the Closing has not occurred on or prior to the Drop Dead Date, except that the right to terminate this Agreement under this Section 10.1(c)(i) shall not be available to Seller if the failure of any Seller to fulfill any of its covenants or obligations or if the breach of any of its representations and warranties under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur by the Drop Dead Date;

(ii)    any of the conditions set forth in Articles 6, 7 or 8 shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that Seller is not then in breach of this Agreement so as to cause any of the conditions in Articles 6, 7 or 8 not to be satisfied;

(iii)    the board of managers of Seller shall have determined in good faith, after considering applicable Law and consulting with outside counsel, that such termination is required by its fiduciary obligations under applicable Law; or

(iv)    Seller consummates a sale or transfer of all or a material portion of the Purchased Assets to a third party whose bid was (A) selected by the Seller as a higher and better bid through the approved sale and auction process pursuant to the Bid Procedures Order and (B) approved by the Bankruptcy Court;

(d)    by Buyer or Seller in the event that:

(i)    any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or causing the transactions contemplated by this Agreement to be rescinded following completion thereof, and such Governmental Order shall have become permanent, final and non-appealable;

(ii)    there shall be enacted or made applicable any Law that makes the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(iii)    a court issues a final non-appealable order that prevents Seller from selling the Purchased Assets to Buyer.

**Section 10.2.    Effect of Termination**.

(a)    In the event of the termination of this Agreement pursuant to Section 10.1(a) or (c), except as provided in Section 10.2(d), this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto.

-41-

(b)     Notwithstanding the termination of this Agreement by Buyer pursuant to Section 10.1(b), if the event giving rise to the right of termination is a result of an intentional breach of covenant, representation or warranty by Seller, then Seller shall reimburse Buyer for expenses actually incurred by Buyer in connection with negotiating and documenting the purchase and sale of the Purchased Assets, provided that Seller shall not be required to reimburse Buyer for any expenses incurred by Buyer in excess of One Hundred Fifty Thousand and no/100 Dollars ($150,000).

(c)     Notwithstanding the termination of this Agreement by Seller pursuant to Section 10.1(c), if the event giving rise to the right of termination is a result of an intentional breach of covenant, representation or warranty by Buyer, then Buyer shall reimburse each Seller for expenses actually incurred by such Seller in connection with negotiating and documenting the purchase and sale of the Purchased Assets, provided that Buyer shall not be required to reimburse Seller for any expenses incurred by Seller in excess of One Hundred Fifty Thousand and no/100 Dollars ($150,000).

(d)     Notwithstanding any other provisions of this Agreement, if this Agreement is terminated (whether by a party or automatically or otherwise), the provisions of Section 9.4 subject to any time limitations referred to therein) shall survive such termination and remain in full force and effect, along with any other provisions of this Agreement which expressly or by their nature survive the termination hereof.

## ARTICLE 11
## MISCELLANEOUS

**Section 11.1.    Survival**.  Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall expire and be of no further force and effect as of the Closing and no party hereto shall thereafter have any liability whatsoever with respect thereto; provided, however, that the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the parties hereto following the Closing shall survive in accordance with their respective terms.  Following the Closing Date with respect to the representations, warranties, and agreements contained in this Agreement or in any instrument delivered pursuant to this Agreement and, with respect to the covenants contained in this Agreement or in any instrument delivered pursuant to this Agreement, following the applicable survival date of such covenant, such representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall terminate and be of no further force or effect and no party hereto shall have any liability with respect thereto.

**Section 11.2.    Expenses**.  Except as otherwise expressly provided herein all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 11.3.    Notices**.  All notices, requests, consents, claims, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt), (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if

#41102296 v8

sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (d) when received by the addressee if mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 11.3</u>):

| | |
|---|---|
| If to Seller: | FTI Consulting, Inc. |
| | Attn: David Beckman, CRO of CS Mining, LLC |
| | 1001 17th St #1100 |
| | Denver, CO 80202 |
| | Email:  <u>dave.beckman@fticonsulting.com</u> |
| | |
| with a copy to: | Pepper Hamilton LLP |
| | Attn:  Donald J. Detweiler, Esq. |
| | Hercules Plaza, Suite 5100 |
| | 1313 N. Market Street |
| | Wilmington, DE 19801 |
| | Email:  <u>detweilerd@pepperlaw.com</u> |

If to Buyer:

with a copy to:

**Section 11.4.**   **Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation", (b) the word "or" is not exclusive, and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein: (i) to Articles and Sections mean the Articles and Sections of this Agreement, (ii) to Schedules mean the Schedules attached to the Disclosure Schedules, (iii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof, and (iv) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  Each of the individuals executing this Agreement and any agreement, document or instrument related hereto is doing so on behalf of the applicable entity, in his or her capacity as an authorized representative of such entity, and is not doing so in his or her individual capacity.

**Section 11.5.**   **Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 11.6.**   **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto or invalidate or render unenforceable such term or provision in any other jurisdiction.

#41102296 v8

**Section 11.7.    Entire Agreement**.  This Agreement and the Confidentiality Agreement constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

**Section 11.8.    Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Buyer may, upon written notice to Seller, assign any or all of its rights and obligations hereunder to one or more wholly-owned subsidiaries of Buyer.  No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 11.9.    No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 11.10.    Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 11.11.    Governing Law; Submission to Jurisdiction; Venue**.  This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Laws of the State of Utah, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code.  With the exception of any appeals, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

**Section 11.12.    Specific Performance**.  The Parties hereby agree that irreparable damage would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages.  Accordingly, the Parties acknowledge and hereby agree that in the event of any breach or threatened breach by any party of any of its covenants or obligations set forth in this Agreement, the other Party

-44-

shall be entitled to injunctive relief to prevent or restrain breaches or threatened breaches of this Agreement by the other, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other under this Agreement. Each of the Parties hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches or threatened breaches of this Agreement by it, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of the other parties under this Agreement.

Section 11.13.   **Limitation on Damages**.  In no event shall any Party be liable to any other Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement or diminution of value or any damages based on any type of multiple.

Section 11.14.   **Disclosure Schedules**.  The information in the Disclosure Schedules constitutes exceptions or qualifications to representations and warranties of each Seller as set forth in this Agreement.  Any disclosure made in the Disclosure Schedules shall be deemed to be disclosures made with respect to all representations and warranties contained in this Agreement to the extent reasonably apparent on their face, regardless of whether or not a specific cross-reference is made thereto.  No disclosure on the Disclosure Schedules relating to a possible breach or violation of any contract or Law shall be construed as an admission or indication that a breach or violation exists or has actually occurred.  Capitalized terms used in the Disclosure Schedules that are not defined therein shall have the meaning given them in this Agreement.

Section 11.15.   **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

-45-