David Leta (1937)
Troy Aramburu (10444)
Jeff Tuttle (14500)
**SNELL & WILMER L.L.P.**
15 W South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: 801-257-1900
Facsimile: 801-257-1800
Email: dleta@swlaw.com
         taramburu@swlaw.com
         jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)
Francis J. Lawall, Esq. (admitted *pro hac vice*)
Joanna J. Cline (admitted *pro hac vice*)
**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 656-8865
E-mail: detweild@pepperlaw.com
         lawallf@pepperlaw.com
         clinej@pepperlaw.com

*Counsel for CS Mining, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

In re **CS MINING, LLC**

         Debtor

Bankruptcy Case No. 16-24818

(Chapter 11)

Judge William T. Thurman

Adv. Pro. No.: 17-02024

## MOTION PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019
## TO APPROVE SETTLEMENT AGREEMENT BY AND BETWEEN
## CS MINING, LLC AND DAVID J. RICHARDS, LLC
## D/B/A WESTERN US MINERAL INVESTORS, LLC

CS Mining, LLC ("Debtor"), by and through its undersigned counsel, hereby files

this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Settlement Order"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United States Code (11

U.S.C. §§ 101 *et seq.* as amended, the "Bankruptcy Code"), approving that certain Settlement

Proposal and Settlement Agreement by and between Debtor and David J. Richards, LLC d/b/a

Western US Mineral Investors, LLC, an Ohio Limited Liability Company ("WUMI" and

collectively with Debtor, "Parties") attached hereto as **Exhibit B** (the "Settlement Proposal") and

**Exhibit C** (the "Settlement Agreement").  In support of this Motion, Debtor respectfully states as

follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      By this Motion, Debtor seeks approval of the Settlement Proposal and Settlement

Agreement, which, if approved, will resolve on a full and final basis: (i) the claims asserted by

Debtor against WUMI in the adversary proceeding captioned *CS Mining, LLC v. David J.*

*Richards, LLC d/b/a Western US Minerals, Inc.*, Adv. P. No. 17-02024 (the "WUMI Adversary

Proceeding"); as well as, (ii) the secured claims asserted by WUMI against Debtor in proof of

claim number 61 (the "Proof of Claim").

2.      The Settlement Proposal and Settlement Agreement are the product of arm's

length negotiations and, if approved:  (i) resolves a significant prepetition secured claim asserted

against Debtor; (ii) provides for the payment of $1,000,000 (the "Cash Consideration") to

Debtor's estate; and (iii) subordinates the collateral (the "WUMI Collateral") securing WUMI's

first priority secured liens and claims to certain other claims in Debtor's bankruptcy case [*i.e.* the

post-petition lenders' ("the DIP Lenders") liens and claim, the "Other Prepetition Liens" defined

in the *Final DIP Financing Order* (Docket No. 505)*,* the administrative claims allowed in the

Bankruptcy Case, the "Completion Fee" due and payable to Debtor's Chief Restructuring

Officer, FTI Consulting, and the $1,000,000 Cash Consideration].

3.      The Settlement Proposal and Settlement Agreement further resolve, in full, all

claims by and between Debtor and WUMI.  The Settlement Proposal and Settlement Agreement

-2-

does not release or resolve any direct or individual claims Debtor may hold against any
individual participants, directors or officers of WUMI.  Nor does they release or resolve any
derivative claims (*i.e.* breach of fiduciary duty claims Debtor may hold against its own directors
or officers).

4.      Under the circumstances present here, including the cost and expense of the
WUMI Adversary Proceeding and the continuing drain on estate resources, Debtor, in the
exercise of its business judgment and fiduciary duties, has determined that entry into the
Settlement Proposal and Settlement Agreement are fair and equitable and in the best interest of
Debtor's estate.

5.      More importantly, Debtor respectfully submits that the Settlement Proposal and
Settlement Agreement fall well within the "range of reasonableness" given the (i) the probability
of success in the litigation; (ii) the difficulties associated with collection; (iii) the complexity of
the litigation, and attendant expense, inconvenience and delay; and (iv) the paramount interests
of creditors.

6.      As such, Debtor respectfully requests that the Settlement Proposal and Settlement
Agreement be approved by the Bankruptcy Court.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and
157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding
pursuant to 28 U.S.C. § 157(b)(2)(O).

## RELEVANT BACKGROUND

a)      **The Bankruptcy Case**

8.      On August 4, 2016 (the "Relief Date"), the Court entered the Order for Relief
(Docket No. 130) under chapter 11 of title 11 of the Bankruptcy Code.  Debtor continues to

-3-

operate its business and manage its properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

**b)     WUMI's Prepetition Loan**

9.      WUMI is a pre-petition lender and in connection therewith, on February 15, 2017, timely filed the Proof of Claim (Claim No. 61) in Debtor's above-captioned bankruptcy case (Case No. 16-24818, the "Bankruptcy Case").  Pursuant to the Proof of Claim, WUMI asserts a secured claim in the amount of $24,926,036.00 against Debtor's bankruptcy estate.  (**Exhibit D**.)

**c)     Debtor's Adversary Action Against WUMI**

10.     On February 17, 2017, Debtor filed its complaint (the "Complaint," WUMI Adversary Proceeding Docket No. 1, **Exhibit E**) against WUMI, which initiated the WUMI Adversary Proceeding.

11.     The Complaint challenges the nature, extent, validity and priority of WUMI's secured claims against Debtor's bankruptcy estate, including the secured claims asserted in the Proof of Claim, and seeks certain affirmative recoveries.

12.     WUMI has answered the Complaint and vigorously opposes the relief sought through the WUMI Adversary Proceeding.

13.     Parties have engaged in discovery and after extensive discussions and desire to resolve and compromise the claims asserted in the WUMI Adversary Proceeding and Proof of Claim on a full, final and consensual basis on the terms set forth in the Settlement Agreement, subject to approval by the Bankruptcy Court.

**d)     The Adversary Actions Filed Against WUMI**

14.     On July 21, 2016 Waterloo Street Limited ("Waterloo") and PacNet Capital (US) Limited ("PacNet") filed a complaint initiating the adversary proceeding captioned *PacNet*

*Capital (US) Limited and Waterloo Street Limited v. David Richards, LLC, Western US Mineral*

*Investors, Skye Mineral Investors, LLC, David J. Richards, Clarity Copper, LLC, Clinton C.*

*Walker, and David C. McMullin*, Adv. P. No. 16-24818 (the "Waterloo Adversary Proceeding;"

**Exhibit F**).  Through the Waterloo Adversary Proceeding, Waterloo seeks to disallow WUMI's

claim in full on grounds of equitable subordination (Count I), recharacterization (Count II), and

tortious interference (Count III).

15.    In contrast, through the WUMI Adversary Proceeding, Debtor seeks to disallow

WUMI's claim in full on grounds of recharacterization (Count II), disallowance of claim (Count

III), breach of contract (Count IV), and promissory estoppel (Count V).

16.    In connection with the prosecution of the WUMI Adversary Proceeding and

Waterloo Adversary Proceeding, the parties have engaged in extensive discovery, including

taking the deposition under oath of several witnesses, exchanging written interrogatories and

responding to requests for production of documents.

17.    Debtor and WUMI have also engaged in extensive discussions regarding the

litigation and desire to resolve and compromise the claims asserted in the WUMI Adversary and

WUMI Proof of Claim on a full, final and consensual basis on the terms set forth in the

Settlement Agreement, subject to approval by the Bankruptcy Court.

**e)     The Board of Managers' Approval of the WUMI Settlement**

18.    On June 15, 2017, Debtor filed its *Motion to Approve Settlement Agreement by*

*and between CS Mining, LLC and David J. Richards, LLC D/B/A Western Mineral Investors,*

*LLC* (the "Original Settlement Motion;" Docket No. 625).

19.    Debtor withdrew the Original Settlement Motion on May 22, 2017 (Docket 639)

as, despite Debtor's expectation, two of the three members of Debtor's Board of Managers had

#44414985 v3
4853-2585-3002.1

not signed the Unanimous Written Consent Authorizing the Settlement (the "Unanimous Written

Consent;" **Exhibit G**).  Specifically, the Chairman of Debtor's Board of Managers, Marshall

Cooper, executed the Unanimous Written Consent on May 4, 2017.  Despite, proposing a similar

settlement resolution at its April 25, 2017 Board Meeting, which resolution authorized the CRO

to settle the WUMI Adversary Proceeding and Waterloo Adversary Proceeding within certain

monetary parameters, two of the Members of the Board, Mr. Walker and Mr. Richards, did not

sign the Unanimous Written Consent.  The two Board Members apparently believed that the

monetary amounts identified in the Unanimous Written Consent were set too high for any

settlement with Waterloo.[1]  All of the Members of the Board did, however, agree on the

monetary amounts for any settlement with WUMI (*i.e.*, \$20.5 million plus 20%).  The settlement

with WUMI set forth in the Settlement Agreement before the Court falls within the monetary

parameters proposed and accepted by all of the Members of the Board of Managers in one form

or other.

20.     Because all of the Members of the Board had not signed the Unanimous Written

Consent and the April 25, 2017 resolution had not been voted upon, Debtor withdrew the

Original Settlement Motion from consideration with the Court without prejudice to refile and

seek approval at a later date.  (Docket 639.)

21.     Following the withdrawal of the Original Settlement Motion, the Board continued

to pursue the potential settlement with WUMI.  On May 23, 2017, Mr. Walker proposed a

Special Meeting of the Board be held on June 1, 2017 to take up a special resolution (the

"WUMI Resolution") approving the "Settlement Proposal" and "Settlement Agreement"

---

[1] Apparently, the 2 Members believed the Waterloo Claim should be settled in an amount no greater than
the actual amount Waterloo paid for the loan (\$22,692.766) plus 20%; not the \$30 million plus 20% as identified in
the Unanimous Written Consent.

#44414985 v3
4853-2585-3002.1

attached to the Original Settlement Motion.  (**Exhibit H**.)  Waterloo objected to the Notice of the

Meeting.  Consequently, by a Re-Notice of Special Meeting, dated May 31, 2017, the June 1,

2017 Special Meeting of the Board was rescheduled to June 14, 2017.  (**Exhibit I**.)  Concerned

that a quorum may not exist at the June 14, 2017 Special Meeting, Mr. Walker requested that an

additional Special Meeting of the Board be scheduled for Friday, June 16, 2017.  (**Exhibit J**.)

The June 16, 2017 Special Meeting was requested in the event a quorum for purposes of

transaction of business by the Board did not exist at the June 14, 2017 Special Meeting.

22.     Given the existing impasse among the Board, as well as the potential conflicts of

interest in voting on and approving any settlement with WUMI or Waterloo, on June 1, 2017

Clarity Copper, LLC ("Clarity") appointed John Bryan as an additional Member of the Board.

(**Exhibit K.**)  On June 2, 2017 Skye Mineral Partners, LLC ("SMP") appointed Sturges Karban

as an additional Member of the Board.  On June 13, 2017, DXS Capital (U.S.) Limited ("DXS")

and PacNet appointed Thomas K. Reilly as an additional Member of the Board. (**Exhibit L.**)

23.     On June 13, 2017, Mr. Cooper advised the Board that neither he, nor Mr. Reilly,

would be able to participate in the June 14, 2017 Special Meeting.  (**Exhibit M**.)  In his June 13,

2017 email, Mr. Cooper advised the Board that he would participate in the June 16, 2017 Special

Meeting.

24.     The Board held the June 14, 2017 Special Meeting.  However, an insufficient

quorum existed and no business was transacted by the Board.

25.     On June 15, 2017, DXS and PacNet's counsel (who also serves as Waterloo's

counsel in the Bankruptcy Case and Waterloo Adversary Proceeding) sent the Board a letter

advising that the WUMI Resolution set forth in the Notice of Special Meeting could not be

considered by the Board.  (**Exhibit N**.)  Counsel's letter offers three (3) reasons in support of

#44414985 v3
4853-2585-3002.1

DXS and PacNet's position: (i) the WUMI Resolution and Proposed Settlement Agreement require DXS' express consent; (ii) DXS does not consent to the Proposed Settlement Agreement; (iii) the CRO lacks authority to negotiate the Proposed Settlement Agreement.[2]

26.     The Board held the June 16, 2017 Special Meeting.  All six (6) of the Members of the Board were present for the Special Meeting.  At the Special Meeting, Mr. Bryan moved for the Board to consider the WUMI Resolution set forth in the June 14, 2017 and June 16, 2017 notices of Special Meeting.  Mr. Karban seconded the Motion.  After discussion and the objection of Mr. Cooper was noted, a vote of the three new members of the Board (Mr. Bryan, Mr. Karban and Mr. Reilly) was recorded.  The vote carried 2 to 1 in favor of the WUMI Resolution, with Mr. Reilly voting against the WUMI Resolution.

27.     Because the existing members of the Board believe they do not hold any conflicting positions, a second vote of the Board was also recorded, with the vote of Messrs. Copper, Richards and Walker being recorded.  Mr. Copper voted against the WUMI Resolution, while Mr. Richards and Mr. Walker voted in favor of the WUMI Resolution.

28.     The WUMI Resolution was approved by a majority of the newly appointed Members of the Board (2 to 1), as well as by a majority of the full Board (4 to 2).

29.     The Court has set a hearing on the Motion for Wednesday, July 5, 2017.

**(f)     Debtor's Continued Efforts At Settlement**

30.     Following withdrawal of the Original Settlement Motion, Debtor continued to pursue bi-lateral settlement discussions with both WUMI and Waterloo.  Specifically, settlement proposals were extended to both parties.  While WUMI remained amenable to the settlement

---

[2]   Debtor disagrees with the conclusions set forth in counsel's June 15, 2017 letter.

#44414985 v3
4853-2585-3002.1

proposal extended to WUMI, Waterloo was not amenable to the settlement proposal extended to it.

## TERMS OF SETTLEMENT AGREEMENT

31.    The Settlement Agreement is the same agreement attached to the Original

Settlement Motion and provides, in pertinent part, as follows:[3]

| Court Approval | The Settlement Agreement is conditioned on entry of the Settlement Order by the Bankruptcy Court and the Settlement Order being in full force and effect, not stayed and not the subject of a motion for reconsideration or appeal ("Final Order"). The date on which the Settlement Order becomes a Final Order shall be the effective date (the "Effective Date"). |
|---|---|
| Allowance Of WUMI Secured Claim | Upon the Effective Date, WUMI shall have an allowed secured claim and lien in the Bankruptcy Case in an amount of $23,000,000 (the "WUMI Allowed Secured Claim"), which WUMI Allowed Secured Claim shall not be subject to challenge by any party on any grounds, including challenges related to the nature, extent, validity and priority of the WUMI Allowed Secured Claim. Without limiting the foregoing, WUMI shall not be obligated to convert any portion of the WUMI Allowed Secured Claim to equity in Skye Mineral Partners, LLC ("SMP") or Debtor, nor shall the WUMI Allowed Secured Claim be subject to subordination or recharacterization. |
| WUMI Collateral | The WUMI Allowed Secured Claim shall be secured by various assets of Debtor (the "WUMI Collateral"), with limited exclusions, as set forth in (i) the August 10, 2012 Loan and Security Agreement, as amended (the "WUMI Loan"), by and between Debtor and WUMI; (ii) the August 10, 2012 Subordination Agreement (the "SMP Subordination Agreement") by and between WUMI and SMP; and (iii) the August 12, 2014 Intercreditor Agreement by and among Debtor, WUMI and Noble Americas Corporation (the "Noble Intercreditor Agreement" and collectively with the WUMI Loan and SMP Subordination Agreement, the "WUMI Loan Documents"). <br><br> The WUMI Collateral shall be subordinate and subject to the following obligations of Debtor (the "Priority Obligations") (a) the first priority liens and claims granted to Wellington Financing |

---

[3] This summary is provided for illustrative purposes only. To the extent of any inconsistency between this summary and the Settlement Agreement itself, the terms of the Settlement Agreement shall control.

#44414985 v3
4853-2585-3002.1

| | |
|---|---|
| | Partners, LLC, St. Cloud Capital Partners II, L.P., and Oxbow Carbon LLC (collectively the "DIP Lenders") in the Bankruptcy Case, (b) the valid, perfected and enforceable Other Prepetition Liens, as defined in the *Final Order (I) Authorizing The Debtor To Enter Into Additional $2.65 million Postpetition Financing Agreement With Vendor And Existing DIP Lender* [Docket No. 505]; (c) all allowed administrative claims in the Bankruptcy Case, (d) the "Completion Fee" due and payable to Debtor's Chief Restructuring Officer, FTI Consulting, and (e) the sum of $1,000,000 (the "Cash Consideration") to be paid by WUMI to Debtor for the benefit of the bankruptcy estate in the Bankruptcy Case.  Except as to the Priority Obligations, the WUMI Allowed Secured Claim shall be entitled to a first priority secured lien and claim on Debtor's assets in accordance with the WUMI Loan Documents, and, where applicable, a second priority secured lien and claim on certain of Debtor's assets that are subject to the alleged first lien and secured claims of Waterloo Street Limited ("Waterloo"), such second priority secured lien and claim as more fully identified and subordinated in accordance with the Noble Intercreditor Agreement. |
| Cash Consideration to Debtor | The Cash Consideration ($1,000,000) shall be due and payable to Debtor's bankruptcy estate exclusively from any consideration paid or payable to WUMI in whole or partial satisfaction of the WUMI Allowed Secured Claim.  The Cash Consideration shall be payable in U.S. Dollars to Debtor's bankruptcy estate, and may be paid from the cash proceeds of a sale of the WUMI Collateral.<br><br>The Cash Consideration paid to Debtor shall not be subject to any liens or claims of the DIP Lenders, Waterloo, SMP or any other creditor alleging or asserting a secured claim or lien against Debtor or Debtor's bankruptcy estate. |
| Releases | Subject to the Effective Date, except for the rights and obligations arising out of the Settlement Agreement, WUMI and Debtor shall fully and finally mutually compromise and settle with, and forever release, remise, relieve, waive, relinquish, and discharge each other from all claims, all causes or causes of action, suits, debts, refunds, dues, demands, obligations, charges, costs, expenses (including but not limited to attorneys' fees), sums of money, controversies, damages, accounts, agreements, covenants, contracts, judgments, reckonings, liens, and liabilities of every kind and nature whatsoever, whether at law or in equity, whether based upon statute, common law or otherwise, whether matured, contingent, or non-contingent, whether direct or indirect, whether known or unknown, whether suspected or unsuspected, whether or not hidden and without regard to the subsequent discovery or existence of different |

-10-

| | or additional facts, each other ever had, now has, or may claim to have against each other, including, but not limited to, those that are based upon, arise from, are in any way related to or connected with the allegations, facts and circumstances underlying, or related to, the WUMI Adversary Proceeding, Proof of Claim, or the Bankruptcy Case. |
|---|---|
| Sale and Credit Bidding | Subject to the Effective Date, WUMI, or any successor-in-interest or purchaser of the WUMI Allowed Secured Claim, shall be entitled to bid, including a credit bid, at any auction or sale of Debtor's assets, whether in this Chapter 11 case or in any case to which this case may be converted, ***provided,*** such bid: (i) is deemed a qualified bid in accordance with the bid procedures approved pursuant to the *Order Granting Debtor's Motion for Entry of an Order (A)  Approving Bidding Procedures in Connection With Sale of Substantially All of the Estate's Assets, (B) Approving Expense Reimbursement, (C) Scheduling an Auction and Hearing to Consider the Proposed Sale and (D) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order") [Docket No. 433], as the same may be modified by further court order; (ii) provides sufficient cash to Debtor for Debtor's estate to pay all of the Priority Obligations, and (iii) any credit bid is limited to the WUMI Collateral. |
| Full Resolution Of WUMI Adversary Proceeding And Proof Of Claim | WUMI shall amend its Proof of Claim in accordance with the Settlement Agreement.  Debtor will dismiss the WUMI Adversary Proceeding, with prejudice. |

## RELIEF REQUESTED

32.     By this Motion, the Debtor seeks entry of the Settlement Order substantially in the form attached hereto as **Exhibit A**, approving the Settlement Proposal and Settlement Agreement pursuant to Bankruptcy Code section 105 and Bankruptcy Rule 9019.

## ARGUMENT

33.     Bankruptcy Rule 9019(a) provides that the Court may approve a compromise or settlement, on a motion by the trustee [or debtor in possession] and after a hearing on notice to creditors.  Settlements and compromises are generally favored in bankruptcy cases.  *See, e.g., In re Donald Wesley Dennett*, 449 B.R. 139, 144 (Bankr. D. Utah 2011); *Myers v. Martin (In re*

-11-

*Martin),* 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY, ¶ 9019.03[1]

(15th ed. 1993)).  )).  Indeed, settlements are "'a normal part of the process of reorganization.'"

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

424 (1968) (quoting *Case v. LA. Lumber Prods. Co.,* 308 U.S. 106, 130 (1939)).

34.     It is within the Court's discretion to approve settlements and compromises that are

brought under its jurisdiction.  *See Reiss v. Hagmann*, 881 F.2d 890, 891-92 (10th Cir. 1989).

"The decision of a bankruptcy court to approve a settlement must be 'an informed one based

upon an objective evaluation of developed facts.'"  *Kopp v. All Am. Life Ins. Co.* (*In re Kopexa*

*Realty Venture Co.*), 213 B.R. 1020, 1022 (10th Cir. BAP 1997) (*quoting Reiss v. Hagmann*, 881

F.2d at 892).  Appellate courts have held that a bankruptcy court's approval of a compromise

must be affirmed unless the court's determination is either (i) completely devoid of minimum

evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the

supportive evidentiary data.  *Dennett*, 449 B.R. at 144 (citing *In re Southern Medical Arts Co.,*

*Inc.*, 343 B.R. 258 (10th Cir. BAP 2006) and *In re Kaiser Steep Corp.*, 105 B.R. 971, 978 (D.

Colo. 1989)).  A bankruptcy court need not decide the numerous issues of law and fact raised by

a settlement, but rather "the underlying test for the bankruptcy court's approval is whether the

[Debtor's] actions are 'within the universe of reasonable actions,' not whether pressing onward

might produce more funds."  *Dennett*, 449 B.R. at 144 (citing *In re Mailman Steam Carpet*

*Cleaning Corp.*, 212 F.3d 632, 636 (1st Cir. 2000), *cert denied*, 531 U.S. 960 (2000) and Fed. R.

Bankr. P. 9019, Selected Case Comment, Approval-Factors and Standards for Consideration).

35.     In determining whether to approve a settlement, a court must simply "canvass the

issues to see whether the settlement falls below the lowest point in the range of reasonableness."

*In re Key3Media Group, Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. Oct. 7, 2005) (citing *In re*

-12-

*Jasmine, Ltd.,* 258 B.R. 119, 123 (D.NJ. 2000)); *In re Coram Healthcare Corp.,* 315 B.R. 321,

330 (Bankr. D. Del. 2004) ("[C]ourt must only conclude that the compromise or settlement falls

within the reasonable range of litigation possibilities.") (citing *In re Perm Central Transp. Co.,*

596 F.2d 1102, 1114 (3d Cir. 1979); *In re Servisense.com, Inc.,* 382 F.3d 68, 71 (1st Cir. 2004).

A full evidentiary hearing to determine the merits of the underlying litigation is not required

under Bankruptcy Rule 9019.  *In re Dennett*, 449 B.R. 139, 145 (Bankr. D. Utah 2011) ("Further,

the Court is not required to hold a mini-trial on the issues involved in the case being

compromised.

36.     In deciding whether a particular settlement falls within the "range of

reasonableness," courts consider the following factors:  (i) the probability of success in the

underlying litigation; (ii) the possible difficulty in collection of a judgment; (iii) the complexity

and expense of the litigation; and (iv) the interests of creditors in deference to their reasonable

views (*i.e.* the paramount interests of creditors).  *In re Kopexa Realty Venture* Co., 213 B.R. at

1022.

37.     In addition, when determining the reasonableness of the settlement, the Court may

weigh the opinions of the debtor, the parties, and their attorneys, and may consider the

principals' belief that all of the factors bearing upon the appropriateness of the settlement have

been explored and that the compromise is fair, equitable, and the wisest course.  *In re Blair*, 538

F.2d 849, 851 (9th Cir. 1976).  In reviewing a proposed settlement, the court must be mindful of

the fact that the law favors compromise.  *In re Pfiester*, 449 B.R. 422, 425 (Bankr. D.N.M. 2011)

(citing *Williams v. First Nat. Bank*, 216 U.S. 582, 595 (1910)); *In re A & C Properties*, 784 F.2d

1377, 1381 (9th Cir. 1986); *Blair* 538 F.2d at 851; *In re Southern Med. Arts Cos.*, 343 B.R. 250,

255 (B.A.P. 10th Cir. 2006) (*citing* 10 Collier on Bankruptcy ¶ 9019.01, at 9019-2 (Alan N.

Resnick & Henry J. Sommer eds., 15th rev. ed. 2006)).  Settlements should be approved so long

as a minimal threshold of reasonableness is satisfied.  *See, e.g., In re Nutritional Sourcing Corp.,*

398 B.R. 816, 833 (Bankr. D. Del. 2008) ("In considering a proposed settlement, the court's duty

is to determine whether the compromise is reasonable, not whether the compromise is the best

possible settlement.").

38.     Debtor believes the settlement is fair and reasonable, and that approval thereof is

in the best interests of the estate and its creditors.  The Settlement Agreement is the product of

extensive good faith, arm's-length negotiations between and among Parties.  Furthermore, each

of the foregoing relevant factors (*i.e.* the probability of success in the litigation; the difficulties

associated with collection; the complexity of the litigation, and attendant expense, inconvenience

and delay; and the paramount interests of creditors) militates in favor of this Bankruptcy Court's

approval of the Settlement Agreement.

39.     First, the probability of success for Debtor in the litigation is less than certain.

Specifically, no dispute exists that WUMI was a prepetition secured lender of Debtor.

Moreover, no dispute exists that WUMI holds valid, perfected, secured liens against the WUMI

Collateral in accordance with the WUMI Loan and WUMI Loan Agreement (both as defined in

the Complaint, WUMI Adversary Proceeding Docket No. 1).  The single most important issue

facing the allowance or disallowance of WUMI's secured claim and Proof of Claim is whether

WUMI was obligated, under the WUMI Loan, the WUMI Loan Agreement, the WUMI Loan

Conversion Agreement or the Intercreditor Agreement (all as defined in the Complaint), to

convert its interest in the WUMI Loan into equity of SMP once Noble Americas Corporation

("Noble") advanced the full $30 million it committed to lend CS Mining under the

Noble/Waterloo Loan Agreement (as defined in the Complaint).  The Court's ultimate

determination of this issue is less than certain and that uncertainty weighs in favor of settlement.

40.     Second, the difficulties associated with collection – namely, reducing or disallowing WUMI's secured claim – weighs in favor of settlement.  The Settlement Agreement provides significant benefits to Debtor's estate, including: (i) the payment of the Cash Consideration, (ii) the subordination of WUMI's allowed claim and the WUMI Collateral to certain other claims in the Bankruptcy Case, (iii) the reduction of  WUMI Allowed Secured Claim in an amount less than that asserted in the Proof of Claim; and (iv) procurement of a mutual limited releases by and between WUMI and Debtor, all of which would not be certain if these issues identified in the Complaint were litigated in full.

41.     Third, the complexity of the litigation, and attendant expense, inconvenience and delay favor approval of the Settlement Agreement.  The issues between Parties and the legal disputes that arise therefrom are fact intensive, time consuming, and have been and will continue to be costly to litigate.  The issues and related disputes are also extremely complex and the settlement embodied in the Settlement Agreement will avoid continued protracted, expensive and uncertain litigation.  When measured against a possible uncertain recovery after trial and possible appeals, the Settlement Agreement is fair and reasonable, falling well above "the lowest point in the range of reasonableness."

42.     Fourth, the paramount interests of creditors militates in favor of approval of the Settlement Agreement.  The Settlement Agreement provides for the payment of $1.0 million to Debtor's estate (the Cash Consideration) as well as the subordination of WUMI's allowed claim and WUMI Collateral to certain other claims and collateral in the Bankruptcy Case.  The releases between WUMI and Debtor are limited in scope and do not release any derivative or direct claims Debtor may have against any directors, officers or employees of WUMI or Debtor.  The

-15-

CRO supports the Settlement Agreement, as does the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.  Accordingly, Debtor reasonably believes that approval of the Settlement Agreement is in the best interests of the estate and the creditors thereof, and respectfully requests that the Bankruptcy Court approve the Settlement Proposal and Settlement Agreement and authorize the Parties to perform the obligations thereunder through entry of the Settlement Order.

## **CONCLUSION**

WHEREFORE, Debtor respectfully requests the entry of the Settlement Order, substantially in the form attached hereto as **Exhibit A,** approving the Settlement Agreement, and authorizing and granting such other and further relief in favor of Debtor as the Bankruptcy Court deems just and proper.

Dated: June 19, 2017                          Respectfully submitted,


*/s/    Jeff Tuttle*
David Leta (1937)
Troy Aramburu (10444)
Jeff Tuttle (14500)
**Snell & Wilmer L.L.P.**
15 W South Temple, Suite 1200
Salt Lake City, Utah 84101
Email: dleta@swlaw.com
taramburu@swlaw.com
jtuttle@swlaw.com

-and-

#44414985 v3
4853-2585-3002.1

Donald J. Detweiler
Francis J. Lawall
Joanna J. Cline
**Pepper Hamilton LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
E-mail: detweild@pepperlaw.com
lawallf@pepperlaw.com
clinej@pepperlaw.com

*Counsel to CS Mining, LLC*

#44414985 v3
4853-2585-3002.1

## <u>CERTIFICATE OF SERVICE – BY NOTICE OF ELECTRONIC FILING (CM/ECF)</u>

I hereby certify that on the 19th day of June, 2017, I electronically filed the foregoing document with the United States Bankruptcy Court for the District of Utah by using the Court's CM/ECF system.  I further certify that the parties of record in this case, as identified below, are listed as registered CM/ECF users and will be served through the CM/ECF system:

- James W. Anderson     jwa@clydesnow.com, jritchie@clydesnow.com
- Troy J. Aramburu     taramburu@swlaw.com, nharward@swlaw.com;docket_slc@swlaw.com
- Darwin H. Bingham     dbingham@scalleyreading.net, cat@scalleyreading.net
- Stephen T. Bobo     sbobo@reedsmith.com
- Kyle A. Brannon     kbrannon@nexsenpruet.com
- Scott S Bridge     sbridge@keslerrust.com
- Martin J. Brill     mjb@lnbyb.com
- Mona Lyman Burton     mburton@hollandhart.com, intaketeam@hollandhart.com;slclitdocket@hollandhart.com;lcpaul@hollandhart.com
- Keith A. Call     kcall@scmlaw.com
- Kenneth L. Cannon     kcannon@djplaw.com, khughes@djplaw.com
- Laurie A. Cayton tr     laurie.cayton@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Patricia W. Christensen     pchristensen@parrbrown.com
- Christopher B. Chuff     chuffc@pepperlaw.com
- Joanna J. Cline     clinej@pepperlaw.com
- Joseph M.R. Covey     calendar@parrbrown.com
- P. Matthew Cox     bankruptcy_pmc@scmlaw.com
- Robert T. Denny     rtd@scmlaw.com, ajm@scmlaw.com
- Timothy D. Ducar     tducar@azlawyers.com, orders@azlawyers.com
- Victoria B. Finlinson     vbf@clydesnow.com
- Philip A. Gasteier     pag@lnbyb.com
- Christopher Grivakes     cg@agzlaw.com
- Robert W. Hamilton     rwhamilton@jonesday.com
- M. Darin Hammond     dhammond@smithknowles.com, astevenson@smithknowles.com
- George B. Hofmann     ghofmann@cohnekinghorn.com, dhaney@cohnekinghorn.com;jthorsen@cohnekinghorn.com
- Paul C. Huck     paulhuck@jonesday.com
- David W. Hunter     davidh@fisherhunterlaw.com
- Evan L. James     elj@cjmlv.com, kbc@cjmlv.com;ljw@cjmlv.com
- Pedro A. Jimenez     pjimenez@jonesday.com
- Michael R. Johnson     mjohnson@rqn.com, docket@rqn.com;dburton@rqn.com
- Peter J. Kuhn tr     Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Suzanne.Verhaal@usdoj.gov
- Brian R. Langford     brian@mhmlawoffices.com, brian@mhmlawoffice.com
- David H. Leigh     dleigh@rqn.com, dburton@rqn.com;docket@rqn.com
- David E. Leta     dleta@swlaw.com, wkalawaia@swlaw.com;csmart@swlaw.com
- Andrew C. Lillie     andrew.lillie@hoganlovells.com

#44414985 v3
4853-2585-3002.1

- Jessica Black Livingston    jessica.livingston@hoganlovells.com
- Ralph R. Mabey    rmabey@kmclaw.com
- Adelaide Maudsley    amaudsley@kmclaw.com, tslaughter@kmclaw.com
- Steven J. McCardell    smccardell@djplaw.com, khughes@djplaw.com
- Scott O. Mercer    som@keslerrust.com
- Krikor J. Meshefejian    kjm@lnbyb.com
- Elijah L. Milne    emilne@djplaw.com, pbricker@djplaw.com
- Matt Munson    matt@mamunsonlaw.com, chris@mamunsonlaw.com
- Sherilyn A. Olsen    solsen@hollandhart.com,
  slclitdocket@hollandhart.com;intaketeam@hollandhart.com;cfries@hollandhart.com
- Ellen E Ostrow    eeostrow@hollandhart.com,
  mkthurgood@hollandhart.com;intaketeam@hollandhart.com
- A.M. Cristina Perez Soto    cperezsoto@jonesday.com
- Lester A. Perry    lap@hooleking.com, apb@hooleking.com
- David L. Pinkston    bankruptcy_dlp@scmlaw.com
- George W. Pratt    gpratt@joneswaldo.com
- Adam H Reiser    areiser@cohnekinghorn.com
- Walter A Romney    war@clydesnow.com
- John H. Schanne    schannej@pepperlaw.com,
  henrys@pepperlaw.com;molitorm@pepperlaw.com
- Chris L. Schmutz    chrisschmutz.pc@gmail.com, hillaryschmutz@yahoo.com
- Jeremy C. Sink    jsink@mbt-law.com
- Stephen Styler    steve@stylerdaniels.com
- Richard C. Terry    richard@tjblawyers.com, cbcecf@yahoo.com
- Jeff D. Tuttle    jtuttle@swlaw.com, jpollard@swlaw.com;docket_slc@swlaw.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Jessica P Wilde    jwilde@joneswaldo.com
- Mark W Williams    mwilliams@shermanhoward.com,
  dfouts@shermanhoward.com;efiling@sah.com;bmcalister@shermanhoward.com
- Kim R. Wilson    bankruptcy_krw@scmlaw.com
- Laura J. Wolff    ljw@cjmlv.com
- Lee E. Woodard    lwoodard@harrisbeach.com
- Beth Ann R. Young    bry@Lnbyb.com
- P. Matthew Cox    bankruptcy_pmc@scmlaw.com
- Gale K. Francis    txbk13@utah.gov

#44414985 v3
4853-2585-3002.1

**And Served VIA ELECTRONIC MAIL AND FIRST CLASS MAIL to:**

David L. Pinkston
Keith A. Call
P. Matthew Cox
Robert T. Denny
**Snow, Christensen & Martineau**
Post Office Box 45000
Salt Lake City, Utah 84145-5000
Email: dlp@scmlaw.com
          kcall@scmlaw.com
                  pmc@scmlaw.com
                  rtd@scmlaw.com

Pedro A. Jimenez
Paul C. Huck
Cristina Perez Soto
**Jones Day**
600 Brickell Avenue
Brickell World Plaza, Suite 3300
Miami, Florida 33131
Email:  pjimenez@jonesday.com
          paulhuck@jonesday.com
          cperezsoto@jonesday.com

Ralph R. Mabey
Adelaide Maudsley
**Kirton McConkie**
50 East South Temple, Ste. 400
Salt Lake City, UT 84111
Email: rmabey@kmclaw.com
          amaudsley@kmclaw.com

Walter A. Romney, Jr.
James W. Anderson
Victoria B. Finlinson
**Clyde Snow & Sessions**
201 South Main Street, Ste. 1300
Salt Lake City, UT 84111
Email: war@clydesnow.com
          jwa@clydesnow.com
          vbf@clydesnow.com

-20-

Martin J. Brill
Philip A. Gasteier
Beth Ann R. Young
**Levene, Neale, Bender, Yoo & Brill, LLP**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067-6200
Email:  mjb@lnbyb.com
        pag@lnbyb.com
        bry@lnbyb.com


Christopher Grivakes
**AFFELD GRIVAKES LLP**
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
Email: cg@agzlaw.com


Epiq Bankruptcy Solutions, LLC
777 Third Ave, 12th Floor
New York, NY 10017

FTI Consulting, Inc.
1001 17th St. #1100
Attn: David Beckman
Denver, CO 80202


                                    *Joyce Kyle* _____


-21-

# EXHIBIT A

*Order Prepared and Submitted by:*

David Leta (1937)                          Donald J. Detweiler, Esq. (admitted *pro hac vice*)
Troy Aramburu (10444)                      Francis J. Lawall, Esq. (admitted *pro hac vice*)
Jeff Tuttle (14500)                        Joanna J. Cline (admitted *pro hac vice*)
**SNELL & WILMER L.L.P.**                  **PEPPER HAMILTON LLP**
15 W South Temple, Suite 1200              Hercules Plaza, Suite 5100
Salt Lake City, Utah 84101                 1313 N. Market Street
Telephone: 801-257-1900                    Wilmington, DE 19899-1709
Facsimile: 801-257-1800                    Telephone: (302) 777-6500
Email: dleta@swlaw.com                     Facsimile: (302) 656-8865
        taramburu@swlaw.com                E-mail: detweild@pepperlaw.com
        jtuttle@swlaw.com                          lawallf@pepperlaw.com
                                                   clinej@pepperlaw.com

*Counsel for CS Mining, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC** | Bankruptcy Case No. 16-24818 |
| Debtor | (Chapter 11) |
| | Judge William T. Thurman |
| | Adv. Pro. No.: 17-02024 |

---

## SETTLEMENT ORDER APPROVING MOTION PURSUANT TO FEDERAL
## RULE OF BANKRUPTCY PROCEDURE 9019 TO APPROVE SETTLEMENT
## AGREEMENT BY AND BETWEEN CS MINING, LLC AND DAVID J. RICHARDS,
## LLC D/B/A WESTERN US MINERAL INVESTORS, LLC

---

This matter came before the Court upon the *Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 to Approve Settlement Agreement by and Between CS Mining, LLC and David J. Richards, LLC d/b/a Western US Mineral Investors, LLC, an Ohio Limited Liability Company* (the "Motion"),[1] pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 105, for entry of an order (this "Settlement Order") approving the Settlement Proposal and Settlement Agreement by and among Parties, and this Bankruptcy Court possessing jurisdiction to consider the Motion; and venue being proper; and notice of the Motion having been sufficient under the circumstances and no other or further notice need be given; and the Settlement Agreement being a product of arm's-length, good-faith negotiations between Parties, and having considered the Motion and all papers related thereto heretofore filed; and the relief requested in the Motion being in the best interests of Debtor's estate, its creditors and other parties-in-interest; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**ORDERED, ADJUDGED AND DECREED THAT**:

1.    The Motion is GRANTED.

2.    The Settlement Proposal is hereby APPROVED in its entirety.

3.    The Settlement Agreement is hereby APPROVED in its entirety.

4.    Upon the Effective Date, WUMI shall have an allowed secured claim and lien in the Bankruptcy Case in an amount of $23,000,000 (the "WUMI Allowed Secured Claim").

5.    The WUMI Allowed Secured Claim shall not be subject to challenge by any party on any grounds, including challenges related to the nature, extent, validity and priority of the WUMI Allowed Secured Claim, and WUMI shall not be obligated to convert any portion of the WUMI Allowed Secured Claim to equity in SMP or Debtor, nor shall the WUMI Allowed Secured claim be subject to subordination or recharacterization.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

#44421940 v1

6.     The WUMI Collateral shall be subordinate and subject to the following obligations of Debtor (the "Priority Obligations") (a) the first priority liens and claims granted to Wellington Financing Partners, LLC, St. Cloud Capital Partners II, L.P., and Oxbow Carbon LLC (collectively the "DIP Lenders") in the Bankruptcy Case, (b) the valid, perfected and enforceable Other Prepetition Liens, as defined in the *Final Order (I) Authorizing The Debtor To Enter Into Additional $2.65 million Postpetition Financing Agreement With Vendor And Existing DIP Lender* [Docket No. 505]; (c) all allowed administrative claims in the Bankruptcy Case, (d) the "Completion Fee" due and payable to Debtor's Chief Restructuring Officer, FTI Consulting, and (e) the sum of $1,000,000 (the "Cash Consideration") to be paid by WUMI to Debtor for the benefit of the bankruptcy estate in the Bankruptcy Case. Except as to the Priority Obligations, the WUMI Allowed Secured Claim shall be entitled to a first priority secured lien and claim on Debtor's assets in accordance with the WUMI Loan Documents, and, where applicable, a second priority secured lien and claim on certain of Debtor's assets that are subject to the alleged first lien and secured claims of Waterloo Street Limited ("Waterloo"), such second priority secured lien and claim as more fully identified and subordinated in accordance with the Noble Intercreditor Agreement.

7.     The Cash Consideration to be paid by WUMI to Debtor for the benefit of the bankruptcy estate shall not be subject to any liens or claims of the DIP Lenders, Waterloo, SMP or any other creditor alleging or asserting a secured claim or lien against Debtor or Debtor's bankruptcy estate.

8.     WUMI, or any successor-in-interest or purchaser of the WUMI Allowed Secured Claim, shall be entitled to bid, including a credit bid, at any auction or sale of Debtor's assets, whether in this Chapter 11 case or in any case to which this case may be converted, ***provided,*** such bid: (i) is deemed a qualified bid in accordance with the bid procedures approved pursuant to the *Order Granting Debtor's Motion for Entry of an Order (A)  Approving Bidding*

-3-

*Procedures in Connection With Sale of Substantially All of the Estate's Assets, (B) Approving*

*Expense Reimbursement, (C) Scheduling an Auction and Hearing to Consider the Proposed Sale*

*and (D) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order")

[Docket No. 433], as the same may be modified by further court order; (ii) provides sufficient

cash to Debtor for Debtor's estate to pay all of the Priority Obligations, and (iii) any credit bid is

limited to the WUMI Collateral.

9.     The releases contained in the Settlement Agreement are approved.  For the

avoidance of doubt, the Settlement Agreement does not release or resolve any direct or

derivative claims Debtor may hold against any individual participants, directors, officers or

employees of WUMI or Debtor.

10.    Notwithstanding any stay that otherwise might be applicable to this Settlement

Order, this Settlement Order shall be effective and enforceable immediately upon entry hereof.

11.    Debtor is authorized to take such actions as it may deem necessary or appropriate

to effectuate and consummate the Settlement Agreement.

12.    This Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation or enforcement of this Settlement Order and the

Settlement Agreement.

------------------------------------------------END OF ORDER

84442)940.v1

# EXHIBIT B

**Confidential Settlement Proposal to**
**Western US Mineral Investors, LLC**

This settlement proposal encompasses the potential full and final settlement of: (i) the adversary action captioned *CS Mining, LLC v. David J. Richards, LLC d/b/a/ Western US Mineral Investors, LLC*, Case Number 17-02024 (the "**Adversary Action**"), pending in the United States Bankruptcy Court for the District of Utah, Central Division (the "**Bankruptcy Court**"); and (ii) the February 15, 2017 Proof of Claim, Claim Number 61 (the "**Proof of Claim**"), filed by Western US Mineral Investors, LLC ("**WUMI**") in the chapter 11 bankruptcy case (the "**Bankruptcy Case**") of CS Mining, LLC (the "**Debtor**"), captioned *In re CS Mining, LLC*, Case Number 16-24818, pending in the Bankruptcy Court.

In full and final settlement of the Adversary Action and Proof of Claim, the parties agree to the following terms and conditions of settlement (the "**Proposed Settlement**"):

A.    **ALLOWANCE OF WUMI SECURED CLAIM**

1.   The Debtor and WUMI will agree and stipulate to the Debtor granting WUMI an allowed secured claim and lien in the Bankruptcy Case in an amount of $23,000,000 (the "**WUMI Allowed Secured Claim**").

2.   The WUMI Allowed Secured Claim shall be secured (the "**WUMI Collateral**"), with limited exclusions, as set forth in (i) the August 10, 2012 Loan and Security Agreement, as amended (the "**WUMI Loan**"), by and between the Debtor and WUMI; (ii) the August 10, 2012 Subordination Agreement (the "**SMP Subordination Agreement**") by and between WUMI and Skye Mineral Partners, LLC ("**SMP**"); and (iii) the August 12, 2014 Intercreditor Agreement by and among the Debtor, WUMI and Noble Americas Corporation (the "**Noble Intercreditor Agreement**"). (The WUMI Loan, SMP Subordination Agreement and Noble Intercreditor Agreement are hereafter collectively referred to as the "**WUMI Loan Documents**").

3.   The WUMI Collateral shall be subordinate and subject to (a) the first priority liens and claims granted to Wellington Financing Partners, LLC, St. Cloud Capital Partners II, L.P., and Oxbow Carbon LLC (collectively the "**DIP Lenders**") in the Bankruptcy Case, (b) the valid, perfected and enforceable Other Prepetition Liens, as defined in the *Final Order (I) Authorizing The Debtor To Enter Into Additional $2.65 million Postpetition Financing Agreement With Vendor And Existing DIP Lender* [Docket No. 505]; (c) all allowed administrative claims in the Bankruptcy Case, (d) the "Completion Fee" due and payable to the Debtor's Chief Restructuring Officer, FTI Consulting, and (e) the sum of $1,000,000 (the "**Cash Consideration**") for the benefit of the bankruptcy estate in the Bankruptcy Case. Otherwise, the WUMI Allowed Secured Claim shall be entitled to a first priority secured lien and claim on the Debtor's assets in accordance with the WUMI Loan Documents, and, where applicable, a second

*Confidential Settlement Communication*
*Subject to F.R.E. 408*

priority secured lien and claim on certain of the Debtor's assets that are subject to the alleged first lien and secured claims of Waterloo Street Limited (**"Waterloo"**), such second priority secured lien and claim as more fully identified and subordinated in accordance with the Noble Intercreditor Agreement. WUMI shall not be obligated to convert any portion of the WUMI Allowed Secured Claim to equity in SMP or the Debtor, nor shall the WUMI Allowed Secured claim be subject to subordination or recharacterization.

**B.    FULL AND FINAL SETTLEMENT OF THE WUMI ADVERSARY CASE AND WUMI PROOF OF CLAM**

1.  Pending entry of a final order approving this Settlement, which order shall be sought on an expedited basis, all further proceedings in the Adversary Proceeding will be stayed and continued without date.

2.  The Cash Consideration identified in paragraph A(3)(e) above shall be due and payable to the bankruptcy estate exclusively from any consideration paid or payable to WUMI in whole or partial satisfaction of the WUMI Allowed Secured Claim.

3.  Subject to Paragraph B2, the Cash Consideration shall be payable in U.S. Dollars to the Debtor's bankruptcy estate, and may be paid from the cash proceeds of a sale of the WUMI Collateral.

4.  The Cash Consideration shall be in full and final payment of all rights, claims, causes of action or defenses the Debtor and WUMI may have or hold against each other, whether known or unknown.

5.  The Cash Consideration paid to the Debtor shall not be subject to any liens or claims of the DIP Lenders, Waterloo, SMP or any other creditor alleging or asserting a secured claim or lien against the Debtor or the Debtor's bankruptcy estate.

6.  Upon the Bankruptcy Court's final approval of the WUMI Allowed Secured Claim, WUMI shall amend its Proof of Claim in accordance with the parties' Settlement Agreement.

7.  Upon final allowance of the WUMI Allowed Secured Claim **and,** to the extent the Cash Consideration is paid pursuant to Paragraphs B(2) above or C(3) below, the Debtor will dismiss the Adversary Action, with prejudice.

8.  The Proposed Settlement and Settlement Agreement shall be subject to mutually acceptable and mutually exclusive releases of claims and causes of action by and between the Debtor and WUMI, which releases of claims and causes of action shall be subject to final review and approval of the Bankruptcy Court.

4821-4529-9784

*Confidential Settlement Communication*
*Subject to F.R.E. 408*

### C.   FURTHER ACTIONS AND BANKRUPTCY COURT APPROVAL

1. The Proposed Settlement will be subject to a formal settlement agreement (the **"Settlement Agreement"**) to be agreed to by the Debtor and WUMI.

2. The Proposed Settlement and Settlement Agreement shall be subject to final review and approval of the Bankruptcy Court, after appropriate motion and notice, in accordance with Federal Rule of Bankruptcy Procedure 9019.

3. Upon the Bankruptcy Court's final approval of the Proposed Settlement and Settlement Agreement, WUMI, or any successor-in-interest or purchaser of the WUMI Allowed Secured Claim, shall be entitled to bid, including a credit bid, at any auction or sale of the Debtor's assets, whether in this Chapter 11 case or in any case to which this case may be converted, *provided,* such bid: (i) is deemed a qualified bid in accordance with the bid procedures approved pursuant to the *Order Granting Debtor's Motion for Entry of an Order (A) Approving Bidding Procedures in Connection With Sale of Substantially All of the Estate's Assets, (B) Approving Expense Reimbursement, (C) Scheduling an Auction and Hearing to Consider the Proposed Sale and (D) Approving the Form and Manner of Notice Thereof* (the **"Bidding Procedures Order"**) [Docket No. 433], as the same may be modified by further court order; (ii) provides sufficient cash to the Debtor for the Debtor's estate to pay all of the obligations identified in paragraphs A(3)(a) – (e) above, and (iii) any credit bid is limited to the WUMI Collateral.

4. During the pendency of the sale process contemplated by the Bidding Procedures Order, WUMI agrees it will not seek: (i) the return of its collateral; (ii) relief from the automatic stay imposed under Section 362 of the Bankruptcy Code; or (iii) additional adequate protection from the Debtor.

5. The Proposed Settlement and Settlement Agreement shall be binding on the Debtor, its bankruptcy estate and any Chapter 7 or 11 Trustee that may be appointed over the Debtor or Debtor's bankruptcy estate.

Approved subject to further documentation and court approval, 11 May 2017:

| | | |
|---|---|---|
| Donald J. Detweiler, | David Beckman, | P. Matthew Cox |
| Counsel for Debtor | CRO for Debtor | Counsel for WUMI |

4821-4529-9784

# EXHIBIT C

David Leta (1937)
Troy Aramburu (10444)
Jeff Tuttle (14500)
**SNELL & WILMER L.L.P.**
15 W South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: 801-257-1900
Facsimile: 801-257-1800
Email: dleta@swlaw.com
      taramburu@swlaw.com
      jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)
Francis J. Lawall, Esq. (admitted *pro hac vice*)
Joanna J. Cline (admitted *pro hac vice*)
**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 656-8865
E-mail: detweild@pepperlaw.com
      lawallf@pepperlaw.com
      clinej@pepperlaw.com

*Counsel for CS Mining, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC**<br><br>        Debtor | Bankruptcy Case No. 16-24818 |
| CS MINING, LLC, a Delaware Limited Liability Company,<br><br>     Plaintiff,<br><br>     v.<br><br>DAVID J. RICHARDS, LLC d/b/a WESTERN US MINERAL INVESTORS, LLC, an Ohio Limited Liability Company.<br><br>     Defendant. | (Chapter 11)<br><br>Judge William T. Thurman<br><br><br>Adv. Pro. No.: 17-02024 |

## SETTLEMENT AGREEMENT BY AND BETWEEN CS MINING, LLC AND DAVID J. RICHARDS, LLC D/B/A WESTERN US MINERAL INVESTORS, LLC

       This settlement agreement (the "Settlement Agreement") is made and entered into

by and between CS Mining, LLC ("Debtor") and David J. Richards, LLC d/b/a Western US

Mineral Investors, LLC, an Ohio Limited Liability Company ("WUMI" and collectively with

Debtor, "Parties").  Parties hereby stipulate and agree as follows:

## RECITALS

WHEREAS, on August 4, 2016 (the "Relief Date"), the Court entered the Order

for Relief (Docket No. 130) under chapter 11 of title 11 of the United States Code (11 U.S.C.

§§ 101 *et seq.*, the "Bankruptcy Code").  Debtor continues to operate its business and manage its

properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108;

WHEREAS, on February 17, 2017, Debtor filed its Complaint (A.D.I. 1) against

WUMI, which initiated the above-captioned adversary proceeding (Adv. Pro. No.: 17-02024, this

"Adversary Proceeding");

WHEREAS, WUMI is a pre-petition lender and in connection therewith, on

February 15, 2017, timely filed a proof of claim (Claim No. 61, the "Proof of Claim") in

Debtor's above-captioned bankruptcy case (Case No. 16-24818, the "Bankruptcy Case");

WHEREAS, pursuant to the Proof of Claim, WUMI asserts a secured claim in the

amount of $24,926,036.00 against Debtor's bankruptcy estate;

WHEREAS, through the Adversary Proceeding, Debtor challenges the validity of

the claims asserted in the Proof of Claim and seeks certain affirmative recoveries;

WHEREAS, WUMI has vigorously opposed the relief sought through the

Adversary Proceeding;

WHEREAS, Parties have exchanged initial discovery and after extensive

discussions now desire to resolve and compromise the claims asserted in the Adversary

Proceeding and Proof of Claim on a full, final and consensual basis; and

NOW, THEREFORE, after good-faith, arm's-length negotiations between Parties,

and in consideration of the foregoing Recitals and of the mutual promises, covenants, and

releases hereinafter set forth and for other good and valuable consideration, the sufficiency and

adequacy of which is hereby acknowledged by Parties, Parties hereby stipulate and agree as

follows, subject to the entry of a settlement order (the "Settlement Order") by the United States

Bankruptcy Court for the District of Utah (the "Bankruptcy Court") in the Bankruptcy Case, as

follows:

## AGREEMENT

**A.**    **Bankruptcy Court Approval Through Entry of Settlement Order**

1.    This Settlement Agreement is conditioned on: (a) the Bankruptcy Court approving

and authorizing the Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure

9019 (the "Settlement Motion"); and (b) the Settlement Order being in full force and effect, not

stayed and not the subject of a motion for reconsideration or appeal ("Final Order").  The date on

which the Settlement Order becomes a Final Order shall be the effective date (the "Effective

Date").

2.    Debtor will coordinate preparation and filing of the Settlement Motion with the

Bankruptcy Court and will seek a hearing with respect thereto in the Bankruptcy Case.  Parties

will act in good faith in connection with the Settlement Motion, and no Party will take any

actions, directly or indirectly, to oppose the Settlement Motion unless such action is necessary to

protect a Party's rights under this Settlement Agreement.

3.    Pending entry of the Settlement Order, which order shall be sought on an

expedited basis, all further proceedings in the Adversary Proceeding shall be stayed and

continued without date.

**B.**    **Parties Bound**

4.    This Settlement Agreement is binding upon and shall inure to the benefit of the

Parties hereto and their respective attorneys, agents, and successors, including Debtor's

bankruptcy estate and any Chapter 7 or 11 Trustee that may be appointed over Debtor or

Debtor's bankruptcy estate. However, there are no third party beneficiaries of this Settlement

Agreement.

## C.    Allowance Of WUMI Secured Claim

5.    Upon the Effective Date, WUMI shall have an allowed secured claim and lien in

the Bankruptcy Case in an amount of $23,000,000 (the "WUMI Allowed Secured Claim"),

which WUMI Allowed Secured Claim shall not be subject to challenge by any party on any

grounds, including challenges related to the nature, extent, validity and priority of the WUMI

Allowed Secured Claim. Without limiting the foregoing, WUMI shall not be obligated to

convert any portion of the WUMI Allowed Secured Claim to equity in Skye Mineral Partners,

LLC ("SMP") or Debtor, nor shall the WUMI Allowed Secured claim be subject to

subordination or recharacterization.

6.    The WUMI Allowed Secured Claim shall be secured (the "WUMI Collateral"),

with limited exclusions, as set forth in (i) the August 10, 2012 Loan and Security Agreement, as

amended (the "WUMI Loan"), by and between Debtor and WUMI; (ii) the August 10, 2012

Subordination Agreement (the "SMP Subordination Agreement") by and between WUMI and

SMP; and (iii) the August 12, 2014 Intercreditor Agreement by and among Debtor, WUMI and

Noble Americas Corporation (the "Noble Intercreditor Agreement" and collectively with the

WUMI Loan and SMP Subordination Agreement, the "WUMI Loan Documents").

7.    The WUMI Collateral shall be subordinate and subject to the following

obligations of Debtor (the "Priority Obligations") (a) the first priority liens and claims granted to

Wellington Financing Partners, LLC, St. Cloud Capital Partners II, L.P., and Oxbow Carbon

LLC (collectively the "DIP Lenders") in the Bankruptcy Case, (b) the valid, perfected and

enforceable Other Prepetition Liens, as defined in the *Final Order (I) Authorizing The Debtor To*

-4-

*Enter Into Additional $2.65 million Postpetition Financing Agreement With Vendor And Existing DIP Lender* [Docket No. 505]; (c) all allowed administrative claims in the Bankruptcy Case, (d) the "Completion Fee" due and payable to Debtor's Chief Restructuring Officer, FTI Consulting, and (e) the sum of $1,000,000 (the "Cash Consideration") to be paid by WUMI to Debtor for the benefit of the bankruptcy estate in the Bankruptcy Case. Except as to the Priority Obligations, the WUMI Allowed Secured Claim shall be entitled to a first priority secured lien and claim on Debtor's assets in accordance with the WUMI Loan Documents, and, where applicable, a second priority secured lien and claim on certain of Debtor's assets that are subject to the alleged first lien and secured claims of Waterloo Street Limited ("Waterloo"), such second priority secured lien and claim as more fully identified and subordinated in accordance with the Noble Intercreditor Agreement.

**D.      Cash Consideration**

8.      The Cash Consideration shall be due and payable to Debtor's bankruptcy estate exclusively from any consideration paid or payable to WUMI in whole or partial satisfaction of the WUMI Allowed Secured Claim. The Cash Consideration shall be payable in U.S. Dollars to Debtor's bankruptcy estate, and may be paid from the cash proceeds of a sale of the WUMI Collateral.

9.      The Cash Consideration shall be in full and final payment of all rights, claims, causes of action or defenses Debtor and WUMI may have or hold against each other, whether known or unknown.

10.      The Cash Consideration paid to Debtor shall not be subject to any liens or claims of the DIP Lenders, Waterloo, SMP or any other creditor alleging or asserting a secured claim or lien against Debtor or Debtor's bankruptcy estate.

E.     **Full Resolution Of Adversary Proceeding And Proof Of Claim**

11.     Upon the Effective Date, WUMI shall amend its Proof of Claim in accordance with this Settlement Agreement.

12.     Upon the Effective Date and payment of the Cash Consideration, Debtor will dismiss the Adversary Action, with prejudice.

F.     **Releases**

13.     Subject to the Effective Date, except for the rights and obligations arising out of this Settlement Agreement, WUMI and Debtor do hereby fully and finally mutually compromise and settle with, and forever release, remise, relieve, waive, relinquish, and discharge each other from all claims, all causes or causes of action, suits, debts, refunds, dues, demands, obligations, charges, costs, expenses (including but not limited to attorneys' fees), sums of money, controversies, damages, accounts, agreements, covenants, contracts, judgments, reckonings, liens, and liabilities of every kind and nature whatsoever, whether at law or in equity, whether based upon statute, common law or otherwise, whether matured, contingent, or non-contingent, whether direct or indirect, whether known or unknown, whether suspected or unsuspected, whether or not hidden and without regard to the subsequent discovery or existence of different or additional facts, each other ever had, now has, or may claim to have against each other, including, but not limited to, those that are based upon, arise from, are in any way related to or connected with the allegations, facts and circumstances underlying, or related to, the Adversary Proceeding, Proof of Claim, or the Bankruptcy Case.

G.     **Sale and Credit Bidding**

14.     Subject to the Effective Date, WUMI, or any successor-in-interest, assignee, transferee, assumee  or purchaser of the WUMI Allowed Secured Claim, shall be entitled to bid, including a credit bid, at any auction or sale of Debtor's assets, whether in this Chapter 11 case

-6-

or in any case to which this case may be converted, ***provided,*** such bid: (i) is deemed a qualified

bid in accordance with the bid procedures approved pursuant to the *Order Granting Debtor's*

*Motion for Entry of an Order (A)  Approving Bidding Procedures in Connection With Sale of*

*Substantially All of the Estate's Assets, (B) Approving Expense Reimbursement, (C) Scheduling*

*an Auction and Hearing to Consider the Proposed Sale and (D) Approving the Form and*

*Manner of Notice Thereof* (the "Bidding Procedures Order") [Docket No. 433], as the same may

be modified by further court order; (ii) provides sufficient cash to Debtor for Debtor's estate to

pay all of the Priority Obligations, and (iii) any credit bid is limited to the WUMI Collateral.

15.     During the pendency of the sale process contemplated by the Bidding Procedures

Order, WUMI agrees it will not seek: (i) the return of the WUMI Collateral; (ii) relief from the

automatic stay imposed under Bankruptcy Code section 362; or (iii) additional adequate

protection from Debtor.

**H.     Cooperation, Further Acts And Covenants.**

16.     Parties covenant and agree to execute and deliver such additional documents and

do all such acts and things in a timely fashion as may be reasonably necessary or appropriate to

carry out the full intent and meaning of this Settlement Agreement.

17.     Each Party represents that it has read this Settlement Agreement, and that it

understands the terms used herein and the consequences thereof.  Upon the Effective Date, this

Settlement Agreement is binding, enforceable, discoverable and admissible to establish the

rights, obligations and duties of Parties in any action that relates to this Settlement Agreement.

Notwithstanding the foregoing, each Party agrees that from and after the date that such Party

executes this Settlement Agreement, such Party (i) shall take no action that interferes in any way

with the efforts of any Party to obtain entry of the Settlement Order or that prevents or delays the

Final Order from becoming a final, non-appealable order, and (ii) shall not take any action

inconsistent with the provisions of this Settlement Agreement. No Party shall be released from this covenant to treat this Settlement Agreement as binding unless the Bankruptcy Court refuses to enter the Settlement Order.

## I.   Representations And Warranties.

18.   Each Party agrees that this Settlement Agreement is the result of a good-faith, arm's-length negotiation between Parties and each Party will support entry of the Settlement Order.

19.   Each Party represents and warrants that it has read this Settlement Agreement in its entirety prior to executing it, and that the respective Parties have executed this Settlement Agreement voluntarily, without duress or coercion, with the capacity and authority to contract and with knowledge of the terms, significance, and legal effect of this Settlement Agreement. Parties agree that the terms of this Settlement Agreement reflect a settlement that was reached voluntarily after consultation by each Party with competent legal counsel as each Party, in its sole discretion, deemed appropriate.

20.   The undersigned persons represent and warrant that they have full authority to execute this Settlement Agreement on behalf of the respective Parties and that the respective Parties have full knowledge of and have consented to this Settlement Agreement.

21.   The undersigned persons represent and warrant that the terms and conditions of this Settlement Agreement apply to the WUMI Allowed Secured Claim.

## J.   No Admission.

22.   Each Party acknowledges that this Settlement Agreement effects the settlement of claims which are denied and contested by the other, and that nothing contained herein shall be construed as an admission of liability or fault by or on behalf of either Party.

#44420611 v1

K.    **Entire Agreement.**

23.    This Settlement Agreement constitutes the entire agreement between Parties

hereto and may not be amended or modified in any manner except by a writing signed by such

Parties or their duly authorized representatives.  There are no other covenants, promises,

agreements, conditions or understandings, either oral or written, expressed or implied, between

Parties hereto, except for this Settlement Agreement with respect to its subject matter.

L.    **Headings and Construction**

24.    The section headings used in this Settlement Agreement are for convenience only

and shall not affect the construction of the Settlement Agreement.  Each Party participated in the

negotiation and drafting of this Settlement Agreement, so this Settlement Agreement shall not be

interpreted or construed against either Party based upon the preparation of this Settlement

Agreement.

M.    **Costs and Fees**

25.    Each Party shall each bear its respective attorneys' fees and costs relating to the

settlement negotiations and implementation of this Settlement Agreement.  However, if any

action is commenced by any Party hereto to enforce the provisions of this Settlement Agreement,

the prevailing party shall be entitled to an award, in addition to any other claims or damages, of

its costs and expenses including attorneys' fees, in connection with said action.

N.    **Execution In Counterparts**

26.    This Settlement Agreement may be executed in multiple counterparts and by

facsimile or by PDF attached to an email, with each such facsimile or PDF counterpart being

deemed an original and constituting one original document when combined.

#44420611 v1

O.     **Retention of Jurisdiction, Choice of Law and Exclusive Forum**

27.     This Settlement Agreement shall be construed in accordance with the laws of the

State of Utah and the Bankruptcy Code, without regard to the conflicts of law jurisprudence

thereof.  Any disputes concerning this Settlement Agreement shall be determined exclusively by

the Bankruptcy Court as a core proceeding, in the Bankruptcy Case, which shall have exclusive

jurisdiction to interpret and enforce the terms of this Settlement Agreement, without a right to a

jury trial.

28.     The Bankruptcy Court shall retain exclusive jurisdiction over all matters

regarding the interpretation or performance of this Settlement Agreement.

*[signature page follows]*

-10-

IN WITNESS WHEREOF, Parties hereto, intending to be legally bound, have

caused the Settlement Agreement to be duly executed as set forth below.

Dated: <u>May 12, 2017</u>

| **PEPPER HAMILTON LLP** | **SNOW, CHRISTENSEN & MARTINEAU** |
|---|---|
| /s/ Donald J. Detweiler | /s/ P. Matthew Cox |
| Donald J. Detweiler (admitted *pro hac vice*) | David L. Pinkston (#6630) |
| Francis J. Lawall (admitted *pro hac vice*) | P. Matthew Cox (#9879) |
| Joanna J. Cline (admitted *pro hac vice*) | 10 Exchange Place, Eleventh Floor |
| Hercules Plaza, Suite 5100 | Post Office Box 45000 |
| 1313 N. Market Street | Salt Lake City, Utah 84145-5000 |
| P.O. Box 1709 | Telephone: (801) 521-9000 |
| Wilmington, DE 19899-1709 | Fax: (801) 363-0400 |
|  | Email: dlp@scmlaw.com |
| - and – | pmc@scmlaw.com |
|  |  |
| **SNELL & WILMER L.L.P.** | *Attorneys for David J. Richards, LLC d/b/a Western US Mineral Investors, LLC* |
| David E. Leta |  |
| Troy J. Aramburu |  |
| Jeffrey D. Tuttle |  |
|  |  |
| *Counsel for CS Mining, LLC* |  |

#44420611 v1

# EXHIBIT D

| | |
|---|---|
| United States Bankruptcy Court for the District of Utah<br>CS Mining, LLC Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>P.O. Box 4419<br>Beaverton, OR 97076-4419<br>Name of Debtor: CS Mining, LLC<br>Case Number: 16-24818 | Fo Filed: USBC - District of Utah<br>CS Mining, LLC<br>16-24818 (WTT)<br><br>0000000153 |

| For Court Use Only |
|---|
| **RECEIVED**<br><br>FEB 1 5 2017<br><br>**LEGAL SERVICES** |

## Proof of Claim (Official Form 410)

Read the Instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. With the exception of 503(b)(9), do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact Information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:   Identify the Claim

**1.   Who is the current creditor?**
Name of the current creditor (the person or entity to be paid for this claim):   David J. Richards, LLC d/b/a/ Western US Minerals Investors, LLC

Other names the creditor used with the debtor:  W U M I

**2.   Has this claim been acquired from someone else?** X No ☐ Yes. From whom? _____

| **3.   Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | | **4.   Does this claim amend one already filed?** |
|---|---|---|
| Where should notices to the creditor be sent?<br><br>Name: David J. Richards, LLC d/b/a Western US Minerals Investors, LLC: C/O Robert Lautz<br><br>10866 Wilshire Boulevard<br>Number    Street<br><br>Los Angeles, CA 90024<br>City          State          Zip Code<br><br>Country (if International): _____<br><br>Contact phone: 3 1 0 - 4 7 5 - 0 5 5 0<br><br>Contact email: _____ | Where should payments to the creditors be sent?<br>(if different)<br><br>Name _____<br><br>Number    Street<br><br>City          State          Zip Code<br><br>Country (if International): _____<br><br>Contact phone: _____<br><br>Contact email: _____ | X No<br><br>☐ Yes.  Claim number on court claims register (if known) _____<br><br>Filed on _____<br>       MM  / DD  / YYYY<br><br>**5.  Do you know if anyone else has filed a proof of claim for this claim?**<br><br>X No<br><br>☐ Yes.  Who made the earlier filing? _____ |

### Part 2:   Give Information About the Claim as of the Date the Case Was Filed

| **6. Do you have any number you use to identify the debtor?**<br><br>☐ No<br><br>☐ Yes.<br>Last 4 digits of the debtor's account or any number you use to identify the debtor:<br><br>___ ___ ___ ___ | **7. How much is the claim?**<br><br>$ 24,926,036.00<br><br>Does this amount include Interest or other charges?<br><br>☐ No<br><br>X Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). | **8. What is the basis of the claim?**<br><br>Examples: Good sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information<br><br>Money Loaned, See Attached summary and loan documents_____ |

Page 1 of 2
-General POC-

Filed: February 15th, 2017

**9. Is all or part of the claim secured?**

☐ No

X Yes.    The claim is secured by a lien on property.
Nature of property:

X Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

X Other. Describe: All real and personal property of CS Mining. See Loan Documents attached

Basis for perfection: Deed of Trust, UCC Financing Statements, See Attached

Attach redacted copies of documents, if any, that show evidence of perfection of security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:                    $Unknown

Amount of the claim that is secured:    $24,926,036

Amount of the claim that is unsecured: $
(The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any
default as of the date of the petition    $

Annual Interest Rate (when case was filed)                    %
                              ☐ Fixed  ☐ Variable

**10. Is this claim based on a lease?**

X No

☐ Yes. Amount necessary to cure any default as of the date of petition.

$

**11. Is this claim subject to a right of setoff?**

X No

☐ Yes. Identify the property:

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☐ No

☐ Yes. Check all that apply:

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other. Specify subsection of 11 U.S.C. § 507 (a)(__) that applies.

\* Amounts are subject to adjustment on 04/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

Amount entitled to priority

$ _____

$ _____

$ _____

$ _____

$ _____

$ _____

**13. Does this claim qualify as an Administrative Expense under 11 U.S.C. § 503(b)(9)?**

☐ No

☐ Yes. Amount that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $ _____

**Part 3    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005 (a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☒ I am the creditor.

X I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    02 / 14 / 17
                  MM / DD / YYYY      Signature

Print the name of the person who is completing and signing this claim:

Name    ROBERT           W.              LAUTZ
        First name      Middle name        Last name

Title    MANAGING DIRECTOR        BOARD MEMBER

Company    ST CLOUD CAPITAL    WBM1
        Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

        Number      Street

        City                    State        Zip Code

Contact Phone                    Email

### Basis for Proof of Claim

1.     On August 10, 2012, CS Mining, as borrower, and WUMI, David J. Richards,

LLC, d/b/a Western US Mineral Investors, LLC ("WUMI"), as lender, entered into that certain

Loan and Security Agreement (the "WUMI Loan"). The WUMI Loan originally consisted of a

$3,500,000 capital expenditure line and a maturity date of July 31, 2017.  See Exhibit 1. This

includes a Debt Subordination Agreement between CS Mining, LLC and Sky Mineral Partners,

LLC in favor of WUMI.

2.     The WUMI Loan was amended on ten (10) different occasions:

a.     December 1, 2012 – additional advance of $1,000,000 and added

additional specified equipment to pledged collateral; see Exhibit 2.

b.     January 4, 2013 – additional advance of $600,000 and added additional

real property and personal property to pledged collateral; see Exhibit 3. The Deed of

Trust recorded on February 11, 2013, as Entry No. 250584 is attached as Exhibit 4.

c.     April 24, 2013 – additional advance of $1,000,000 and added real property

and mining claims to pledged collateral; see Exhibit 5. The Deed of Trust recorded on

May 6, 2013, as Entry No. 251093, is attached as Exhibit 6.

d.     May 14, 2013 – additional advance of $8,400,000 and added additional

real property and personal property interests to pledged collateral; see Exhibit 7.  The

Deed of Trust recorded on May 13, 2013, as Entry No. 251233, is attached as Exhibit 8.

e.     July 9, 2013 – modifications of interest payments and covenants; see

Exhibit 9.

   f. January 28, 2014 – omnibus amendment to loan documents with additional advance of $2,000,000, amendment also includes inclusion of Loan Conversion and Participation Rights Agreement; see Exhibit 10.

   g. February 4, 2014 – additional advance of $2,000,000; see Exhibit 11.

   h. March 4, 2014 – additional advance of $2,000,000; see Exhibit 12.

   i. July 21, 2014 – additional advance of $2,500,000; See Exhibit 13.

   j. March 10, 2015 – adds covenant requiring notice and consent before CS Mining can draw down more than $29,750,000 under Noble/Waterloo Loan, also includes certain subordination agreements where WUMI subordinates certain rights under a fixture filing and Deed of Trust to Noble. See Exhibit 14.

3. On July 21, 2014, the parties amended the Loan Conversion and Participation Rights Agreement to modify the "conversion price" associated with any conversion features of the WUMI Loan. See Exhibit 15.

4. A Deed of Trust recorded on August 13, 2014, as Entry No. 25485, is attached as Exhibit 18.

5. In connection with the WUMI Loan, the Debtor granted WUMI as security interest in all of its assets, with limited exclusions. The security interests granted to WUMI included a first priority deed of trust, lien and security interest in all assets of the Company, including all real and personal property and the proceeds thereof. The first position priority has been modified with respect to certain of the collateral pursuant to intercreditor subordination agreements.

6.      The Intercreditor Agreement is attached as Exhibit 16. Copies of the WUMI Loan

Copies of the other security documents are attached as Exhibit 17.

7.      As of the Petition Date, $20,500,000 in principal, $4,426,036 in interest are due

and owing under the WUMI loan.

The exhibits are voluminous and are not attached.  A full copy is available upon request and will be provided to the Court at the hearing.

# EXHIBIT E

David Leta (1937)
Troy Aramburu (10444)
Jeff Tuttle (14500)
**SNELL & WILMER L.L.P.**
15 W South Temple, Suite 1200
Salt Lake City, Utah 84101
Telephone: 801-257-1900
Facsimile: 801-257-1800
Email: dleta@swlaw.com
        taramburu@swlaw.com
        jtuttle@swlaw.com

Donald J. Detweiler, Esq. (admitted *pro hac vice*)
Francis J. Lawall, Esq. (admitted *pro hac vice*)
Joanna J. Cline (admitted *pro hac vice*)
**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 656-8865
E-mail: detweild@pepperlaw.com
        lawallf@pepperlaw.com
        clinej@pepperlaw.com

*Counsel for CS Mining, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re **CS MINING, LLC**<br><br>                    Debtor | Bankruptcy Case No. 16-24818<br><br>(Chapter 11)<br><br>Judge William T. Thurman |
| CS MINING, LLC, a Delaware Limited<br>Liability Company,<br><br>        Plaintiff,<br><br>        v.<br><br>DAVID J. RICHARDS, LLC d/b/a<br>WESTERN US MINERAL INVESTORS,<br>LLC, an Ohio Limited Liability Company.<br><br>        Defendant. | Adv. Pro. No.: |

Plaintiff CS Mining, LLC ("**CS Mining**" or the "**Company**") hereby brings this

adversary proceeding against defendant David J. Richards, LLC (d/b/a Western US Mineral

Investors or "**WUMI**"), and alleges as follows:

## NATURE OF ACTION

1.      This is an action seeking (i) a determination of the nature, extent, validity, and priority of WUMI's prepetition secured claims, if any, against CS Mining's bankruptcy estate; (ii) an order recharacterizing and/or disallowing WUMI's prepetition secured claims, if any, against CS Mining's bankruptcy estate; and (iii) the imposition of damages against WUMI for breach of contract and promissory estoppel.

2.      Headquartered in Milford, Utah, CS Mining is in the business of mining and processing copper.

3.      Defendant WUMI is a pre-petition lender to the Company.  WUMI breached contractual obligations to convert its debt to equity and wrongfully commenced an action to foreclose on alleged liens and claims arising under the loan documents.  Because of WUMI's conduct, and because the debt obligations allegedly owed to WUMI are subject to the equitable remedy of recharacterization, WUMI's claims against CS Mining's bankruptcy estate should not be permitted and should be disallowed in their entirety.  CS Mining is also entitled to recover damages from WUMI for its contractual breaches.

## JURISDICTION AND VENUE

4.      This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).  The causes of action for disallowance of claim under 11 U.S.C. § 502, recharacterization, and recovery from property securing a secured claim under 11 U.S.C. § 506(c) are core proceedings under 28 U.S.C. § 157.  The remaining causes of action for breach of contract and promissory estoppel are non-core proceedings that are related to the bankruptcy proceeding under this Court's jurisdiction pursuant to 28 U.S.C. § 157(c)(1).  Plaintiff consents

25801862.1

to an entry of final order or judgment on the non-core matters by this Court pursuant to 28 U.S.C. § 157(c)(2).

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES AND RELEVANT NON-PARTIES

7.      CS Mining is a Delaware limited liability company, with its principal place of business in Milford, Beaver County, Utah.  The Company is in the business of mining and processing copper and other metals and minerals, and it owns or otherwise controls approximately 60,000 acres of mineral rights in Utah.

8.      CS Mining is owned by three members, all of whom are parties to the Limited Liability Company Agreement of CS Mining, LLC, dated as of October 31, 2011, and amendments thereto (together, the "**Operating Agreement**").  A true and correct copy of the Operating Agreement is attached hereto as Exhibit A.

9.      The Members of the Company are:  (i) Skye Mineral Partners, LLC ("**SMP**"), a Delaware limited liability company; (ii) Robert Reynolds, as representative of the First Lien Lenders under that certain Equity Administration Agreement by and among the former first lien lenders of Western Utah Copper Company ("**WUCC**") and Copper King Mining Corporation ("**Copper King**"), dated June 6, 2011; and (iii) Copper King.

10.     SMP is the majority controlling member of CS Mining, owning approximately 94% of the common membership units of CS Mining, 100% of the preferred membership units of CS Mining, and 99.25% of the total membership units of the Company. Copper King owns approximately 1% of the common units and 0.12% of the overall units of the Company.  Robert Reynolds owns approximately 5% of the common units and 0.62% of the overall units of the Company.

25801862.1

11.     SMP is owned by four members – Sky Mineral Investors, LLC ("**SMI**"), Clarity Copper, LLC ("**Clarity**"), DXS Capital (U.S.) Limited ("**DXS**"), and PacNet Capital (U.S.) Limited ("**PacNet**").

12.     SMI is an Ohio limited liability company and owns 38.27% of SMP. David J. Richards ("**Richards**") serves, and at all relevant times has served, as SMI's designated representative to the SMP and CS Mining Boards.

13.     Clarity is a Delaware limited liability company that owns 33.67% of SMP. Clinton W. Walker ("**Walker**") serves, and at all relevant times has served, as Clarity's designated representative to the SMP and CS Mining Boards.

14.     PacNet is a Delaware corporation that owns 14.2% of SMP.  Marshall Cooper ("**Cooper**") serves, and at all relevant times has served, as PacNet's designated representative to the SMP and CS Mining Boards.

15.     DXS is a Delaware corporation that owns 13.8% of SMP.  Cooper serves, and at all relevant times has served, as DXS's designated representative to the SMP and CS Mining Boards.

16.     DXS and PacNet are owned and controlled by Lippo China Resources Limited ("**Lippo**"), a company traded on the Stock Exchange of Hong Kong, Limited.  A true and correct copy of the organizational structure of CS Mining and SMP is attached hereto as Exhibit B.

17.     Pursuant to Section 5.1 of CS Mining's Operating Agreement, CS Mining's business and affairs are managed by a Board of Managers (the "**Board**").

18.     The Boards of both SMP and CS Mining consist of Richards, Walker, and Cooper.

19. As members of CS Mining's Board, Richards and Walker are "insiders" as such term is defined under 11 U.S.C. § 101(31).

20. Defendant WUMI is an Ohio limited liability company. Upon information and belief, WUMI's principal place of business is located at S. Front Street, Suite 1200, Columbus, Ohio. WUMI is one of three of CS Mining's secured lenders. WUMI provided CS Mining with a secured loan (the "**WUMI Loan**"), pursuant to a Loan and Security Agreement dated August 10, 2012, as amended (together with amendments thereto, the "**WUMI Loan Agreement**"). As of June 2, 2016 (the "**Petition Date**"), $20.5 million in principal and approximately $4.3 million in interest were allegedly due and owing under the WUMI Loan Agreement. A true and correct copy of the WUMI Loan Agreement is attached hereto as Exhibit C.

21. Upon information and belief, Richards and Walker previously owned and/or controlled WUMI.

## FACTUAL ALLEGATIONS

### I. The Origins Of CS Mining

22. CS Mining's origins can be traced back to the bankruptcies of WUCC and Copper King.

23. WUCC was incorporated in mid-2002 in Utah. From 2002 through 2004, WUCC consolidated the mining claims of a large number of formerly productive copper deposits located in the Milford district of Beaver County, Utah. WUCC believed that although each of the deposits individually was insufficient to support the capital expenditures required for a copper processing plant, that the aggregate value of the parcels made the project economically feasible. WUCC, however, experienced numerous setbacks on the project and due to those setbacks was unable to finance the project to completion.

-5-

24.    In February 2008, WUCC merged with a wholly-owned subsidiary of Copper King. As a result of the merger, Copper King became the sole stockholder of WUCC.

25.    After suffering numerous additional setbacks, WUCC and Copper King filed for bankruptcy on May 18, 2010. These jointly administered cases were filed in the Bankruptcy Court for the District of Utah, styled *In re Copper King Mining Corporation*, Case No. 10-30002 WTT (Bankr. D. Utah) and *In re Western Utah Copper Company*, Case No. 10-29159 WTT (Bankr. D. Utah).

26.    On June 20, 2011, CS Mining was formed to acquire all of the assets and certain of the debt obligations of WUCC and Copper King in connection with their respective chapter 11 bankruptcy cases.

## II.    CS Mining's Operating Strategy And Plans – The Flotation Mill (Phase I) And The Agitated Leach Facility (Phase II)

27.    Following its purchase of WUCC and Copper King's assets, CS Mining embarked on its two-part business plan: (i) optimize and restart operations of WUCC's existing flotation mill (the "**Flotation Mill**" or "**Phase I**"); and (ii) finance and construct a state-of-the-art agitated leach processing facility designed to maximize recovery of oxide copper ore via an agitated leach circuit and counter current decantation processing circuit (the "**Agitated Leach Facility**" or "**Phase II**").

28.    The Board authorized and approved CS Mining's two-part business plan, and was aware, at all relevant times, that implementation of Phase II of the project was necessary to the Company's ongoing business and operations.

29.    Indeed, CS Mining believes that the Agitated Leach Facility (*i.e.* Phase II) presents, by far, the most cost-effective method to maximize recoveries of copper. The Company estimates that approximately 75% to 80% of the total copper resource on its mining

-6-

properties is primarily oxide-based minerals that will require acid leaching via the Agitated

Leach Facility (*i.e.*, Phase II of the project) to maximize recovery of the copper.

30.     Shortly after acquiring WUCC and Copper King's assets on November 14,

2011, the Company began to implement Phase I of the project, including seeking to optimize and

restart operations of the Flotation Mill.

31.     CS Mining's plan was to have the Flotation Mill up and running as soon as

reasonably practicable. Due to various operational setbacks, it ultimately took about a year to

fully restart the Flotation Mill.  In the meantime, copper prices decreased, and CS Mining was

not able to extract the volume of copper that it had anticipated.  As a result, CS Mining was not

able to earn its expected revenue during Phase I, and it was accordingly not able to fully fund

Phase II and associated resource development using Phase I revenues, as it had planned.

32.     Although CS Mining was able to complete construction of the Agitated

Leach Facility, due to significant liquidity constraints, lack of funding, and delays in constructing

the Flotation Mill, CS Mining was not able to capitalize on the benefits of its state-of-the-art

Agitated Leach copper production capabilities.

33.     Indeed, although CS Mining began the commissioning process of its

Agitated Leach Facility (*i.e.*, Phase II of the project) prior to the Petition Date, the full

commissioning and optimization was not completed.

34.     Instead, prior to the commencement of this bankruptcy proceeding, CS

Mining was primarily limited to processing its copper resources in the Company's Flotation Mill

(*i.e.*, Phase I of the project).

### III.     CS Mining's Prepetition Debt Obligations

35.     Prior to this bankruptcy proceeding, CS Mining was indebted to several

different lenders, including, but not limited to: (a) SMP; (b) WUMI; and (C) Noble Americas

-7-

Corp. ("**Noble**")/Waterloo Street Limited ("**Waterloo**"). Indeed, CS Mining's prepetition debt

obligations included a loan from SMP (the "**SMP Loan**"), the WUMI Loan, and a loan from

Noble, which was subsequently purchased and assumed by Waterloo (the "**Noble/Waterloo**

**Loan**").

A.    **The SMP Loan**

36.    On November 10, 2011, CS Mining, as borrower, and SMP, as lender,

entered into a Joint Loan Modification Agreement (together with amendments thereto, the "**SMP**

**Loan Agreement**") whereby CS Mining and SMP agreed to modify the terms of certain debt

instruments previously issued by WUCC and Copper King, which SMP acquired in the WUCC

and Copper King bankruptcies.

37.    In connection with the SMP Loan Agreement, CS Mining granted SMP a

security interest in all of its assets.

38.    As described further below, on August 10, 2012, SMP agreed to

subordinate its debt and lien rights under the SMP Loan Agreement to WUMI's debt and lien

rights under the WUMI Loan.

39.    In addition, two years later, on August 12, 2014, SMP agreed to further

subordinate its debt and lien rights under the SMP Loan Agreement to Noble's debt and lien

rights under the Noble/Waterloo Loan.

40.    As of the Petition Date, it was estimated that SMP would file a claim in

the bankruptcy case in excess of $27 million, consisting of $25,886,653 in principal and

$1,543,052 in accrued interest.

B.    **The WUMI Loan**

41.    On August 10, 2012, CS Mining, as borrower, and WUMI, as lender,

entered into the WUMI Loan Agreement. Pursuant to the terms of the agreement, WUMI agreed

to lend money to CS Mining to fund operations and/or make capital investments subject to an interest rate of 12.5% per annum.

42.     The WUMI Loan also gave WUMI a senior lien over substantially all of CS Mining's assets.

43.     Indeed, as part of the WUMI Loan, CS Mining granted WUMI a security interest in all of its assets, with limited exclusions. The security interests granted to WUMI under the WUMI Loan included a first priority deed of trust, lien, and security interest in all assets of the Company, with limited exclusions, including all real and personal property and proceeds thereof.

44.     Initially, on August 10, 2012, WUMI loaned $1 million to CS Mining. *Id.* From 2012 through 2014, WUMI lent CS Mining a total of $20.5 million in a series of draws as additional funding was requested and approved by the Board of CS Mining. As of the Petition Date, $20.5 million in principal, and approximately $4.4 million in interest were allegedly due and owing under the WUMI Loan Agreement.

45.     On December 1, 2012, January 4, 2013, April 24, 2013, and May 14, 2013, the parties executed, respectively, the First, Second, Third, and Fourth Amendments to the WUMI Loan Agreement, under which WUMI provided an additional $11 million in funding (over and above the initial $1 million) and obtained liens on additional specified real and personal property, including equipment.

46.     Notably, the Fourth Amendment, executed on May 14, 2013, also gave WUMI rights that are normally only granted to stockholders. A true and correct copy of the Fourth Amendment to the WUMI Loan is attached hereto as Exhibit D. For instance, the Fourth Amendment provided WUMI with the ability to convert any outstanding debt owed to it by CS

Mining into SMP Class A membership units. *Id.* at 2. In addition, the Fourth Amendment also

afforded WUMI the right to receive a share of the proceeds from a merger, recapitalization,

reclassification, dividend, and other similar transactions, in an amount equal to what WUMI

would have received had it exercised its conversion rights immediately prior to the merger,

recapitalization, reclassification, dividend, or other similar transaction. *Id.* at 3-4. In other

words, WUMI received all of the upside of being a member of the Company, without the

downside of being characterized as an equity holder, including being subordinate to unsecured

debtholders.

47.    On July 9, 2013, the parties executed a Fifth Amendment to the WUMI

Loan Agreement, under which certain modifications to interest payments and covenants were

made. Specifically, it allowed CS Mining to make interest-only payments under the WUMI

Loan Agreement, with no payments owed on the principal through January 31, 2014.

48.    On or about January 28, 2014, the parties executed the Sixth Amendment

to the WUMI Loan Agreement, which was styled as an "Omnibus Amendment." The omnibus

Sixth Amendment: (i) provided for an additional $2 million advance; (ii) extended CS Mining's

right to make interest-only payments through July 31, 2014, with the remainder of the loan

amortized over a period of forty-three months; and (iii) acknowledged and incorporated by

reference a Conversion and Participation Rights Agreement (the "**Loan Conversion**

**Agreement**") among CS Mining, SMP, WUMI, PacNet, DXS, Clarity, and SMI. A true and

correct copy of the Sixth Amendment to the WUMI Loan Agreement is attached hereto as

Exhibit E. A true and correct copy of the Loan Conversion Agreement is attached hereto as

Exhibit F.

25801862.1

49.     Under the Loan Conversion Agreement, WUMI obtained the right to convert the debt owed by CS Mining under the WUMI Loan Agreement, including any accrued interest, into equity of SMP. Ex. F at 2. Similar to the Fourth Amendment to the WUMI Loan Agreement, the Conversion and Participation Rights Agreement afforded WUMI the right to receive a share of the proceeds from an SMP merger, recapitalization, reclassification, dividend, or other similar transaction, in an amount equal to what WUMI would have received had it exercised its conversion rights immediately prior to the merger, recapitalization, reclassification, dividend, or other similar transaction. *Id.* at 2-3.

50.     Thus, by virtue of the Sixth Amendment (which incorporated the Conversion and Participation Rights Agreement), WUMI was entitled to share in the proceeds of a merger, recapitalization, reclassification, dividend, or other similar transaction, even if it had not previously exercised its right to convert its debt into equity. In other words, the Conversion and Participation Rights Agreement afforded WUMI all of the upside of being a member of the Company, without the downside of being characterized as an equity holder, including being subordinate to unsecured debtholders.

51.     On February 4, 2014, March 4, 2014, and July 21, 2014, the parties executed, respectively, the Seventh, Eighth, and Ninth Amendments to the WUMI Loan Agreement, under which WUMI provided an additional $6.5 million in funding and obtained a lien on additional specified real and personal property, including equipment. Notably, under Section 2 of the Ninth Amendment to the WUMI Loan Agreement, CS Mining's right to make interest-only payments was extended through July 31, 2015.

52.     On March 10, 2015, WUMI and CS Mining's CEO, David McMullin, executed a Tenth Amendment to the WUMI Loan Agreement. Among other things, the Tenth

-11-

Amendment provided that CS Mining would not be required to make any payments (principal or interest) through December 31, 2015. A true and correct copy of the Tenth Amendment is attached hereto as Exhibit G.

53.    CS Mining has never made any principal payments under the WUMI Loan. As of the Petition Date, $20.5 million in principal, and approximately $4.3 million in interest were allegedly due and owing under the WUMI Loan Agreement.

C.    **The Noble/Waterloo Loan, The Intercreditor Agreement, And The 10th Amendment To The WUMI Loan**

54.    On or about August 12, 2014, in a continued effort to finance Phase II, CS Mining, as borrower, secured a $30 million loan from Noble, a Delaware corporation conducting business in Utah (together with the amendments thereto, the "**Noble/Waterloo Loan Agreement**"). As of the Petition Date, $30 million in principal (without reducing for the original issue discount applicable to the loan amount because of certain warrants issued to Noble as part of the Noble/Waterloo Loan Agreement), and $5,423,837 in interest, were allegedly due and owing under the Noble/Waterloo Loan Agreement.

55.    Noble, which is in the business of marketing and distributing energy, metals, and mineral products, including copper, agreed to provide financing to the Company in large part because of its interest in securing warrants in SMP and copper supply agreements with CS Mining.

56.    The Company and Noble (and to some extent, WUMI) memorialized their respective obligations in connection with the Noble/Waterloo Loan into four Agreements: (i) the Noble/Waterloo Loan Agreement; (ii) an Intercreditor Agreement between CS Mining, Noble, and WUMI (the "**Intercreditor Agreement**"); (iii) a Copper Concentrate Sales and Purchase Agreement (the "**Concentrate Agreement**"); and (iv) a Copper Cathode Sales and Purchase

-12-

Agreement (the "Cathode Agreement" and together with the Concentrate Agreement, the "**Supply Agreements**"). These agreements were executed concurrently on or about August 12, 2014. A true and correct copy of the Intercreditor Agreement is attached as Exhibit H.

57.     The Noble/Waterloo Loan Agreement required Noble to loan to CS Mining $15 million initially, and a second $15 million (for a total of $30 million) if and when CS Mining was able to raise $15 million in matching equity financing (the "**Matching Equity Financing**").

58.     Under the Intercreditor Agreement, and as an inducement to Noble to provide CS Mining with the funds under the Noble/Waterloo Loan Agreement, WUMI agreed to subordinate certain of the liens it held against CS Mining's assets to Noble's liens, while retaining a senior lien on certain other assets. Ex. H at 2-3.

59.     In addition, WUMI agreed that it would convert its remaining debt into equity in SMP once Noble advanced the full $30 million it was committing to lend CS Mining under the Noble/Waterloo Loan Agreement, thus reducing CS Mining's debt burden and freeing CS Mining's assets from WUMI's liens.

60.     Indeed, Section 5.2 of the Intercreditor Agreement provides that in the event that "Noble loans [CS Mining] the [$30 million] pursuant to the Noble/Waterloo Loan Agreement, and there are no existing defaults under the Noble/Waterloo Loan Agreement or that occur in connection with lending the [$30 million], [WUMI] agrees to promptly (but in any event within 5 business days] convert [its loan] in full into equity of [SMP], pursuant to the terms of the [Richards] Loan Agreement . . . . In connection with such conversion, the [WUMI Loan Agreement] obligations will be extinguished [and] all [l]iens held by [WUMI] on [c]ollateral shall be released." Ex. H at 4.

61.    WUMI understood that its promise to convert was an inducement for Noble to enter into the Noble/Waterloo Loan Agreement.

IV.    **Events After The Funding Of The Noble/Waterloo Loan**

62.    As noted above, on August 12, 2014, concurrently with the execution of the Noble/Waterloo Loan Agreement, the Intercreditor Agreement, and the Supply Agreements, Noble funded the initial $15 million of funding.

63.    CS Mining then took steps to secure the $15 million in Matching Equity Financing that would trigger CS Mining's ability to access the second $15 million tranche of Noble financing and WUMI's corresponding obligation under the Intercreditor Agreement to convert its debt into equity and release its liens.

64.    On or about April 24, 2015, PacNet, Clarity, and SMI entered into a Membership Unit Purchase Agreement to provide the Matching Equity Financing by purchasing additional equity interests in SMP in the amount of $15 million. The $15 million in funding, once provided pursuant to the Membership Unit Purchase Agreement, would enable CS Mining to obtain the full second $15 million tranche of funding under the Noble/Waterloo Loan Agreement.

65.    By June 4, 2015, CS Mining's members invested a total of $15 million in SMP pursuant to the Membership Unit Purchase Agreement. Thus, as of June 4, 2015, CS Mining had satisfied the condition in the Noble/Waterloo Loan Agreement that it obtain $15 million in Matching Equity Financing in order to obtain the second $15 million tranche of Noble financing.

66.    Noble therefore provided CS Mining with additional funding, and as of July 8, 2015, Noble had provided CS Mining with $29.75 million of the $30 million of the funds available under the Noble/Waterloo Loan Agreement. Waterloo, after it purchased the

-14-

Noble/Waterloo Loan from Noble, provided CS Mining with the remaining $250,000 on February 3, 2016.

## V.   Transfer Of The Noble/Waterloo Loan To Waterloo

67.     As the Company continued to struggle financially, Noble was experiencing its own financial difficulties and accordingly began exploring the possibility of selling its loan.

68.     In fact, in November 2015, Noble sent a letter to CS Mining identifying "Events of Default" related to the Noble/Waterloo Loan Agreement and, among other things, reserving its right "to sell or assign" the Noble/Waterloo Loan Agreement to "one or more Eligible Assignees without the consent of the Company."

69.     On December 30, 2015, Noble sent another letter to the Company identifying "Events of Default" related to the Noble/Waterloo Loan Agreement and, among other things, reserving its right "to sell or assign" the Noble/Waterloo Loan Agreement to "one or more Eligible Assignees without the consent of the Company."

70.     On December 31, 2015, Waterloo acquired the Noble loan.  Specifically, Waterloo, which is owned and controlled by Lippo, entered into a Purchase and Sale Agreement under which it acquired Noble's interests and assumed Noble's obligations under the Noble/Waterloo Loan Agreement and the Intercreditor Agreement.  Waterloo notified CS Mining of its acquisition of Noble's interests on or about January 7, 2016.

## VI.   Drawing Down Of The Noble/Waterloo Loan And WUMI's Failure To Convert

71.     On February 2, 2016, WUMI sent CS Mining a letter purporting to declare defaults under the WUMI Loan Agreement.

-15-

72.    On February 3, 2016, CS Mining drew down the last installment under the Noble/Waterloo Loan Agreement, bringing the total amount loaned to CS Mining under the Noble/Waterloo Loan Agreement to $30 million.

73.    On February 4, 2016, Waterloo sent a letter to CS Mining agreeing to waive any defaults that existed as of that date.

74.    As of February 4, 2016, Noble/Waterloo had fulfilled the obligation to fully fund $30 million, and no defaults existed as described in Section 8.01 in the Noble/Waterloo Loan Agreement, as any events of default that may have existed had been waived by Waterloo.

75.    Thus, under the Intercreditor Agreement, WUMI was obligated to convert its debt into equity and release its remaining liens by no later than February 11, 2016.

76.    Despite being obligated to convert its loan into SMP equity and to take steps to release its liens, WUMI has refused to do so.

VII.    **WUMI's Improper Enforcement Actions**

77.    Not only has WUMI refused to convert the WUMI Loan, on February 11, 2016, it sent an Enforcement Action Notice Letter declaring its intent to take Enforcement Action, as defined in the Intercreditor Agreement.

78.    Furthermore, on February 29, 2016, WUMI's attorneys sent a letter purporting to accelerate all moneys CS Mining allegedly owed to WUMI pursuant to the WUMI Loan Agreement.

79.    Then, on April 11, 2016, WUMI filed "Notices of Default and Election to Sell" (the "**Notices of Default**") with respect to CS Mining's real property and mining interests. The Notices of Default state that they are intended to permit WUMI to seize the Company's assets and subject them to foreclosure sale under Title 57, Chapter 1, of the Utah Code.

-16-

25801862.1

80.     The real estate and mining claims subject to WUMI's threats were carefully selected and acquired by CS Mining because they hold valuable and unique mineral deposits. Indeed, among the properties on which WUMI has threatened to foreclose is a parcel CS Mining needs to construct a new "tailings pond" to deposit the rock and process effluents that are generated by its processing plant. Without a place to deposit these materials, CS Mining would not be able to continue its ore processing operation once the capacity of its existing "tailings pond" is exhausted.

81.     Similarly, the water rights and equipment that WUMI has threatened to seize are vital to CS Mining's business. CS Mining needs access to water to be able to run its operations. Water is used as an essential element at various stages in the refining process. The ball mills on which WUMI holds liens are central to its processing operations. Without them, CS Mining would not be able to process copper ore into a commercially viable product.

82.     WUMI's conduct violated Section 5.2 of the Intercreditor Agreement, pursuant to which the liens previously held by WUMI should have been released.

**VIII.   CS Mining Declares Bankruptcy**

83.     Due to, among other things, WUMI's failure to convert, WUMI's improper attempts to enforce its liens, a depressed copper commodities market (including a 3 to 4 year low price of copper), cost overruns and delays, and lower than anticipated copper recoveries, CS Mining's financial struggles continued throughout 2016 and ultimately led to its filing for bankruptcy protection.

84.     On the Petition Date, Minerals Advisory Group, LLC, RJ Bayer Professional Geologist, LLC, Rollins Construction & Trucking, LLC, Rollins Machine, Inc., Oxbow Sulphur, Inc., and Bahama Group, Inc. filed an Involuntary Bankruptcy Petition against CS Mining in the Bankruptcy Court for the District of Utah.

-17-

85.     On August 4, 2016, the Company filed a letter with the Court advising it
that it had received the requisite approvals to consent to a voluntary Chapter 11 Bankruptcy
proceeding.  That same day, the Court entered an Order for Relief.

86.     CS Mining continues to operate its business and manage its properties as a
debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

87.     During the pendency of the bankruptcy case, Waterloo and PacNet
brought suit against WUMI, SMI, Richards, Clarity, Walker, and David C. McMullin in this
Court alleging, among other things, that: (i) "Richards and Walker entered into an unauthorized
and undisclosed side agreement [*i.e.*, the Tenth Amendment to the WUMI Loan Agreement] to
prevent CS Mining from drawing down on the entire $30 million available under the
Noble[/Waterloo] Loan so that [WUMI] could avoid its obligation to convert its debt to equity
and release its liens against CS Mining's assets"; (ii) "Richards, Walker, and [WUMI] refused to
convert the [WUMI] Loan debt into equity and to release its liens against CS Mining's assets as
required by the Intercreditor Agreement"; (iii) "Richards, Walker and [WUMI] affirmatively
sought to enforce invalid liens on CS Mining's assets"; (iv) "Richards and Walker used [SMI]
and Clarity . . . to obstruct PacNet's efforts to provide necessary equity contributions to CS
Mining so that CS Mining would default under the Noble[/Waterloo] Loan and thereby relieve
[WUMI] of its obligations to convert its debt to equity and release its liens against CS Mining's
assets"; and (v) Richards and Walker used [SMI] and Clarity . . . to purportedly withdraw
consent to the amendment to the Noble[/Waterloo] Loan in an attempt to place CS Mining back
in default so that [WUMI] would not have to convert its debt to equity and release its liens
against CS Mining."  According to Waterloo and PacNet, Richards, Walker, and WUMI

engaged in this conduct "in an effort to artificially and improperly maintain [WUMI] as a secured senior creditor of CS Mining . . . ."

88.     This action remains pending before the Court for resolution in connection with the bankruptcy case.

## COUNT I
## SURCHARGE AGAINST THE WUMI LOAN
## AGAINST WUMI

89.     Plaintiff repeats and realleges each preceding allegation as if fully set forth herein.

90.     CS Mining has incurred substantial reasonable, necessary costs and expenses that benefited WUMI in preserving or disposing of the property securing WUMI's claim against CS Mining's bankruptcy estate.

91.     WUMI consented to various costs and expenses in preserving or disposing of the property securing WUMI's claim against CS Mining's bankruptcy estate.

92.     All costs and expenses incurred in preserving or disposing of the property securing WUMI's claim against CS Mining's bankruptcy estate should be recovered by CS Mining's estate.

93.     Pursuant to Bankruptcy Code Section 506(c), CS Mining may recover from WUMI the reasonable, necessary costs and expenses that have been incurred and that benefitted WUMI in preserving or disposing of WUMI's collateral.

94.     CS Mining may recover from WUMI the costs and expenses to which WUMI consented in preserving or disposing of WUMI's collateral.

95.     Accordingly, CS Mining is entitled to a judgment against WUMI ordering the recovery for the benefit of CS Mining's estate all costs and expenses incurred in preserving or disposing of WUMI's collateral.

25801862.1

**COUNT II**
**RECHARACTERIZATION OF WUMI LOAN**
**AGAINST WUMI**

96.     Plaintiff repeats and realleges each preceding allegation as if set forth
herein.

97.     The WUMI Loan should be recharacterized as equity based on WUMI's
conduct and the plain language of the agreements into which WUMI entered into over the
lifetime of the WUMI Loan.

98.     First, as Richards and Walker are members of the CS Mining Board, are
affiliated with two of CS Mining's ultimate members, and are managers and owners of WUMI,
the WUMI Loan Agreement was made by an affiliate of CS Mining's ultimate members.

99.     Second, WUMI itself has not enforced the terms of the WUMI Loan
Agreement, repeatedly permitting CS Mining to make interest-only payments throughout the life
of the loan and, on March 10, 2015, agreeing that CS Mining did not need to make *any* payments
until December 31, 2015.  Over the life of the loan, CS Mining has never paid any money against
the principal amount of the loan.

100.    Third, WUMI negotiated for rights typically afforded to equity investors.
Both the Fourth Amendment to the WUMI Loan and the Sixth Amendment provide WUMI
rights and benefits that equity holders would receive, rather than those of lenders.

101.    Fourth, the Intercreditor Agreement provides for a *mandatory* conversion
of WUMI's debts to equity following the full $30 million draw down under the Noble/Waterloo
Loan Agreement.  Had WUMI honored its commitment, the debt would have been converted to
equity.

102.    Fifth, the WUMI Loan Agreement provides for CS Mining to use the
funds to acquire capital assets.

-20-

103.    In light of these factors, the Company's debt to WUMI is really camouflaged equity.

104.    Therefore, Plaintiff seeks an order recharacterizing the amounts allegedly due and owing to WUMI as equity contributions.

**COUNT III**
**DISALLOWANCE OF THE WUMI LOAN CLAIM**
**AGAINST WUMI**

105.    Plaintiff repeats and realleges each preceding allegation as if set forth herein.

106.    On February 16, 2017, WUMI filed a proof of claim in this bankruptcy seeking allowance of all monies purportedly owed under the WUMI Loan Agreement and any related interest, totaling $24,926,036.

107.    WUMI's claim must be disallowed in full.

108.    As described below, because WUMI breached its obligations under the Intercreditor Agreement, any claim WUMI asserts against the Company should be disallowed. Alternatively, the Company is permitted (but not required) to set off WUMI's liability for its breaches against WUMI's claim.

109.    Indeed, the WUMI Loan amount is not really a general unsecured claim but should be deemed an equity investment in the Company.  WUMI's claim seeks payments on purported "obligations" that are invalid and unenforceable, and therefore should not be allowed pursuant to Section 502(b)(1) of the Bankruptcy Code.

110.    Therefore, Plaintiff seeks an order declaring that any current or subsequently filed secured claim seeking amounts purportedly owed under the WUMI Loan Agreement be disallowed in its entirety, or, in the alternative, and at the option of the Company,

-21-

that any recovery on WUMI's claim be set off against the damages due the Company as a result
of claims pled in this Complaint.

**COUNT IV**
**BREACH OF CONTRACT – INTERCREDITOR AGREEMENT**
**AGAINST WUMI**

111.    Plaintiff repeats and realleges each preceding allegation as if fully set forth
herein.

112.    On or about August 12, 2014, CS Mining, WUMI, and Noble entered into
the Intercreditor Agreement.

113.    Section 5.2 of the Intercreditor Agreement provides that in the event that
"Noble loans [CS Mining] the [$30 million] pursuant to the Noble/Waterloo Loan Agreement,
and there are no existing defaults under the Noble/Waterloo Loan Agreement or that occur in
connection with lending the [$30 million], [WUMI] agrees to promptly (but in any event within
5 business days] convert [its loan] in full into equity of [SMP], pursuant to the terms of the
[Richards] Loan Agreement . . . . In connection with such conversion, the [WUMI Loan
Agreement] obligations will be extinguished [and] all [l]iens held by [WUMI] on [c]ollateral
shall be released."

114.    On February 3, 2016, CS Mining drew down the last installment under the
Noble/Waterloo Loan Agreement, bringing the total amount loaned to CS Mining under the
Noble/Waterloo Loan Agreement to $30 million.

115.    As of February 4, 2016, Noble/Waterloo had fulfilled the obligation to
fully fund $30 million, and no defaults existed as described in Section 8.01 in the
Noble/Waterloo Loan Agreement, as any events of default that may have existed had been
waived by Waterloo.

25801862.1

116.    Thus, under the Intercreditor Agreement, WUMI was obligated to convert its debt into equity and release its remaining liens no later than February 11, 2016.  Despite being obligated to convert its loan into SMP equity and to take steps to release its liens, WUMI has refused to do so.

117.    As a result of WUMI's refusal to convert its debt into SMP equity, its continued assertion that it has valid liens and its currently pending actions to foreclose on the WUMI Loan and seize CS Mining's assets, CS Mining has been and continues to be harmed.

118.    Plaintiff therefore seeks a judgment declaring WUMI's debt and liens to be extinguished as of February 11, 2016 and ordering WUMI to take any steps necessary to effectuate the conversion of its debt and release of its liens, and damages in an amount to be proven at trial.

## COUNT V
## PROMISSORY ESTOPPEL
## AGAINST WUMI

119.    Plaintiff repeats and realleges each preceding allegation as if fully set forth herein.

120.    WUMI made a promise that it would convert its debt into equity following the draw-down of the full $30 million pursuant to the Noble/Waterloo Loan Agreement.

121.    CS Mining reasonably relied upon that promise in ultimately drawing-down the full $30 million.

122.    WUMI knew full well of CS Mining's reliance on the promise to convert debt to equity, given Richards' and Walker's seats on CS Mining's Board of Managers.

123.    Nevertheless, WUMI failed to honor its promise.

25801862.1

124.    WUMI had no intention of converting its debt to equity, as evidenced by the fact that when CS Mining finally did draw down the full $30 million, WUMI refused to convert its debt to equity.

125.    In reliance on WUMI's promise to convert, CS Mining incurred substantial additional debt, on the premise that upon that full draw-down, all of the WUMI debt would be converted into equity and CS Mining would be relieved of that debt obligation's onerous interest terms.

126.    CS Mining has been substantially damaged by WUMI's failure to abide by its promise, up to and including the commencement of this Chapter 11 case.

127.    Plaintiff therefore seeks a judgment declaring WUMI's debt and liens to be extinguished as of February 11, 2016 and ordering WUMI to take any steps necessary to effectuate the conversion of its debt and release of its liens, and damages in an amount to be proven at trial.

WHEREFORE, CS Mining respectfully requests judgment for CS Mining and against the Defendants, and for the Court to enter an order as follows:

A.    Ordering the recovery for the benefit of CS Mining's estate of all costs and expenses incurred in preserving or disposing of WUMI's collateral;

B.    Ordering that the WUMI Loan Agreement be recharacterized as equity rather than debt;

C.    Ordering that any claims arising out of or under the WUMI Loan Agreement be disallowed;

D.    Declaring WUMI to have breached its obligations to convert the Company's debt to equity and to extinguish its liens on the Company's property;

-24-

25801862.1

E.    Declaring WUMI's debt and liens to be extinguished as of February 11, 2016;

F.    Ordering WUMI to take any steps necessary to effectuate the conversion of its

debt and release of its liens;

G    Awarding damages to CS Mining for each of the foregoing wrongs in an amount

to be determined at trial;

H.    Awarding attorneys' fees, legal costs, and other expenses incurred by the

Company in connection with this action; and

I.    Granting any further relief the Court deems just and proper.


Dated:  February 17, 2017.

SNELL & WILMER L.L.P.

/s/    *Jeff Tuttle*
David E. Leta
Troy J. Aramburu
Jeffrey D. Tuttle

- and –

**PEPPER HAMILTON LLP**
Donald J. Detweiler (admitted *pro hac vice*)
Francis J. Lawall (admitted *pro hac vice*)
Joanna J. Cline (admitted *pro hac vice*)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

*Counsel for CS Mining, LLC*

25801862.1

# EXHIBIT A

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CS MINING, LLC**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH HEREIN.

LIMITED LIABILITY COMPANY AGREEMENT

OF

CS MINING, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this *"Agreement"*) of CS MINING, LLC, dated as of October 31, 2011, by and among the Members (as defined below), will become effective as of the date hereof.

### RECITALS

A. The Company was organized as a Delaware limited liability company on June 20, 2011 by duly filing a Certificate of Formation with the Secretary of State of the State of Delaware.

B. The parties now desire to adopt and approve this limited liability company agreement for the Company to set forth the rights and obligations of Members of the Company.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the parties agree as follows:

### SECTION 1.  DEFINITIONS.

When used in this Agreement, the following terms shall have the meanings set forth below.  Any terms used in this Agreement that are not defined in this Section 1 shall have the meanings set forth elsewhere in this Agreement.

*"Act"* shall mean the Delaware Limited Liability Company Act (6 Del.C. § 18-101, *et seq.*), as hereinafter amended from time to time.

*"Adjusted Capital Account Deficit"* means with respect to any Member, the deficit balance, if any, in the Capital Account of that Member as of the end of the relevant Fiscal Year, or other relevant period, giving effect to the adjustments thereto and further adjusted as follows:  (i) credit to such Capital Account, any amounts which that Member is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to such Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6); and (iii) to the extent required under the Treasury Regulations, credit to such Capital Account (A) that Member's share of Company Minimum Gain and (B) that Member's share of "partner nonrecourse debt minimum gain."   (Each Member's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

*"Affiliate"* of a Member, Manager, or other entity shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, a Member, Manager, or other entity, as applicable.  The term *"control,"* as used in the immediately preceding sentence, shall mean with respect to a corporation or limited liability company the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity, or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

1

*"Agreement"* shall mean this Limited Liability Company Agreement, as originally executed and as amended from time to time, and shall refer to the Agreement as a whole, unless the context requires otherwise.

*"Approved Sale"* is defined in Section 8.10(b).

*"Assignee"* shall mean the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Section 8.

*"Board" or "Board of Managers"* shall mean the group of Managers designated or elected from time to time pursuant to this Agreement.

*"Business"* shall mean that business owned and operated by the Company and its Subsidiaries.

*"Business Days"* means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Utah shall not be regarded as a Business Day.

*"Capital Account"* shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.3.

*"Capital Contribution"* shall mean, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company by a Member in its capacity as a Member, as reflected on Exhibit A, as the same may be amended from time to time in accordance with the terms of this Agreement.

*"Code"* shall mean the Internal Revenue Code of 1986, as amended from time to time, and the provisions of succeeding law.

*"Common Units"* means the Common Units of the Company granted to the Members having the rights and obligations described in this Agreement.

*"Company"* shall mean the limited liability company organized pursuant to this Agreement and the filing of those documents described in Recital A.

*"Company Minimum Gain"* shall have the meaning ascribed to the term "partnership minimum gain" in the Treasury Regulations Section 1.704-2(d).

*"Company Sale"* is defined in Section 8.10(a).

*"Depreciation"* shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year bears to such beginning adjusted tax basis; *provided, however,* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

*"Distribution"* shall mean a transfer of money or property by the Company to its Members without consideration. For avoidance of doubt, any payment of money or property pursuant to any advisory agreement or with respect to any management or advisory services shall not constitute a Distribution, and neither repayment of any loan (or payment of any interest thereon) nor receipt of Units in connection with any Unit split or reverse Unit split shall constitute a Distribution.

*"Dollars"* or *"$"* shall refer to currency of the United States of America.

*"DXS"* means DXS Capital (U.S.) Limited, a Delaware corporation.

*"DXS Designee"* means a Manager of the Majority Member designated by DXS.

*"Economic Interest"* shall mean the right to receive Distributions of the Company's assets and allocations of income, gain, loss, deduction, credit, and similar items from the Company pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management or business affairs of the Company.

*"Equity Securities"* means (i) Units or other equity interests in the Company (including other classes or groups thereof having such relative rights, powers and duties as may from time to time be established by the Board of Managers pursuant to the provisions of this Agreement, including rights, powers and/or duties senior to existing classes and groups of Units and other equity interests in the Company), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other equity interests in the Company and (iii) warrants, options or other rights to purchase or otherwise acquire Units or other equity interests in the Company.

*"Event of Dissolution"* is defined in Section 10.1.

*"Expenses"* shall mean all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a Proceeding that is the subject of a right to indemnification under Section 11, applicable law or otherwise.

*"Fiscal Year"* shall mean the Company's fiscal year, which shall be the calendar year.

*"Gross Asset Value"* shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as reasonably determined by the contributing Member and the Board of Managers;

(b) The Gross Asset Values of all assets of the Company shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Board of Managers, as of the following times: (i) the acquisition of Units by any new or existing Member in exchange for more than a *de minimis* Capital Contribution or for services rendered to the Company; (ii) the Distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for the redemption of a Unit; and (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); *provided, however,* that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative Economic Interests of the Members in the Company;

3

(c) The Gross Asset Value of any asset of the Company distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of Distribution, as reasonably determined by the distributee and the Board of Managers;

(d) The Gross Asset Values of assets of the Company shall be increased (or decreased) to reflect any adjustments to the adjusted bases of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704–1(b)(2)(iv)(m); *provided, however,* that Gross Asset Values shall not be adjusted pursuant to this subparagraph to the extent the Board of Managers determines that an adjustment pursuant to subparagraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection; and

(e) If the Gross Asset Value of an asset has been determined or adjusted pursuant to any of the subsections above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset and shall be utilized for purposes of computing Net Profits and Net Losses.

*"Indemnified Party"* is defined in Section 11.1.

*"Initial Contribution"* is defined in Section 3.1.

*"Initial Contribution Date"* is defined in Section 3.1.

*"Independent Manager"* is defined in Section 5.1(a).

*"Investment Manager"* is defined in Section 5.1(a).

*"Liable Member"* is defined in Section 4.10.

*"Liquidation"* shall mean a liquidation of the Company in accordance with Section 10.3.

*"Loan Purchase Agreement"* means the Loan Purchase Agreement dated March 17, 2011 among the Majority Member, the other Members, and the other parties thereto.

*"Majority Member"* means Skye Mineral Partners, LLC, a Delaware limited liability company.

*"Managers"* shall mean, the Managers appointed to the Board of Managers as provided in Section 5 hereof.

*"Member"* shall mean each Person who (a) (i) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with this Agreement, (ii) is issued Common Units as reflected in Schedule A hereto; or (iii) is an Assignee who has become a Member in accordance with Section 8, and (b) has not ceased to be a Member in accordance with Section 8 or for any other reason.

*"Member Nonrecourse Debt"* shall have the meaning ascribed to the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

*"Member Nonrecourse Deductions"* shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

4

*"Minimum Gain Attributable to Member Nonrecourse Debt"* has the meaning ascribed to "partner nonrecourse debt minimum gain" as determined in accordance with Treasury Regulations section 1.704-2(i)(2).

*"Net Profits" and "Net Losses"* shall mean, for each Fiscal Year or other period, an amount equal to Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a), and all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss, with the following adjustments:

    **(a)** Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, shall be added to such taxable income or loss;

    **(b)** Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

    **(c)** In the event the Gross Asset Value of any Company asset is adjusted pursuant to Section 3.3, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

    **(d)** Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

    **(e)** In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period;

    **(f)** To the extent an adjustment to the adjusted tax basis of any Company asset is required pursuant to Code Section 734(b) or Code Section 743(b) and in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for computing Net Profits or Net Losses; and

    **(g)** Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to (i) Section 6 of the Agreement or (ii) the last sentence of Section 10.5 shall not be taken into account in computing Net Profits or Net Losses.

*"Nonrecourse Liability"* shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2).

*"Offer"* is defined in Section 8.9(a)(i).

*"Offered Units"* is defined in Section 8.9(a)(i).

*"Officers"* is defined in Section 5.2(b).

*"Permitted Transfer"* has the meaning set forth in Section 8.4(b).

*"Percentage Interest"* means, with respect to a Member, the quotient of the number of Units held by such Member, divided by the total number of Units held by all of the Members.  If the "Percentage Interest" is only being applied amongst one class of Units (Preferred Units or Common Units), the "Percentage Interest" shall be the quotient of the number of such Units held by such Member, divided by the total number of such Units held by all of the Members.

*"Person"* shall mean an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association, or any other entity.

*"Preferred Unit Liquidation Preference"* means, as to each Preferred Unit, the capital contribution provided in exchange for such Preferred Unit (as reflected in Exhibit A hereto) multiplied by two (2).

*"Preferred Units"* means the Series A Participating Preferred Units issued to the Members as set forth in Exhibit A hereto, with the rights and obligations described in this Agreement.

*"Preferred Members"* means holders of the Preferred Units.

*"Proceeding"* shall mean any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

*"Public Offering"* means an underwritten initial public offering and any subsequent underwritten public offering by the Company of its Equity Securities to the public effected pursuant to an effective registration statement under the Securities Act, or any comparable statement under any similar United States federal statute then in effect (other than a registration of Form S-4 or Form S-8 or any successor forms), or an initial public listing of the Company's equity securities on any stock exchange.

*"Selling Member"* is defined in Section 8.9(a)(ii).

*"Selling Notice"* is defined in Section 8.9(a)(ii).

*"Settlement Agreement"* means the Settlement Agreement dated February 2, 2011 among the WUCC and the other parties thereto.

*"Subsidiary"* means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of units entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof, and for this purpose a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

*"Tax Matters Partner"* (as defined in Code Section 6231) shall be Skye Mineral Partners, LLC.

6

*"Treasury Regulations"* shall, unless the context clearly indicates otherwise, mean the regulations in force as final or temporary that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code, and any successor regulations.

*"Units"* refers collectively to Common Units and Preferred Units. The number and class of Units held by each Member shall be set forth in <u>Exhibit A</u>, as the same may be amended from time to time in accordance with the terms of this Agreement.

*"Unit Holder"* shall mean the holder of one (1) or more Units of the Company.

"*WUCC*" means Western Utah Copper Company, a Utah corporation.

## SECTION 2. ORGANIZATIONAL MATTERS.

**2.1    Formation**.  The Members have and do hereby form and constitute themselves as a Delaware limited liability company pursuant to the provisions of the Act and this Agreement.  In connection therewith, an authorized person previously executed a Certificate of Formation for the Company as an authorized person in accordance with Section 18-201 of the Act, which was duly filed with the Office of the Delaware Secretary of State on June 20, 2011.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement, which shall be deemed effective as of the date the Certificate of Formation was so filed.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.  Notwithstanding the foregoing, Section 18-210 of the Act shall not apply or be incorporated into this Agreement.

**2.2    Name**.  The name of the Company shall be "CS Mining, LLC."  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable.  The Board of Managers (or its designee) shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Board of Managers considers appropriate or advisable.  The phrase "LLC" or such other designation as may be permitted by law to designate that the Company is a limited liability company organized pursuant to the Act shall always appear as part of the name of the Company on all correspondence, stationery, checks, invoices, and any and all documents and papers executed by the Company.

**2.3    Term**.  The term of the Company commenced as of the day the Certificate of Formation for the Company was filed with the Delaware Secretary of State, and shall continue until the winding up and liquidation of the Company and the completion of its business following an Event of Dissolution, as provided in <u>Section 10</u> herein.

**2.4    Office and Agent**.  The Company shall continuously maintain a registered office and registered agent in the State of Delaware; *provided, however,* that the registered office need not be a place of business in the state.  The principal office of the Company shall be 500 South Front St., Suite 1200, Columbus, OH 43215, provided that such address shall primarily serve as a mailing address as the Company does not plan on conducting business at such address or engaging in business activity in the State of Ohio.  The Company may also have such other offices as the Board of Managers may determine from time to time, or the business of the Company may require.  The registered agent shall be as stated in the Certificate of Formation or as otherwise determined by the Board of Managers.

**2.5    Addresses of the Members**.  The respective addresses of the Members are set forth on <u>Exhibit A</u>.  A Member may change its address of record upon notice thereof to the Company.

7

**2.6    Purpose and Business of Company**.  The purpose and business of the Company shall be any business which may lawfully be conducted by a limited liability company formed pursuant to the Delaware Act (including the carrying on of the Business and ownership of any entities engaged in the Business).

**2.7    No Individual Authority for Member**.  No Member acting alone shall have any authority to act for, or to undertake or assume, any obligation, responsibility, debt, or duty on behalf of the Company, but, subject to the terms of this Agreement, the Board of Managers, acting in their capacity as "managers", shall have such authority.

**2.8    Title to Properties**.  Real and personal property owned or purchased by the Company shall be held and owned, and conveyance made, in the name of the Company.  Instruments and documents providing for the acquisition, mortgage, or disposition of property of the Company shall be valid and binding upon the Company, except as otherwise limited in this Agreement, if executed by the Board of Managers (or its designee).

## SECTION 3.  CAPITAL CONTRIBUTIONS.

**3.1    Initial Capital Contributions; Issuance of Units**.  Concurrently with the execution of this Agreement ("*Initial Contribution Date*"), each Member shall have contributed an amount in cash or assets indicated across from such Member's name on Exhibit A to the capital of the Company (with respect to each Member, its "*Initial Contribution*"), which amount shall be credited to such Member's Capital Account as and when made, in exchange for the issuance of the number and class of Units indicated across from such Member's name on Exhibit A.  Subject to the foregoing and the other provisions of this Section 3, the Members agree that the number and class of Units issued to each Member as of the date of this Agreement are as set forth opposite each Member's name on Exhibit A, as the same may be amended from time to time to reflect the addition of new Members or the exchange of Units in conformance with the applicable terms of this Agreement.

**3.2    Additional Capital Contributions; Unit Adjustment**.

**(a) Generally.**  To the extent approved by the Board of Managers and subject to the approval rights of the Members pursuant to Section 4.6 and to the provisions of Section 8 of this Agreement, from time to time, the Unit Holders may be permitted to make additional Capital Contributions with respect to their then outstanding Units if and to the extent they so desire and to the extent the Board of Managers determines that such additional Capital Contributions are necessary or appropriate for the conduct of the Business of the Company or any of its Subsidiaries.  In no event shall a Member be required to make any additional Capital Contribution following the date hereof, including without limitation to make up any deficit in such Member's Capital Account.  No Members will have any pre-emptive rights to purchase Units of the Company issued by the Company after the date of this Agreement.

**(b) Unit Adjustment.**  In applying the provisions of this Section 3, the Board of Managers may grant fractional Unit interests, or alternatively adjust the Unit(s) held by each Member so that each Member holds full Unit(s) by maintaining the ratio of Units held among the Members the same but increasing or decreasing the actual number of Units held by each Member. Exhibit A shall be deemed automatically revised and amended in accordance with Capital Contributions actually made pursuant to Sections 3.1 and 3.2, and may be formally revised and amended along with this Agreement by the Board of Managers from time to time to reflect any such Capital Contributions and in accordance with the above.

3.3     **Capital Accounts.**

(a) **Capital Account for Each Member**.  The Board of Managers shall maintain a separate Capital Account as defined below for each Member strictly in accordance with the requirements of Code Section 704(b) and applicable Treasury Regulations promulgated thereunder.  In this connection, to the extent the results determined under a literal application of this Section vary from the results that would be required under the rules described in Treasury Regulations Section 1.704-1(b)(2)(iv), the rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv) shall be used and govern the maintenance of Capital Accounts under this Agreement.

(b) **Property Valuation**.  Exhibit A from time to time shall list any property contributed in kind to the Company.  The valuation of such property on Exhibit A will have been agreed to as specified in the definition of the term Gross Asset Value set forth in Section 1 and shall be utilized for purposes of establishing and maintaining Capital Accounts.

(c) **Capital Account Maintenance**.  Subject to the other Sections of this Section, the "Capital Account" of any Member is the account maintained for such Member in accordance with the following provisions:

(i)     The Capital Account of each Member as of the date hereof shall equal such Member's Initial Contribution.

(ii)     To each Member's Capital Account there shall be credited all subsequent Capital Contributions of the Member, and any items in the nature of income or gains which are specially allocated, and the amount of any liabilities of the Company assumed by the Member.  In the case of a contribution in kind, the contributed asset shall be valued at its Gross Asset Value.

(iii)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to the Member pursuant to any provision of this Agreement, and any items in the nature of expenses or losses which are specially allocated, and the amount of any liabilities of the Member assumed by the Company.

(d) **Capital Account Adjustments for Special Events.**

(i)     **Succession to Capital Account**.  In the event a Unit is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit.

(ii)     **Assumption of Liability**.  For purposes of each Member's Capital Account:

(1)     An assumption of an unsecured liability of a Member by the Company shall be treated as a Distribution of money to the Member.

(2)     An assumption of the unsecured liability of the Company by a Member shall be treated as a cash contribution to the Company.

(3)     In determining the amount of any liability for this purpose, there shall be taken into account Code Section 752 and any other applicable provisions of the Code and Treasury Regulations.

9

(iii)  **Adjustment for Noncash Distributions**.  In the event that assets of the Company other than cash are distributed in kind to a Member, Capital Accounts shall be adjusted for the hypothetical "book" gain or loss that would have been realized by the Company if the distributed assets had been sold for their fair market values in a cash sale (in order to reflect unrealized gain or loss).

(iv)  **Adjustment for Constructive Termination of Company**.  Capital Accounts shall be adjusted upon the constructive termination of the Company as provided under Code Section 708 in accordance with the Treasury Regulations pertaining to such constructive terminations.

(v)  **Adjustment for Tax Credits and Recapture of Certain Credits**. Capital Accounts shall be adjusted appropriately pursuant to the Treasury Regulations on account of tax credits and tax credit recaptures, if any.

(e)  **Power to Modify Capital Accounts to Comply with Regulations.**  The foregoing provisions and the other provisions of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event the Board of Managers determines that it is necessary to modify the manner in which the Capital Accounts are computed in order to comply with such Treasury Regulations and to reflect the agreed upon sharing of the Distribution of cash, the Board of Managers may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company.  The Board of Managers also shall make any appropriate modifications in the event unanticipated events occur that might otherwise cause the Agreement not to comply with Treasury Regulations Section 1.704-1(b).

**3.4**  **No Interest**.  No Member shall be entitled to receive any interest on its Capital Contributions.

**3.5**  **Member Loans**.  The Company does not currently anticipate borrowing funds from Members, but, subject to Section 4.6 hereof, the Board of Managers is authorized to cause the Company to engage in such borrowing.  A Member shall not receive an increase to such Member's Capital Account as a result of making a loan to the Company.  The Board of Managers shall reasonably determine the amount of a loan to be requested and the terms of such loan.

### SECTION 4.  MEMBERS.

**4.1**  **Limited Liability**.  No Member shall be personally liable under any judgment of a court or in any other manner for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.  No Member shall be required to lend any funds to the Company.

**4.2**  **Resignation or Withdrawal of Member.**  A Member shall not resign or withdraw as a Member without the prior approval of the Board of Managers, which approval may be given, withheld, conditioned or delayed in the reasonable discretion of the Board of Managers.

**4.3**  **Fiduciary Duties**.  In view of the limited purposes of the Company, no Member or any of its Affiliates shall have any fiduciary obligations with respect to the Company or to the other Members insofar as making other investment opportunities available to the Company or to the other Members. Each Member and its respective Affiliates may, notwithstanding the existence of this Agreement, engage in whatever activities such Member or Affiliate may choose, without having or incurring any obligation to offer any interest in such activities to the Company or to the other Members.  Neither this Agreement nor any activities undertaken pursuant hereto shall prevent any Member from engaging in such activities.

**4.4    Transactions with Company.** Subject to any limitations set forth in this Agreement, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto as a Person who is not a Member.

**4.5    Members are not Agents.** Pursuant to Section 5.1, the day-to-day management of the Company is vested in the Board of Managers. The Members shall have no power, as Members, to participate in the management of the Company except as expressly authorized by this Agreement, or as expressly required by the Act. No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Board of Managers, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf, or to render it liable for any purpose.

**4.6    Voting Rights.**

**(a) Voting.** Except as expressly provided in this Agreement (including without limitation the provisions of Section 4.6(b) below), or as may be required by the Act, Members shall have no voting, approval, or consent rights. Except as otherwise specifically provided in this Agreement, all votes, approvals, or consents of a Member may be given or withheld, conditioned or delayed, as such Member may determine in such Member's sole and absolute discretion. Any matter to be approved by affirmative vote or written consent shall be approved upon the date of receipt of the votes or written consent executed by the Majority Member unless a later date is set forth in the action being approved (without any requirement to wait until all Unit Holders have responded thereto).

**(b) Extraordinary Matters.** Notwithstanding any provision in this Agreement to the contrary, the Company shall not undertake any of the following without the prior written approval of holders of a majority of all Common Units:

(i)    approve the annual budget of the Company;

(ii)    incur any obligation, enter into any agreement, or take any action that will subject the Company to liabilities or obligations in excess of 120% those specifically identified in the annual operating budget of the Company;

(iii)    approve the business plan of the Company and any modifications thereto;

(iv)    change the scope or nature of the business carried on by the Company;

(v)    enter into or materially modify a contract, agreement or other transaction with a Manager or Officer of the Company;

(vi)    provide compensation to any Manager for his/its services in such capacity in excess of the reimbursement of the Manager's reasonable expenses;

(vii)    the Company's organization, acquisition or investment in the business of any other Person, the Company's acquisition of the securities of any other Person, or the Company's guaranty of the indebtedness or obligations of any other Person;

(viii)    grant or pledge of any security interest, lien or other encumbrance against any of the assets of the Company;

11

(ix)    the establishment or authorization of any class of Units not previously established or authorized under the provisions of this Agreement, including the determination of any designation therefor and the determination of the rights of such new class to share in the capital, equity/capital appreciation and/or profits of the Company, or any combination of or any one of the foregoing, and the voting rights (if any), tax allocations, rights to distributions, rights upon dissolution or liquidation, preferences, limitations and other terms, conditions and other relative rights or restrictions applicable to such new class of Units;

(x)    subject to the provisions of Section 8 hereof, the admission of a new Member;

(xi)    the issuance of Units of any class to an existing Member or a new Member;

(xii)    the merger of the Company with one or more domestic or foreign limited liability companies, limited partnerships, or corporations under the applicable provisions of the Act;

(xiii)    the sale or other disposition of all or substantially all of the assets of the Company other than in the ordinary course of business;

(xiv)    Elect to place the Company in Bankruptcy, receivership, the appointment of a trustee or custodian for its assets, or make a general assignment for the benefit of creditors;

(xv)    the dissolution or termination of the Company pursuant to the applicable provisions of the Act; or

(xvi)    any amendment or restatement of this Agreement or the Certificate.

**4.7    Meetings of Members**.  The Members do not plan to hold formal meetings.  However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act.

**4.8    Unit Certificates**.  Unless otherwise determined by the Board of Managers, the Company will not issue certificates to represent Units.  Ownership of Units will be recorded on the Company's books and records.

**4.9    Member as Trustee for Company**.  A Member holds as trustee for the Company (a) specific property stated as contributed by such Member in this Agreement or other document executed by the Member, but which was not contributed or which has been wrongfully or erroneously returned, and (b) money or other property wrongfully paid or conveyed to such Member from the Company.

**4.10    No Responsibility for Pre-formation Commitments**.  Except as otherwise expressly provided in this Agreement, in the event that any Member (or any of such Member's shareholders, partners or members or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that related to or otherwise affects the Company, neither the Company nor any other Member shall have any liability or responsibility for or with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument signed by the Board of Managers and the Members (to the extent required pursuant to Section 4.6 hereof).  Neither the Company nor any Member shall be responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or any of such Member's shareholders, partners or members or Affiliates).  In the event that a Member (or any of such Member's shareholders, partners, members or Affiliates, collectively, the *"Liable Member"*), whether prior to or after the date hereof, incurs (or has incurred) any

debt or obligation that neither the Company nor the other Members has any responsibility or liability for, the Liable Member shall indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur in respect thereof.

## SECTION 5. MANAGEMENT AND CONTROL OF COMPANY.

**5.1    Management of Company by the Board of Managers**. Except as otherwise provided in this Agreement (including without limitation Section 4.6 hereof) or by the Act, the business and affairs of the Company will be managed and all Company powers will be exercised by or under the direction of the Board of Managers.  The Board of Managers may delegate the management of the day-to-day operation of the business of the Company to the officers of the Company or other committees or third parties, provided that the business and affairs of the Company will be managed and all Company powers will be exercised under the ultimate direction of the Board of Managers.  All matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures, except as otherwise provided in this Agreement, will be determined in good faith by the Board of Managers in consultation with the Company's independent accountants.  Without limiting the generality of Section 5.1, but subject to the express limitations set forth elsewhere in this Agreement (including without limitation Section 4.6 hereof), the Board of Managers shall have the power to exercise on behalf and in the name of the Company all of the powers of a manager permitted under the Act.  The Company shall pay the reasonable out-of-pocket expenses incurred by each Manager in connection with attending the meetings of the Board of Managers and any committee thereof.

**(a) Appointment and Removal of Investor Managers.**  The Company's Board of Managers will consist of the members of the Majority Member's Board of Managers as constituted under the terms of its Operating Agreement from time-to-time. Members of the Company's Board of Managers shall be automatically appointed and removed as such Managers are appointed and removed from the Majority Member's Board of Managers.

**(b) Action by Board of Managers.**  Except as otherwise provided in this Agreement, a quorum for purposes of transaction of business by the Board of Managers shall exist if at least (i) four (4) Managers are present, and (ii) the Managers present include the DXS Designee; provided however that (i) if the DXS Designee fails to attend a duly noticed meeting of the Board at which a matter is presented for approval of the Managers, and (ii) such matter is again presented for approval at the next subsequent duly noticed meeting of the Board and such DXS Designee is not present at such second meeting, then the presence of the DXS Designee shall not be required for a quorum to be present.  Managers may participate in a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.  Any action required or permitted to be taken by the Board of Managers may be taken without a meeting if the requisite four (4) members of the Board of Managers (including the DXS Designee) consent thereto in writing and the writing is filed with the records of the Company.

**(c)  Place and Date of Meetings; Notice**.  The Board of Managers may fix by resolution the place, date and time for the holding of its regular meetings, in which case no notice of such regular meetings need be given to the Managers; provided, that if the Board of Managers fixes or changes the time or place of any regular meeting, at least ten (10) Business Days' prior written  notice of such new time or place will be given to each Manager not present at the time such action was taken.  Any of the Managers may call a special meeting of the Board of Managers.  Notice of meetings of the Board of Managers (other than the regular meetings) will be given to each member of the Board of Managers at least ten (10) Business Day prior to such meeting.  Notice of any meeting of the Board of Managers may be waived by members of the Board of Managers before, at or after the meeting. If the Board of Managers cannot obtain the required quorum to make any given decision within twenty (20) days of the decision

being presented to the Board of Managers, or such shorter time period within which the decision must be made, the matter shall be arbitrated in accordance with the provisions set forth below. The matter shall be arbitrated by an independent professional selected by the Board of Managers who is knowledgeable with respect to the business matters relevant to the decision. If the Board of Managers are unable to agree upon an independent professional within five (5) days, then each Member with the right to appoint a Manager shall select an independent professional with not less than ten (10) years' experience in the relevant area and who has not been employed or otherwise previously affiliated with any Manager or Member. The independent professionals so appointed shall, within three (3) business days after their appointment, appoint an independent professional consultant meeting the foregoing qualifications to resolve the dispute. The cost of the consultant to resolve the dispute and the cost of the arbitration shall be divided equally among the Members. Any such arbitration may be conducted electronically and there shall be no official proceedings or requirement of appearance.

**(d) Liability for Certain Acts.** Each Manager will not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by a Manager in conducting the business, operations and affairs of the Company that may cause or result in any loss or damage to the Company or its Members unless such act or failure to act involved such Manager's breach of fiduciary duty or a breach of this Agreement, in which event such Manager will cease to be exempt from liability to the Company and the other Members for any such loss to the same extent such exemption from liability is not permitted by the General Corporation Law of the State of Delaware. A Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. A Manager will not be responsible to any Member because of a loss of their investment or a loss in operations unless such loss is the result of such Manager's breach of this Agreement, in which event such Manager will cease to be exempt from liability to the Company and the other Members for any such loss to the same extent such exemption from liability is not permitted by the General Corporation Law of the State of Delaware. A Manager will incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

**(e) Manager's Standard of Care.** Except as otherwise set forth in this Agreement, a Manager has a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders, respectively, pursuant to the General Corporation Law of the State of Delaware. In discharging his or her duties, a Manager will be fully protected in relying in good faith upon any records maintained by the Company and upon such information, opinions, reports or statements by any Members or their agents, or by any other person as to matters such Manager reasonably believes are within such person's professional or expert competence and who has been selected with reasonable care by or on behalf of such Manager, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

**(f) Manager Has No Exclusive Duty to Company.** A Manager will not be required to manage the Company as its sole and exclusive function and a Manager may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member will have any right, by virtue of this Agreement, to share or participate in such other investments or activities of a Manager or to the income or proceeds derived therefrom. Each Manager and its respective Affiliates may, notwithstanding the existence of this Agreement, engage in whatever activities such Manager or its Affiliates may choose, without having or incurring any obligation to offer any interest in such activities to the Company or to the Members.

14

**(g) Resignation.** A Manager may resign at any time by giving written notice to the Unit Holders. The resignation of a Manager will take effect upon delivery of notice thereof or at such later time as will be specified in such notice; unless otherwise specified therein, the acceptance of such resignation will not be necessary to make it effective.

**(h) Removal.** A Manager may be removed at any time, with or without cause, if, and only if, such Manager is removed from the Majority Member's Board of Managers.

**(i) Vacancies.** Any vacancy on the Board of Managers (whether created by expansion of the number of managers by the Members or an individual's death, resignation or renewal or otherwise), will be filled as such vacancy is filled on the Majority Member's Board of Managers.

**5.2    Officers.**

**(a) Appointment.** The Board of Managers may appoint officers of the Company including; but not limited to: (i) a chief executive officer; (ii) president; (iii) one or more vice presidents; (iv) a secretary; and (v) a chief financial officer. Subject to Section 5.1, the Board of Managers may delegate a portion of its day-to-day management responsibilities to any such officers, and such officers will have the authority to contract for, negotiate on behalf of and otherwise represent the interests of the Company as authorized by the Board of Managers in any job description created by the Board of Managers.

**(b) Tenure and Duties of Officers.** Subject to the terms of any applicable employment agreement, all officers will hold office at the pleasure of the Board of Managers and until their successors have been duly appointed, unless sooner removed. Any officer elected or appointed by the Board of Managers may be removed at any time by the Board of Managers. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Managers. Unless and until any officers are appointed by the Board of Managers, the Board of Managers shall have all duties, powers and responsibilities with respect to the management and affairs of the Company. If and when appointed, officers of the Company shall have the respective powers set forth as follows (the following being referred to in this Agreement as the **"Officers"**):

(i)    **Chief Executive Officer.** The Chief Executive Officer will, subject to the control of the Board of Managers, have general supervision, direction and control of the business and officers of the Company. The Chief Executive Officer will perform other duties commonly incident to a Chief Executive Officer of a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(ii)    **President.** The President may assume and perform the duties of the Chief Executive Officer in the absence or disability of the Chief Executive Officer or whenever the office of Chief Executive Officer is vacant. The President will perform other duties commonly incident to a President of a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(iii)    **Vice Presidents.** The Vice Presidents, in the order of their seniority, may assume and perform the duties of the Chief Executive Officer in the absence or disability of the Chief Executive Officer and the President or whenever the office of Chief Executive Officer and President are vacant. The Vice Presidents will perform other duties commonly incident to a vice president of a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

15

(iv) **Secretary.** The Secretary will attend all meetings of the Members and will record all acts and proceedings thereof in the minute book of the Company. The Secretary will give notice in conformity with this Agreement of all meetings of the Members requiring notice. The Secretary will perform other duties commonly incident to a secretary of a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(v) **Chief Financial Officer.** The Chief Financial Officer will keep or cause to be kept the books of account of the Company in a thorough and proper manner, and will render statements of the financial affairs of the Company in such form and as often as required by this Agreement, the Board of Managers and/or the Chief Executive Officer. The Chief Financial Officer, subject to the order of the Board of Managers, will have the custody of all funds and securities of the Company. The Chief Financial Officer will perform other duties commonly incident to the office of chief financial officer or treasurer in a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

**5.3    Committees.** The Board of Managers may create committees to assist the Board of Managers and the officers in the governance of areas of importance to the Company. Subject to the terms of this Agreement, such committees will have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees. Each such committee shall consist of at least three (3) Managers including the DXS Designee.

**5.4    Units Held by Managers**. A Unit held by a Manager in its capacity as a Member shall entitle such person to all the rights of a Member, including, without limitation, the economic, voting, information, and inspection rights of a Member, if any, pursuant to the Act as well as any additional economic, voting, informational, and inspection rights pursuant to this Agreement.

## SECTION 6.  ALLOCATIONS OF NET PROFITS AND NET LOSSES.

**6.1    Allocations.**

(a) **General Allocations of Net Profits and Net Losses**. After giving effect to the special allocations set forth in Section 6.2, for any taxable year of the Company and except as otherwise provided in subsection (b) below, all allocations of Net Profit and Net Losses of the Company shall be allocated among the Unit Holders in a manner such that the Capital Account balance of each Unit Holder is, as nearly as possible, equal to (i) the distributions that would be made to such Unit Holder if the Company were dissolved, its affairs wound up and each of its assets sold for cash equal to its respective Gross Asset Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Company were distributed pursuant to Section 7.1 of this Agreement to the Unit Holders immediately after making such allocation, minus (ii) such Unit Holder's share of Company Minimum Gain and   Minimum Gain Attributable to Member Nonrecourse Debt, computed immediately prior to the hypothetical sale of assets.

(b) **Loss Limitation**. The Net Losses allocated pursuant to Section 6.1(a) shall not exceed the maximum amount of Net Losses that can be so allocated without causing any Unit Holder to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event that some but not all Unit Holders would have an Adjusted Capital Account Deficit as a consequence of an allocation of Net Losses pursuant to Section 6.1(a), the limitation set forth in this Section 6.1(b) shall be applied on a Unit Holder by Unit Holder basis so as to allocate the maximum permissible Net Losses to each Unit Holder under Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

16

**6.2    Special Allocations**. Notwithstanding Section 6.1:

(a) **Minimum Gain Chargeback**. If there is a net decrease in Company Minimum Gain during any Fiscal Year, each Unit Holder shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Unit Holder's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2(a) shall be made in proportion to the amounts required to be allocated to each Unit Holder under this Section 6.2(a). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 6.2(a) is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) **Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt**. If there is a net decrease in Minimum Gain Attributable to a Member Nonrecourse Debt, during any Fiscal Year, each member who has a share of the Minimum Gain Attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Unit Holder's share of the net decrease in Minimum Gain Attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2(b) shall be made in proportion to the amounts required to be allocated to each Unit Holder under this Section 6.2(b). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section 6.2(b) is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) **Nonrecourse Deductions**. Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Unit Holders in accordance with their pro rata ownership of all Units.

(d) **Member Nonrecourse Deductions**. Those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Unit Holder who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(e) **Qualified Income Offset**. If a Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5), or (d)(6), then items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, *provided* that an allocation pursuant to this Section 6.2(e) shall be made if and only to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 6 have been tentatively made without considering this Section 6.2(e). Any special allocation of items of income and gain, pursuant to this Section 6.2(e) shall be taken into account in computing subsequent allocations of income and gain pursuant to this Section 6 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Unit Holder pursuant to this Section 6 to the extent possible, shall be equal to the net amount that would have been allocated to each such Unit Holder pursuant to the

17

provisions of this Section 6.2(e) if such unexpected adjustments, allocations, or distributions had not occurred.

### 6.3    Certain Other Allocation Rules.

(a) **Allocation of Taxable Income.**  Except as otherwise provided below, each item of income, gain, loss and deduction, for federal income tax purposes, shall be allocated among the Unit Holders in the same manner as the corresponding item of book income, gain, loss or deduction is allocated pursuant to Section 6.1.

(b) **Allocation of Income, Gains, and Losses Related to Contributed Property.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Unit Holders so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value. In the event the Gross Asset Value of any Company asset is adjusted pursuant to the provisions of this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.  Any elections or other decisions relating to such allocations shall be made by the Board of Managers in any manner permitted by the Treasury Regulations.

(c) **Allocation of Gain and Loss from Sale or Other Disposition of Property Not Revalued**.  If, in connection with the admission of an additional Member to the Company or the liquidation of a Member's Units, Company property is not revalued pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) and the Members' Capital Accounts are not adjusted accordingly, then, upon any subsequent sale or other disposition of Company property, gain or loss recognized upon the sale or other disposition shall be allocated among the Unit Holders so as to take into account the variation between the adjusted basis of such property and its fair market value as of the date the additional Member was admitted or the date the Member's Units were liquidated, as the case may be, in the same manner as under Code Section 704(c).

(d) **Varying Interests**.  For purposes of determining the Net Profits, Net Losses, or any other items allocable to any period, Net Profits, Net Losses, and any such other items shall be determined on a daily, monthly, or other basis as determined by the Board of Managers in good faith using any permissible method under Code Section 706 and the Regulations thereunder.

(e) **Conformity By Members**.  The Members are aware of the income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Agreement in reporting their share of Company income or loss for income tax purposes.

### SECTION 7. DISTRIBUTIONS.

### 7.1 Distributions.

(a) **Generally**.  Except as otherwise provided in this Agreement (including with respect to the proceeds of a Liquidation, which shall be distributed in the order of priority set forth in Section 10.5, and with respect to distributions pursuant to Section 7.2), in each Fiscal Year the Company shall distribute cash or other property to the Members at such times as may be determined by the Board, in the following order of priority:

18

      (i)     first, to the holders of Preferred Units, pro rata in accordance with their respective unreturned Preferred Unit Liquidation Preferences, until the cumulative distributions made for the current Fiscal Year and all prior Fiscal Years pursuant to this Section 7.1(a)(i) are equal to the Preferred Unit Liquidation Preference; and

      (ii)    thereafter, to the holders of all Units, pro rata, in accordance with their relative Percentage Interests.

    **(b)** Subject to the provisions of Section 7.2 below and applicable law, Distributions of any earnings, profits or other income of the Company shall be made promptly unless in the sole discretion of the Board of Managers it is determined that any such income should not be so distributed.

    **7.2**    **Amounts Withheld.**.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Unit Holders shall be treated as amounts paid, distributed or allocated, as the case may be, to the Unit Holders with respect to which such amount was withheld pursuant to this Section 7.2 for all purposes under this Agreement. The Company is authorized to withhold from payments and distributions, and with respect to allocations to the Unit Holders, and to pay over to any federal, state or local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Unit Holder with respect to which such amount was withheld. The withholdings by the Company referred to in this Section 7.2 shall be made at the appropriate applicable rate under the applicable tax law as determined by the Board of Managers, in its reasonable discretion.

    **7.3**    **Form of Distribution**.  A Unit Holder, regardless of the nature of the Unit Holder's Capital Contribution, has no right to demand and receive any Distribution from the Company in any form other than money.  Except as provided in Section 10.4, no Unit Holders may be compelled to accept from the Company a Distribution of any asset in kind in lieu of a proportionate Distribution of money being made to other Unit Holders.

### SECTION 8.  TRANSFER AND ASSIGNMENT OF UNITS.

    **8.1**    **Transfer and Assignment of Units**.

    **(a)** Except as otherwise expressly provided in this Agreement, no Member may transfer, assign, convey, sell, encumber, or in any way alienate all or any part of such Member's Units (collectively, *"transfer"*), without the consent of the Board of Managers, and without first complying with the provisions of this Section 8.

    **(b)** Any permitted transferee of a Unit shall merely be an Assignee possessing only an Economic Interest and shall not become a substitute Member except upon compliance with Section 8.3. Transfers in violation of this Section 8 shall only be effective to the extent set forth in Section 8.7.  After the consummation of any transfer of a Unit, the Unit so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.  No Member shall avoid the provisions of this Section 8.1 by making one or more transfers to one or more transferees permitted by this Agreement and then disposing of all or any portion of such Member's interest in such transferee.  Except as otherwise permitted by this Agreement, a Member that is not a natural person may not cause or permit an interest, direct or indirect, in itself to be issued or transferred such that, after the issuance or transfer, (a)  the Company would be considered to have terminated within the meaning of Section 708 of the Code or (b) without the consent

of the Board of Managers, it shall cease to be controlled by substantially the same Persons who control it as of the date of its admission to the Company as a Member.

**8.2     Further Restrictions on Transfer of Interests**. In addition to other restrictions found in this Agreement, no Member shall transfer all or any part of such Member's Units without compliance with all federal and state securities laws.

**8.3     Substitution of Members**. An Assignee of a Unit shall have the right to become a substitute Member only if (a) the requirements of Sections 8.1 and 8.2 hereof are met, (b) the Assignee executes an instrument satisfactory to the Board of Managers accepting and adopting the terms and provisions of this Agreement in full, and (c) the Assignee pays any reasonable expenses in connection with such Assignee's admission as a substitute Member. The admission of an Assignee as a substitute Member shall not result in the release of the Member who assigned the Units from any liability that such Member may have to the Company.

**8.4     Permitted Transfers**. Notwithstanding anything in this Section 8 to the contrary, a Member may transfer all or any portion of such members Units pursuant to any of the following (each, a "**Permitted Transfer**") without requiring the consent of the Board or of any other Member, and without being subject to Section 8.9 hereof: (i) by *inter vivos* gift or by testamentary transfer to any spouse, parent, sibling, in-law, child, or grandchild of the Member, (ii) to a trust or family partnership solely for the benefit of the Member and/or the spouse, parent, sibling, in-law, child, or grandchild of the Member, (iii) to any Affiliate of a Member, or (iv) to any "Recipient" under and in accordance with the terms of that certain Subscription Agreement executed by the Company, the Majority Member and Robert Reynolds as "Representative" of the Recipients, providing for the issuance of the Units to Robert Reynolds as reflected in Exhibit A hereto (the foregoing terms being define therein); provided that the effectiveness of any such transfer shall be conditioned upon the applicable transferee first having agreed in writing to be bound by all of the terms and conditions of this Agreement as though such transferee were an original party hereto and subject to all of the provisions hereof applicable to the transferor. Transfers pursuant to this Section 8.4 may cause the transferee to become a mere Assignee and shall not result in the transferee becoming a substitute Member except upon satisfaction of the conditions in Section 8.3. No Member shall avoid the provisions of Section 8.1 by making one or more transfers to one or more transferees permitted hereby and then disposing of all or any portion of such Member's interest in such transferee.

**8.5     Effective Date of Permitted Transfers**. Any Permitted Transfer of all or any part of a Member's Units or an Economic Interest shall be effective as of the date provided in Section 8.4 following the date upon which the requirements of Section 8.2 have been met. The Board of Managers shall provide the Members with written notice of such transfer within a reasonable time after the requirements of Section 8.2 have been met. Any transferee of a Unit shall take subject to the restrictions on transfer imposed by this Agreement.

**8.6     Rights of Legal Representatives**. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights solely for the purpose of settling the Member's estate or administering the Member's property. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by its legal representative or successor.

**8.7     No Effect to Transfers in Violation of Agreement**. Upon any transfer of a Unit in violation of this Section 8, such purported transfer shall be void and the transferee shall have no right to

20

vote or participate in the management or business affairs of the Company or to exercise any rights of a Member.

### 8.8    Public Offering.

(a) If at any time, the Board of Managers and the applicable Members (as provided in Section 4.6 hereof) approves a Public Offering of any of the Equity Securities of the Company to be registered under the Securities Act, all Members and the Company and all direct or indirect holders of the Company's Equity Securities will take all necessary or reasonably desirable actions in connection with the consummation of such registered offering. It is the intent of the Members that immediately prior to the initial registered Public Offering of Equity Securities of the Company, whether or not pursuant to the immediately preceding sentence and regardless of whether pursuant to a sale by the Company or by any Member, then, at the election of the Board of Managers, (i) the Company shall elect to be treated as a corporation for U.S. federal income tax purposes pursuant to Treasury Regulation Section 301.7701-3 or convert into a Delaware corporation pursuant to the Act, (ii) any of the transactions permitted by Section 8.8(b) below shall be effected, or (iii) a Delaware corporation will be incorporated (the *"Entity"*) and thereafter the Equity Securities of the Company will be recapitalized or reorganized (whether by merger, exchange, contribution, a combination of the foregoing or otherwise) at the Board of Managers' election into (A) a single class of common stock of the Entity (with each former holder of Equity Securities of the Company receiving shares of common stock having a proportionate value of such newly issued common stock equal to that which such holder would have received upon liquidation of the Company immediately prior to such event) or (B) classes of capital stock of the Entity which have the same relative rights and preferences as such Equity Securities, and each Unit Holder hereby agrees that it will consent to and vote for (and which consent or vote may be conditioned upon the consummation of the Public Offering) any recapitalization, reorganization or exchange of the existing Equity Securities of the Company into capital stock of the Entity that the Board of Managers finds acceptable (consistent with the requirements of this paragraph) and will take all necessary or desirable actions in connection with the consummation of such recapitalization, reorganization or exchange. Without limiting the generality of the foregoing, each Unit Holder (and each direct or indirect Unit Holder) hereby waives any dissenters' rights, appraisal rights or similar rights that it might otherwise have in connection with such recapitalization, reorganization or exchange. The securities to be so held by the Unit Holders will be allocated among the Unit Holders so that, immediately after such recapitalization, reorganization or exchange, each Unit Holder holds securities having an aggregate value equal to the amount which such holder would have received if, immediately prior to such recapitalization, reorganization or exchange, the Company had distributed to its Members an aggregate amount equal to the aggregate value of the securities which are to be held by all Members immediately after such recapitalization, reorganization or exchange in a complete liquidation immediately prior to such recapitalization, reorganization or exchange, with each share of such securities, if any, offered to the public as part of such offering having a "value" for such purposes equal to the price per share of sales to the public as part of such offering. In addition to the foregoing, each Unit Holder agrees that it shall not directly or indirectly effect any public sale or distribution (including sales pursuant to Rule 144, or any similar or successor rule, under the Securities Act) of any Equity Securities or rights to acquire Equity Securities or of any other capital stock or equity securities of the Company (or any successor corporation), or any securities convertible into or exchangeable or exercisable for such stock or securities, during the seven days prior to and the 180-day period beginning on the effective date of an initial Public Offering (except as part of any such registration), unless the underwriters managing the registration otherwise agree in writing. Nothing in this Agreement shall prohibit any direct or indirect Subsidiary of the Company from registering, or effecting a public offering of, any of its equity securities.

(b) A Public Offering under the following terms and in the following order shall also be permitted (and undertaken by the Members) upon the occurrence of an election made pursuant to the first sentence of Section 8.8(a) above:

21

(i)     the Company or Members will organize a single newly formed Delaware corporation whose shares are to be sold to the public in connection with the Public Offering; and

(ii)     the Unit Holders (or, as applicable, the indirect owners of the Unit Holders designated by the Board of Managers), will contribute their interests in the Company or Unit Holders, as the case may be, to such newly formed Delaware corporation, in consideration for a number of shares of common stock of such Delaware corporation determined in accordance with Section 8.8(a); and

(iii)     the holders of equity, debt, and options of Unit Holders (or any entity which directly or indirectly owns 100% of the outstanding equity interests of Unit Holders) will contribute such stock, debt and options to such newly formed Delaware corporation , in consideration for a number of shares of common stock of such Delaware corporation determined in accordance with Section 8.8(a); and

(iv)     Such newly formed Delaware corporation will effect the Public Offering (it being understood that any Unit Holders contributed to the Company shall, at the request of the Board of Managers, be merged with and into the Company prior to consummation of such Public Offering).

(c) In any conversation or reorganization contemplated by Section 8.8(a) or Section 8.1(b) above, the Units shall be exchanged so that the holders thereof receive the same proportionate ownership of the successor entity vis-à-vis one another as they had prior to such event.  The Members and the Company acknowledge and agree that, to the extent reasonably possible, any conversion to a C corporation will be on a substantially tax-free basis to all Members; however, it is possible that any such conversion or reorganization could have adverse tax consequences for some or all of the Members and the Company, including without limitation, taxes imposed as a result of the application of foreign tax laws.  It is the intent of the Members that the conversion of the Company into corporate form and the conversion or reorganization of any of the Company's operating divisions, whether currently existing or existing in the future, into corporate form are part of the Members' investment decision with respect to the Units of the Company.

(d) If at any time the Board of Managers approves the conversion of the Company into a corporation (whether by way of a statutory conversion, merger, consolidation or any other form of reorganization), or takes any steps to consummate a Public Offering, the Company (or its successor corporation) shall enter into a registration rights agreement with the Members containing customary terms and conditions which shall include, without limitation, demand registration rights for the Members, an unlimited number of pro rata piggyback rights for the Members on all registrations (subject to customary pro rata cutbacks) in which a Member requests registration of any of the securities of the Company (or its successor corporation) then held by it, that pursuant to such agreement the Company (or its successor corporation) shall pay all reasonable costs and expenses (excluding, for avoidance of doubt, underwriters' discounts) arising from or related to any such registrations, and that the Members shall agree to be bound by the same holdback provisions with respect to an initial public offering as set forth in this Section 8.8.

**8.9     Member Sale of Units to Third Party**.

**(a)  Right of First Refusal**.

(i)     No Member may transfer all or any part of his or its Units to any Person (other than in connection with a Permitted Transfer) without receipt of an Offer (as defined below) and compliance with Section 8.9(a)(ii) below.  An "*Offer*" shall mean a bona fide, signed, written offer to purchase all or part of a Member's Units (the "*Offered Units*") made by any Person having sufficient

22

financial ability to consummate the purchase according to the terms and conditions of the Offer, in a form legally enforceable against the offeror, accompanied by a good faith deposit and obligating the offeror to furnish sufficient information on which a reasonable judgment may be made as to his ability to perform the offer.

(ii)     If a Member receives an Offer that such Member desires to accept, such Member (the "**Selling Member**") shall give the Preferred Members a written notice ("**Selling Notice**") accompanied by a true and complete copy of the Offer. The Selling Notice shall set forth the Selling Member's willingness to transfer the Offered Units in accordance with the terms of the Offer and shall include the name and address of the proposed transferee. Each of the Preferred Members shall then have the option to purchase all of the Offered Units at the price and upon the terms and conditions set forth in the Offer; provided, however, for purposes hereof any terms in the Offer other than price and payment terms shall be disregarded. The option may be exercised by giving notice to the Selling Member within thirty (30) days after the Company's receipt of the Selling Notice. If more than one Preferred Member desires to purchase the Offered Units, they may purchase the Offered Units in proportion to their respective Percentage Interest of the Company's issued and outstanding Preferred Units, unless they otherwise agree. In either case, the closing on such purchase shall not be more than sixty (60) days after the date of the Selling Notice. If the other Preferred Members elect not to purchase all of the Offered Units, the Selling Member may transfer the Offered Units not so purchased to the Person named in the Selling Notice at a price and upon terms and conditions that are not more advantageous to the purchaser than those contained in the Selling Notice. If such transfer is not made and consummated within one hundred and twenty (120) days after the date of the Selling Notice, the Selling Member may not thereafter dispose of the Offered Units without again complying with this Section 8.9(a).

### 8.10    Sale of the Company.

(a) In the event of a sale or exchange, directly or indirectly, of all or substantially all of the Company's Equity Securities by the direct and/or indirect holders thereof (whether by sale, merger, recapitalization, reorganization, consolidation, combination or otherwise) (a "**Company Sale**"), each Unit Holder shall receive in exchange for his/her/its Units the same portion of the aggregate consideration from such sale or exchange that such Unit Holder would have received if such aggregate consideration had been distributed by the Company to its Members (and subsequently up to such holder, as applicable) in complete liquidation pursuant to the rights and preferences of the Unit Holders set forth in Section 7 and Section 10.5 of this Agreement as in effect immediately prior to the Company Sale. Each Unit Holder shall take all necessary or desirable actions in connection with the distribution of the aggregate consideration from such sale or exchange as requested by the Board of Managers in order to effectuate the provisions of this paragraph, provided that such Company Sale is approved under the provisions of Section 4.6.

(b) Subject to Section 8.10(c), if a Company Sale is approved by the Majority Member under the provisions of Section 4.6 (an "**Approved Sale**"), each direct and indirect holder of the Company's Equity Securities will be deemed to have consented to and agrees to raise no objections against (and to confirm such consent in writing to) such Approved Sale. If the Approved Sale is structured as (i) a merger or consolidation, each Unit Holder will waive any dissenter's rights, appraisal rights or similar rights in connection with (and vote in favor of) such merger or consolidation or (ii) a sale of units or membership interests (including by recapitalization, consolidation, reorganization, combination or otherwise), each Unit Holder will agree to sell, and to sign any definitive written sale agreement that is signed by the Majority Member and any other Members required to approve the Approved Sale, with respect to the sale of, all of the Company's Equity Securities held by such Unit Holder on the terms and conditions approved by the Majority Member and any other Members required to approve the Approved Sale. Each Unit Holder, shall be obligated to join in writing on a pro rata basis

23

(based on their respective Percentage Interests of the applicable Units to be sold), and in such a manner that indemnification obligations constituting an adjustment to the purchase price shall be borne by the (and to the extent that such) Units shared directly or indirectly in the proceeds of the portion of the purchase price in excess of the purchase price resulting from such adjustment) in any indemnification, escrow, holdback or other obligations that the Company or the Majority Member and any other Members required to approve the Approved Sale agree to provide in connection with the Approved Sale (other than any such non-escrow obligations that relate solely to a particular Unit Holder, such as indemnification with respect to representations and warranties given by a Unit Holder regarding such Unit Holder's title to and ownership of Units, in respect of which only such Unit Holder shall be liable); provided, that any indemnification shall be limited to the aggregate amount of proceeds actually received in connection with such Approved Sale, other than any non-competition or similar restrictions. In addition, each Unit Holder shall agree in writing to the same individual covenants and releases that the Majority Member and other Members required to approve the Approved Sale agree to provide in connection with such Approved Sale. Subject to the limitations set forth in this Section 8.10, each Unit Holder will take all necessary or reasonably desirable actions in connection with the consummation of the Approved Sale as requested by the Majority Member, any other Members required to approve the Approved Sale, and the Company.

(c) The obligations of the Unit Holders with respect to an Approved Sale are subject to the satisfaction of the following conditions: (i) upon the consummation of the Approved Sale and subject to the provisions of this Agreement, each Unit Holder will receive its pro rata share of the aggregate consideration received by other Unit Holders of the same class of Units, in the same form of consideration as any other Unit Holder of the same class of Units, (ii) if any Unit Holder of a class of Units is given an option as to the form and amount of consideration to be received, each Unit Holder of such class of Units will be given the same option, (iii) each Unit Holder of then currently exercisable rights to acquire Units, if any, will be given an opportunity to exercise such rights prior to the consummation of the Approved Sale and participate in such sale as Unit Holders, and (iv) all consideration paid in exchange for the Units shall be shared on a pro rata basis based on the proceeds to be received by the Unit Holders with respect to their respective ownership of Units of each class after taking into account the relative distribution priorities and preferences of each such class of Units in relation to the other classes

(d) The provisions of paragraphs (b), and (c) of this Section 8.10 will terminate upon the consummation of an Approved Sale (except as such provisions relate to such Approved Sale or the consummation thereof).

**8.11   Spousal Consent.** In connection with the execution and delivery of this Agreement, any Member who is a natural person will deliver to the Company an executed consent from such Member's spouse (if any) in the form of Exhibit B attached hereto. If, at any time subsequent to the date of this Agreement such Member becomes legally married (whether in the first instance or to a different spouse), such Member shall cause his or her spouse to execute and deliver to the Company a consent in the form of Exhibit B attached hereto. Such Member's failure to deliver to the Company an executed consent in the form of Exhibit B at any time when such Member would otherwise be required to deliver such consent shall constitute such Member's continuing representation and warranty that such Member is not legally married as of such date.

**8.12   Waiver of Withdrawal and Purchase Rights.** Each Member hereby waives any and all rights such Member may have to withdraw and/or resign from the Company pursuant to Section 18-603 of the Act and hereby waives any and all rights such Member may have to receive the fair value of its Units upon such resignation and/or withdrawal pursuant to Section 18-604 of the Act.

**8.13   Purchase of Equity Securities.** Subject to any other provisions of this Agreement, the Board of Managers may cause the Company to purchase or otherwise acquire Equity Securities, or may

24

purchase or otherwise acquire Equity Securities on behalf of the Company. As long as such Equity Securities are owned by or on behalf of the Company, such Equity Securities will not be considered outstanding for any purpose.

## SECTION 9. ACCOUNTING, RECORDS, REPORTING TO MEMBERS.

**9.1     Books and Records**. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with generally accepted accounting principles and, to the extent appropriate in accordance with the accounting methods followed for federal income tax purposes. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. The Company shall use its reasonable best efforts to maintain at its principal office all of the following:

**(a)** A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with the Capital Contributions, Capital Account, and number and class of Units held by each Member and Assignee;

**(b)** A current list of the full name and business or residence address of each Manager;

**(c)** A copy of the Certificate of Formation and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate of Formation or any amendments thereto have been executed;

**(d)** Copies of the Company's and each of its Subsidiaries federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

**(e)** A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

**(f)** Copies of the financial statements of the Company and each Subsidiary, if any, for the six (6) most recent Fiscal Years; and

**(g)** The Company's and each Subsidiary's books and records as they relate to the internal affairs of the Company (including all accounting books and records) for at least the current and past four (4) Fiscal Years.

**9.2     Tax Information.** The Company shall cause to be prepared at least annually, at Company expense, information necessary for the preparation of the Unit Holders' and Assignees' federal and state income tax returns. The Company shall use all reasonable best efforts to send or cause to be sent to each Unit Holder or Assignee within ninety (90) days after the end of each taxable year such information as is necessary to complete federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for that year.

**9.3     Filings**. The Board of Managers, at the Company's expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Board of Managers, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate of Formation and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations.

**9.4    Bank Accounts**. The Board of Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person (other than any of its Subsidiaries).

**9.5    Accounting Decisions and Reliance on Others**. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers. The Board of Managers may rely upon the advice of the Company's accountants as to whether such decisions are in accordance with generally accepted accounting principles or with accounting methods followed for federal income tax purposes.

**9.6    Tax Matters for Company Handled by the Board of Managers and Tax Matters Partner**. The Board of Managers shall from time to time cause the Company to make such tax elections as it deems to be in the best interests of the Company and the Members. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith, provided that the consent of the Board of Managers shall be required for any actions taken by the Tax Matters Partner in its capacity as such, other than ministerial acts. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company and shall have the right to agree to extend any statute of limitations. The Tax Matter Partner shall take such actions as are required to cause each of the Initial Members to be a "notice partner" under the applicable Treasury Regulations.

## SECTION 10. DISSOLUTION AND WINDING UP.

**10.1    Dissolution**. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a) The happening of any event of dissolution specified in the Certificate of Formation, if any;

(b) The entry of a decree of judicial dissolution;

(c) The written consent of the Members as provided in Section 4.6 hereof; or

(d) Any other event which causes a dissolution of the Company because the Act mandates dissolution upon the occurrence of such other event, notwithstanding any agreement among the Members to the contrary (each an *"Event of Dissolution"*).

**10.2    Termination of Company**. Upon the completion of the liquidation of the Company and the distribution of all Company assets, the Company's affairs shall terminate and the Board of Managers shall cause to be executed and filed a certificate of cancellation of the Company's Certificate of Formation meeting the requirements of the Act, as well as any and all other documents required to effectuate the termination of the Company.

**10.3    Winding Up**. Upon the occurrence of an Event of Dissolution, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Board of Managers (or its designee) (a) shall be responsible for overseeing the winding up and liquidation of the Company, (b) shall take full account of the assets and liabilities of the Company, (c) shall either cause its assets to be sold or distributed, and if sold, as promptly as is consistent with obtaining the fair market value thereof, and (d) shall cause the proceeds

therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 10.5. The Board of Managers (or its designee) shall give written notice of the commencement of winding up by mail to the Members and to all known creditors and claimants whose addresses appear on the records of the Company.

10.4    **Distributions in Kind**.  The Board of Managers shall be permitted to make Distributions in cash or in kind in the form of any other securities or property; provided, however, that all Distributions in kind shall be Distributed among all Members in accordance with the order of priorities set forth in Section 7.1 and Section 10.5 as applicable.

10.5    **Order of Payment upon Dissolution**.   After payment or reasonable provision for payment of all claims and obligations of the Company, including all contingent, conditional, or unmatured claims and obligations, known to the Company including, without limitation, debts and liabilities to Members who are creditors of the Company, and all claims and obligations which are known to the Company but for which the identity of the claimant is unknown, the remaining assets shall be distributed to the Members in accordance with the following order of priority:

(a)  first, to the holders of Preferred Units, pro rata in accordance with their respective unreturned Preferred Unit Liquidation Preferences, until the cumulative distributions made for the current Fiscal Year and all prior Fiscal Years pursuant to Section 7.1(a)(i) and this Section 10.5(a) are equal to the Preferred Unit Liquidation Preference; and

(b)  thereafter, to the holders of all Units, pro rata, in accordance with their relative Percentage Interests.

10.6    **Limitations on Payments Made in Dissolution**.   Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look solely to the assets of the Company for the return of its positive Capital Account balance and shall have no recourse for its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Board of Managers or any other Member.

10.7    **Negative Capital Account Restoration**.   No Member shall have any obligation whatsoever upon the liquidation of such Member's Units, the liquidation of the Company or in any other event to contribute all or any portion of any negative balance standing in such Member's Capital Account to the Company, to any other Member, or to any other person or entity.

10.8    **No Action for Dissolution**.   Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that causes a Dissolution Event.   The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Board of Managers has failed to liquidate the Company as required by this Section 10, each Member hereby waives and renounces its right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member.   Damages for breach of this Section 10.8 shall be monetary damages only (and not specific performance), and the damages may be offset against Distributions by the Company to which such Member would otherwise be entitled.

27

## SECTION 11. INDEMNIFICATION AND INSURANCE.

**11.1    Indemnification of Members and Managers**.  To the greatest extent not inconsistent with the Act and the laws and public policies of the State of Delaware, the Company shall defend, indemnify and hold harmless each current and former Member, Manager, or Officer of the Company (collectively, *"Indemnified Party"*) made a party or who was threatened to be made a party to any Proceeding by the Company or another because such party is or was a Member, Manager, or Officer of the Company, as a matter of right, against all losses, liabilities, claims, Expenses, amounts paid in settlement, judgments, fines and penalties incurred by or levied upon such Indemnified Party in connection with any Proceeding or any threatened Proceeding; whether civil, criminal, administrative, or investigative provided that it shall be determined in the specific case in accordance with Section 11.5 of this Section 11 that indemnification of such Person is permissible in the circumstances because the Person has met the standard of conduct for indemnification set forth in this Section 11.

**11.2    Advance Undertakings for Indemnification**.  To the greatest extent not inconsistent with the Act and laws and public policies of the State of Delaware, the Company shall pay for, advance or reimburse, pursuant to this Section 11, the reasonable Expenses incurred by an Indemnified Party in connection with any such Proceeding as incurred in advance of final disposition of the Proceeding if (a) the Person furnishes the Company a written affirmation of the Person's good faith belief that it has met the standard of conduct for indemnification described in Section 11.4, (b) the Person furnishes the Company a written undertaking, executed personally or on such Person's behalf, to repay the advance if it is ultimately determined by a court having jurisdiction that such Person did not meet such standard of conduct and that it is not entitled to be indemnified, and (c) a determination is made in accordance with Section 11.5 that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 11.

The undertaking described above must be a general obligation of the Person, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment.  The Company shall indemnify an Indemnified Party who is wholly successful, on the merits or otherwise, in the defense of any such Proceeding, as a matter of right, against reasonable Expenses incurred by the Person in connection with the Proceeding without the requirement of a determination as set forth in Section 11.6.

**11.3    Advancement of Expenses**.  Upon demand by an Indemnified Party for indemnification or advancement of Expenses incurred in defending a civil or criminal suit or Proceeding, as the case may be, the Company shall expeditiously determine whether the Indemnified Party is entitled thereto in accordance with this Section 11.  The indemnification and advancement of Expenses provided for under this Section 11 shall be applicable to any Proceeding arising from acts or omissions occurring before or after the adoption of this Agreement.

**11.4    Indemnification of Others**.  The Company shall be empowered, but shall not be obligated, to indemnify any Person to the same extent as if such Person were an Indemnified Party.

**11.5    Standards of Conduct for Indemnification**.  Indemnification of an Indemnified Party is permissible under this Section 11 only if (a) such Person conducted itself in good faith, and (b) reasonably believed that its conduct was in or at least not opposed to the Company's best interest; and (c) in the case of any criminal Proceeding, it had no reasonable cause to believe its conduct was unlawful. The termination of a Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Person did not meet the standard of conduct described in this Section 11.5.

28

**11.6    Procedures to Determine Indemnification**.    A determination as to whether indemnification of or advancement of Expenses is permissible shall be made by any one of the following procedures:

**(a)** If so requested by the Indemnified Party, by special legal counsel to the Company selected by the Board of Managers; or

**(b)** Otherwise, by the Members in good faith by a vote of a majority of the Unit Holders that are not and whose Affiliates are not at the time parties to the Proceedings.

**11.7    Court Order of Indemnification**.  An Indemnified Party who is a party to a Proceeding may apply for indemnification from the Company to the court, if any, conducting the Proceeding or to another court of competent jurisdiction.  On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

**(a)** In a Proceeding in which the Indemnified Party is wholly successful, on the merits or otherwise, the Indemnified Party is entitled to indemnification under this Section 11, in which case the court shall order the Company to pay the Indemnified Party its reasonable Expenses incurred to obtain such court ordered indemnification; or

**(b)** The Indemnified Party is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnified Party met the standard of conduct set forth in Section 11.5 above.

**11.8    Described Indemnification Rights Nonexhaustive**.    Nothing contained in this Section 11 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of Expenses to any Person who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not, but in all such cases, the Company shall be the indemnitor of first resort.

**11.9    Construction of Indemnification Rights**.  Nothing contained in this Section 11 shall limit the ability of the Company to otherwise indemnify or advance Expenses to any Person.  It is the intent of this Section to provide indemnification to an Indemnified Party to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 11. **INDEMNIFICATION SHALL BE PROVIDED IN ACCORDANCE WITH THIS SECTION 11 IRRESPECTIVE OF THE NATURE OF THE LEGAL OR EQUITABLE THEORY UPON WHICH A CLAIM IS MADE INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, BREACH OF DUTY, MISMANAGEMENT, WASTE, BREACH OF CONTRACT, BREACH OF WARRANTY, STRICT LIABILITY, VIOLATION OF FEDERAL OR STATE SECURITIES LAW, VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR VIOLATION OF ANY OTHER STATE OR FEDERAL LAW**. The provisions of this Section 11 shall be in the nature of a contractual right.  Any amendment to this Section 11 shall not adversely affect an Indemnified Party's rights under this Section 11 for any actions taken or omission prior to such amendment.

**11.10    Insurance for Indemnification**.  To the greatest extent not inconsistent with the Act and laws and public policies of the State of Delaware, the Company may purchase and maintain insurance or other financial arrangement for the benefit of any Person who is or was a Member, Manager, officer,

29

employee or agent, against any liability asserted against or Expenses incurred by such Person in any capacity or arising out of such Person's service with Company, whether or not Company would have the power to indemnify such Person against such liability. No financial arrangement may provide protection for a Person adjudged by a court having jurisdiction, after exhaustion of all appeals therefrom, to be liable for intentional misconduct, fraud, or a knowing violation of law, except with respect to the advancement of Expenses or indemnification ordered by a court.

## SECTION 12. MISCELLANEOUS.

**12.1    Release.** Each Member (other than the Majority Member) by its execution hereof and acceptance of the Common Units allocated to such Member pursuant hereto and as set forth on Exhibit A attached hereto, acknowledges and agrees that the allocation and issuance of such Common Units to such Member satisfies in full all obligations of the Company and of the Majority Member and its Affiliates with respect to issuance to such Member of equity interests in any entity, whether pursuant to the Loan Purchase Agreement, the Settlement Agreement or otherwise, and hereby irrevocably waives and releases any claim as to any further equity interest in any such entity.

**12.2    Partnership Intended Solely for Tax Purposes**. The Members have formed the Company as a Delaware limited liability company under the Act, and do not intend to form a general or limited partnership under Delaware or any other state law. The Members intend the Company to be classified and treated as a partnership solely for federal and state income taxation purposes. Each Member agrees to act consistently with the foregoing provisions of this Section 12.1 for all purposes, including, without limitation, for purposes of reporting the transactions contemplated herein to the Internal Revenue Service and all state and local taxing authorities.

**12.3    Complete Agreement**. This Agreement constitutes the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and replaces and supersedes all prior written and oral agreements or statements by and among the Members or any of them. No representation, statement, condition, or warranty related to the subject matter hereof not contained in this Agreement or expressly incorporated herein by reference, will be binding on the Members or have any force or effect whatsoever.

**12.4    Binding Effect**. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

**12.5    Parties in Interest**. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third Person to any party to this Agreement, nor shall any provision give any third Person any right of subrogation or action over or against any party to this Agreement.

**12.6    Pronouns; Statutory References**. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference to the Code, the Treasury Regulations, the Act, or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

**12.7    Headings**. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

**12.8    Interpretation.** In the event any claim is made by any Member relating to any conflict, omission, or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or its counsel. The use of the word "including" in this Agreement shall mean "including without limitation."

**12.9    References to this Agreement.** Numbered or lettered sections and subsections herein contained refer to sections and subsections of this Agreement unless otherwise expressly stated.

**12.10    Exhibits.** All Exhibits, as the same may be amended from time to time in accordance with the terms of this Agreement, attached to this Agreement are incorporated and shall be treated as if set forth herein.

**12.11    Severability.** If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**12.12    Additional Documents and Acts.** Upon the request of a Member or the Board of Managers, each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or reasonably appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**12.13    Notices.**    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, or (d) two (2) Business Days after deposit with a recognized international courier service, freight prepaid, specifying next business day delivery (or second business day delivery for international delivery), with written verification of receipt. All communications shall be sent to the respective parties at their address or facsimile number as set forth on Exhibit A, or to such facsimile number or address as subsequently modified by written notice given in accordance with this Section 12.13. If notice is given to the Company, a copy shall also be sent to Integral Business Counsel, PC, 8090 Amsterdam Court, Gainesville, VA 20155.

**12.14    Amendments.** This Agreement may be amended (and shall only be amended) with the written consent of the Majority Member in compliance with the provisions of Section 4.6 hereof. Notwithstanding the foregoing, except as may be expressly provided for in this Agreement or in the proviso to this sentence, no amendment of this Agreement may:  (a) reduce a Member's Capital Account, (b) impose any new monetary obligations on Members, (c) eliminate any express right that a Member or class of Unit Holders is entitled to pursuant to this Agreement, (d) adversely affect any Member or class of Unit Holders in any material respect if the holders of all Units are not similarly affected, (e) change the terms of Section 4.4 or Section 4.6, (f) modify a Members' right to receive distributions in accordance with Section 7.1 (subject to the priorities of existing and future classes of Equity Securities), or (g) change the restrictions contained in this Section 12.14, in each case unless a majority of each class of Unit Holders (determined by Unit vote) adversely affected thereby has expressly consented in writing to such amendment; provided that the Board of Managers may make any amendments of this Agreement that are necessary in order to admit, substitute, remove or withdraw any Member, including admission of any subsequent purchaser or recipient of Unit as a Member pursuant hereto.

31

**12.15   Governing Law.**  The laws of the State of Delaware shall govern the validity of this Agreement, the construction of the terms and the interpretation of the rights and duties arising hereunder.

**12.16   Reliance on Authority of Person Signing Agreement**.  If a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or (b) be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

**12.17   No Interest in Company Property; Waiver of Action for Partition**.  No Member or Assignee has any interest in specific property of the Company.  Without limiting the foregoing, each Member and Assignee irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

**12.18   Multiple Counterparts**.  This Agreement and any amendments hereto may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  This Agreement may be executed electronically by the exchange of signature pages via email or facsimile.

**12.19   Remedies Cumulative**.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

**12.20   No Third Party Beneficiary**.  The Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of the Agreement as a third party beneficiary or otherwise.

**12.21   Not for Benefit of Creditors**.  The provisions of the Agreement are intended only for the regulation of relations among Members and the Company and the Agreement is not intended for the benefit of a creditor who is not a Member and does not grant any rights to or confer any benefits on any creditor who is not a Member or any other Person who is not a Member, Manager or Officer. If any creditor levies upon or otherwise acquires any interest in a Member's Unit(s), or other interests and/or rights hereunder, such creditor shall only have the ability to acquire the relevant Member's Economic Interest. Any payments or distributions made to creditor(s) by Company to a creditor that levies on or otherwise acquires such Economic Interest shall reduce the right of the relevant Member to receive any distributions or payments by the amount paid to such creditor(s). In no event shall any creditor of any Member have the ability to obtain any voting rights or control of the Company of any kind.

**12.22   Warranties and Representations**.  Each Member separately represents and warrants that such Member is not a party to any pending or threatened suit, action, or legal, administrative, arbitration, or other Proceeding that might materially and adversely affect the business of the Company or the transactions contemplated by this Agreement, nor does such Member know of any facts that are likely with the passage of time to give rise to such a suit, action, or Proceeding.

*[The remainder of this page intentionally has been left blank]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the day and year first above written.

"Company"

_____
Clinton W. Walker – Manager

_____
David J. Richards – Manager

*"Members"*

SKYE MINERAL PARTNERS, LLC

By: _____

Name: _____David J. Richards_____

Its: _____Manager_____


COPPER KING MINING CORPORATION

By: _____

Name: _____

Its: _____


—————————————————————————

Robert Reynolds

as Representative for the First Lien Lenders under
that certain Equity Administration Agreement
dated June 6, 2011

*"Members"*

SKYE MINERAL PARTNERS, LLC

By:_____

Name:_____

Its:_____

COPPER KING MINING CORPORATION

By:_____

Name: A. John A. Bryan, Jr.

Its: Chief Executive Officer

_____

Robert Reynolds

as Representative for the First Lien Lenders under
that certain Equity Administration Agreement
dated June 6, 2011

*"Members"*

SKYE MINERAL PARTNERS, LLC

By: _____

Name: _____

Its: _____


COPPER KING MINING CORPORATION

By: _____

Name: _____

Its: _____


Robert Reynolds

as Representative for the First Lien Lenders under
that certain Equity Administration Agreement
dated June 6, 2011

## EXHIBIT A

### MEMBER NAME, ADDRESS, CAPITAL CONTRIBUTION
### AND NUMBER AND CLASS OF UNITS

### (to be made prior to November 11, 2011 unless otherwise agreed)

| Pro-Forma Cap Table | | | | | | |
|---|---|---|---|---|---|---|
| CS Mining, LLC - APA Closing Date | | | | | | |
| Investor | Address | Investment Amount* | Purchase Price per Common Unit | Total Common Units | Purchase Price per Preferred Unit | Total Preferred Units |
| Skye Mineral Partners, LLC | 500 South Front St., Suite 1200 Columbus, OH 43215 | $4,700,000.00 | $1.00 | 4,700,000 | N/A | |
| Robert Reynolds** | 6891 S. 700 W. #200, Midvale, UT 84047 | $250,000.00 | $1.00 | 250,000 | N/A | |
| Copper King Mining Coporation | c/o Levene, Neale, Bender, Yoo and Brill, L.L.P. 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067 | $50,000.00 | $1.00 | 50,000 | N/A | |
| Skye Mineral Partners, LLC | 500 South Front St., Suite 1200 Columbus, OH 43215 | $4,000,000.00 | N/A | - | $1.00 | 4,000,000 |
| | | $9,000,000.00 | | 5,000,000 | | 4,000,000 |
| *Skye Mineral Partners Capital Contribution for Common Units represents the amount of capital necessary to close the acquisition contemplated under the APA and transactions related thereto. | | | | | | |
| *Capital Contribution for Robert Reynolds and CKMC is attributed as compensation under the terms of the Loan Purchase Agreement and the Asset Purchase Term Sheet executed by the Copper King Mining Corporation, the Company and the Majority Member on July 11, 2011. | | | | | | |
| **As "Representative" under the terms of that certain Equity Administration Agreement by and among the former first lien lenders of Western Utah Copper Company and Copper King Mining Corporation, dated June 6, 2011. | | | | | | |

A-1

## EXHIBIT B

### SPOUSAL CONSENT

### TO

### LIMITED LIABILITY COMPANY AGREEMENT

### OF

### CS MINING, LLC

1.  I, _____, the spouse of _____, hereby consent to the terms and conditions set forth in that certain Limited Liability Company Agreement of CS Mining, LLC, and all related documents referenced therein.

2.  I acknowledge and certify having read said agreements and documents described in Section 1 and understand the terms and the effects thereof, and execute this Spousal Consent freely, under no duress or threat of duress, and with full knowledge that I am not bound or required to execute this Spousal Consent.

3.  I acknowledge and agree that I will have no rights or claims whatsoever against or with respect to CS Mining, LLC, any of its affiliates or Members, or with respect to any of the foregoing documents or interests, and I am specifically waiving any rights that might exist with respect to any of the above documents and transactions. I may not revoke this consent.

I declare under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.   Signed on this ____ day of _____, 20___, in the County of _____, State of _____.


_____
(Signature)

Name:_____


On this _____ day of  May, in the year 2011, before me _____, a notary public, personally appeared _____,  proved on the basis of satisfactory evidence to be the person(s) whose name(s) (is/are) subscribed to this instrument, and acknowledged (he/she/they) executed the same.  Witness my hand and official seal.


_____
Notary Public   [Seal]

C-1

## AMENDMENT TO
## LIMITED LIABILITY COMPANY AGREEMENT

THIS AMENDMENT TO LIMITED LIABILITY COMPANY AGREEMENT (the "**Amendment**") is made and entered into as of January 28, 2014 by and among CS Mining, LLC, a Delaware limited liability company (the "**Company**"), and the undersigned members of the Company (the "**Members**").

### RECITALS

A.      CS Mining, LLC (the "**Company**") is a Delaware limited liability company.  The Company is governed by that certain Limited Liability Company Agreement of CS Mining, LLC by and among the Members, as amended by subsequent amendments thereto (the "**Operating Agreement**").

B.      The Members desire to further amend the Operating Agreement on the terms and conditions hereinafter set forth.

C.      Capitalized terms used, and not defined, in this Amendment have the meanings given to them in the Operating Agreement.

### AMENDMENT

NOW THEREFORE, based on the foregoing premises and for other good and valuable consideration, the receipt of which is hereby acknowledged by each of the parties hereto, such parties do hereby agree as follows:

1.      **Amendments.**

(a)      The following new defined term are added to Section 1:

"*Clarity Designee*" means a Manager of the Company designated by Clarity pursuant to Section 5.1(a) hereof.

"*Major Holders*" means each of Clarity Copper, LLC, DXS Capital (U.S.) Limited, PacNet Capital (U.S.) Limited and Skye Mineral Investors, LLC, and their respective assignees or successors in interest.

"*SMI Designee*" means a Manager of the Company designated by SMI pursuant to Section 5.1(a) hereof.

(b)      The following is added to the end of Section 4.6(a) of the Operating Agreement:

"Any action of the Members (or a subset thereof) may be taken by written consent of that number or percentage of the Members whose consent is otherwise required for such action under this Agreement. Any such written

consent shall be deemed given only upon delivery by each applicable Member, or their authorized signatory, of an signed written instrument (which may be signed manually or by affixing a digital signature or authorizing attachment of digital signature via email) setting forth such Member's consent or approval, which instrument may be delivered in person, by mail or messenger, or by electronic mail or facsimile."

(c)     A new subsection (j) is hereby inserted into Section 5.1 of the Operating Agreement to read in its entirety as follows:

"(j)     **Information Rights.** Within 7 days after the written request of any Manager or Major Holder to the Chief Executive Officer, the Company shall deliver to the requesting Manager or Major Holder, at the reasonable expense of the Company (not to exceed $5,000 annually), copies of any requested and available Company financial records, planning reports (to the extent then available) or other books and records of the Company or the Subsidiary.   No Member or Manager (or group of Members or Managers) shall have any right or authority to direct the Company or the Subsidiary to withhold or delay providing any such requested information or records to the requesting Manager or Major Holder."

(f)     Section 5.3 of the Operating Agreement is hereby amended and restated in its entirety to read as follows:

"5.3     **Committees.**     The Board of Managers may create committees to assist the Board of Managers and the officers in the governance of areas of importance to the Company.  Subject to the terms of this Agreement, such committees will have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees.   Each such committee shall consist of at least three (3) Managers to consist of managers designated by SMI, Clarity Copper and Pac-Net/DXS, consistent with the below. Without limiting the foregoing:

(a)     The Company will form a Capital Expenditure Committee of the Board.  The Capital Expenditure Committee will consist of the DXS Designee, the Independent Director and the SMI Designee or the Clarity Designee. All capital expenses exceeding $50,000 contemplated by an approved annual operating budget will require authorization from the Capital Expenditure Committee before such expenses are incurred.

(b)     The Company will form an Exploration Committee of the Board.   The Exploration Committee will consist of the DXS Designee, the Independent Director and the SMI Designee or the Clarity Designee.  All exploration expenses exceeding $50,000 contemplated by an approved annual operating budget will require authorization from the Capital Expenditure Committee before such expenses are incurred.

- 2 -

(c)     Immediately upon the election of an Independent Manager, the Company will form a Governance Committee of the Board. The Governance Committee will consist of the DXS Designee, the SMI Designee and the Independent Director.  The Governance Committee will have the right and authority (i) to cause the Chief Executive Officer of the Company to be removed for failure to achieve KPIs, and (ii) to exercise such other powers as may be specified in the Charter of the Governance Committee, if any, which Charter will be adopted with the unanimous approval of all Managers.

(d)     Proposals may be presented for approval of the respective Committees at duly convened meetings of the Committees, or for approval by written consent of the members of such Committees.  Meetings and actions by written consent of the members of a Committee shall be subject to the same procedures and requirements as meetings and actions by written consent of the full Board, as set forth in Section 5.1 above.  If a committee member fails to respond to a request for written approval of a proposed matter within ten calendar (10) days of delivery of such request for approval, the matter will be deemed approved by that Committee member. Majority vote or written consent of a Committee shall be an action of such Committee."

2.     **Counterparts.**  This Amendment may be executed in counterpart originals, each of which when duly executed and delivered shall be deemed an original and all of which when taken together shall constitute one instrument.  Executed originals (or counterpart originals) of this Amendment may be delivered by facsimile or electronic transmission, which facsimile or electronic transmission copies shall be deemed originals.

3.     **Miscellaneous.**     Except as expressly modified by the provisions of this Amendment, the Operating Agreement shall continue in full force and effect.  This Amendment, the Operating Agreement and the exhibits and schedules thereto contain the entire agreement between the parties with respect to the Company and supersede all prior written and/or oral representations and/or agreements with respect to the subject matter hereof.  In the event any inconsistencies exist between the terms of this Amendment and the Operating Agreement, this Amendment shall control.  The individuals who execute this Amendment represent and warrant that they are duly authorized to execute this Amendment on behalf of the respective undersigned Members, and that no other signature, act or authorization is necessary to bind such entities to the provisions of this Amendment.

*[Remainder of page intentionally left blank – signature pages follow]*

US_ACTIVE-115125093

IN WITNESS WHEREOF, the Members have agreed to and accepted the provisions of this Amendment as of the date first above written.

*"Members"*                                    SKYE MINERAL PARTNERS, LLC


By: _____
        Clinton Walker
        Manager

US_ACTIVE-115125093

# CS MINING, LLC

## CHARTER OF THE
## CAPITAL EXPENDITURE COMMITTEE
## OF THE BOARD OF MANAGERS

August 12, 2014

### I.   *Adoption of Charter*

The Board of Managers (the "Board") of the CS Mining, LLC, a Delaware limited liability company (the "Company") has adopted this Charter (the "Charter") of the Capital Expenditure Committee of the Board (the "Capex Committee") as of the date set forth above.

### II.   *Purpose*

The purposes of the Capex Committee shall be to oversee the Company's capital expenditure transactions, management, policies and guidelines, including review of proposed capital improvements relating to development, expansion and maintenance of the Company's ore processing facilities.

### III.   *Organization*

#### A.   Committee Membership

The Capex Committee shall consist of two directors.

#### B.   Appointment

The Capex Committee members will be appointed by the Board, in a manner consistent with the Company's Limited Liability Company Agreement, as amended (the "LLC Agreement").  Except as may be otherwise provided in the LLC Agreement or in any other agreement of the members of the Company, each member of the Capex Committee may be removed at any time, with or without cause, by a majority vote of the Board.  Capex Committee members will hold their offices until their successors are elected and qualified, or until their earlier resignation or removal.

#### C.   Committee Meetings

The Capex Committee shall meet as often as it deems necessary, but not less frequently than six (6) times each year. All meetings will be at the call of a majority of members of the Capex Committee, except as specified below in Section D. A majority of the members of the Capex Committee will constitute a quorum for the transaction of business. Members of the Capex Committee may participate in a meeting in person or via telephone or video conference in accordance with the Corporate Governance Guidelines of the Company (the "Corporate Governance Guidelines"). The Capex Committee may also act by unanimous written consent.

The Capex Committee, as it may determine to be appropriate, may meet in separate executive sessions with other directors, the Chairman of the Board, the Chief Executive Officer, and other Company employees, agents or representatives invited by the Capex Committee.

Members of the Capex Committee shall in all events endeavor to reach a consensus as to all matters presented for approval of the Capex Committee. In the event of any difference of opinion over a material item presented for approval, the Members shall promptly meet and confer (including an in-person meeting if required) and present all information and analysis relevant to their respective view of the matter under consideration. If the members of the Committee are unable to reach a consensus opinion of any such material item within ten (10) business days of the applicable committee meeting at which the item was presented for consideration, the Committee members shall engage a third party intermediary (which may include a mutually agreed member of the Board or a professional mediator or third party mining or engineering consultancy) to assist with resolving such difference of opinion, and shall promptly cooperate with such intermediary in good faith to resolve the matter in the best interest of the Company.

**D.    Extraordinary Meetings and Matters**

In the event there is (i) a loss or breakdown of critical equipment that requires immediate expenditure to replace or repair, without which the Company's mining or ore processing operations, would be materially and adversely affected, or (ii) another equipment failure or other unexpected event that causes the Company to require ordering additional equipment or repairing or replacing existing equipment or facilities to avoid a material interruption of the Company plant construction or mineral exploration activities, then in each case, any member of the Capex

2

Committee may call an extraordinary telephonic meeting of the Capex Committee (an "**Extraordinary Meeting**"), for the purpose of considering approval of such expenditure item only.   An Extraordinary Meeting may be called on two (2) business days' prior written notice to the Capex Committee members, and shall be scheduled at a time convenient to all members.  For Extraordinary Meetings only, the presence of a single Capex Committee member shall constitute a sufficient quorum.   All other requirements for the conduct of business at regular meetings of the Capex Committee shall apply to Extraordinary Meetings.

**E.**     **Resources and Authority**

The Capex Committee shall have the resources and authority appropriate to discharge its duties and responsibilities, including the authority to select, retain, terminate and approve the fees and other retention terms of special counsel or other experts or consultants, as it deems appropriate, subject to such reasonable budgets the Board may approve.

**F.**     **Reports to the Board**

The Capex Committee shall maintain written minutes or other records of its meetings and activities.  Following each Capex Committee meeting, the Chair of the Capex Committee shall report to the Board at the next Board meeting on all activities of the Capex Committee and any matters that were submitted to a vote of the Capex Committee since the time of the immediately previous Board meeting and as otherwise requested by the Chairman of the Board.  The Capex Committee shall submit such other reports to the Board as may from time to time be requested by the Chairman of the Board or the Chairman of a majority of the Members of the Board.

*IV.*    *Function and Responsibilities*

To fulfill its purpose and responsibilities, the Capex Committee's functions will include the following:

A. Oversee the capital investment policies, plans, guidelines, and programs of the Company and monitor compliance with those policies, plans, guidelines, and programs.

B. Review and approve capital investment expenditures made by or on behalf of the Company, including all capital expenses exceeding $10,000 specifically included the

3

Company's annual operating budget approved by the Board, and including all capital expenses exceeding $5,000 not specifically included the Company's approved annual operating budget.  Any cost overrun for any item not exceeding 10% of the expenditure previously approved by the Capex Committee shall not require additional approval from the Committee, provided however that such cost overrun shall be promptly reported to the Committee.

C.  Delegate authority to management to execute individual investment transactions on behalf of the Company in accordance with the policies and limits approved by the Committee and subject to the terms of the LLC Agreement.

D.  Recommend periodically to the Board policies, strategies, guidelines, and programs governing the Company's capital expenditure programs.

E.  Receive reports from management on, and monitor execution of, capital expenditures authorized by the Committee.

F.  Undertake such other work and studies as may be necessary to keep the Board adequately informed as to the status of the Company's capital expenditure activities.

G.  Perform any other activities consistent with this Charter and the LLC Agreement as the Capex Committee deems appropriate or necessary or as delegated to the Capex Committee by the Board.

## V.    *Annual Review of Charter and Committee*

The Capex Committee shall perform a review and evaluation, at least annually, of the performance of the Capex Committee and its members, including by reviewing the compliance of the Capex Committee with this Charter.  In addition, the Capex Committee shall review and reassess, at least annually, the adequacy of this Charter and recommend to the Board, subject to Board approval, any improvements to this Charter that the Capex Committee considers necessary or valuable.  The Capex Committee shall conduct such evaluations and reviews in such manner as it deems appropriate.

*         *         *

4

**CS MINING, LLC**

**CHARTER OF THE
EXPLORATION COMMITTEE
OF THE BOARD OF MANAGERS**

August 12, 2014

**I.**  *Adoption of Charter*

The Board of Managers (the "Board") of the CS Mining, LLC, a Delaware limited liability company (the "Company") has adopted this Charter (the "Charter") of the Exploration Committee of the Board (the "Exploration Committee").

**II.**  *Purpose*

The purposes of the Exploration Committee shall be to oversee the Company's exploration programs, including review of proposed investments in drilling, testing and resource definition on the properties owned or controlled by the Company.

**III.**  *Organization*

**A.**  **Committee Membership**

The Exploration Committee shall consist of two directors.

**B.**  **Appointment**

The Exploration Committee members will be appointed by the Board, in a manner consistent with the Company's Limited Liability Company Agreement, as amended (the "LLC Agreement"). Except as may be otherwise provided in the LLC Agreement or in any other agreement of the members of the Company, each member of the Exploration Committee may be removed at any time, with or without cause, by a majority vote of the Board. Exploration Committee members will hold their offices until their successors are elected and qualified, or until their earlier resignation or removal.

**C.**  **Committee Meetings**

The Exploration Committee shall meet as often as it deems necessary, but not less frequently than six (6) times each year. All meetings will be at the call of a majority of members of the Exploration Committee, except as specified below in Section D.  A majority of the members of the Exploration Committee will constitute a quorum for the transaction of business. Members of the Exploration Committee may participate in a meeting in person or via telephone or video conference in accordance with the Corporate Governance Guidelines of the Company (the "Corporate Governance Guidelines").   The Exploration Committee may also act by unanimous written consent.

The Exploration Committee, as it may determine to be appropriate, may meet in separate executive sessions with other directors, the Chairman of the Board, the Chief Executive Officer, and other Company employees, agents or representatives invited by the Exploration Committee.

Members of the Exploration Committee  shall in all events endeavor to reach a consensus as to all matters presented for approval of the Exploration Committee .  In the event of any difference of opinion over a material item presented for approval, the Members shall promptly meet and confer (including an in-person meeting if required) and present all information and analysis relevant to their respective view of the matter under consideration.  If the members of the Committee are unable to reach a consensus opinion of any such material item within ten (10) business days of the applicable committee meeting at which the item was presented for consideration, the Committee members shall engage a third party intermediary (which may include a mutually agreed member of the Board or a professional mediator or third party mining or engineering consultancy) to assist with resolving such difference of opinion, and shall promptly cooperate with such intermediary in good faith to resolve the matter in the best interests of the Company.

**D.     Extraordinary Meetings and Matters**

In the event the Company experiences an unexpected event that causes the Company to require an immediate additional expenditure, without which the Company's relevant exploration program to be delayed beyond an applicable deadline for completion set by the Exploration Committee or the Board, any member of the Exploration Committee may call an extraordinary telephonic meeting of the Exploration Committee (an "**Extraordinary Meeting**"), for the

purpose of considering approval of such expenditure item only.   An Extraordinary Meeting may be called on two (2) business days' prior written notice to the Exploration Committee members, and shall be scheduled at a time convenient to all members.  For Extraordinary Meetings only, the presence of a single Exploration Committee member shall constitute a sufficient quorum. All other requirements for the conduct of business at regular meetings of the Exploration Committee shall apply to Extraordinary Meetings.

### E.    Resources and Authority

The Exploration Committee shall have the resources and authority appropriate to discharge its duties and responsibilities, including the authority to select, retain, terminate and approve the fees and other retention terms of special counsel or other experts or consultants, as it deems appropriate, subject to such reasonable budgets the Board may approve.

### F.    Reports to the Board

The Exploration Committee shall maintain written minutes or other records of its meetings and activities.  Following each Exploration Committee meeting, the Chair of the Exploration Committee shall report to the Board at the next Board meeting on all activities of the Exploration Committee and any matters that were submitted to a vote of the Exploration Committee since the time of the immediately previous Board meeting and as otherwise requested by the Chairman of the Board.  The Exploration Committee shall submit such other reports to the Board as may from time to time be requested by the Chairman of the Board or the Chairman of a majority of the Members of the Board.

### IV.    Function and Responsibilities

To fulfill its purpose and responsibilities, the Exploration Committee's functions will include the following:

A. Oversee the exploration and resource definition policies, plans, guidelines, and programs of the Company and monitor compliance with those policies, plans, guidelines, and programs.

3

B. Review and approve capital investment expenditures made by or on behalf of the Company, including all capital expenses exceeding $10,000 specifically included the Company's annual operating budget approved by the Board, and including all capital expenses exceeding $5,000 not specifically included the Company's approved annual operating budget. Any cost overrun for any item not exceeding 10% of the expenditure for such item previously approved by the Exploration Committee shall not require additional approval from the Committee, provided however that such cost overrun shall be promptly reported to the Committee.

C. Delegate authority to management to execute individual programs or activities on behalf of the Company within the policies and limits approved by the Committee and subject to the terms of the LLC Agreement.

D. Recommend periodically to the Board policies, strategies, guidelines, and programs governing the Company's exploration and resource definition activities.

E. Receive reports from management on, and monitor execution of, capital expenditures authorized by the Committee.

F. Undertake such other work and studies as may be necessary to keep the Board adequately informed as to the status of the Company's exploration and resource definition activities.

G. Perform any other activities consistent with this Charter and the LLC Agreement as the Exploration Committee deems appropriate or necessary or as delegated to the Exploration Committee by the Board.

## V.  *Annual Review of Charter and Committee*

The Exploration Committee shall perform a review and evaluation, at least annually, of the performance of the Exploration Committee and its members, including by reviewing the compliance of the Exploration Committee with this Charter.  In addition, the Exploration Committee shall review and reassess, at least annually, the adequacy of this Charter and recommend to the Board, subject to Board approval, any improvements to this Charter that the

Exploration Committee considers necessary or valuable.   The Exploration Committee shall conduct such evaluations and reviews in such manner as it deems appropriate.

*       *       *

## AMENDMENT TO
## LIMITED LIABILITY COMPANY AGREEMENT
## OF CS MINING, LLC

THIS AMENDMENT TO LIMITED LIABILITY COMPANY AGREEMENT (the "**Amendment**") is made and entered into as of April 24, 2015 by and among CS Mining, LLC, a Delaware limited liability company (the "**Company**"), and the undersigned members of the Company (the "**Members**").

### RECITALS

A.      CS Mining, LLC (the "**Company**") is a Delaware limited liability company. The Company is governed by that certain Limited Liability Company Agreement of Skye Mineral Partners, LLC by and among the Members, as amended by subsequent amendments thereto (the "**Operating Agreement**").

B.      The Members desire to further amend the Operating Agreement on the terms and conditions hereinafter set forth.

C.      Capitalized terms used, and not defined, in this Amendment have the meanings given to them in the Operating Agreement.

### AMENDMENT

NOW THEREFORE, based on the foregoing premises and for other good and valuable consideration, the receipt of which is hereby acknowledged by each of the parties hereto, such parties do hereby agree as follows:

1.      **Amendments.**

(a)      The following new defined term are added to Section 1:

"*Approved Budget*" means the Annual Budget of the Company and the Majority Member approved by the Company's Board of Managers.

"*April 2015 MUPA*" means the Membership Unit Purchase Agreement dated as of April 24, 2015, by and among the Company and the Major Holders.

"*Class A Unit Holders*" means members of the Majority Member holding Class A Common Units of the Majority Member (as defined in the Majority Member's Third Amended and Restated Limited Liability Company Agreement, as amended.

"*Class B Unit Holders*" means members of the Majority Member holding Class B Common Units of the Majority Member (as defined in the

US_ACTIVE·115125093

Majority Member's Third Amended and Restated Limited Liability Company Agreement, as amended.

"***DXS Designee***" means a Manager of the Company designated by DXS/PacNet.

"***DXS/PacNet***" means collectively, DXS and PacNet.

"***PacNet***" means PacNet Capital (U.S.) Limited, a Delaware corporation.

"***PacNet Purchase***" means the purchase by PacNet or its Affiliates of 2,226 Class A Units pursuant to the Third Closing under the April 2015 MUPA by the Third Closing Date as defined in the April 2015 MUPA.

"***Phase II Facility***" means the SX-EW leach processing facility under construction by the Company and due for completion and commissioning in the late summer or fall of 2015.

"***Phase II Facility Completion***" means such time as construction of the Phase II Facility is completed and such Phase II Facility is operating as planned (i.e. such facility has been commissioned and is functioning in substantial conformity with the planned output capacity).

"***SMI***" means Skye Mineral Investors, LLC, and Ohio limited liability company.

"***SMI Designee***" means a Manager of the Company designated by SMI.

(c)     Section 5.1(b) of the Operating Agreement is hereby amended and restated in its entirety to read as follows:

"(b)     **Action by Board of Managers.** Except as otherwise provided in this Agreement, a quorum for purposes of transaction of business by the Board of Managers shall exist if (i) the meeting is duly noticed, (ii) at least two-thirds (2/3) of the Managers are present, and (iii) the Managers present include the DXS Designee; provided however that (A) if the DXS Designee fails to attend a duly noticed meeting of the Board at which a matter is presented for approval of the Managers, and (B) such matter is again presented for approval at the next subsequent duly noticed meeting of the Board and such DXS Designee is not present at such second meeting, then the presence of the DXS Designee shall not be required for a quorum to be present. Decisions of a majority of the Managers present and acting at a meeting of the Board of Managers at which a quorum is present will constitute decisions of the Board of Managers. Managers may participate in a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Any action required or permitted to be taken by the Board of Managers may be taken without a meeting if all members of the Board of Managers consent thereto in writing and the writing is filed with the records of the Company."

(c)     Sections 5.2 and 5.3 of the Operating Agreement are hereby amended and restated in their entirety to read as follows:

### 5.2     Officers.

(a)     **Appointment.**  The Board of Managers may appoint officers of the Company including; but not limited to: (i)  the Chairman (i) a chief executive officer; (ii) president; (iii) one or more vice presidents; (iv) a secretary; and (v) a chief financial officer. Subject to Section 5.2, the Board of Managers may delegate a portion of its day-to-day management responsibilities to any such officers, and such officers will have the authority to contract for, negotiate on behalf of and otherwise represent the interests of the Company as authorized by the Board of Managers in any job description created by the Board of Managers.

(a) **Tenure and Duties of Officers.**  Subject to the terms of any applicable employment agreement, all officers will hold office at the pleasure of the Board of Managers and until their successors have been duly appointed, unless sooner removed.  Any officer elected or appointed by the Board of Managers may be removed at any time by the Board of Managers.  If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Managers.  Unless and until any officers are appointed by the Board of Managers, the Board of Managers shall have all duties, powers and responsibilities with respect to the management and affairs of the Company.  If and when appointed, officers of the Company shall have the respective powers set forth as follows (the following being referred to in this Agreement as the "*Officers*"):

(i)     **Chief Executive Officer.**  The Chief Executive Officer will, subject to the provisions of this Agreement and limitations on authority set by the Board, this Agreement and applicable law, have general supervision, direction and control of the business and officers of the Company.  The Chief Executive Officer will perform other duties commonly incident to a Chief Executive Officer of a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(ii)     **President.**  The President may assume and perform the duties of the Chief Executive Officer in the absence or disability of the Chief Executive Officer or whenever the office of Chief Executive Officer is vacant.  The President will perform other duties commonly incident to a President of a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(iii)     **Vice Presidents.**  The Vice Presidents, in the order of their seniority, may assume and perform the duties of the Chief Executive Officer in the absence or disability of the Chief Executive Officer and the President or whenever the office of Chief Executive Officer and President are vacant.  The Vice Presidents will perform other duties commonly incident to a vice president of a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(iv)     **Secretary.**  The Secretary will attend all meetings of the Members and will record all acts and proceedings thereof in the minute book of the Company.  The Secretary will give notice in conformity with this Agreement of all meetings of the Members requiring notice.  The Secretary will perform other duties commonly incident to a secretary of a Delaware

corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(v)   **Chief Financial Officer.**  The Chief Financial Officer will keep or cause to be kept the books of account of the Company in a thorough and proper manner, and will render statements of the financial affairs of the Company in such form and as often as required by this Agreement, the Board of Managers and/or the Chief Executive Officer.  The Chief Financial Officer, subject to the order of the Board of Managers, will have the custody of all funds and securities of the Company.  The Chief Financial Officer will perform other duties commonly incident to the office of chief financial officer or treasurer in a Delaware corporation and will also perform such other duties and have such other powers as the Board of Managers will designate from time to time.

(b)   **Chairman Oversight and Reporting.**  This Section 5.2(c) shall remain effective if the PacNet Purchase occurs. The Chairman shall be responsible for formal direction of the performance of the Chief Executive Officer, and shall consult with the Chief Executive Officer with respect to management of the Company's operations.  The officers of the Company shall direct all written reporting, inquiries and communications regarding material aspects of the Company's business, and all requests for authority required from the Board or Members under this Agreement to the Chairman, and upon receipt of any such reports, inquiries, requests or communications the Chairman shall promptly report the same to the Board.  Members of the Board other than the Chairman may communicate directly with the Company's officers and Managers, provided that: (i) no Manager, including the Chairman, will provide authority to, or order, the Company's officers or managers to act without first having obtained all requisite authorizations for such authority or order, including without limitation due approval thereof by a vote or written consent of the Board, and due approval by the Members of the Company if so required pursuant to this Agreement, any Board committee charter or pursuant to any other agreement amongst the Members; and (ii) if the communication is for purposes of providing authority to Company officers required from the Board or Members under this Agreement, all members of the Board are copied or included when any such authority is provided.

(c)   **Appointment of Officers.**

(i)   Chief Executive Officer.  Provided that the PacNet Purchase occurs, at such time as the term of employment of the current Chief Executive Officer expires and is not renewed, or is otherwise terminated, a successor shall be selected as provided in this Section 5.2(d)(i). DXS/PacNet and SMI shall jointly nominate a candidate for the Chief Executive Officer mutually determined by such Members.  If such candidate proposed by DXS/PacNet and SMI is not approved by the Board at its next subsequent meeting, DXS/PacNet and SMI shall jointly nominate another candidate for the position.  If the Board fails to approve a candidate nominated by DXS/PacNet and SMI after three such nominees have been advanced, then the Company shall promptly engage a qualified executive recruiter to identify and additional candidates that may be considered for appointment by the Board.

(ii)   Chief Financial Officer.  This Section 5.2(d) shall remain effective if the PacNet Purchase occurs. The Board will conduct a review of the Company's accounting and finance department by the third quarter of 2015 to ensure that the Company has sufficient

personnel to support the Company's planned growth and increased financial reporting requirements. Following such review, a Chief Financial Officer shall be appointed by the Board by no later than November 2015, either through promotion of an existing Company officer if unanimously approved by all Board members, or by engaging an executive recruiter to identify and propose candidates for the position.

(d) **Payment Authorization**. This Section 5.2(e) shall remain effective if the PacNet Purchase occurs.

(i)   No payment by the Company (or any series of related payments) in the following amount(s) (other than regular payroll, consultant and contractor fees and expenses) shall be made without authorization from the following:

(1)   $5,000 or less: any one of the following: Chairman, a Manager, Chief Executive Officer, Chief Financial Officer, Vice President of Finance, or Human Resources Director;

(2)   greater than $5,000 but less than $75,000: any two of the following: Chairman, a Manager, Chief Executive Officer, Chief Financial Officer, Vice President of Finance, Human Resources Director; and

(3)   greater than $75,000: the Chairman and any one of the following: a Manager, Chief Executive Officer, Chief Financial Officer.

(ii)   Any such authorization may be given through physical signature of a check or bank transfer slip, notification by electronic mail, or approval through a secure online system approved by the Chairman. No officer or other Company employee will be authorized or directed to undertake any such payment without the requisite approvals as stated in this Section, except in the case of an urgent unforeseen or emergency event. The Chairman shall be informed at least bi-monthly of any payments made without the Chairman's prior approval. For avoidance of doubt, the foregoing payment authorization procedure is in addition to, and does not supersede or replace, approval requirements set forth elsewhere in this Agreement or in the charters of Capital Expenditure Committee and Exploration Committee. The Chief Executive Officer, Chief Financial Officer or Controller may request multiple payments in a single batch authorization request.

The Chairman, Chief Executive Officer and Vice President of Finance will agree to develop a pre-approved process to be presented for the approval by the Chairman and the Board for a limited number of specific recurring invoices included the Business Plan for vendors, contractors, critical consumable or recurring items such as energy (propane, fuel, power, etc), sulfuric acid, lubricants, reagents, grinding media which are consumed on a daily basis and requirement constant management of key vendors.

5.3   **Committees.** The Board of Managers may create committees to assist the Board of Managers and the officers in the governance of areas of importance to the Company. Subject to the terms of this Agreement, such committees will have such powers and perform such duties as may be prescribed by the resolution or resolutions creating such committees. The Chairman shall serve on all Board Committees. Without limiting the foregoing:

(a)      Capital Expenditure and Plant Development Committee.   The Company will form a Capital Expenditure and Plant Development Committee of the Board.  The Capital Expenditure Committee will initially consist of the DXS Designee and the SMI Designee. All capital expenses exceeding $50,000 will require authorization from the Capital Expenditure Committee before such expenses are incurred.  The foregoing dollar limit will be increased to $250,000 after the Phase II Facility Completion. In addition to existing duties, the Capital Expenditure and Plant Development Committee shall oversee material activities related to the design and development of the Phase II Facilities, and may hire consultants and other appropriate personnel for such purposes.

(b)      Exploration Committee.  The Company will form an Exploration Committee of the Board. All exploration expenses exceeding $50,000 will require authorization from the Exploration Committee before such expenses are incurred.

(d)      Committee Members.  The Capital Expenditure Committee and Exploration Committee shall initially consist of the DXS Designee and the SMI Designee. Provided that the PacNet Purchase occurs, the SMI Designee shall step down upon Phase II Facility Completion.   In the event an Independent Manager is appointed, the Independent Manager will be invited to join each Committee.

(e)      Governance Committee. Immediately upon the election of an Independent Manager, the Company will form a Governance Committee of the Board.  The Governance Committee will consist of the DXS Designee, the SMI Designee and the Independent Director. The Governance Committee will have the right and authority (i) provided that it qualifies as a "for cause" termination under the applicable executive employment contract, to cause the Chief Executive Officer of the Company to be removed for failure to achieve KPIs, and (ii) to exercise such other powers as may be specified in the Charter of the Governance Committee, if any, which Charter will be adopted with the unanimous approval of all Managers.

(f)      Proposals may be presented for approval of the respective Committees at duly convened meetings of the Committees, or for approval by written consent of the members of such Committees. Meetings and actions by written consent of the members of a Committee shall be subject to the same procedures and requirements as meetings and actions by written consent of the full Board, as set forth in Section 5.1 above.  If a committee member fails to respond to a request for written approval of a proposed matter within seven (7) calendar days of delivery of such request for approval, the matter will be deemed approved by that Committee member. Majority vote or written consent of a Committee shall be an action of such Committee."

(c)      A new Section 9.7 is added to the Agreement immediately following the current Section 9.6, reading as follows:

**"9.7     Annual Budget and Financial Reporting**.

(a)      This Section 9.7(a) shall remain effective if the PacNet Purchase occurs. The Company shall develop an Annual Budget for each fiscal year. The Annual Budget shall be developed as follows (assuming a Fiscal Year ending December 31):

(i)     The budgeting process should commence in August each year. The Chairman shall provide management with budget guidelines, timelines, objectives, goals and targets on which the Annual Budget shall be based. The Chairman will discuss the budget guidelines with the Board to ensure its meets the strategy for the business.

(ii)     Management shall prepare a complete first draft of the Annual Budget by mid-September, and present the draft to the Chairman for review and to the Board for consideration and discussion. The Chairman shall provide comments and directions for alteration or enhancement of the draft Annual Budget to management after consulting with the Board.

(iii)     Subsequent drafts of the Annual Budgets will be processed by management and submitted for preliminary approval by the Chairman, before submission of a final draft to the Board for approval by no later than October 31.

(b)     The Annual Budget will contain a detailed financing plan (the "***Financing Plan***") setting forth (i) all financing requirements for the business for the fiscal year, and (ii) a funding plan setting forth how and when the requisite funding is to be raised or obtained. The Financing Plan will be supported with a full cash flow statement. The Financing Plan will specify whether required funding will be obtained through equity, development or commercial debt instruments, and or vendor financing. The Financing Plan shall be designed to remain within limits of debt to equity ratios approved by the Board.

(c)     If the Financing Plan calls for equity funding to be raised by the Company or the Majority Member, then agreements must be reached with the relevant investors, whether current Members of the Company or new investors. Debt or financing guidelines must also be defined in the Financing Plan. The Financing Plan must provide for all requisite funds to be raised in no more than two (2) closings during the subsequent twelve months, each of which must be completed *before* the Company or the Majority Member incurs any expenditure or commitment that presumes that the relevant funding will be available.

(d)     The Company shall use its best efforts not to request any additional funding contributions from the Members or propose to raise additional funding from third parties other than as set forth in the Financing Plan, other than in the case of unforeseen events that require additional capital.

(e)     The Capex Committee during the Fiscal Year will ensure that no capital expenditures are approved with respect to any expansion project or other improvement (or series of related improvements) unless sufficient funds are available and or secured to complete the relevant project or other improvement in its entirety.

(f)     The Company shall cause an annual report to be sent to each of the Class A Unit Holders not later than one hundred twenty (120) days after the end of each Fiscal Year. The report shall contain a balance sheet as of the end of the Fiscal Year, an income statement for such Fiscal Year and a statement of changes in financial position for the Fiscal Year for the Company, in each case with comparison's against the Company's prior Fiscal Year and against the Company's Annual Budget. Such financial statements of the Company shall be accompanied by

a report thereon by the independent auditors engaged by the Company to audit such financial statements.

(g)     The Company shall cause monthly financial statements to be sent to each of the Class A Unit Holders not later than fifteen (15) days after the end of each calendar month. The financial statements shall contain a balance sheet as of the end of the month, an income statement for such month and year-to-date, and a statement of changes in financial position for the month and year-to-date, in each case with comparison's against the Company's prior Fiscal Year and against the Company's Annual Budget.

(h)     All financial statements prepared and delivered pursuant hereto shall be prepared in accordance with general accepted accounting principles, consistently applied, and the Company's accounting policies as described therein, subject in the case of interim financial statement to normal year-end adjustments.

(i)     The Class B Unit Holders shall have no rights to receive the information set forth in this Section other than as required by applicable provisions of the Act."

2.     **Counterparts.** This Amendment may be executed in counterpart originals, each of which when duly executed and delivered shall be deemed an original and all of which when taken together shall constitute one instrument. Executed originals (or counterpart originals) of this Amendment may be delivered by facsimile or electronic transmission, which facsimile or electronic transmission copies shall be deemed originals.

3.     **Miscellaneous.**     Except as expressly modified by the provisions of this Amendment, the Operating Agreement shall continue in full force and effect. This Amendment, the Operating Agreement and the exhibits and schedules thereto contain the entire agreement between the parties with respect to the Company and supersede all prior written and/or oral representations and/or agreements with respect to the subject matter hereof. In the event any inconsistencies exist between the terms of this Amendment and the Operating Agreement, this Amendment shall control. The individuals who execute this Amendment represent and warrant that they are duly authorized to execute this Amendment on behalf of the respective undersigned Members, and that no other signature, act or authorization is necessary to bind such entities to the provisions of this Amendment.

*[Remainder of page intentionally left blank – signature pages follow]*

IN WITNESS WHEREOF, the Members have agreed to and accepted the provisions of this Amendment as of the date first above written.

*"Company"*                                        CS MINING, LLC

                                        By: _David J. Richards_

                                            Name:  David J. Richards
                                            Title:   Manager

*"Members"*                                        SKYE MINERAL PARTNERS, LLC

                                        By: _David J. Richards_

                                            Name:  David J. Richards
                                            Title:   Manager

# EXHIBIT B

CS Mining, LLC – Entity Structure Chart



## MEMBERSHIP INTEREST IN SKYE MINERAL PARTNERS, LLC  &  CS MINING, LLC



# EXHIBIT C

# David J. Richards, LLC

# Loan and Security Agreement

**Borrower:  CS Mining, LLC**

**Address:      P.O. Box 608**
**1208 South 200 West**
**Milford, Utah 84751**

**Date:         August 10, 2012**

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is entered into as of the above date between David J. Richards, LLC, an Ohio limited liability company ("Lender"), whose address is 500 South Front Street, Suite 1200, Columbus, Ohio 43215, and the borrower(s) named above (jointly and severally, the "Borrower"), whose chief executive office is located at the above address ("Borrower's Address"). The Schedule to this Agreement (the "Schedule") shall for all purposes be deemed to be a part of this Agreement, and the same is an integral part of this Agreement. (Definitions of certain terms used in this Agreement are set forth in Section 8 below.)

## 1. LOAN.

*1.1 Loan.* Lender will make a loan to Borrower (the "Loan"), in the amount shown on the Schedule, provided no Default or Event of Default has occurred and is continuing.

*1.2 Interest.* The Loan and all other monetary Obligations shall bear interest at the rate shown on the Schedule, except where expressly set forth to the contrary in this Agreement.

*1.3 Fees.* Borrower shall pay Lender the fees shown on the Schedule, which are in addition to all interest and other sums payable to Lender and are not refundable.

## 2. SECURITY INTEREST.

To secure the payment and performance of all of the Obligations when due, Borrower hereby grants to Lender a security interest in all of the Specific Equipment listed in Exhibit A and Exhibit B to the Schedule to Loan and Security Agreement (collectively, the "Collateral"); and any and all claims, rights and interests in any of the above, and all guaranties and security for any of the above, and all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the above, and all Borrower's books relating to any and all of the above.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF BORROWER.

*3.1* In order to induce Lender to enter into this Agreement and to make the Loan, Borrower represents and warrants to Lender as follows, and Borrower covenants that the following representations will to the best of Borrower's knowledge continue to be true, and that Borrower will at all times comply, in all material respects with all of the following covenants, throughout the term of this Agreement and until all Obligations have been paid and performed in full, except as disclosed in the Disclosure Schedule:

*3.1.1 Corporate Existence and Authority.* Borrower is and will continue to be, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization. Borrower is and will continue to be qualified and licensed to do business in all jurisdictions in which any failure to do so would result in a Material Adverse Change. The execution, delivery and performance by Borrower of this Agreement, and all other documents contemplated hereby (i) have been duly and validly authorized, (ii) are enforceable against Borrower in accordance with their terms (except as enforcement may be limited by equitable principles and by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to creditors' rights generally), and (iii) do not violate Borrower's articles or certificate of incorporation, or Borrower's by-laws, or Borrower's partnership

David J. Richards, LLC

CS Mining Loan and Security Agreement

agreement or operating agreement (as the case may be) or any law or any material agreement or instrument which is binding upon Borrower or its property, and (iv) do not constitute grounds for acceleration of any indebtedness or obligation under any agreement or instrument which is binding upon Borrower or its property.

*3.1.2 Name; Trade Names and Styles.* The name of Borrower set forth in the heading to this Agreement is its correct name. Listed in the Representations are all prior names of Borrower and all of Borrower's present and prior trade names. Borrower shall give Lender 30 days' prior written notice before changing its name or doing business under any other name. Borrower has complied, and will in the future comply, in all material respects, with all laws relating to the conduct of business under a fictitious business name.

*3.1.3 Place of Business; Location of Collateral.* The address set forth in the heading to this Agreement is Borrower's chief executive office. In addition, Borrower has places of business and Collateral is located only at the locations set forth in the Representations, which include the mining claims and properties owned, held or leased by Borrower in the general vicinity or area of its office address. Borrower will give Lender at least 30 days prior written notice before opening any additional place of business outside its current properties or holdings or changing its chief executive office. Borrower shall not move any of the Collateral to a location other than Borrower's Address or one of the locations set forth in the Representations or listed on **Exhibit A**, which include the mining claims and properties owned, held or leased by Borrower in the general vicinity or area of its office address or listed on **Exhibit A**, without Lender's prior written consent. Notwithstanding anything to the contrary contained herein, Borrower shall not be obligated to notify Lender prior to exploring, drilling or mining in new locations unless the Collateral will be attached or affixed upon any such new locations

*3.1.4 Title to Collateral; Perfection; Permitted Liens.*

(a) Borrower is now, and will at all times in the future be, the sole owner of all the Collateral. The Collateral now is and will remain free and clear of any and all liens, charges, security interests, encumbrances and adverse claims. Lender now has, and will continue to have, a first-priority perfected and enforceable security interest in all of the Collateral, and Borrower will at all times defend Lender and the Collateral against all claims of others.

(c) In the event that Borrower shall at any time after the date hereof have any commercial tort claims against others relating to the Collateral, which it is asserting or intends to assert, and in which the potential recovery exceeds $50,000, Borrower shall promptly notify Lender thereof in writing and provide Lender with such information regarding the same as Lender shall request

Such notification to Lender shall constitute a grant of a security interest in the commercial tort claim relating to the Collateral and all proceeds thereof to Lender, and Borrower shall execute and deliver all such documents and take all such actions as Lender shall request in connection therewith.

(d) None of the Collateral now is or will be affixed to any real property, except in the case of: (i) the Collateral listed in Exhibit B to the Schedule to Loan and Security Agreement, which may only be affixed, if necessary, to land held in fee simple or patented mining claims owned by Borrower, and for which a first priority fixture filing for the benefit of Lender will be filed, such that Lender shall retain its first priority Lien on such Collateral; or (ii) following notice and consent of Lender and filing of a valid fixture filing covering the affixed Collateral for the benefit of Lender, such that Lender shall retain its first priority Lien on such Collateral.

*3.1.5 Maintenance of Collateral.* Borrower will maintain the Collateral in good working condition (ordinary wear and tear excepted), and Borrower will not use the Collateral for any unlawful purpose. Borrower will immediately advise Lender in writing of any material loss or damage to the Collateral.

*3.1.6 Taxes affecting Collateral.* Borrower has timely filed, and will timely file, all required tax returns and reports, and Borrower has timely paid, and will timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions now or in the future owed by Borrower with respect to, or that may encumber, the Collateral. Borrower not allow, regardless of whether such taxes are being contested taxes from becoming a lien upon any of the Collateral

*3.1.7 Collateral's Maintenance and Compliance with Law.* Borrower shall maintain and operate the Collateral in good working order, normal wear and tear excepted, and in compliance with laws applicable to the Collateral.

*3.1.8 Litigation involving Collateral.* There is no claim, suit, litigation, proceeding or investigation pending or threatened against or affecting the Collateral. Should any third-party suit or proceeding be instituted by or against the Collateral or, Borrower shall, without expense to Lender, make reasonably available Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding

*3.1.9 Use of Proceeds.* All proceeds of the Loan shall be used solely for legal purposes and as may be shown on the Schedule or **Exhibit B** thereto. Borrower is not purchasing or carrying any "margin stock" (as defined in Regulation G of the Board of Governors of the Federal Reserve System) and no part of the proceeds of the Loan will be used to purchase or carry any "margin stock" or to

-2-

David J. Richards, LLC                                    CS Mining Loan and Security Agreement

extend credit to others for the purpose of purchasing or carrying any "margin stock".

In order to induce Lender to enter into this Agreement and to make the Loan, Borrower represents and warrants to Lender as follows, and Borrower covenants that the following representations will to the best of Borrower's knowledge continue to be true, and that Borrower will at all times comply, in all material respects with all of the following covenants, following any Change of Control and until all Obligations have been paid and performed in full, except as disclosed in the Disclosure Schedule:

**3.2.1 Books and Records.** From Borrower has maintained and will maintain at Borrower's Address complete and accurate books and records consistent with past practice and as required by Borrower's Members and Board, comprising an accounting system in accordance with GAAP

**3.2.2 Financial Condition, Statements and Reports.** All quarterly and annual financial statements delivered to Lender will be, to Borrower's knowledge, prepared in material conformity with GAAP and now and in the future will fairly present the results of operations and financial condition of Borrower, in accordance with GAAP.

**3.2.3 Reports.** Borrower, at its expense, shall provide Lender with the written reports set forth in the Schedule.

**3.2.4 Access to Collateral, Books and Records.** At reasonable times, and on one Business Day's notice, Lender, or its agents, shall have the right to inspect the Collateral, and the right to audit and copy Borrower's books and records. Any audits conducted by Lender beyond Borrower's normal audits shall be incurred at the expense of Lender.

**3.2.5. Litigation Cooperation.** Should any third-party suit or proceeding be instituted by or against Lender in connection herewith or that relates to Borrower and could be reasonably anticipated to cause a Material Adverse Change, Borrower shall, without expense to Lender, make reasonably available Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding.

**3.2.6 Notification of Changes.** Borrower will promptly notify Lender in writing of (i) any change in its officers or directors, and (ii) any Material Adverse Change

**3.2.7. Certain Items.** Borrower shall not permit: (a) any default or event of default under any obligation secured by a Permitted Lien, which is not cured within any applicable cure period or waived in writing by the holder of the Permitted Lien, and which has resulted or may reasonably be expected to result in a Material Adverse Change, or (b) breach of any material contract or

obligation, or other event, which has resulted or may reasonably be expected to result in a Material Adverse Change.

## 4.   [INTENTIONALLY OMITTED]

## 5. ADDITIONAL DUTIES OF BORROWER.

**5.1 Insurance.** Borrower shall, at all times insure all of the tangible personal property Collateral and carry such other business insurance, with insurers reasonably acceptable to Lender and disclosed to Lender in connection herewith, in such form and amounts disclosed to Lender, and Borrower shall provide evidence of such insurance to Lender. In the event of a loss of Collateral resulting in the payment of insurance proceeds to Borrower, Borrower shall provide written notice to Lender and, at Lender's request, Borrower shall instruct the applicable insurer to pay all applicable insurance proceeds directly to Lender. Upon receipt of the proceeds of any such insurance with respect to loss on the Collateral, Lender shall apply such proceeds in reduction of the Obligations as Lender shall determine in its good faith business judgment. If Borrower fails to provide or pay for any insurance, Lender may, but is not obligated to, obtain the same at Borrower's expense. Borrower shall promptly deliver to Lender copies of all material reports made to insurance companies with respect to the insurance required hereunder.

**5.2 Negative Covenants.** Except as may be permitted in the Schedule, Borrower shall not, without Lender's prior written consent (which shall be a matter of its good faith business judgment), do any of the following on or after the date hereof:

(i) sell, transfer or in any way encumber any Collateral;

(ii) store any Collateral with any warehouseman or other third party;

(iii) create, incur, assume or permit to be outstanding any material Indebtedness that may encumber the Collateral;

(iv) guarantee or otherwise become liable with respect to any material obligations of another party or entity in a manner that encumbers the Collateral;

(v) dissolve or elect to dissolve

Transactions permitted by the foregoing provisions of this Section are only permitted if no Default or Event of Default has occurred and is continuing, or would occur as a result of such transaction. Notwithstanding anything to the contrary contained herein, the transfer or sale of equity among the Parent Members and their Affiliates are expressly permitted pursuant to the Agreement

**5.3 Further Assurances.** Borrower agrees, at its expense, on request by Lender, to execute all documents and take all actions, as Lender, may, in its good faith business

-3-

David J. Richards, LLC

CS Mining Loan and Security Agreement

judgment, deem necessary or useful in order to perfect and maintain Lender's perfected first-priority security interest in the Collateral (subject only to Permitted Liens), and in order to fully consummate the transactions contemplated by this Agreement in accordance with the parties intentions.

## 6.  TERM.

**6.1  Term.** This Agreement shall continue in full force and effect until all Obligations have been paid and performed in full; provided that if the only remaining Obligations hereunder are potential future indemnification Obligations, then this Agreement shall terminate except with respect to such provisions applicable to such indemnification obligations.

**6.2  Prepayment.** Borrower shall have the option of prepaying the unpaid principal balance of the Loan, in whole but not in part, prior to the date payment is due as provided in the Schedule, subject to any limitations set forth in the Schedule, and provided that Borrower pays the prepayment fees set forth in the Schedule; *provided, however,* that notwithstanding the foregoing, Borrower may prepay the Obligations at any time if Lender declares an Event of Default and/or acceleration.

**6.3  Termination Statements.**  Upon payment and performance in full of all the Obligations, and execution and delivery by Borrower to Lender of a general release in a form reasonably acceptable to Borrower and Lender, Lender shall promptly terminate its financing statements and any other filings with respect to the Borrower and deliver to Borrower such other documents as may be required to fully terminate Lender's security interests and liens.   Notwithstanding any such termination, the indemnity provisions of this Agreement shall continue in full force and effect

## 7.  EVENTS OF DEFAULT AND REMEDIES.

**7.1  Events of Default.**  The occurrence of any of the following events shall constitute an "Event of Default" under this Agreement, and Borrower shall give Lender, and Lender shall provide Borrower, immediate written notice thereof upon becoming aware of any such Event of Default.

(a)  Any material warranty, representation, statement, report or certificate made or delivered to Lender by Borrower or any of Borrower's officers, employees or agents, now or in the future, shall be untrue or misleading in a material respect, when made or deemed to be made; or

(b)  Borrower shall fail to pay when due any Loan or any interest thereon or any other monetary Obligation owed to Lender, or

(c)  Borrower shall fail to comply, in all material respects, with any of the financial covenants set forth in the Schedule, or shall fail to perform, in all material

respects, any other material non-monetary Obligation or covenant which by its nature cannot be cured; or

(d)  Borrower shall fail to perform or correct any other material non-monetary Obligation or covenant, which failure is not cured within ten Business Days after the earlier of Borrower's (i) discovery of such failure, or (ii) receipt of notice of such failure from Lender, or

(e)  any levy, assessment, attachment, seizure, lien or encumbrance (other than a Permitted Lien) is made on all or any part of the Collateral, which is not cured within 10 days after the occurrence of the same; or

(f)  Dissolution, termination of existence, insolvency or business failure of Borrower or any Guarantor, if applicable, or appointment of a receiver, trustee or custodian, for all or any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding by Borrower or any Guarantor, if applicable, under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect, which is not cured by the dismissal thereof within 45 days after the date of appointment or assignment; *provided, however,* that the foregoing shall not apply to temporary suspensions of mining or milling operations of Borrower that are not expected to have a Material Adverse Change; or

(g)  the commencement of any proceeding against Borrower or any Guarantor, if applicable, under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect, which is not cured by the dismissal thereof within 45 days after the date commenced; or

(l)  Borrower makes any payment on account of any indebtedness or obligation which has been subordinated to the Obligations other than as permitted in the applicable subordination agreement, or if any Person, who has subordinated such indebtedness or obligations, terminates or in any way limits his subordination agreement, or

(l)  there shall be a change in the authorized agents of the Borrower as disclosed in the Disclosure Schedule, and such person is not replaced with another person reasonably acceptable to Lender in its good faith business judgment within 30 days thereafter, or

(n)  Borrower shall generally not pay its debts as they become due, or Borrower shall conceal, remove or transfer any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law.

-4-

David J. Richards, LLC

CS Mining Loan and Security Agreement

Lender may cease making any disbursements of the Loan hereunder during the Cure Period (as defined below), and thereafter if an Event of Default has occurred and is continuing.

Upon providing or receiving notice of any Event of Default hereunder, Borrower shall have a period (the "Cure Period") equal to thirty (30) days, or if such Event of Default is not capable of cure within thirty (30) days, such longer period as is necessary to cure such Event of Default, provided that the latter case of extension beyond the 30-day cure period shall only continue to apply if (i) Borrower continues to diligently pursue the cure of such Event of Default and (ii) the continuance of such Event of Default has not caused, and would not be reasonably be anticipated to cause, a Material Adverse Change due to such continuance beyond a 30-day Cure Period; *provided however,* that (a) the Borrower shall be provided a Cure Period for Events of Default that are not capable for cure or remedy, through the payment of damages or otherwise, and (b) if a shorter time period that the foregoing Cure Period is specified in this Agreement, such shorter period shall control as the required time period for cure of the Event of Default.

*7.2 Remedies.* Upon the occurrence and during the continuance of any Event of Default, and at any time thereafter when such Event of Default is not cured, Lender, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Borrower), may cease extending credit to Borrower under this Agreement or any other Loan Document. Upon the occurrence and during the continuance of any Event of Default, and the expiration of the Cure Period, Lender, at its option, may do any one or more of the following: (a) Accelerate and declare all or any part of the Obligations to be immediately due, payable, and performable, notwithstanding any deferred or installment payments allowed by any instrument or agreement evidencing or relating to any Obligation; (b) Take possession of any or all of the Collateral wherever it may be found, and for that purpose Borrower hereby authorizes Lender without judicial process to enter onto any of Borrower's premises without interference to search for, take possession of, keep, store, or remove any of the Collateral, and remain on the premises or cause a custodian to remain on the premises in exclusive control thereof, without charge for so long as Lender deems it necessary, in its good faith business judgment, in order to complete the enforcement of its rights under this Agreement or any other agreement; provided, however, that should Lender seek to take possession of any of the Collateral by court process, Borrower hereby irrevocably waives: (i) any bond and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession; (ii) any demand for possession prior to the commencement of any suit or action to recover possession thereof, other than notice hereunder; and (iii) any

requirement that Lender retain possession of, and not dispose of, any such Collateral until after trial or final judgment; (c) Require Borrower to assemble any or all of the Collateral and make it available to Lender at places designated by Lender which are reasonably convenient to Lender and Borrower, and to remove the Collateral to such locations as Lender may deem advisable; (d) Complete reasonable processing, manufacturing or repair of any Collateral prior to a disposition thereof and, for such purpose and for the purpose of removal, Lender shall have the right to use Borrower's premises, vehicles, hoists, lifts, cranes, and other Equipment and all other property without charge; and (e) Sell, lease or otherwise dispose of any of the Collateral, in its condition at the time Lender obtains possession of it or after further manufacturing, processing or repair, at one or more public and/or private sales, in lots or in bulk, for cash, exchange or other property, or on credit, and to adjourn any such sale from time to time without notice other than oral announcement at the time scheduled for sale; *provided, however,* that in all cases Lender (I) shall exercise reasonable care in any use of Borrower's Equipment and only use Borrower's Equipment if Lender's use would not be reasonably expected to damage such Equipment, (II) if Lender uses Borrower's Equipment or enters upon Borrower's premises, Lender shall comply with all applicable laws, rules and regulations regarding the use of, or entrance upon, Borrower's Equipment or premises, or that are applicable to Borrower, including all safety and hazard rules and regulations applicable to Borrower's premises and work areas. Lender shall have the right to conduct such disposition on Borrower's premises without charge and following notice hereunder, for such time or times as Lender deems reasonable, or on Lender's premises, or elsewhere and the Collateral need not be located at the place of disposition. Lender may directly or through any affiliated company purchase or lease any Collateral at any such public disposition, and if permissible under applicable law, at any private disposition. Any sale or other disposition of Collateral shall not relieve Borrower of any liability Borrower may have if any Collateral is defective as to title or physical condition or otherwise at the time of sale, unless (i) such title defect or physical condition was directly caused by Lender's actions, or (ii) such title defect or physical condition is remedied by Borrower within the Cure Period. All reasonable attorneys' fees, expenses, costs, liabilities and obligations incurred by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations.

*7.3 Standards for Determining Commercial Reasonableness.* Borrower and Lender agree that a sale or other disposition (collectively, "sale") of any Collateral which complies with the following standards will conclusively be deemed to be commercially reasonable: (i)

David J. Richards, LLC

CS Mining Loan and Security Agreement

Notice of the sale is given to Borrower at least ten days prior to the sale, and, in the case of a public sale, notice of the sale is published at least five days before the sale in a newspaper of general circulation in the county where the sale is to be conducted; (ii) Notice of the sale describes the collateral in general, non-specific terms; (iii) The sale is conducted at a place designated by Lender, with or without the Collateral being present; (iv) The sale commences at any time between 8.00 a.m. and 6:00 p.m; (v) Payment of the purchase price in cash or by cashier's check or wire transfer, or by deferred payment obligation acceptable to Lender in its discretion, is required; (vi) With respect to any sale of any of the Collateral, Lender may (but is not obligated to) direct any prospective purchaser to ascertain directly from Borrower any and all information concerning the same. Lender shall be free to employ other methods of noticing and selling the Collateral, in its discretion, if they are commercially reasonable.

*7.4  Power of Attorney.*   Upon the occurrence and during the continuance of any Event of Default and the expiration of the Cure Period, without limiting Lender's other rights and remedies, Borrower grants to Lender an irrevocable power of attorney coupled with an interest, authorizing and permitting Lender (acting through any of its employees, attorneys or agents) at any time, at its option, but without obligation, with notice to Borrower, and at Borrower's expense, to do any or all of the following, in Borrower's name or otherwise, but Lender agrees that if it exercises any right hereunder, it will do so in good faith and in a commercially reasonable manner: (a) Execute on behalf of Borrower any documents that Lender may, in its good faith business judgment, deem advisable in order to perfect and maintain Lender's security interest in the Collateral, or in order to exercise a right of Borrower or Lender, or in order to fully consummate all the transactions contemplated under this Agreement, and all other Loan Documents; (b) Pay, contest or settle any lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (c) Pay any sums required on account of Borrower's taxes or to secure the release of any liens therefor, or both, (d) Settle and adjust, and give releases of, any insurance claim that relates to any of the Collateral and obtain payment therefor; (e) endorse the name of Borrower upon any instruments, or documents, as evidence of payment or collateral that may come into Lender's possession, (f) Instruct any third party having custody or control of any books or records belonging to, or relating to, Borrower to give Lender the same rights of access and other rights with respect thereto as Lender has under this Agreement, and (g) Take any action or pay any sum required of Borrower pursuant to this Agreement and any other Loan Documents. Any and all reasonable sums paid and any and all reasonable costs, expenses, liabilities, obligations and attorneys' fees

incurred by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be payable on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations. In no event shall Lender's rights under the foregoing power of attorney or any of Lender's other rights under this Agreement be deemed to indicate that Lender is in control of the business, management or properties of Borrower.

*7.5  Application of Proceeds.*   All proceeds realized as the result of any sale of the Collateral shall be applied by Lender to the Obligations in such order as Lender shall determine in its sole discretion. Any surplus shall be paid to Borrower or other persons legally entitled thereto; Borrower shall remain liable to Lender for any deficiency. If, Lender, in its good faith business judgment, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Lender shall have the option, exercisable at any time, in its good faith business judgment, of either reducing the Obligations by the principal amount of purchase price or deferring the reduction of the Obligations until the actual receipt by Lender of the cash therefore; *provided, however,* that if Lender chooses to accept a deferred payment obligation, such deferred payment obligation shall be deemed paid when accepted by Lender.

*7.6  Remedies Cumulative.*   In addition to the rights and remedies set forth in this Agreement, Lender shall have all the other rights and remedies accorded a secured party under the Ohio Uniform Commercial Code and under all other applicable laws, and under any other instrument or agreement now or in the future entered into between Lender and Borrower, and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Lender of one or more of its rights or remedies shall not be deemed an election, nor bar Lender from subsequent exercise or partial exercise of any other rights or remedies, if the Obligations have not been satisfied and performed in full. The failure or delay of Lender to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been fully paid and performed.

*8.   DEFINITIONS.*   As used in this Agreement, the following terms have the following meanings:

"Account Debtor" means the obligor on an Account

"Accounts" means all present and future "accounts" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all accounts receivable and other sums owing to Borrower

"Affiliate" means, with respect to any Person, a relative, partner, shareholder, director, officer, or employee of such Person, or any parent or subsidiary of

6

David J. Richards, LLC

such Person, or any Person controlling, controlled by or under common control with such Person.

"Business Day" means a day on which Lender is open for business.

"Capital Expenditures" means all expenditures made and liabilities incurred for the acquisition of any fixed asset or improvement, replacement, substitution or addition thereto which has a useful life of more than one year and including, without limitation, those arising in connection with any lease of property by Borrower that, in accordance with GAAP, should be capitalized for financial reporting purposes and reflected as a liability on the balance sheet of Borrower.

"Change of Control" shall mean: (a) a change in the record or beneficial ownership of an aggregate of more than 50% of the outstanding shares of stock of, or equity ownership interest in, Borrower or Borrower's Parent, in one or more transactions, compared to the ownership of the same in effect on the date hereof, without the prior written consent of Lender; or (b) a change in composition of the equity or operating agreement of Borrower such that a current Member of Borrower's Parent loses the right to appoint any managers to the Borrower's Parent's board of managers.

"Code" means the Uniform Commercial Code as adopted and in effect in the State of Ohio from time to time.

"Collateral" has the meaning set forth in Section 2 above.

"continuing" and "during the continuance of" when used with reference to a Default or Event of Default means that the Default or Event of Default has occurred and has not been either waived in writing by Lender or cured within any applicable cure period.

"Cure Period" is defined in Section 7.1

"Default" means any event which with notice would constitute an Event of Default.

"Default Rate" has the meaning set forth in the Schedule.

"Deposit Accounts" means all present and future "deposit accounts" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all general and special bank accounts, demand accounts, checking accounts, savings accounts and certificates of deposit.

"Disbursement Date" is defined in Section 1 of the Schedule

"Disclosure Schedule" means that certain schedule attached hereto, with section numbers corresponding to the Sections of this Agreement, that sets forth exceptions

or qualifications to the representations, warranties, and covenants set forth herein. Items provided to Lender through Borrower's electronic document data room provided to Lender shall be deemed disclosed in the Disclosure Schedule, and items disclosed in one Section of the Disclosure Schedule, shall be deemed disclosed in other Section(s) of the Disclosure Schedule and with respect to other Section(s) of this Agreement to the extent reasonably evident that such disclosure applies to such other Section(s).

"Equipment" means all present and future "equipment" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"Event of Default" means any of the events set forth in Section 7.1 of this Agreement.

"GAAP" means generally accepted accounting principles consistently applied.

"good faith business judgment" means honesty in fact and good faith (as defined in Section 1201 of the Code) in the exercise of Lender's business judgment.

"Guarantor" means any Person who has guaranteed, or in the future guarantees, any of the Obligations.

"including" means including (but not limited to).

"Indebtedness" means all of Borrower's present and future obligations, liabilities, debts, claims and indebtedness, contingent, fixed or otherwise, however evidenced, created, incurred, acquired, owing or arising, whether under written or oral agreement, operation of law or otherwise to any Person, and includes, without limiting the foregoing (i) the Obligations, (ii) obligations and liabilities of any Person secured by a lien, claim, encumbrance or security interest upon property owned by Borrower, even though Borrower has not assumed or become liable therefor, (iii) obligations and liabilities created or arising under any lease (including capital leases) or conditional sales contract or other title retention agreement with respect to property used or acquired by Borrower, even though the rights and remedies of the lessor, seller or lender are limited to repossession, (iv) all unfunded pension fund obligations and liabilities, and (v) deferred taxes.

"Inventory" means all present and future "inventory" as defined in the Ohio Uniform Commercial Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in

David J. Richards, LLC                                              CS Mining Loan and Security Agreement

transit, and including any returned goods and any documents of title representing any of the above.

"Investment" means any beneficial ownership interest in any Person (including stock, securities, partnership interest, limited liability company interest, or other interests), and any material loan, advance or capital contribution to any Person (including the creation or capital contribution to any wholly-owned or partially-owned subsidiary).

"Loan Documents" means, collectively, this Agreement, the Representations, and all other present and future documents, instruments and agreements between Lender and Borrower, including, but not limited to those relating to this Agreement, and all amendments and modifications thereto and replacements therefor.

"Material Adverse Change" means any of the following: (i) a material and significant adverse change in the business, operations, or financial or other significant condition of the Borrower, or (ii) a material and significant impairment of the prospect of repayment of any portion of the Obligations; or (iii) a material and significant impairment of the value or priority of Lender's security interests in the Collateral.

"Obligations" means the Loan and all other present and future loans, advances, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower to Lender, whether evidenced by this Agreement or any note or other instrument or document, or otherwise, whether arising from an extension of credit, opening of a letter of credit, banker's acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect (including, without limitation, those acquired by assignment and any participation by Lender in Borrower's debts owing to others), absolute or contingent, due or to become due, including, without limitation, all interest, charges, reasonable expenses, fees, and reasonable attorney's fees, expert witness fees, audit fees, letter of credit fees, collateral monitoring fees, closing fees, facility fees, equipment liquidation fees, auction fees, appraisal fees, termination fees, minimum interest charges and any other sums chargeable to Borrower under, and in each case subject to the terms and conditions of, this Agreement or under any other Loan Documents.

"Parent" or "Borrower's Parent" means Skye Mineral Partners, LLC.

"Payment" means all checks, wire transfers and other items of payment received by Lender for credit to Borrower's outstanding Obligations.

"Permitted Investments" means

(i) Investments in Subsidiaries shown on the Representations and existing on the date hereof,

(ii) cash and cash equivalents,

(iii) Investments consisting of Deposit Accounts;

(iv) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(v) Investments in accordance with the Borrower's business plan, disclosed on the Disclosure Schedule, or necessary for bonding or permitting; and

(vi) Investments in new Subsidiaries created for specific business reasons or in accordance with Borrower's business plan.

"Permitted Liens" means the following:

(i) purchase money security interests, or security interests for vendor financing, in specific items of Equipment that are not Collateral,

(ii) leases of specific items of Equipment that are not Collateral;

(iii) liens for taxes or assessments not yet payable;

(iv) additional security interests and liens which are subordinate to the security interest of Lender in the Collateral and are consented to in writing by Lender, which consent may be withheld in its good faith business judgment;

(v) security interests and liens that do not encumber the Collateral;

(vi) security interests being terminated substantially concurrently with this Agreement,

(vii) liens existing as of the date hereof and disclosed in the Disclosure Schedule; and

(viii) liens disclosed in the Borrower's business plan or associated with any required bonding for Borrower's activities or operations.

Lender will have the right to require, as a condition to its consent under subparagraph (iv) above, that the holder of the additional security interest or lien sign an intercreditor agreement on Lender's then standard and customary form, acknowledge that the security interest is subordinate to the security interest in favor of Lender, and agree not to take any action to enforce its subordinate security interest so long as any Obligations remain outstanding, and that Borrower agree that any uncured default in any obligation secured by the subordinate security interest shall also constitute an Event of Default under this Agreement.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, government, or any agency or political division thereof, or any other entity

8-

David J. Richards, LLC

CS Mining Loan and Security Agreement

"Representations" means the written Representations and Warranties provided by Borrower to Lender referred to in the Schedule.

Other Terms. All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with GAAP, consistently applied. All other terms contained in this Agreement, unless otherwise indicated, shall have the meanings provided by the Code, to the extent such terms are defined therein.

## 9. GENERAL PROVISIONS.

9.1 *Computations.* Payments received by Lender (including payment of the Obligations in full) shall be deemed applied by Lender on account of the Obligations on receipt by Lender of immediately available funds; provided that immediately available funds received after 12:00 Noon Pacific Time on any day shall be deemed received on the next Business Day. Lender shall not be required to credit Borrower's account for the amount of any item of payment which is unsatisfactory to Lender in its reasonable and good faith business judgment.

9.2 *Application of Payments.* All payments with respect to the Obligations may be applied, and in Lender's good faith business judgment reversed and re-applied, to the Obligations, in such order and manner as Lender shall determine in its reasonable and good faith business judgment.

9.3 *Monthly Accountings.* Lender shall provide Borrower monthly with a Statement of Account. Such account shall be deemed correct, accurate and binding on Borrower and an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by Lender), unless (a) Borrower notifies Lender in writing to the contrary within 60 days after such account is rendered, describing the nature of any alleged errors or omissions, or (b) the Statement of Account contained a material error or miscalculation.

9.4 *Notices.* All notices to be given under this Agreement shall be in writing and shall be given either personally or by reputable private delivery service or by regular first-class mail, or certified mail return receipt requested, addressed (i) to Borrower at the address shown in the heading to this Agreement, or (ii) to Lender at the address shown in the heading to this Agreement, or (iii) for either party at any other address designated in writing by one party to the other party. All notices shall be deemed to have been given upon delivery in the case of notices personally delivered, or at the expiration of one Business Day following delivery to the private delivery service, or two Business Days following the deposit thereof in the United States mail, with postage prepaid.

9.5 *Severability.* Should any provision of this Agreement be held by any court of competent jurisdiction to be void or unenforceable, such defect shall not affect the remainder of this Agreement, which shall continue in full force and effect.

9.6 *Integration.* This Agreement and such other written agreements, documents and instruments as may be executed in connection herewith are the final, entire and complete agreement between Borrower and Lender and supersede all prior and contemporaneous negotiations and oral representations and agreements, all of which are merged and integrated in this Agreement. There are no oral understandings, representations or agreements between the parties which are not set forth in this Agreement or in other written agreements signed by the parties in connection herewith.

9.7 *Waivers; Indemnity.* The failure of Lender at any time or times to require Borrower to strictly comply with any of the provisions of this Agreement or any other Loan Document shall not waive or diminish any right of Lender later to demand and receive strict compliance therewith. Any waiver of any default shall not waive or affect any other default, whether prior or subsequent, and whether or not similar. None of the provisions of this Agreement or any other Loan Document shall be deemed to have been waived by any act or knowledge of Lender or its agents or employees, but only by a specific written waiver signed by an authorized officer of Lender and delivered to Borrower. Borrower waives the benefit of all statutes of limitations relating to any of the Obligations or this Agreement or any other Loan Document, and Borrower waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, release, compromise, settlement, extension or renewal of any commercial paper, instrument, account, General Intangible, document or guaranty at any time held by Lender on which Borrower is or may in any way be liable, and notice of any action taken by Lender, unless expressly required by this Agreement. Borrower hereby agrees to indemnify Lender and its affiliates, subsidiaries, parent, directors, officers, employees, agents, and attorneys, and to hold them harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every kind, which they may sustain or incur based upon or arising out of any of the Obligations, or any relationship or agreement between Lender and Borrower, or any other matter, relating to Borrower or the Obligations created hereunder; provided that this indemnity shall not extend to damages proximately caused by the indemnitee's own gross negligence, unlawful actions or omissions, willful or intentional misconduct. Notwithstanding any provision in this Agreement to the contrary, the indemnity agreement set forth in this Section shall survive any termination of this Agreement and shall for all purposes continue in full force and effect.

9.8 *Liability.* NEITHER LENDER NOR ITS PARENT, NOR ANY OF ITS AFFILIATES, SUBSIDIARIES,

David J. Richards, LLC

CS Mining Loan and Security Agreement

DIRECTORS: OFFICERS: EMPLOYEES, AGENTS OR ATTORNEYS SHALL BE LIABLE FOR ANY CLAIMS, DEMANDS, LOSSES OR DAMAGES, OF ANY KIND WHATSOEVER, MADE. CLAIMED, INCURRED OR SUFFERED BY BORROWER OR ANY OTHER PARTY THROUGH THE ORDINARY NEGLIGENCE OF LENDER, OR ITS PARENT OR ANY OF ITS AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS, BUT NOTHING HEREIN SHALL RELIEVE LENDER FROM LIABILITY FOR ITS OWN GROSS NEGLIGENCE, UNLAWFUL ACTIONS OR OMISSIONS, WILLFUL OR INTENTIONAL MISCONDUCT. NEITHER LENDER NOR ITS PARENT, NOR ANY OF ITS AFFILIATES, SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ATTORNEYS SHALL BE RESPONSIBLE OR LIABLE TO BORROWER OR TO ANY OTHER PARTY FOR ANY INDIRECT, PUNITIVE. EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF ANY FINANCIAL ACCOMMODATION HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR AS A RESULT OF ANY OTHER ACT, OMISSION OR TRANSACTION THAT IS NOT THE RESULT OF WILLFUL OR INTENTIONAL MISCONDUCT Notwithstanding the foregoing or anything to the contrary contained in this Agreement, Lender (I) shall exercise reasonable care in any use, handling, foreclosure upon or sale of the Collateral and any use of Borrower's Equipment, and only use Borrower's Equipment if Lender's use would not be reasonably expected to damage such Equipment, (II) if Lender uses Borrower's Equipment or enters upon Borrower's premises, Lender shall comply with all applicable laws, rules and regulations regarding the use of, or entrance upon, Borrower's Equipment or premises, or that are applicable to Borrower, including all safety and hazard rules and regulations applicable to Borrower's premises and work areas.

9.9  *Amendment.*  The terms and provisions of this Agreement may not be waived or amended, except in a writing executed by Borrower and a duly authorized officer of Lender

9.10  *Time of Essence.*  Time is of the essence in the performance by Borrower of each and every obligation under this Agreement

9.11  *Attorneys Fees and Costs.*  Borrower shall reimburse Lender for all reasonable attorneys' fees and all reasonable filing, recording, search, title insurance, appraisal, audit, and other reasonable costs incurred by Lender, pursuant to, or in connection with, or relating to this Agreement (whether or not a lawsuit is filed), including, but not limited to, any reasonable attorneys' fees and costs Lender incurs in order to do the following

prepare and negotiate this Agreement and all present and future documents relating to this Agreement; obtain legal advice in connection with this Agreement or Borrower; enforce, or seek to enforce, any of its rights; prosecute actions against, or defend actions by, Account Debtors; commence, intervene in, or defend any action or proceeding; initiate any complaint to be relieved of the automatic stay in bankruptcy; file or prosecute any probate claim, bankruptcy claim, third-party claim, or other claim; examine, audit, copy, and inspect any of the Collateral or any of Borrower's books and records; protect, obtain possession of, lease, dispose of, or otherwise enforce Lender's security interest in, the Collateral; and otherwise represent Lender in any litigation relating to Borrower that is material to Lender or the Collateral; in each case, however, subject to the following: (i) all such expenses shall be subject to the terms set forth in this Agreement and any Schedules attached hereto, (ii) while an Event of Default is not continuing, Lender shall, if possible, notify Borrower prior to incurring expenses that exceed $1,000; (iii) Lender's attorney's fees in connection with the preparation of this Agreement and related agreements shall not exceed $10,000 without Borrower's consent; and (iv) the following terms of this Section and the terms of Section 9.18 If either Lender or Borrower files any lawsuit against the other predicated on a breach of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable costs and attorneys' fees, including (but not limited to) reasonable attorneys' fees and costs incurred in the enforcement of, execution upon or defense of any order, decree, award or judgment. All attorneys' fees and costs to which Lender may be entitled pursuant to this Paragraph shall immediately become part of Borrower's Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations

9.12  *Benefit of Agreement.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower and Lender; provided, however, that Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of Lender, and any prohibited assignment shall be void. No consent by Lender to any assignment shall release Borrower from its liability for the Obligations. Lender shall not sell, transfer or assign this Agreement or any Loans without providing notice to Borrower and obtaining Borrower's consent, not to be unreasonably withheld

9.13  *Intentionally Omitted.*

9.14  *Limitation of Actions.*  Any claim or cause of action by Borrower against Lender, its directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Loan Agreement, or any other Loan Document, or any other transaction contemplated hereby or thereby or relating hereto or

10

David J. Richards, LLC

thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Lender, its directors, officers, employees, agents, accountants or attorneys, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within one year after Borrower should have discovered, based on reasonable due diligence, the first act, occurrence or omission upon which such claim or cause of action, or any material part thereof, is based, and the service of a summons and complaint on an officer of Lender, or on any other person authorized to accept service on behalf of Lender, within thirty (30) days thereafter. Borrower agrees that such one-year period is a reasonable and sufficient time for Borrower to investigate and act upon any such claim or cause of action. The one-year period provided herein shall not be waived, tolled, or extended except by the written consent of Lender in its sole discretion. This provision shall survive any termination of this Loan Agreement or any other Loan Document.

9.15 *Paragraph Headings; Construction.* Paragraph headings are only used in this Agreement for convenience. Borrower and Lender acknowledge that the headings may not describe completely the subject matter of the applicable paragraph, and the headings shall not be used in any manner to construe, limit, define or interpret any term or provision of this Agreement. This Agreement has been fully reviewed and negotiated between the parties and no uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Lender or Borrower under any rule of construction or otherwise.

9.16 *Public Announcement.* Borrower hereby agrees that Lender may make a public announcement of the transactions contemplated by this Agreement, without disclosing the specific terms of the transactions contemplated hereunder, and may publicize the same in marketing materials, newspapers and other publications, and otherwise, and in connection therewith may use "private equity owned Utah-based mining company" to describe Borrower.

9.17 *Governing Law; Jurisdiction; Venue.* This Agreement and all acts, transactions disputes and controversies arising hereunder or relating hereto, and all rights and obligations of the parties shall be governed by, and construed in accordance with, the internal laws (and not the conflict of laws rules) of the State of Ohio. Each party consents to the jurisdiction of courts located within Franklin County, Ohio and the referee referred to in Section 9.18 below, and agrees that the exclusive venue for all actions and proceedings relating directly or indirectly to this Agreement shall be Franklin County, Ohio, and each party waives any and all rights the party may have to object to the jurisdiction of any such court or said referee, or to transfer or change the venue of any

such action or proceeding, including, without limitation, any objection to venue or request for change in venue based on the doctrine of *forum non conveniens* Borrower consents to service of process in any action or proceeding brought against it by Lender, by personal delivery, or by mail addressed as set forth in this Agreement or by any other method permitted by law.

9.18 *Intentionally Omitted.*

9.19 *Mutual Waiver of Jury Trial.* BORROWER AND LENDER EACH HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO, THIS AGREEMENT OR ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND BORROWER, OR ANY CONDUCT, ACTS OR OMISSIONS OF LENDER OR BORROWER OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN ALL OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

Borrower:


CS MINING, LLC

Tax ID # 45-3088341

By _____

Russell D. Alley, CEO


Lender:

David J. Richards, LLC


By _____

David J. Richards, Manager

## David J. Richards, LLC

# Schedule #1 to

# Loan and Security Agreement

**Borrower:** CS Mining, LLC

**Address:**  P.O. Box 608
1208 South 200 West
Milford, Utah 84751

**Date:**  August 10, 2012

This Schedule #1 forms an integral part of the Loan and Security Agreement between David J. Richards, LLC and the above-borrower of even date.

1. **LOAN AMOUNT** (Section 1.1):

Capital Expenditures Line ("Capex Line"): **$ 3,500,000**

Advances under the Capex Line shall be limited to $1,000,000 until Borrower reports a Debt Service Coverage of at least 1.0x for at least 3 consecutive months after commencing operations. Additionally, at the time of any advance after the initial $1,000,000 of advances, Borrower shall be required to have a collateral coverage ratio of at least 1.2x based on the Net Orderly Liquidation Value ("NOLV") of existing Collateral plus the estimated NOLV of equipment purchased under the Capex Line. Borrower may be required to pledge additional unencumbered equipment as Collateral at the time of future advances to meet this requirement, if any new Collateral purchased with future advances is not sufficiently valuable to maintain this coverage ratio, and subject to the below.

Borrower may request up to 4 Loans under the Capex Line per quarter for up to 4 quarters after the date of this Agreement upon satisfaction of the conditions set forth in this Agreement. In addition to satisfaction of the Conditions set forth in this Agreement, Borrower's right to draw advances under the Capex Line in excess of $1,000,000 shall be subject to Lender's prior approval, which may be withheld in Lender's sole discretion. Advances under the Capex Line may be used to purchase 100% of the hard cost of Eligible Equipment. Eligible Equipment may include both new and used equipment and

David J. Richards, LLC                          Schedule #1 to CS Mining Loan and Security Agreement

shall exclude any soft costs (such as installation, service contracts, warranties, delivery fees and other such expenses outside of the cost of the actual equipment). At the end of each quarter, the sum of the disbursements shall be aggregated into a schedule.

Advances under the Capex Line shall be repaid as follows:

Prior to the aggregating of the individual advances under the Capex Line into a schedule at the end of each quarter, Borrower shall pay interest monthly payable on the 1st day of each month on the average monthly balance during the prior month. Payments on the aggregate amount of disbursements evidenced by the schedules shall be due on the 1st day of each month subsequent to the creation of the schedule in equal payments of principal and interest based on a 48-month amortization and the interest rate stated below. On the Maturity Date, Borrower shall make a balloon payment which shall include all outstanding principal and accrued interest.

If any payment of principal or accrued interest is not made within ten days after the date due, Borrower shall pay Lender a late payment fee equal to 5% of the amount of such late payment. The provisions of this paragraph shall not be construed as Lender's consent to Borrower's failure to pay any amounts when due, and Lender's acceptance of any such late payments shall not restrict Lender's exercise of any remedies arising out of any such failure.

## 2. INTEREST.

Interest Rate (Section 1.2):

During the period from the closing date until Borrower reports a Debt Service Coverage of at least 1.0x for at least one full month of operations, the Loans shall bear a fixed interest rate of 1.35% per month on the average outstanding balance. Starting on the 1st of the month following Lender's receipt of financial reports showing Debt Service Coverage of at least 1.0x for at least one full month, advances under the Capex Line shall bear interest at a floating interest rate equal to the sum of the Prime Index Rate, plus 9.25% per annum, currently at 12.5%, but will have a fixed / set monthly payment for the entire term for cash flow and accounting purposes. If the Prime Index Rate, currently 3.25%, should increase, the interest due will be billed accordingly on a quarterly basis. Conversely, if the prime rate should go down, the Borrower will benefit on this as well, but never lower than the initial interest rate at funding of 12.5%.

David J. Richards, LLC                          Schedule #1 to CS Mining Loan and Security Agreement

Interest shall be computed on the basis of a 360-day year for the actual number of days elapsed. Without limiting any of Lender's rights and remedies, from and after the occurrence and during the continuance of any Event of Default and the expiration of the Cure Period or other applicable cure period, the interest rate applicable to the Obligations shall be increased by an additional five percent (5.0%) per annum (the "Default Rate").

3. FEES (Section 1.4):

Facility Fee:

A Facility Fee of one and three-fourths of one percent (1.75%) of the initial $1,000,000 in advances under the Capex Line ($ 17,500) will be paid from the proceeds of the funding due at close.  A Facility Fee of one percent (1.0%) on all subsequent advances under the Capex Line shall be earned at the time of each advance, but payable from the proceeds of the funding at the time that advances are bundled into schedules at the end of each quarter.

Prepayment and
Prepayment Fees·

In months 1-24 of the Loans a two percent (2.0%) prepayment fee will be assessed. All prepayment penalties will be assessed against the original principal amount of aggregate advances under the Capex Line. Notwithstanding the foregoing, Borrower may prepay the Obligations at any time if Lender declares an Event of Default and/or acceleration.

Said prepayment fee shall be due from Borrower to Lender upon any prepayment of the principal of any Loan, including without limitation any prepayment as a result of an Event of Default or the exercise of any rights or remedies by Lender following the same.  Prepayments of the principal amount of any Loan shall be applied to the payments set forth herein in the inverse order of their maturity.

Wire Fee:

$25.00 per wire.

4. MATURITY DATE
(Section 6.1):

The earliest of the following dates ("Maturity Date"): (i) the date that all advances under the Capex Line have been paid in full; or (ii) July 31, 2017; or (iii) the date this Agreement terminates by its terms or is terminated, as provided in this Agreement.  On the Maturity Date (or, if earlier, upon acceleration of the Obligations in accordance with the terms of this Agreement), the entire unpaid principal balance of the Term Loan, plus all other Obligations relating to the Term Loan (including accrued and unpaid interest thereon) shall be due and payable

David J. Richards, LLC          Schedule #1 to CS Mining Loan and Security Agreement

## 5. FINANCIAL COVENANTS
(Section 5.1):

Borrower shall comply with each of the following covenants. Compliance shall be determined as of the end of each fiscal month:

Minimum Cash Balance. Borrower shall maintain a minimum Cash Balance of at least $500,000 until Borrower reports a Debt Service Coverage of at least 1.0x for at least 3 consecutive months after commencing flotation mill operations and processing.

## 6. REPORTING.
(Section 5.3):

Following any Change of Control, Borrower shall provide Lender with the following:

(a) Borrower shall provide Lender with copies of CPA-audited annual business financial statements within 120 days of the company's fiscal year end for the year ending December 31, 2012 and each year thereafter, which shall be prepared in accordance with GAAP.

(b) Borrower shall provide Lender with copies of internally prepared monthly business financial statements within 30 days of the company's fiscal month end; Borrower's balance sheet, profit & loss statement, and cash flow statement contained in Borrower's Monthly Operating Reports and periodic statements will be prepared, to the best of Borrower's knowledge, in accordance with GAAP. Borrower's Monthly Operating Reports shall be true and correct to the best of Borrower's knowledge.

(c) Each of the financial statements in subsections (a), and (b) above shall be accompanied by Compliance Certificates, signed by the Chief Executive Officer of Borrower, certifying that, to the best of his knowledge, as of the end of such period Borrower was in full compliance with all of the terms and conditions of this Agreement. Borrower's quarterly financial statements shall be prepared in accordance with GAAP, to the best of Borrower's knowledge.

(d) Borrower shall provide Lender with copies of corporate income tax returns, or its extension, within 10 days of their filing, but in no event later than 10 months after its fiscal year end.

(e) Annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for the upcoming fiscal year of Borrower no later than 30 days prior to the end of each fiscal year of Borrower, beginning with year 2013.

David J. Richards, LLC                    Schedule #1 to CS Mining Loan and Security Agreement

(f) Other information requested by Lender in its reasonable and good faith business judgment.

## 7. BORROWER INFORMATION:

Borrower represents and warrants that the information set forth in the Representations and Warranties of the Borrower dated March 27, 2012 previously submitted to Lender (the "Representations") is true and correct as of the date hereof.

## 8. ADDITIONAL PROVISIONS

(a)     Specified Equipment. As used herein, "Specified Equipment" means the following:

1. the Equipment listed on Exhibit A hereto.

2. the New Equipment listed on Exhibit B hereto.

3. all present and future additions, attachments, accessions, accessories, and accessions to the foregoing, and any and all substitutions, replacements or exchanges therefore, and any and all insurance and other proceeds of the foregoing, and all warranty claims and all other claims and rights of every kind relating to any of the foregoing. (Any mistake in any serial number listed on Exhibit A or Exhibit B shall not affect the above equipment's status as "Specified Equipment").

(b)     Subordination of Inside Debt.    All present and future indebtedness of Borrower to its officers, directors and shareholders ("Inside Debt") shall, at all times, be subordinated to this Loan and Security Agreement and any liens with respect to the Inside Debt shall be, and hereby are, subordinated to Lender's liens and Security Interests in the Collateral. The foregoing subordination shall not apply, however, to Inside Debt that is secured by separate collateral distinct from the Collateral. Borrower represents and warrants that there is no Inside Debt presently outstanding other than those certain loans held by and due to the parent company of Borrower Skye Mineral Partners, LLC in the amount of $24,025,346.66 as of November 10, 2011  Prior to incurring any additional Inside Debt in the future, Borrower shall cause the person to whom such Inside Debt will be owed to execute and deliver to Lender a subordination agreement on Lender's standard form.  The foregoing shall not prohibit or prevent the Company from obtaining third-party debt that encumbers assets separate and distinct from the Collateral.

-5

David J. Richards, LLC         Schedule #1 to CS Mining Loan and Security Agreement

Borrower:

CS MINING, LLC

By _____
      Russell Alley - CEO

Lender:

David J. Richards, LLC

By _____
      David J. Richards. Manager

David J. Richards, LLC                    Schedule #1 to CS Mining Loan and Security Agreement

Borrower:                                 Lender:

  CS MINING, LLC                  David J. Richards, LLC

By_____               By _____
    Russell Alley - CEO            David J. Richards, Manager

## EXHIBIT A

### SPECIFIC EQUIPMENT

CATERPILLAR® 14G MOTOR ROAD GRADER (1985), S/N  96U06420

CATERPILLAR® 16G MOTOR ROAD GRADER (1988-1989), S/N. 93U02885

CATERPILLAR® 330CL TRACK HOE, S/N: DKY02492

CATERPILLAR® 385BL EXCAVATOR (2003), S/N. ANS00295

CATERPILLAR® 773B HAUL TRUCK (1995), S/N: 63W03899

CATERPILLAR® 773B HAUL TRUCKS (1995), S/N. 63W04504

CATERPILLAR® 773B HAUL TRUCKS (1995), S/N: 63W04509

CATERPILLAR® 773B HAUL TRUCKS (1995), S/N 63W04374

CATERPILLAR® 966G WHEEL LOADER (2000), S/N: 3SW00823

CATERPILLAR® 988G LOADER (2002), S/N: BNH00506

CATERPILLAR® 992C WHEEL LOADER (1991), S/N 49Z01839

CATERPILLAR® D10R TRACK DOZER (1999), S/N. 3KR01362

CATERPILLAR® D8H DOZER, (1974), S/N: 46A34012

That Certain New Equipment listed on Exhibit B, which the initial $1 million Capex Line proceeds will be utilized to purchase or reimburse the purchase by the Company.

Equipment locations:

Borrower's Address or one of the locations set forth in the Representations, which include the mining claims and properties owned, held or leased by Borrower in the general vicinity of its office address. For purposes of clarity, none of Borrower's mining claims or real properties are including as Collateral under this Agreement

**BORROWER:**

CS MINING, LLC

By _____

Russell Alley - CEO

EXHIBIT B

## USE OF PROCEEDS AND NEW EQUIPMENT

| Item | Quantity | S/N | Cost |
|---|---|---|---|
| S70 Bobcat Skid-Steer Loader | 1 | | $19,330.15 |
| Magnetite Circuit Screens, Machine: Model 2SG48-60W-5STK Stack-Sizer™ of carbon steel construction | 2 | | $357,458.00 |
| FLOW DIVIDER: 72" Diameter 10-Way Flow Divider of carbon steel construction and vulcanized rubber lining | 1 | | $43,930.00 |
| SINGLE ROUGHER WET DRUM MAGNETIC SEPARATOR | 1 | | $110,000.00 |
| DOUBLE CLEANER WET DRUM MAGNETIC SEPARATOR | 1 | | $209,000.00 |
| Other Equipment Approved by Lender | | | $260,281.85 |
| **TOTAL** | | | **$1,000,000** |



AZ Mining    159,000

A&amp; Electric

Vehicles                    X . Truck
    1.          19,000
    2.          13,000

Phone: (801) 798-8676 / Fax (801) 798-3605

## DISCLOSURE SCHEDULE TO

## LOAN AND SECURITY AGREEMENT

### Section 3.4

Skye Mineral Partners, LLC, the parent of Borrower, hold liens on substantially all of Borrower's assets.

The State of Utah Division of Oil, Gas and Mining has a security interest in $1.6 million in U.S. Treasury Notes held by C.S. Mining pursuant to that certain pledge agreement dated 11/8/2011 between CS Mining, LLC, a Delaware limited liability company and the State of Utah, Division Of Oil, Gas And Mining.

H & E Equipment Services, Inc. has a security interest in the following equipment:

1. One (1) 2012 Manitou M50-4T Forklift, S/N 796173 together with all present and future attachments, accessories, replacement parts, repairs and additions thereto and proceeds thereof.

2. One (1) 2012 JG-JLG 600AJ BOOM, S/N 0300154821 together with all present and future attachments, accessories, replacement parts, repairs and additions thereto and proceeds thereof.

Revo Leasing Company holds a security interest in the following equipment: HP-Laser Jet M601n Workgroup Printer SN:Cnbl312yz HP-Laser Jet M601n Workgroup Printer SN:Cnbc312ys Sharp Mx-B402s Digital Copen SN:19009249 Sharp Mx-Ds14 Stackable Cabinets Sharp Mx-Ds13 Base Sharp Mx-Fxx3 Fax Expansion Sharp Mx-3610 Digital Color Copier Sn 15088158 Sharp Mx-De12 Paper Feed Desk.

Pursuant to that certain Settlement & Release Agreement entered into by and among Borrower and Nevada Star Resource Corp. (US), a Nevada corporation ("NS"), and Pure Nickel, Inc. ("PN", and collectively with NS, "Nevada Star") as of October 26, 2011 ("NS Settlement Agreement"), Borrower delivered and granted to Nevada Star that certain Deed of Trust, Assignment of Leases And Rents, Security Agreement, Financing Statement, and Fixture Filing executed as of November 16th, 2011 with respect to Borrower's properties and assets described therein, to secure obligations under the 1st Promissory Note delivered thereunder.

Items disclosed in Lender's UCC and other lien searches with respect to Borrower.

The New Equipment will be attached and/or utilized in connection with Borrower's existing flotation mill facility.

### Section 5.5

Borrower has existing, and will post additional bonds, pledges and reclamation obligations in connection with permitting for its operations, mining and milling. In connection therewith, Borrower may post cash bonds or may purchase investment securities and pledge such investment securities to the relevant permitting or state entity.

Borrower may enter into "cost plus" agreements with contractors or service providers in which Borrower reimburses or guarantees the costs and expenses of such service providers or contractors.

Borrower is obligated to indemnify Borrower's officers, directors and Members in connection with their engagement and/or involvement with Borrower.

### Section 7.1

*See* Sections 3 and 5.

The agents authorized to deal with Borrower are Russell Alley and David McMullin, provided that matters involving greater than $100,000 require board consent.

# EXHIBIT D

## FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

This FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "**Amendment**") is made as of the 14th day of May, 2013 ("**Execution Date**"), by and among DAVID J. RICHARDS, LLC, an Ohio limited liability company ("**Lender**") and CS MINING, LLC, an Delaware limited liability company ("**Borrower**"). This Amendment will be deemed effective as of May 1, 2013 or the earlier of date of the first advance of the Additional Loan (as defined below) ("**Effective Date**").

### RECITALS

A.    Purchaser and Company entered into that certain Loan and Security Agreement dated as of August 10, 2012, as amended by that certain First Amendment to Loan and Security Agreement dated as of December 1, 2012 and that certain Second Amendment to Loan and Security Agreement dated as of January 4, 2013, and that certain Third Amendment to Loan and Security Agreement dated as of April 24, 2013 (the "**Agreement**"). Capitalized terms utilized herein but not defined herein shall have the meanings assigned to such terms in the Agreement.

B.    Purchaser and Company desire to amend the Agreement and the Loan Documents as more specifically set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Purchaser and the Company agree as follows:

1.    **Additional Loan.**  Pursuant to the Capex Line under the Agreement and the Loan Documents, Lender agrees to advance and/or fund up to an additional $8,400,000 to Borrower (the "**Additional Loan**"), in addition to the amounts already authorized and/or advanced and/or funded to the Borrower in connection with the Agreement, such that the total "**Loan**" amount pursuant to the Agreement and related documents shall be increased to include the Additional Loan amount for a total amount of up to $12,000,000. The Additional Loan and all Loans shall in all respects (a) be secured by the Specified Equipment, Collateral, Additional RE Collateral and Additional Collateral, as amended hereby, and subject to "Section 8. ADDITIONAL PROVISIONS" of Schedule 1 to the Loan and Security Agreement and the Debt Subordination Agreement entered into by and among, Lender, Borrower and Skye Mineral Partners, LLC as of August 10, 2012, as amended (the "**Subordination Agreement**"), and all collateral specified herein, and (b) be treated as part of the Loan and Obligations under the Agreement and Loan Documents, and entitled to all of the protections thereunder, including with respect to all Loans and Obligations. All representations, warranties and covenants apply to the Additional Loan as part of the Additional Loan, at the time of funding or advance of the Additional Loan. All references to the Loan and Obligations in the Loan Documents, and all provisions related thereto, shall be deemed amended to include and incorporate the Additional Loan.

2.    **Additional Documents.**  The parties shall execute all additional documents, and take such additional actions as are deemed reasonably necessary by Lender in order to document the Additional Loan and maintain or create any liens or security interests in connection therewith. Borrower shall be responsible for securing all necessary signatures to such documentation, including any amendments to the Loan Documents. Borrower shall, and Lender may, file any UCC financings statements, fixture filings, or deeds of trusts deemed necessary or advisable to maintain or perfect Lender's liens or security interests.

Page 1

3.     **Use of Proceeds.**  The use of proceeds for the Additional Loan shall be as agreed by Lender in accordance with the Borrower's business plan presented to Lender.

4.     **Additional Collateral.** Lender shall have a first priority deed of trust, lien and security interest on the assets of the Company, including but not limited to: (a) all real property, interests therein, mining claims, mineral leases, water rights and similar rights; (b) all tools, inventory, contract rights, consumer goods, equipment, inventory, general intangibles, accounts, chattel paper, deposit accounts, documents, instruments, investment property, letter-of-credit rights, letters of credit, money, patents, licenses, intellectual property, cash, cash equivalents, cash collateral, accounts receivable, contracts rights, contracts, real property, minerals, mineral or mining rights, as-extracted collateral, water rights plant, machinery, equipment, fixtures, vehicles, stock and equity instruments; (c) all proceeds, replacements, substitutions, products, rents and profits of or from any and all of the foregoing Collateral and, to the extent not otherwise included, all payments under insurance (whether or not Debtor is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral; (d) any after-acquired collateral or assets of any of the foregoing types; and (e) set forth on Exhibit A attached hereto (collectively, the "**Additional Collateral**"); excluding only that collateral specified on Exhibit B.  For purposes of this paragraph, the term "proceeds" includes whatever is receivable or received when Additional Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary. The Additional Collateral shall in all respects be included in the definition of, treated as, and entitled to the protections of, Collateral and/or Specified Equipment pursuant to the Loan Documents.  Borrower shall execute and file in the appropriate real estate records that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing in connection herewith with respect to the Additional Collateral, and UCC-1 Financing Statements, and similar filings, in order to properly pledge, create and/or perfect the liens granted hereunder with respect to the Additional Collateral. The Deed of Trust shall be in the same form as the prior Deeds of Trust recorded in connection with the loans, but shall include all of Borrower's real property interests and rights.

5.     **Conversion of Loans.**

(a)     Optional Conversion.  Upon the earlier of approval of all permits relating to the the Company's planned "Phase II" operations or presentment of repayment of the applicable outstanding Loan obligation amount(s), the Lender may, at its option sixty (60) days after providing written notice to Company, convert all or any portion of such amount(s) into shares of Class A Units of Skye ("**Units**"), at a price of $2,222 per share of Units (as same may be adjusted from time to time in accordance herewith, the "**Conversion Price**").  The effective date of any conversion hereunder is herein referred to as the "**Conversion Date.**"  During the 60-day notice period, the holders of Class A Units (other than Skye Mineral Investors, LLC or its transferees) shall have the opportunity to complete a purchase of their respective pro rata allocation of equity in order to maintain their percentage ownership prior to conversion, pursuant to a private placement closing prior to the effective date of the conversion, at the same price per unit as the Conversion Price and on substantially the same terms as set forth in that certain Membership Unit Purchase Agreement dated January 31, 2013 among Skye and the other parties thereto. To the extent that the Loans are converted only in part, then such conversion shall be treated as a prepayment of principal until the entire principal balance of the relevant Loan(s) have been paid, and then as a prepayment of unpaid accrued interest hereunder.

(b)     Mechanics of Conversion.  Upon notice to Skye of the Lender's conversion election as provided in Section 4(a), Skye shall, in accordance with Section 4(c), issue to the Lender (or

*Fourth Amendment to Loan and Security Agreement*

to the Lender's designee(s) set forth in the Lender's conversion election) the number of shares of Units to which the Lender shall be entitled upon such conversion, and, if applicable, shall deliver or cause to be delivered to the Lender or such designee(s) the certificates representing such shares of Units. All shares of Units issued or delivered upon any conversion hereunder shall, when issued or delivered, be duly authorized, validly issued, fully paid and nonassessable. In lieu of any fractional shares to which the Lender would otherwise be entitled, Company or Skye shall pay cash equal to such fraction multiplied by the per share Conversion Price.

(c)    Issuance of Units Upon Conversion. Within a reasonable time, not exceeding five (5) Business Days after the Conversion Date, Skye shall deliver or cause to be delivered, to or upon the written order of the Lender, certificates (if applicable) representing the number of fully paid and nonassessable shares of Units into which the Loan(s) have converted in accordance with the provisions of this Section 4. If so requested by Skye, the Lender shall, within a reasonable time (not exceeding five (5) Business Days after receipt by the Lender of such certificates), surrender the relevant promissory notes and Loan Documents with respect to the converted shares to Skye for cancellation, against delivery of replacement promissory notes and documents representing the remaining balance (if any) of the Loan obligations which have not been converted. Subject to the following provisions of this Section 4, such conversion shall be deemed to have occurred on the Conversion Date, so that the Lender or such Lender's designee(s) shall be treated for all purposes as having become the record holder of such shares of Units at such time.

(d)    Taxes on Conversion. The issuance of certificates for shares of Units upon the conversion, if applicable, shall be made without charge by the Company or Skye to the converting Lender for any tax in respect of the issuance of such certificates and such certificates shall be issued in the name of, or in such names as may be directed by, the Lender; provided, however, that neither the Company nor Skye shall be required to pay any tax which may be payable in respect of any transfer involved in the issuance or delivery of any such certificate in a name other than that of the Lender, and Skye shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to Skye the amount of any such tax or shall have established to the satisfaction of Skye that any such tax has been paid; and further provided, that Skye shall not be required to pay any income tax to which the Lender may be subject in respect of the issuance of promissory notes to Lender or the shares issued upon conversion hereof.

(e)    Adjustment of Shares.

(i)    Stock Dividends, Distributions or Subdivisions. In the event that, at any time and from time to time from and after the date hereof, Skye or the Company shall issue additional shares of Units (or securities convertible into Units) in a stock dividend, stock distribution or subdivision paid with respect to Units, or declare any dividend or other distribution payable in additional shares of Units (or securities convertible into Units) or effect a split or subdivision of the outstanding shares of Units, then, concurrently with the effectiveness of such stock dividend, stock distribution or subdivision, the then-effective Conversion Price shall be proportionately decreased, and the number of shares of Units issuable upon conversion shall thus be proportionately increased. Skye shall not, at any time, take or permit to be taken any action which would cause the Conversion Price to be reduced to an amount less than the par value per share of the class of stock into which the Loans are convertible, if applicable.

(ii)    Combinations or Consolidations. In the event that, at any time and from time to time from and after the date hereof, the outstanding shares of Units shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Units, then, concurrently

with the effectiveness of such combination or consolidation, the then-effective Conversion Price shall be proportionately increased, and the number of shares of Units issuable upon conversion of this Amendment shall thus be proportionately decreased.

(iii)   <u>Other Dividends or Distributions</u>.  If Skye, at any time or from time to time after the date hereof, makes a distribution to the holders of Units which is payable in securities of Skye other than Units, then, in each such event, provision shall be made so that the Lender shall receive upon conversion of the relevant Loan(s), in addition to the number of shares of Units, the amount of such securities of Skye which would have been received if the portion of this Amendment so converted had been exercised for Units on the date of such event, subject to adjustments subsequent to the date of such event with respect to such distributed securities which shall be on terms as nearly equivalent as practicable to the adjustments provided in this Section 4(e)(iii) and all other adjustments under this Section 4(e).  Nothing contained in this Section 4(e)(iii) shall be deemed to permit the payment of any distribution in violation of the Loan Documents.

(iv)   <u>Merger, Consolidation or Exchange</u>.  If, at any time or from time to time after the date of this Amendment, there occurs any merger, consolidation, arrangement or statutory share exchange of Skye with or into any other person or entity, then, in each such event, provision shall be made so that the Lender shall receive upon conversion of this Amendment the kind and amount of shares and other securities and property (including cash) which would have been received upon such merger, consolidation, arrangement or statutory share exchange by the Lender if the portion of this Amendment so converted had been exercised for shares of Units immediately prior to such merger, consolidation, arrangement or statutory share exchange, subject to adjustments for events subsequent to the effective date of such merger, consolidation, arrangement or statutory share exchange with respect to such shares and other securities which shall be on terms as nearly equivalent as practicable to the adjustments provided in this Section 4(e)(iv) and all other adjustments under this Section 4(e).  Nothing contained in this Section 4(e)(iv) shall be deemed to permit any such transaction in violation of the Loan Documents.

(v)   <u>Recapitalization or Reclassification</u>.  If, at any time or from time to time after the date of this Amendment, the shares of Units issuable upon conversion of this Amendment are changed into the same or a different number of securities of any class of Skye, whether by recapitalization, reclassification or otherwise (other than a merger, consolidation, arrangement or statutory share exchange provided for elsewhere in this Section 4(e)), then, in each such event, provision shall be made so that the Lender shall receive upon conversion of this Amendment the kind and amount of securities or other property which would have been received in connection with such recapitalization, reclassification or other change by the Lender if the portion of this Amendment so converted had been converted immediately prior to such recapitalization, reclassification or change, subject to adjustments for events subsequent to the effective date of such recapitalization, reclassification or other change with respect to such securities which shall be on terms as nearly equivalent as practicable to the adjustments provided in this Section 4(e)(v) and all other adjustments under this Section 4(e).

(vi)   <u>Extraordinary Dividends or Distributions</u>.  If, at any time or from time to time after the date of this Amendment, Skye shall declare a dividend or any other distribution upon the Units payable other than in shares of Units or other securities of Skye as described in Section 4(e)(iii) above, then the Conversion Price in effect immediately prior to such declaration shall be reduced by an amount equal, in the case of a dividend or distribution in cash, to the amount thereof payable per share of Units or, in the case of any other dividend or distribution, to the value thereof per share of Units at the time such dividend or distribution was declared, as determined by the Board of Directors of Skye in

*Fourth Amendment to Loan and Security Agreement*

good faith. Such reductions shall take effect as of the date on which a record is taken for the purposes of the subject dividend or distribution, or, if a record is not taken, the date as of which the holders of record of Units entitled to such dividend or distribution are to be determined. Nothing contained in this Section 4(e)(vi) shall be deemed to permit the payment of any dividend in violation of the Loan Documents.

(vii)    Adjustment Upon Certain Issuances.    In the event that, while any portion of the Loans remains outstanding, the Company or Skye completes a sale of equity securities with proceeds to Skye Company of $3,000,000 or more, and at a valuation per share less than the Conversion Price (a "New Round"), then the Lender shall have the option of causing some or all of the Loans, in Lender's discretion, to convert at the same price and on the same terms offered to investors in the New Round, provided that such election shall be made within sixty (60) days of written notice from the Company setting forth the material terms of the New Round. If the material terms of the New Round are changed, then Lender shall have (60) days from receipt of written notice of such change to make such election.

(vii)    Certificate of Adjustment.    Whenever the Conversion Price and/or the number of share of Units or other securities receivable upon conversion of this Amendment is adjusted, Skye shall promptly deliver to the Lender a certificate of adjustment, setting forth the Conversion Price and/or shares of Units or other securities issuable after adjustment, a brief statement of the facts requiring the adjustment and the computation by which the adjustment was made. The certificate of adjustment shall be prima facie evidence of the correctness of the adjustment.

(ix)    Successive Application.    The provisions of this Section 4(e) shall be applicable successively to each event described herein which may occur subsequent to the date of this Amendment and prior to the conversion in full of this Amendment.

(x)    Fractional Shares.    No fractional shares of Units or other securities shall be issuable by reason of any adjustments made pursuant to this Section 4(e); and in lieu of any such fractional shares, Skye shall pay cash therefor in accordance with Section 4(b) above.

(f)    No Impairment.    Neither the Company nor Skye shall, by amendment of its incorporation documents or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder but will at all times in good faith assist in the carrying out of all the provisions of this Section 4 and in the taking of all such action as may be necessary or appropriate in order to protect the conversion rights of the Lender against impairment, inclusive through any issuance of new securities by Company or the issuance of equity securities senior or with preference to the Units. In the event of any merger or consolidation in which the Skye or Company is not the surviving entity, Skye or Company shall make appropriate arrangements in order that, upon any subsequent conversion of this Amendment, the Lender shall become entitled to receive the same securities or other consideration that such Lender would have received had such conversion been made immediately prior to the consummation of such merger or consolidation, subject to further adjustments, of the type provided in this Amendment, with respect to any events relating to any such securities occurring subsequent to the consummation of such merger or consolidation.

(g)    Units Reserved.    Skye shall at all times reserve and keep available out of its authorized but unissued Units or other securities (as applicable) such number of shares of Units or other

Page 5

securities as shall from time to time be sufficient to effect the maximum available conversion of this Amendment into Units or other securities (as applicable).

(h)     Restricted Securities.   The shares of Units or other securities issuable to the Lender hereunder (the "Shares") may not, at the time of issuance, have been registered under any federal or state securities laws, and may constitute "restricted securities" within the meaning of federal and state securities laws.   By its receipt of Shares, if the Shares are not then the subject of an effective registration statement under the Securities Act, the Lender will be deemed to acknowledge and confirm that it is receiving such Shares for its own account for investment, and not with a view to the resale or distribution thereof in violation of any federal or state securities laws.

7.     **Fees and Expenses.** In accordance with the Agreement, the 1% Facility Fee with respect to the Additional Loan shall be capitalized into the Loan at the time of advance of the Additional Loan, and payable at the time that advances are bundled at the end of each quarter. Lender's fees and expenses in connection with the Additional Loan and documentation thereof shall be reimbursed in an amount not to exceed $15,000, which also shall be payable at the time of bundling, or such other time specified by Lender.

8.     **Change of Name.** The Lender may freely change its name or create a new "doing business as" name for Lender following the date hereof, which shall have no impact whatsoever on the Loans or Loan Documents. Upon any such name change, all references to Lender shall be deemed to refer to and/or include such new name.  Lender may shortly after or in connection with this Amendment change Lender's name to, or establish a doing business as name as desired by Lender in its discretion.

9.     **Miscellaneous.** Except as set forth in this Amendment, the Agreement, all Loan Documents and all associated agreements and agreements incorporated therein shall continue in full force and effect.  This Amendment and all agreements and documents and agreements entered into in connection herewith are part of the Loan Documents. This Amendment shall be governed by the laws of the State of Ohio.  In the event of any inconsistency between agreements previously executed by the parties and this Amendment, this Amendment shall control.  This Amendment may be executed in counterparts by the exchange of signature pages electronically.  Borrower represents and warrants that all parties executing this Amendment and any documents executed in connection herewith have all requisite power and authority to do so.  Receipt of the funds from the Additional Loan shall cause this Amendment to become effective.  The parties acknowledge that the transactions entered into pursuant to the Loan Documents and hereunder have been entered into in arm's length, in good faith, and represent fair transactions(s) with fair value being provided to Borrower by Lender in consideration for the transactions hereunder.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

**LENDER:**

**DAVID J. RICHARDS, LLC**

By: _____

Name:  David J. Richards
Title:  Manager

**BORROWER:**

**CS MINING, LLC**

By: _____

Name:  David D. McMullin
Title:  VP Operations

**SKYE MINERAL PARTNERS, LLC**

By: _____

Name:  Clinton W. Walker
Title:  Manager

# EXHIBIT E

## OMNIBUS AMENDMENT TO LOAN DOCUMENTS

This OMNIBUS AMENDMENT TO LOAN DOCUMENTS (this "**Amendment**") is made as of the 28th day of January, 2014 ("**Execution Date**"), by and among DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**Lender**"), CS MINING, LLC, a Delaware limited liability company ("**Borrower**") and PACNET CAPITAL (U.S.) LIMITED, LLC, a Delaware corporation ("**PacNet**"). Lender, Borrower and PacNet are collectively referred to herein as the "**Parties**" and each as a "**Party**." This Amendment will be deemed effective as of the Execution Date ("**Effective Date**").

### RECITALS

A.     Lender has made a loan to Borrower in the original principal amount of up to $12,000,000.00 ("**Loan**"), as evidenced by the loan documents listed on Schedule A hereto together with any and all other documents executed by the Borrower in connection with the Loan (collectively, the "**Loan Documents**"). The Loan is described in a Loan and Security Agreement dated August 10, 2012, entered into by Lender and Borrower (the "**Loan Agreement**"). Borrower and Lender have also executed certain Deeds of Trust (as defined in Schedule A), with respect to real and personal property of Borrower as described in the Loan Agreement and Deeds of Trust.

B.     The Loan Agreement was amended pursuant to the terms of that certain First Amendment to Loan and Security Agreement dated as of December 1, 2012, made by and between Borrower and Lender (the "**First Amendment**"); further amended pursuant to that certain Second Amendment to Loan and Security Agreement dated as of January 24, 2013, made by and between Borrower and Lender (the "**Second Amendment**"); further amended pursuant to that certain Third Amendment to Loan and Security Agreement dated as of April 24, made by and between Borrower and Lender (the "**Third Amendment**"); further amended pursuant to that certain Fourth Amendment to Loan and Security Agreement dated as of May 14, 2013, made by and between Borrower and Lender (the "**Fourth Amendment**"); and further amended pursuant to that certain Fifth Amendment to Loan and Security Agreement dated as of July 9, 2013, made by and between Borrower, Lender and Skye (the "**Fifth Amendment**").

C.     Capitalized terms used, and not defined, in this Amendment (including the exhibits and schedules hereto), have the meanings given to them in the Loan Agreement and other Loan Documents.

D.     Lender, Borrower and Skye desire to amend the Loan Agreement and the other Loan Documents as more specifically set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Lender, Borrower and Skye agree as follows:

1.    **Additional Loan.** Pursuant to the Capex Line under the Loan Agreement and the Loan Documents, Lender agrees to advance and/or fund up to an additional $2,000,000 to Borrower (the "**Additional Loan**"), in addition to the amounts already authorized and/or advanced and/or funded to the Borrower in connection with the Loan Agreement, such that the total "Loan" amount pursuant to the Loan Agreement and related documents shall be increased to include the Additional Loan amount for a total amount of up to $14,000,000. The Additional Loan and all Loans shall in all respects be treated as part of the Loan and Obligations under the Loan Agreement and other Loan Documents, and entitled to all of the protections thereunder, including with respect to all Loans and Obligations. All representations, warranties and covenants of Borrower pursuant to the Loan Documents apply to the Additional Loan as part of the Additional Loan, at the time of funding or advance of the Additional Loan. All references to the Loan and Obligations in the Loan Documents, and all provisions related thereto, shall be deemed amended to include and incorporate the Additional Loan.

2.    **Additional Documents.** The parties shall execute all additional documents, and take such additional actions as are deemed reasonably necessary by Lender in order to document the Additional Loan, including by way of Borrower executing and delivering one or more promissory note(s) at the time of funding or advance of the Additional Loan.

3.    **Loan Payments.** Notwithstanding anything to the contrary in the Loan Documents, in the absence of an Event of Default: (a) The monthly payments due pursuant the Loan Agreement and the other Loan Documents shall, through July 31, 2014, consist only payments of accrued interest under the Notes; and (b) commencing on August 1, 2014, the monthly payments due pursuant to the Loan Agreement shall consist of payments of principal and interest, amortized over the period of forty-three (43) months.

4.    **Cure Period.** Notwithstanding anything to the contrary in the Loan Documents, Lender shall not exercise any of its contractual or statutory remedies in connection with any Event of Default (including instituting any foreclosure proceeding with respect to any assets of Borrower) unless such Event of Default is not cured within thirty (30) days Lender delivering written notice to Borrower and to PacNet of the occurrence of such Event of Default.

5.    **Conversion of Loans.** Section 5 (Conversion of Loans) of the Fourth Amendment is hereby deleted in its entirety. The parties hereto acknowledge and agree that any conversion of outstanding Loan obligation amounts into shares of Class A Units of, or any other ownership interests in, Skye Mineral Partners, LLC ("Skye") shall be subject to the terms and conditions of that certain Conversion and Participation Rights Agreement of even date herewith, by and among Borrower, Lender, Skye, PacNet, DXS Capital (U.S.) Limited, a Delaware corporation and Clarity Copper, LLC, a Delaware limited liability company.

6.    **Amendment of Loan Documents.** The Loan Agreement and all other Loan Documents are hereby amended to the extent necessary to give effect to the provisions of this Amendment. Except as set forth in this Amendment, the Loan Agreement, the other Loan Documents and all associated agreements and agreements incorporated therein shall continue in full force and effect.

US ACTIVE 115125016

7.    <u>Miscellaneous.</u>    This Amendment and all agreements and documents and agreements entered into in connection herewith are part of the Loan Documents. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter of this Agreement.    No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by either party hereto.    None of this Agreement, nor any provision hereof, is intended to confer upon any person or entity, other than the parties hereto, any rights or remedies hereunder.    Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed by all Parties. This Amendment shall be governed by the laws of the State of Ohio. In the event of any inconsistency between agreements previously executed by the parties and this Amendment, this Amendment shall control. This Amendment may be executed in counterparts by the exchange of signature pages electronically. Borrower represents and warrants that all parties executing this Amendment and any documents executed in connection herewith have all requisite power and authority to do so. The parties acknowledge that the transactions entered into pursuant to the Loan Documents and hereunder have been entered into in arm's length, in good faith, and represent fair transactions(s) with fair value being provided to Borrower by Lender in consideration for the transactions hereunder.

*[Signature Pages Follow]*

US_ACTIVE 115125016

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

| | |
|---|---|
| **LENDER:** | **BORROWER:** |
| **DAVID J. RICHARDS, LLC** **d/b/a WESTERN US MINERAL** **INVESTORS, LLC,** an Ohio limited liability company | **CS MINING, LLC,** a Delaware limited liability company |
| By: _____ Name: *ROBERT LANTZ* Title: Manager | By: _____ Name: _____ Title: _____ Address: |

**PACNET:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
 Marshall W. Cooper
 Manager

Address:

US_ACTIVE 115125016

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**LENDER:**

**DAVID J. RICHARDS, LLC**
**d/b/a WESTERN US MINERAL**
**INVESTORS, LLC,**
an Ohio limited liability company

By: _____
Name:
Title:   Manager

**BORROWER:**

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name: Russell D. Alley
Title:   Chief Executive Officer

Address: 1208 South 200 West, Milford, Utah 84751

**PACNET:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
        Marshall W. Cooper
        Manager

Address:

- 4 -

US_ACTIVE-115125016

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**LENDER:**

**DAVID J. RICHARDS, LLC
d/b/a WESTERN US MINERAL
INVESTORS, LLC,**
an Ohio limited liability company


By: _____
Name: David J. Richards
Title:   Manager

**BORROWER:**

**CS MINING, LLC,**
a Delaware limited liability company


By: _____
Name: _____
Title: _____

Address:


**PACNET:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
          Marshall W. Cooper
          Manager

Address:

## SCHEDULE A

### Loan Documents

- Loan Agreement;

- Schedule #1 to Loan and Security Agreement, dated as of August 10, 2012, made by and between Lender and Borrower ("**Schedule #1**");

- First Amendment;

- Second Amendment;

- Third Amendment;

- Fourth Amendment;

- Fifth Amendment;

- Subordination Agreement;

- Secured Promissory Note in the principal amount of $1,000,000.00 dated as of August 10, 2012, made by Borrower in favor of Lender (the "**August 10, 2012 Note**");

- Secured Promissory Note in the principal amount of $1,000,000.00 dated as of December 1, 2012, made by Borrower in favor of Lender (the "**December 1, 2012 Note**");

- Secured Promissory Note in the principal amount of $600,000.00 dated as of January 4, 2013, made by Borrower in favor of Lender (the "**January 4, 2013 Note**");

- Secured Promissory Note in the principal amount of $500,000.00 dated as of April 25, 2013, made by Borrower in favor of Lender (the "**April 25, 2013 $500,000 Note**");

- Secured Promissory Note in the principal amount of $1,000,000.00 dated as of April 25, 2013, made by Borrower in favor of Lender (the "**April 25, 2013 $1,000,000 Note**");

- Secured Promissory Note in the principal amount of $800,000.00 dated as of May 14, 2013, made by Borrower in favor of Lender (the "**May 14, 2013 Note**");

- Secured Promissory Note in the principal amount of $600,000.00 dated as of June 3, 2013, made by Borrower in favor of Lender (the "**June 3, 2013 Note**");

- Secured Promissory Note in the principal amount of $630,000.00 dated as of June 12, 2013, made by Borrower in favor of Lender (the "**June 12, 2013 Note**");

- Secured Promissory Note in the principal amount of $1,320,000.00 dated as of July 10, 2013, made by Borrower in favor of Lender (the "**July 10, 2013 Note**");

- Secured Promissory Note in the principal amount of $5,050,000.00 dated as of July 24, 2013, made by Borrower in favor of Lender (the "**July 24, 2013 Note**", and together with the August 10, 2012 Note, December 1, 2012 Note, January 4, 2013 Note, April 25, 2013 $500,000 Note, April 25, 2013 $1,000,000 Note, May 14, 2013 Note, June 3, 2013 Note, June 12, 2013 Note, and July 10, 2013 Note, the "**Notes**"));

- Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing dated as of January 4, 2013, made by and among Borrower as trustor, Lender as beneficiary and First American Title Insurance Company as trustee; and recorded on February 11, 2013, in the Recorder's Office of Beaver County, State of Utah, as Entry # 250584 (the "**January 4, 2013 Deed of Trust**");

- Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing dated as of April 24, 2013, made by and among Borrower as trustor, Lender as beneficiary and First American Title Insurance Company as trustee (the "**April 24, 2013 Deed of Trust**");

- Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing dated as of May 14, 2013, made by and among Borrower as trustor, Lender as beneficiary and First American Title Insurance Company as trustee (the "**May 14, 2013 Deed of Trust**", and together with the January 4, 2013 Deed of Trust and April 24, 2013 Deed of Trust, the "**Deeds of Trust**").

U.S. ACTIVE 115125916

# EXHIBIT F

## LOAN CONVERSION AND
## PARTICIPATION RIGHTS AGREEMENT

This **LOAN CONVERSION AND PARTICIPATION RIGHTS AGREEMENT** (this "**Agreement**") is made as of the 28TH day of January, 2014, by and among DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**Lender**"), CS MINING, LLC, a Delaware limited liability company ("**Borrower**"), PACNET CAPITAL (U.S.) LIMITED, LLC, a Delaware corporation ("**PacNet**"), Skye Mineral Partners, LLC, a Delaware limited liability company ("**Skye**" or the "**Company**")), DXS Capital (U.S.) Limited, a Delaware corporation ("**DXS**"), Clarity Copper, LLC, a Delaware limited liability company ("**Clarity**"), and Skye Mineral Investors, LLC, an Ohio limited liability company ("**SMI**"). Lender, Borrower, PacNet, Skye, DXS and Clarity are collectively referred to herein as the "**Parties**" and each as a "**Party.**"

### RECITALS

A.     Lender has made a loan to Borrower in the original principal amount of up to $14,000,000.00 ("**Loan**"), as evidenced by the Loan Agreement and other loan documents listed on Schedule A hereto together with any and all other documents executed by the Borrower in connection with the Loan (collectively, the "**Loan Documents**").

B.     The Loan Agreement and other Loan Documents were amended pursuant to the terms of that certain First Amendment to Loan and Security Agreement dated as of December 1, 2012, made by and between Borrower and Lender (the "**First Amendment**"); further amended pursuant to that certain Second Amendment to Loan and Security Agreement dated as of January 24, 2013, made by and between Borrower and Lender (the "**Second Amendment**"); further amended pursuant to that certain Third Amendment to Loan and Security Agreement dated as of April 24, 2013 made by and between Borrower and Lender (the "**Third Amendment**"); further amended pursuant to that certain Fourth Amendment to Loan and Security Agreement dated as of May 14, 2013, made by and between Borrower and Lender (the "**Fourth Amendment**"); further amended pursuant to that certain Fifth Amendment to Loan and Security Agreement dated as of July 9, 2013 made by and between Borrower, Lender and Skye (the "Fifth Amendment"); and further amended pursuant to that certain Omnibus Amendment to Loan Documents (the "**Omnibus Amendment**").

C.     Capitalized terms used, and not defined, in this Agreement (including the exhibits and schedules hereto), have the meanings given to them in the Third Amended and Restated Limited Liability Company Agreement of Skye Mineral Partners, LLC, dated as of November 11, 2011, by and among the Members set forth therein (the "**Operating Agreement**").

D.     The Parties desire to provide for a right of Lender to cause conversion of outstanding Loan obligations into shares of Class A Units of Skye, and grant to certain of the Parties the right to concurrently acquire additional Class A Units of Skye.

### AGREEMENT

US_ACTIVE 115149070

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties agree as follows:

1. **Lender Conversion Right.**

(a) In the event and at such time as the Borrower obtains all material regulatory permits required for its planned Phase II Expansion (as defined below), Lender shall have the rights set forth in this Section 1 to acquire an equity interest in Skye. **"Phase II Expansion"** means construction of the Company's planned SX-EW leaching facility, expansion of the Company's flotation mill facility, and construction of an enlarged tailings pond, in accordance with a business plan approved by all holders of Class A Units of the Company.

(b) In the event that the condition specified above is satisfied, then Lender may elect to cause all or any portion of amounts owed by Borrower under each of the Notes (including all outstanding principal and accrued but unpaid interest owed on each of the Notes) to be (i) assumed by Skye, and (ii) cancelled in consideration for Skye's issuance to Lender of a membership interest in Skye represented by Class A Units of Skye. The number of Class A Units into which the Notes shall be convertible shall be equal to the quotient obtained by dividing (i) the outstanding principal plus any accrued but unpaid interest then owed under such Notes, by (ii) the Conversion Price (such exchange being referred to herein as the **"Loan Conversion"**).

(c) The **"Conversion Price"** shall be $2,222.22 per Class A Unit (as adjusted pursuant to Section 1(e) below, if applicable); provided however that in the event that the Company completes an offering of Units with proceeds to the Company of at least $3,000,000 and at a price per Unit less than $2,222.22 (as adjusted for the events described in Section 1(e) below) (a **"New Round"**), then Lender shall have the right, exercisable by written notice to the Company delivered within sixty (60) days of written notice from the Company setting forth the material terms of the New Round, to cause the Loan to be converted at the same price per Unit and on the same terms offered to investors in the New Round, in which case the Conversion Price shall be such price as is offered to investors in the New Round.

(d) Lender shall initiate the Loan Conversion by providing written notice to the Company and Borrower of such election (the **"Exercise Notice"**).

(e) Adjustment of Shares.

(i)     Stock Dividends, Distributions or Subdivisions. In the event that, at any time and from time to time from and after the date hereof, Skye or the Company shall issue additional Units (or securities convertible into Units) in a unit dividend, unit distribution or subdivision paid with respect to Units, or declare any dividend or other distribution payable in additional Units (or securities convertible into Units) or effect a split or subdivision of the outstanding Units, then, concurrently with the effectiveness of such dividend, distribution or subdivision, the then-effective Conversion Price shall be proportionately decreased, and the number of Units issuable upon conversion of the Notes shall thus be proportionately increased. Skye shall not, at any time, take or permit to be taken any action which would cause the Conversion Price to be reduced to an amount less than the par value per Unit, if applicable.

US_ACTIVE 115149070

          (ii)     Combinations or Consolidations. In the event that, at any time and from time to time from and after the date hereof, the outstanding Units shall be combined or consolidated, by reclassification or otherwise, into a lesser number of Units, then, concurrently with the effectiveness of such combination or consolidation, the then-effective Conversion Price shall be proportionately increased, and the number of Units issuable upon conversion of the Notes shall thus be proportionately decreased.

          (iii)    Other Dividends or Distributions. If Skye, at any time or from time to time after the date hereof, makes a distribution to the holders of Units which is payable in securities of Skye other than Units, then, in each such event, provision shall be made so that the Lender shall receive upon conversion of the relevant Note(s), in addition to the number of Units into which such Notes are convertible, the amount of such securities of Skye which would have been received if the Note(s) so converted had been exercised for Units on the date of such event, subject to adjustments subsequent to the date of such event with respect to such distributed securities which shall be on terms as nearly equivalent as practicable to the adjustments provided in this Section 1(e)(iii) and all other adjustments under this Section 1(e). Nothing contained in this Section 1(e)(iii) shall be deemed to permit the payment of any distribution in violation of the Loan Documents.

          (iv)    Merger, Consolidation or Exchange. If, at any time or from time to time after the date of this Amendment, there occurs any merger, consolidation, arrangement or statutory equityexchange of Skye with or into any other person or entity, then, in each such event, provision shall be made so that the Lender shall receive upon conversion of this Notes the kind and amount of securities and property (including cash) which would have been received upon such merger, consolidation, arrangement or statutory share exchange by the Lender if the the Notes so converted had been exercised for Units immediately prior to such merger, consolidation, arrangement or statutory share exchange, subject to adjustments for events subsequent to the effective date of such merger, consolidation, arrangement or statutory share exchange with respect to such shares and other securities which shall be on terms as nearly equivalent as practicable to the adjustments provided in this Section 1(e)(iv) and all other adjustments under this Section 1(e). Nothing contained in this Section 1(e)(iv) shall be deemed to permit any such transaction in violation of the Loan Documents.

          (v)     Recapitalization or Reclassification. If, at any time or from time to time after the date of this Amendment, the Units issuable upon conversion of this Amendment are changed into the same or a different number of securities of any class of Skye, whether by recapitalization, reclassification or otherwise (other than a merger, consolidation, arrangement or statutory share exchange provided for elsewhere in this Section 1(e)), then, in each such event, provision shall be made so that the Lender shall receive upon conversion of the Notes the kind and amount of securities or other property which would have been received in connection with such recapitalization, reclassification or other change by the Lender if the Notes so converted had been converted immediately prior to such recapitalization, reclassification or change, subject to adjustments for events subsequent to the effective date of such recapitalization, reclassification or other change with respect to such securities which shall be on terms as nearly equivalent as practicable to the adjustments provided in this Section 1(e)(v) and all other adjustments under this Section 1(e).

US_ACTIVE-115140019

(vi)    Certificate of Adjustment.  Whenever the Conversion Price and/or the number of Units or other securities receivable upon conversion of this Amendment is adjusted, Skye shall promptly deliver to the Lender a certificate of adjustment, setting forth the Conversion Price and/or number of Units or other securities issuable after adjustment, a brief statement of the facts requiring the adjustment and the computation by which the adjustment was made.  The certificate of adjustment shall be prima facie evidence of the correctness of the adjustment.

(vii)    Successive Application.  The provisions of this Section 1(e) shall be applicable successively to each event described herein which may occur subsequent to the date of this Agreement and prior to the conversion in full of the Notes.

(viii)   Fractional Shares.  No fractional Units or other securities shall be issuable by reason of any adjustments made pursuant to this Section 1(e); and in lieu of any such fractional Units, Skye shall pay cash therefor in an amount equal to the Conversion Price multiplied by the fractional Unit.

2.      **Participation Rights.**

(a)     Upon receipt of Lender's Exercise Notice, Skye shall promptly give each of PacNet, DXS and Clarity (each a "**Rights Holder**") written notice of Lender's election (the "**Skye Notice**"), and shall initiate a private placement of its Class A Units to such Rights Holders (the "**Private Placement**").

(b)     Each Rights Holder shall have the right (but not the obligation) to elect within sixty (60) days of receipt of the Skye Notice to participate in the Private Placement and purchase from Skye up to such number of Class A Units as will cause such Rights Holder to continue to hold the same percentage of all outstanding Class A Units, after giving effect to the Loan Conversion and after giving effect to each other Rights Holder's participation in the Private Placement at the full amount each such other Rights Holder is entitled to invest.

(c)     SMI and its assignees or successors in interest shall not be Rights Holders. SMI, by its execution of this Agreement, irrevocably waives any right to participate in the Private Placement, whether pursuant to the preemptive rights provisions of the Operating Agreement or otherwise.

(d)     The purchase price for such shares of Class A Units shall be the Conversion Price.  The Private Placement shall otherwise be effected on the same terms and conditions as the Company's last offering of Class A Units pursuant to the Membership Unit Purchase Agreement dated January 31, 2013 (the "**Last MUPA**").  Each of the Company and the participating Rights Holders shall execute a Membership Unit Purchase Agreement in substantially the same form as the Last MUPA, and shall consummate the Private Placement in accordance with the terms of such agreement.  Each of the Parties agrees to promptly execute such consents, agreements and instruments as may be reasonably required to effect and close the Private Placement, including an appropriate amendment to the Operating Agreement to reflect the issuance of such Class A Units to participating Rights Holders.

3.      **Mechanics of Conversion.**

- 4 -

(a)        The Loan Conversion shall be completed as soon as reasonably practicable following completion of the Private Placement.

(b)        In order for Lender to cause the Notes to be exchanged for Class A Units, Lender shall surrender each of the Notes, duly endorsed for transfer, at the office of Skye or of any transfer agent for such Class A Units. Lender and the Company shall enter into a Membership Unit Purchase Agreement in substantially the same form as the Last MUPA and providing for the issuance and sale of Class A Units to Lender, in consideration for cancellation of all indebtedness pursuant to Notes and the Loan Documents. Each of the Parties agrees to promptly execute such consents, agreements and instruments as may be reasonably required to effect and close the Loan Conversion, including an appropriate amendment to the Operating Agreement to reflect the issuance of such Class A Units to Lender.

(c)        Upon such Loan Conversion, the Lender and the other parties hereto shall take all such actions as may be reasonably required to terminate all liens and encumbrances on the Company's and Borrower's real and personal property pursuant to the Loan Documents.

4.    **Miscellaneous**.

(a)    **Amendment; No Waiver.**

(i)        Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by the Company, the Lender and Investor or in the case of a waiver, by the Party against whom the waiver is to be effective.

(ii)        No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

(b)        **Choice of Law**. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY, THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

(c)        **Specific Performance.** Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. Accordingly, each party agrees that the other party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter, in addition to any other remedy to which they may be entitled, at law or in equity.

(d)        **Notices.** All notices and other communications under this Agreement shall be in writing, and shall be deemed to have been duly given on the date of delivery if delivered personally or by confirmed facsimile, or on the next day after dispatch via overnight messenger or

courier to the party, and addressed to each of the Parties at the respective addresses set forth on the signature pages hereto (until any such address is changed by notice duly given).

(e)         **Counterparts; Effectiveness.**   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.   This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

(f)         **Entire Agreement.**   This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements, understandings and negotiations, both written and oral, between the parties with respect to the subject matter of this Agreement.   No representation, inducement, promise, understanding, condition or warranty not set forth herein has been made or relied upon by either party hereto. None of this Agreement, nor any provision hereof, is intended to confer upon any person or entity, other than the parties hereto, any rights or remedies hereunder.

(g)         **Captions.**   The titles and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

(h)         **Severability.**   Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement (which remaining terms shall be interpreted so as to preserve, to the greatest extent possible, the benefit of the bargain and mutual intent of the parties, as contemplated by this Agreement as originally executed), and without affecting the validity or enforceability of any of the terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

(i)         **Further Assurances.**   Each of the parties shall sign and deliver, without additional consideration, such other documents of further assurance as may reasonably be necessary to give effect to the provisions of this Agreement.

(j)         **Survival.**   The representations, warranties, covenants and agreements set forth in this Agreement shall survive the consummation of any purchase and sale of securities hereunder in accordance with their respective terms.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**LENDER:**

**DAVID J. RICHARDS, LLC
d/b/a WESTERN US MINERAL
INVESTORS, LLC,**
an Ohio limited liability company

By: _____
Name:  ROBERT LAUTZ
Title:  Manager

**BORROWER:**

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name: Russell Alley
Title:  Chief Executive Officer

**PACNET:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
      Marshall W. Cooper
      Manager

**SKYE:**

**SKYE MINERAL PARTNERS, LLC**
a Delaware limited liability company

By _____
Name: David J. Richards
Title:  Manager

**DXS:**

**DXS CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
      Marshall W. Cooper
      Authorized Signatory

**CLARITY:**

**CLARITY COPPER, LLC**
a Delaware limited liability company

By _____
      Clinton Walker
      Manager

- 7 -

US_ACTIVE 115149070

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**LENDER:**

**DAVID J. RICHARDS, LLC**
**d/b/a WESTERN US MINERAL**
**INVESTORS, LLC,**
an Ohio limited liability company


By: _____
Name: David J. Richards
Title:  Manager


**BORROWER:**

**CS MINING, LLC,**
a Delaware limited liability company


By: _____
Name: _____
Title: _____


**PACNET:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
     Marshall W. Cooper
     Manager


**SKYE:**

**SKYE MINERAL PARTNERS, LLC**
a Delaware limited liability company

By _____
Name: _____
Title: _____


**DXS:**

**DXS CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
     Marshall W. Cooper
     Authorized Signatory


**CLARITY:**

**CLARITY COPPER, LLC**
a Delaware limited liability company

By _____
     Clinton Walker
     Manager


- 7 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LENDER:

**DAVID J. RICHARDS, LLC
d/b/a WESTERN US MINERAL
INVESTORS, LLC,**
an Ohio limited liability company


By: _____
Name:
Title:   Manager


BORROWER:

**CS MINING, LLC,**
a Delaware limited liability company


By: _____
Name: Russell Alley
Title:   Chief Executive Officer


PACNET:

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation


By _____
       Marshall W. Cooper
       Manager


SKYE:

**SKYE MINERAL PARTNERS, LLC**
a Delaware limited liability company


By _____
Name: David J. Richards
Title:   Manager


DXS:

**DXS CAPITAL (U.S.) LIMITED**
a Delaware corporation


By _____
       Marshall W. Cooper
       Authorized Signatory


CLARITY:

**CLARITY COPPER, LLC**
a Delaware limited liability company


By _____
       Clinton Walker
       Manager

US_ACTIVE-115149070

**SMI:**

SKYE MINERAL INVESTORS, LLC
an Ohio limited liability company

By: Empire Advisers, LLC

By: _David J. Richards_
Name: David J. Richards
Title:  Manager

US_ACTIVE·115149070

## SCHEDULE A
### Loan Documents

- Loan Agreement;

- Schedule #1 to Loan and Security Agreement, dated as of August 10, 2012, made by and between Lender and Borrower ("Schedule #1");

- First Amendment;

- Second Amendment;

- Third Amendment;

- Fourth Amendment;

- Fifth Amendment;

- Omnibus Amendment

- Secured Promissory Note in the principal amount of $1,000,000.00 dated as of August 10, 2012, made by Borrower in favor of Lender (the "August 10, 2012 Note");

- Secured Promissory Note in the principal amount of $1,000,000.00 dated as of December 1, 2012, made by Borrower in favor of Lender (the "December 1, 2012 Note");

- Secured Promissory Note in the principal amount of $600,000.00 dated as of January 4, 2013, made by Borrower in favor of Lender (the "January 4, 2013 Note");

- Secured Promissory Note in the principal amount of $500,000.00 dated as of April 25, 2013, made by Borrower in favor of Lender (the "April 25, 2013 $500,000 Note");

- Secured Promissory Note in the principal amount of $1,000,000.00 dated as of April 25, 2013, made by Borrower in favor of Lender (the "April 25, 2013 $1,000,000 Note");

- Secured Promissory Note in the principal amount of $800,000.00 dated as of May 14, 2013, made by Borrower in favor of Lender (the "May 14, 2013 Note");

- Secured Promissory Note in the principal amount of $600,000.00 dated as of June 3, 2013, made by Borrower in favor of Lender (the "June 3, 2013 Note");

- Secured Promissory Note in the principal amount of $630,000.00 dated as of June 12, 2013, made by Borrower in favor of Lender (the "June 12, 2013 Note");

- Secured Promissory Note in the principal amount of $1,320,000.00 dated as of July 10, 2013, made by Borrower in favor of Lender (the "July 10, 2013 Note");

- Secured Promissory Note in the principal amount of $5,050,000.00 dated as of July 24, 2013, made by Borrower in favor of Lender (the "**July 24, 2013 Note**", and together with the August 10, 2012 Note, December 1, 2012 Note, January 4, 2013 Note, April 25, 2013 $500,000 Note, April 25, 2013 $1,000,000 Note, May 14, 2013 Note, June 3, 2013 Note, June 12, 2013 Note, and July 10, 2013 Note, the "**Notes**")).

US_ACTIVE-115149070

## FIRST AMENDMENT TO LOAN CONVERSION AND PARTICIPATION RIGHTS AGREEMENT

This FIRST AMENDMENT TO LOAN CONVERSION AND PARTICIPATION RIGHTS AGREEMENT (this "**Amendment**") is made as of the 21st day of July, 2014 ("**Effective Date**"), by and among DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**Lender**") CS MINING, LLC, an Delaware limited liability company ("**Borrower**"), Pacnet Capital (U.S.) Limited, LLC, a Delaware corporation ("**PacNet**"), Skye Mineral Partners, LLC, a Delaware limited liability company ("**Skye** o r t h e " **Company**")), DXS Capital (U.S.) Limited, a Delaware corporation ("**DXS**"), Clarity Copper, LLC, a Delaware limited liability company ("**Clarity**"), and Skye Mineral Investors, LLC, an Ohio limited liability company ("**SMI**"). Lender, Borrower, PacNet, Skye, DXS and Clarity are collectively referred to herein as the "**Parties**" and each as a "**Party**."

### RECITALS

A.    The Parties entered into that certain Loan Conversion and Participation Rights Agreement dated January 28th, 2014 by and among the Parties (the "**Conversion Agreement**"). Capitalized terms utilized herein but not defined herein shall have the meanings assigned to such terms in the Conversion Agreement.

B.    Lender and Borrower desire to amend the Conversion Agreement as more specifically set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Lender and the Borrower agree as follows:

1.    **Defined Terms.** Capitalized terms not defined herein shall have the respective meanings defined in the Conversion Agreement.

2.    **Effectiveness of Amendment.** This Amendment shall become effective only in the event and at such time as Lender has advanced Loans with an aggregate principal amount of $20,000,000 to Borrower pursuant to the Loan Documents on or before July 31, 2014 (the "**Loan Completion Date**"). This Amendment shall be null and void if the foregoing aggregate principal amount has not been received by Borrower by the Loan Completion Date.

3.    **Loan Amount.** Recital A and other references to the Loan amount are hereby deemed modified to reference and reflect the total authorized Loan amount as of the date hereof of up to $20,500,000.

4.    **Conversion Price.** Section 1.(c) of the Conversion Agreement is hereby deleted in its entirety and replaced with the following new Section 1.(c):

"(c) The "**Conversion Price**" shall be: (i) with respect to an amount of the Loan principal equal to the positive difference (if any) of (A) $10,000,000 less (B) the aggregate amount of Loan principal previously or concurrently repaid to Lender in cash or other consideration, and any unpaid interest with respect to such principal amount, $1,900.00 per Class A Unit (as adjusted pursuant to Section 1(e) below, if applicable) and (ii) with respect to the balance of the Loan principal amount, and any unpaid interest with respect to such

principal amount, $2,222.22 per Class A Unit. In each of the foregoing cases, the relevant Conversion Price may be adjusted: (A) pursuant to Section 1(e) below, if applicable; and (B) in the event that the Company completes an offering of Units with proceeds to the Company of at least $3,000,000 and at a price per Unit less than the applicable Conversion Price (as adjusted for the events described in Section 1(e) below) (a "**New Round**"), then Lender shall have the right, exercisable by written notice to the Company delivered within sixty (60) days of written notice from the Company setting forth the material terms of the New Round, to cause the applicable portion(s) of the Loan with a higher Conversion Price to be converted at the same price per Unit and on the same terms offered to investors in the New Round, in which case the Conversion Price shall be such price as is offered to investors in the New Round. For purposes of clarity, Lender shall be provided notice and the opportunity to convert prior to payoff."

5.     **Participation Rights**. The first sentence of Section 2(d) of the Conversion Agreement is hereby deleted in its entirety and replaced with the following:

"(c) The purchase price for Class A Units shall be the applicable Conversion Price determined in accordance with Section 1(c) for each portion of the Loan principal being converted. If a Loan Conversion is being effected based on more than one Conversion Price, each Rights Holder shall have may elect to purchase the number of Class A units available for purchase at the lower Conversion Price and waive its right to purchase the Class A Units available for purchase at the higher Conversion Price. By way of example, if pursuant to a Loan Conversion 1,000 Class A Units are to be issued at a Conversion Price of $1900 and 1,000 Class A Units are to be issued at a Conversion Price of $2,222.22, then each Rights Holder may elect to purchase up to 50% of the maximum number of Class A Units available for purchase pursuant to this Section 2 at a price of $1,900 per Class A Unit, and such Rights Holder may separately (but need not) elect to purchase up to 50% of the maximum number of Class A Units available for purchase pursuant to this Section 2 at a price of $2,222.22 per Class A Unit."

6.     **Miscellaneous**. Except as set forth in this Amendment, the Conversion Agreement shall continue in full force and effect. This Amendment shall be governed by the laws of the State of Delaware. In the event of any inconsistency between agreements previously executed by the parties and this Amendment, this Amendment shall control. This Amendment may be executed in counterparts by the exchange of signature pages electronically. Each Party represents and warrants that all parties executing this Amendment and any documents executed in connection herewith have all requisite power and authority to do so.

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

**LENDER:**

**BORROWER:**

**DAVID J. RICHARDS, LLC**
**d/b/a WESTERN US MINERAL**
**INVESTORS, LLC,**
an Ohio limited liability company

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name:  Robert Lautz
Title:  Manager

By: _____
Name:  Russell Alley
Title:   Chief Executive Officer

**PACNET:**

**SKYE:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

**SKYE MINERAL PARTNERS, LLC**
a Delaware limited liability company

By _____
     Marshall W. Cooper
     Manager

By _____
Name: David J. Richards
Title:  Manager

**DXS:**

**CLARITY:**

**DXS CAPITAL (U.S.) LIMITED**
a Delaware corporation

**CLARITY COPPER, LLC**
a Delaware limited liability company

By _____
     Marshall W. Cooper
     Authorized Signatory

By _____
     Clinton Walker
     Manager

*First Amendment to Loan Conversion and Participation Rights Agreement*

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

**LENDER:**

**DAVID J. RICHARDS, LLC**
d/b/a **WESTERN US MINERAL INVESTORS, LLC,**
an Ohio limited liability company

By: _____
Name:
Title:   Manager

**BORROWER:**

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name:  Russell Alley
Title:   Chief Executive Officer

**PACNET:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
    Marshall W. Cooper
    Manager

**SKYE:**

**SKYE MINERAL PARTNERS, LLC**
a Delaware limited liability company

By _____
Name:  David J. Richards
Title:   Manager

**DXS:**

**DXS CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
    Marshall W. Cooper
    Authorized Signatory

**CLARITY:**

**CLARITY COPPER, LLC**
a Delaware limited liability company

By _____
    Clinton Walker
    Manager

*First Amendment to Loan Conversion and Participation Rights Agreement*

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

**LENDER:**

**DAVID J. RICHARDS, LLC
d/b/a WESTERN US MINERAL
INVESTORS, LLC,**
an Ohio limited liability company

By: _____
Name:
Title: Manager

**BORROWER:**

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name: Russell Alley
Title: Chief Executive Officer

**PACNET:**

**PACNET CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
Marshall W. Cooper
Manager

**SKYE:**

**SKYE MINERAL PARTNERS, LLC**
a Delaware limited liability company

By _____
Name: David J. Richards
Title: Manager

**DXS:**

**DXS CAPITAL (U.S.) LIMITED**
a Delaware corporation

By _____
Marshall W. Cooper
Authorized Signatory

**CLARITY:**

**CLARITY COPPER, LLC**
a Delaware limited liability company

By _____
Clinton Walker
Manager

*First Amendment to Loan Conversion and Participation Rights Agreement*

SMI:

SKYE MINERAL INVESTORS, LLC
an Ohio limited liability company

By: Empire Advisers, LLC

By: _____
Name:  David J. Richards
Title:   Manager

# EXHIBIT G

## TENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

This TENTH AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "**Amendment**") is made as of the 10th day of March, 2015 ("**Effective Date**"), by and among DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**Lender**") and CS MINING, LLC, an Delaware limited liability company ("**Borrower**").

### RECITALS

A.    Lender and Borrower entered into that certain Loan and Security Agreement dated as of August 10, 2012, as amended by that certain First Amendment to Loan and Security Agreement dated as of December 1, 2012, that certain Second Amendment to Loan and Security Agreement dated as of January 4, 2013, that certain Third Amendment to Loan and Security Agreement dated as of April 24, 2013, that certain Fourth Amendment to Loan and Security Agreement dated as of May 14, 2013, that certain Fifth Amendment to Loan and Security Agreement dated as of July 9, 2013, that certain Omnibus Amendment to Loan Agreement dated as of January 28, 2014, that certain Loan Conversion and Participation Rights Agreement dated as of January 28, 2014, that certain Seventh Amendment to Loan and Security Agreement dated as of February 4, 2014, that certain Eighth Amendment to Loan and Security Agreement dated as of March 4, 2014, and that certain Ninth Amendment to Loan and Security Agreement dated July 21st, 2014 (the "**Agreement**"). Capitalized terms utilized herein but not defined herein shall have the meanings assigned to such terms in the Agreement.

B.    Lender and Borrower desire to amend the Agreement and the Loan Documents as more specifically set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Lender and the Borrower agree as follows:

1.    **Accrual of Interest.** Notwithstanding anything to the contrary in the Agreement or Loan Documents (as defined in the Agreement), Lender and Borrower agree that (a) the monthly payments owed under the Loan Documents beginning with the monthly payment payable on February 1, 2015, shall accrue and be capitalized into the Loan under the Agreement, and shall not be payable in cash, through December 31, 2015 and (b) if the Loan is not converted into the equity of Borrower's parent, Skye Mineral Partners, LLC, prior to December 31, 2015, then the monthly cash payments due pursuant to the Loan and Agreement shall resume on January 1, 2016, with such monthly payments consisting of equal payments of principal and interest on the amount owed as of December 31, 2015, amortized over forty eight (48) months.

2.    **Drawdown of Noble Loan.** Prior to drawing down more than $29,750,000 of the loan facility pursuant to that certain Loan and Security Agreement between Borrower and Noble Americas Corp. dated August 12, 2014, as amended, Borrower shall notify Lender at the following address and obtain Lender's consent and approval from the following, not to be unreasonably withheld:

> David J. Richards, LLC d/b/a Western US Mineral Investors, LLC
> c/o St. Cloud Capital Partners II, L.P. (St. Cloud)
> Attn: Robert Lautz, Kevin Tom
> 10866 Wilshire Blvd, Suite 1450
> Los Angeles, CA 90024

*Tenth Amendment to Loan and Security Agreement*

Fax: (310) 475-0550
Email: rlautz@stcloudcapital.com, ktom@stcloudcapital.com

3.   **Miscellaneous.** Except as set forth in this Amendment, the Agreement, all Loan Documents and all associated agreements and agreements incorporated therein shall continue in full force and effect. This Amendment and all agreements and documents and agreements entered into in connection herewith are part of the Loan Documents. This Amendment shall be governed by the laws of the State of Ohio. In the event of any inconsistency between agreements previously executed by the parties and this Amendment, this Amendment shall control. This Amendment may be executed in counterparts by the exchange of signature pages electronically. Borrower represents and warrants that all parties executing this Amendment and any documents executed in connection herewith have all requisite power and authority to do so.

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

LENDER:                                          BORROWER:

DAVID J. RICHARDS, LLC                CS MINING, LLC,
d/b/a WESTERN US MINERAL          a Delaware limited liability company
INVESTORS, LLC,
an Ohio limited liability company

                                                      By: _____
By: _____      Name: David McMullin
Name:  Robert Lautz                          Title:   President & Chief Executive Officer
Title:   Manager  Partner

Fax: (310) 475-0550
Email: rlautz@stcloudcapital.com, ktom@stcloudcapital.com

3.   **Miscellaneous.** Except as set forth in this Amendment, the Agreement, all Loan Documents and all associated agreements and agreements incorporated therein shall continue in full force and effect.  This Amendment and all agreements and documents and agreements entered into in connection herewith are part of the Loan Documents. This Amendment shall be governed by the laws of the State of Ohio.  In the event of any inconsistency between agreements previously executed by the parties and this Amendment, this Amendment shall control.  This Amendment may be executed in counterparts by the exchange of signature pages electronically.  Borrower represents and warrants that all parties executing this Amendment and any documents executed in connection herewith have all requisite power and authority to do so.

IN WITNESS WHEREOF, this Amendment has been executed by the parties as of the date set forth above.

**LENDER:**

**DAVID J. RICHARDS, LLC
d/b/a WESTERN US MINERAL
INVESTORS, LLC,**
an Ohio limited liability company

By: _____
Name:
Title:  Manager

**BORROWER:**

**CS MINING, LLC,**
a Delaware limited liability company

By: _____
Name:  David McMullin
Title:   President & Chief Executive Officer

*Tenth Amendment to Loan and Security Agreement*

# EXHIBIT H

Execution Version

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("**Agreement**") is made and entered into as of August 12, 2014, by and among CS MINING, LLC, a Delaware limited liability company ("**Borrower**"), DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a Western US Mineral Investors, LLC ("**WUMI**"), and NOBLE AMERICAS CORP., a Delaware corporation ("**Noble**").  Each of WUMI and Noble may be referred to herein as a "**Party**", and together they may be referred to as the "**Parties**."

## RECITALS

WHEREAS, WUMI has extended credit to Borrower pursuant to that certain Loan and Security Agreement originally dated as of August 10, 2012, (as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time after the date hereof, including any agreement extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof, the "**WUMI Loan Agreement**");

WHEREAS, Borrower desires Noble to extend credit and loans to Borrower pursuant to and on the terms set forth in that certain Loan and Security Agreement  between Noble and Borrower dated August 12, 2014 (as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time after the date hereof, including any agreement extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof, the "**Noble Loan Agreement**", and together with the WUMI Loan Agreement, the "**Loan Agreements**");

WHEREAS, Noble desires to have WUMI subordinate its rights to repayment and liens under the WUMI Loan to all obligations now or hereinafter owing from the Borrower to Noble under or pursuant to the Noble Loan; and

WHEREAS, WUMI anticipates to benefit directly from the Noble Loan as well as benefits flowing to Borrower.

## AGREEMENT

NOW, THEREFORE, in consideration of the good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Noble to

1

Execution Version

extend credit to Borrower, which Noble would not have done but for this Agreement, the parties agree as follows:

1.     **Acknowledgements and Consents**.   Each of WUMI and Noble (including for purposes of their respective Loan Agreements on the date hereof): (a) acknowledges and consents to the Borrower having entered into the Loan Agreements in their respective forms on the date hereof; and (b) consents to the Borrower granting to the other Party security interests in the Collateral pursuant to the applicable security documents and the terms hereof.

2.     **Subordination Agreements**.

2.1.    Subordination of Noble Collateral by WUMI.   WUMI hereby subordinates any lien, security interest, mortgage or deed of trust (each, a "**Lien**") that WUMI may now have or hereafter acquire in those certain properties, assets and/or equipment set forth on Exhibit A hereto (the "**Noble Priority Collateral**"), in favor of any Lien that Noble now has or hereafter acquires in the Noble Priority Collateral. All Noble Obligations shall at all times be senior and prior to the WUMI Obligations in right to receive cash payment from or with respect to the Noble Priority Collateral and sale or proceeds thereof, and WUMI's Liens in the Noble Priority Collateral, regardless of the time or order of creation, grant, attachment, or perfection and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Loan Agreements or any defect or deficiencies in, or failure to perfect any such Liens or any other circumstance whatsoever (including any non-perfection of any Lien purporting to secure the Noble Obligations and/or the WUMI Obligations).

"**Noble Obligations**" means all "Obligations" (as such term is defined in the Noble Loan Agreement) and all other obligations of the Borrower to pay principal, premium, if any, and interest (including any interest accruing after the commencement of any Creditor Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the Noble Loan Agreement and the performance of all other Obligations of the Borrower thereunder to Noble under the Noble Loan Agreement, according to the respective terms thereof.

"**WUMI Obligations**" means all obligations of the Borrower to pay principal, premium, if any, and interest (including any interest accruing after the commencement of any Creditor Proceeding, regardless of whether allowed or allowable in such proceeding) when due and payable, and all other amounts due or to become due under or in connection with the WUMI Loan Agreement and the performance of all other Obligations of the Borrower thereunder to WUMI under the WUMI Loan Agreement, according to the respective terms thereof.

2.2.    Subordination of Other Collateral by Noble.   Noble acknowledges that it is subordinate to WUMI with respect to, and to the extent necessary hereby subordinates, any Lien that Noble may now have or hereafter acquire in the properties of Borrower that do not constitute Noble Priority Collateral (the "**WUMI Priority Collateral**", and collectively with the Noble

Execution Version

Priority Collateral, the "**Collateral**"), in favor of any Lien that WUMI now has or hereafter acquires in the WUMI Priority Collateral. The WUMI Obligations shall at all times be senior and prior to the Noble Obligations in right to receive cash payment from or with respect to the WUMI Priority Collateral and sale or proceeds thereof, and Noble's Liens in the WUMI Priority Collateral, regardless of the time or order of creation, grant, attachment, or perfection and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Loan Agreements or any defect or deficiencies in, or failure to perfect any such Liens or any other circumstance whatsoever (including any non-perfection of any Lien purporting to secure the Noble Obligations and/or the WUMI Obligations).

2.3.   Agreement Priorities Control.  The priority set forth in this Section 2 shall apply regardless of the time or order of attachment or perfection of the respective interests of Noble and WUMI to the relevant Collateral, the time of sequence in which any financing statements, mortgages, deeds of trust or similar perfection filings or documents are or were filed or the time of giving or failure to give notice of the acquisition of purchase money or other security interests.

3.   **Payments; Other Agreements and Restrictions**.  Each of the Parties agrees that:

3.1.   Prior to taking any Enforcement Action, each Party shall provide the other Party with at least three business days' prior notice and the Parties agree to consult in good faith and in a timely manner with each other with respect thereto.

3.2.   Nothing contained herein shall be construed as restricting the right of any Party to take any Unrestricted Enforcement Action or otherwise deal with its Loan Agreement in a manner that does not constitute an Enforcement Action.

3.3.   The Noble Priority Collateral listed as item number 3 on the attached Exhibit A includes the Borrower's interest and rights in the Copper Ranch and Niagra Hills deposits as further described therein (the "Deposits"). WUMI Priority Collateral includes the identical collateral , resulting in WUMI and Nobel, combined, both having a secured interest in all of the Deposits.  Nobel and WUMI agree that any Enforcement Action by a Party with respect to the Deposits shall be as an agent for, and on behalf of the other Party and proceeds of the Deposits shall be shared equally as described further under item 3 of the attached Exhibit A

4.   **Representations of the Parties**.  Each Party hereby warrants to the other that: (a) except in connection with the Loan Agreements and the Skye Loan Agreement, it has neither given nor executed any prior subordination, security agreement, or assignment which is presently effective with respect to any of Collateral; (b) there are no other debts or loan amounts owing from Borrower to such Party except as provided under the Loan Agreements and that such Party will not enter into any other loans with Borrower unless such loan is subject to this Agreement; (c) the execution, delivery, and performance by such Party of this Agreement and the

3

Execution Version

consummation of the transactions contemplated hereby do not contravene any law or any contractual restriction binding on or affecting such Party; (d) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by such Party of this Agreement; (e) such Party has duly executed and delivered this Agreement; (f) this Agreement is the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting such Party's rights or insolvent corporations, generally; and (e) there is no pending or, to the best of its knowledge, threatened action or proceeding affecting such Party, or any basis therefor, which questions the validity, binding effect or enforceability hereof, any action taken or to be taken pursuant hereto, or any of the transactions contemplated hereby. Each Party further agrees that it shall not assign or otherwise transfer any of his right, title and interest in its Loan, without the prior written consent of the other Party; provided that no consent shall be required in the event the assignee or transferee of the Loan agrees in writing to be bound by the terms hereof.

5.     **Conversion of WUMI Loan**.

5.1.     Optional Conversion. Notwithstanding any provision of this Agreement or in any Loan Documents (as defined in the Noble Loan Agreement), Noble agrees that WUMI shall continue have the right to convert the WUMI Obligations, in full but not in part, into equity of Skye Mineral Partners, LLC, a Delaware limited liability company ("**Skye**"), pursuant to the terms of the WUMI Loan Agreement and the Loan Conversion and Participation Rights Agreement referenced therein and part thereof, as amended, at any time and without notice to or consent from Noble, and that this Agreement shall not apply in any way to the equity interests issued upon such conversion; provided that the WUMI Obligations are extinguished and the Liens held by WUMI on the Collateral released.

5.2.     Mandatory Conversion. In the event that the Project Completion Date (as defined in the Noble Loan Agreement) occurs or Noble loans the Borrower the Full Facility Amount pursuant to the Noble Loan Agreement, and there are no existing defaults under the Noble Loan Agreement or that occur in connection with lending the Full Facility Amount, WUMI hereby agrees to promptly (but in any event within 5 business days) convert the WUMI Obligations in full into the equity of Skye, pursuant to the terms of the WUMI Loan Agreement (and the parties agree that by the terms of the WUMI Loan Agreement and the Loan Conversion and Participation Rights Agreement referenced therein and part thereof, as amended WUMI shall then be entitled to so convert the WUMI Obligations).. In connection with such conversion, the WUMI Obligations will be extinguished all Liens held by WUMI on Collateral shall be released.

6.     **No Additional Commitment Regarding Noble Loan.** It is understood and agreed that this Agreement shall in no way be construed as any additional commitment or agreement by Noble to continue financing arrangements with the Borrower pursuant to the Noble Loan Agreement.

4

*Intercreditor Agreement*

Execution Version

7.    **No Contest.** Each Party agrees not to contest (or support any other Person in contesting), the validity, perfection, priority or enforceability of the other Party's Loan Agreement or its security interest in any of its Collateral, as specified hereunder or the provisions of this Agreement (including in any Creditor Proceeding). Each Party acknowledges and agrees that (a) neither Party shall have any duties or other obligations to the other Party with respect to any Collateral, other as herein specified, including to transfer to the other Party any proceeds of any such Collateral in accordance with the priority herein specified or duty or obligation first to marshal or realize upon any type of Collateral (or any other collateral securing the its obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Collateral, in any manner that would maximize the return to the other Party, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received from such realization, sale, disposition or liquidation, (b) it waives any claim it may now or hereafter have against the other Party (or its representatives) arising out of any actions which such Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the obligations of the Borrower from any account debtor, guarantor or any other party) or to the collection of the obligations of the Borrower or the valuation, use, protection or release of any security for the obligations of the Borrower and (c) that it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the other Party. The foregoing provisions of this section shall not be construed to prevent a Party from enforcing the terms of this Agreement against the other Party or release either Party from its obligations hereunder. For the avoidance of doubt, nothing herein shall limit Borrower or the ability of the managers or principals of Borrower (including those who serve as officers or managers of WUMI) to cause Borrower to enforce its rights and remedies under the Loan Agreements.

8.    **Creditor Proceedings; Clawback.**    Whether or not any Creditor Proceeding has been commenced by or against Borrower, any Collateral or proceeds thereof received by a Party (including by way of set off) in connection with any Enforcement Action in contravention of this Agreement (to the extent in excess of its entitlements hereunder) shall be segregated and held in trust and forthwith paid over to the other Party in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. If any payment or other proceeds of the Collateral received by any Party for its own account under this Agreement shall be required pursuant to applicable law to be repaid or returned, in whole or in part, by such Party to the payor thereof, or to any trustee, agent or other representative of such payor, or such payment shall have been otherwise rescinded, in whole or in part, pursuant to applicable law, the other Party that shall have received all or part of such payment or proceeds shall promptly, upon written demand by the first Party, acting on a direction, certificate, order or other demand occurring pursuant to applicable law, return to the first Party all or the ratable part, as the case may be, of the portion of such payment or proceeds so received by such other Party (and any interest thereon to the extent the same is required to be paid by the other Party originally receiving such payment or proceeds in respect of the return of such payment or proceeds) in order to equitably adjust for the return of all or part of such payment or proceeds. In addition, in

Execution Version

the event that any such payment is required to be returned or repaid or is otherwise rescinded, an amount of the Loan equal to the amount of such returned, repaid or rescinded payment shall be deemed to be reinstated and the Parties hereto shall be restored to their original position as if such payment had not been made.

9.    **Miscellaneous.**

9.1.    Termination.  This Agreement shall terminate and be of no further force or effect upon the repayment in full, or full conversion to equity, of the Noble Obligations or WUMI Obligations.

9.2.    Further Assurances.  Each Party agrees, upon the other Party's reasonable request, to execute all such documents and instruments and take all such actions as such Party shall deem reasonably necessary or advisable in order to carry out the purposes of this Agreement (but this Agreement shall remain fully effective notwithstanding any failure to execute any additional documents or instruments).

9.3.    Rights and Remedies Cumulative.  All of each Party's rights and remedies hereunder and under applicable law are cumulative and not exclusive.  If a Party, in violation of this Agreement, shall institute or participate in any suit, action or proceeding against Borrower, Borrower may interpose as a defense or dilatory plea this Agreement and each Party is irrevocably authorized to intervene and to interpose such defense or plea in such Party's or Borrower's name.  If a Party attempts to enforce or realize upon any the Collateral in violation of this Agreement, Borrower or the affected Party (in Borrower's or such Party's name) may by virtue of this Agreement, restrain such realization or enforcement.

9.4.    Entire Agreement.   This Agreement sets forth in full the terms of agreement between the parties with respect to the subject matter hereof, and may not be modified or amended, nor may any rights hereunder be waived, except in a writing signed by the Parties.

9.5.    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of the Parties and Borrower and shall inure to the benefit of and be binding upon the successors and assigns of each Party.

9.6.    Governing Law; Jurisdiction; Venue.  This Agreement shall be construed in accordance with, and governed by, the laws of the State of New York.  Each party consents to the jurisdiction of courts located within New York, and agrees that the exclusive venue for all actions and proceedings relating directly or indirectly to this Agreement shall be within the courts of the State of New York, and each party waives any and all rights the party may have to object to the jurisdiction of any such court, or to transfer or change the venue of any such action or proceeding, including, without

*Intercreditor Agreement*

Execution Version

limitation, any objection to venue or request for change in venue based on the doctrine of forum non conveniens.

9.7.   Counterparts. This Agreement may be executed in one or more counterparts, and by the exchange of signature pages electronically, each to be effective as the original.

9.8.   Certain Definitions. For the purposes of this Agreement (including the recitals), unless the context otherwise requires, each of the following terms shall have the following meanings:

9.8.1. **"Creditor Proceedings"** means:

(a)   any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, compromise, arrangement with creditors, plan of arrangement, proposal or similar proceedings under Insolvency Laws of or with respect to Borrower or its property or liabilities, in each case under Insolvency Laws;

(b)   any dissolution, winding up, total or partial liquidation, adjustment or readjustment of debt, reorganization, compromise, arrangement with creditors, plan of arrangement or similar proceedings under the arrangement provisions of any applicable corporate law (in any case which involves the alteration, amendment, conversion, compromise, satisfaction or discharge of obligations owing to any or all creditors) of or with respect to Borrower or its property or liabilities;

(c)   any bankruptcy, insolvency, receivership, petition or assignment in bankruptcy, or assignment for the benefit of creditors under any Insolvency Laws of or with respect to Borrower;

(d)   any marshalling of assets and liabilities of Borrower under any Insolvency Laws;

(e)   any bulk sale of assets by Borrower; or

(f)   any proceedings in relation to any of the foregoing,

whether any of the foregoing is voluntary or involuntary, partial or complete, and includes any such proceedings initiated or consented to by Borrower.

9.8.2. **"Enforcement Action"** means the exercise of any rights or remedies against any Collateral, including, without limitation, any right to take possession or control of any Collateral under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or

Execution Version

arrangement, any right of set off or recoupment and any enforcement, collection, execution, levy or foreclosure action or proceeding taken against the Collateral.

9.8.3. "**Insolvency Laws**" means the *Bankruptcy Code of the United States* or any other bankruptcy, insolvency or analogous laws applicable to Borrower or any of its properties or liabilities.

9.8.4. "**Unrestricted Enforcement Action**" means any of: (i) the provision of any notice of default or event of default under any Loan Agreement; (ii) termination of any commitments to provide the loans; (iii) the acceleration of any loans; (iv) the making of a demand with respect to any loans (including any guarantee thereof); (v) the filing of a proof of claim or similar instrument with respect to any loans after the occurrence of any Creditor Proceedings; (vi) the voting of a claim with respect to any loans after the occurrence of any Creditor Proceedings in a manner not inconsistent with the terms of this Agreement; (vii) the institution of a default rate of interest; (viii) the taking of any action required to preserve the validity, efficacy or priority of the loans, including the commencement or initiation of any action required to comply with statutory limitation periods (provided that such proceeding is then stayed) and (ix) the exercise by Noble of set-off right against amounts owed by it under the Cathode Agreement or the Concentrate Agreement.

9.8.5. The defined terms Cathode Agreement, Concentrate Agreement, Project, Project Budget, Project Costs and Project Account shall have the meanings assigned thereto in the Noble Loan Agreement on the date hereof

*[Signature page follows.]*

The parties have executed this Agreement as of the first date written above.

**WUMI:**

**DAVID J. RICHARDS, LLC d/b/a WESTERN US MINERAL INVESTORS, LLC**

By: _____

    Name:  Robert Lautz

    Title:  Manager

    Date:  8/12/2014


**BORROWER:**

**CS MINING, LLC**


By: _____

    Name: _____

    Title: _____

    Date: _____


**NOBLE:**

**NOBLE AMERICAS CORP.**


By: _____

    Name: _____

    Title: _____

    Date: _____


*[Signature Page to Intercreditor Agreement]*

**BORROWER:**

CS MINING, LLC

By: _____

    Name: Russell D. Alley

    Title:   Chief Executive Officer

    Date:

        12 AUG 2014

[Signature Page to Intercreditor and Subordination Agreement-CS Mining, LLC]

**NOBLE:**

NOBLE AMERICAS CORP.

By:

    Name: Joseph Limone
    Title: Secretary & General Counsel
    Date:

## EXHIBIT A

### NOBLE PRIORITY COLLATERAL

The "**Noble Priority Collateral**" means:

1.  The properties upon which the Phase II project (the "**Project**") described in the "Project Budget" set forth as an attachment to the Noble Loan Agreement, the SX/EW and leaching plant, are built, and fixtures and assets located thereon, more expressly specified as follows:

THE FOLLOWING PATENTED MINING CLAIMS IN BEAVER LAKE MINING DISTRICT:

FRANCIS, IRON KING, LITTLE DICK, VAN-M.S. 5481, TOWNSHIP 27, RANGE 11 AND 12 WEST - BEAVER LAKE MD BEAVER COUNTY.

NOUN, VERB-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

2.  The properties upon which that certain new intermediate tailings dam for the Project to be constructed with Noble Loan proceeds as specified in the Project Budget, will be constructed, and fixtures and assets located thereon, more expressly specified as follows:

THE FOLLOWING PATENTED MINING CLAIMS IN BEAVER LAKE MINING DISTRICT:

FRANCIS, IRON KING, LITTLE DICK, VAN-M.S. 5481, TOWNSHIP 27, RANGE 11 AND 12 WEST - BEAVER LAKE MD BEAVER COUNTY.

NOUN, VERB-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

BEN HARRISON MINE, BEN HARRISON FRACTION, CHALCOPRITE, KLONDYKE NO. 2, GALVESTON MINE, GALVESTON MINE NO. 2, GALVESTON MINE NO. 3, MARY 1 NO. 1, MARY 1 NO. 2, TROJAN, WANDERING JEW-M.S. 5474 TOWNSHIP 27 SOUTH RANGE 11 WEST, BEAVER LAKE MD BEAVER COUNTY.

3.  A **fifty percent (50%) interest** in Borrower's interests and rights in the Copper Ranch and Niagara Hill deposits (it being the intention of the parties that this is an agreement to share proceeds of collateral and not limit the liens or claims of either creditor and that both Noble and WUMI shall have a lien on and security interest in 100% of all of the property and assets listed in this item 3, with the proceeds of such collateral being applied first, equally to the Noble Obligations and the WUMI Obligations until the Noble Obligations or the WUMI Obligations shall have been paid in full and second if and when the Noble Obligations or the WUMI

Obligations shall have been paid in full the balance of the proceeds shall be applied 100% to the Noble Obligations or the WUMI Obligations, as the case may be, until paid in full):

### Niagara Hill

| McCulley-Wood Lease Patented Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description |
|---|---|---|---|---|
| Colorado Boom, Sarault, Montreal, Niagara Falls | 6254 | 1009 | Rocky | Sec. 22 T27S R11W |
| Consolidated Montreal #1, Albert, Annex, Contact, | 3446 | 1008 | Rocky | Sec. 22 T27S R11W |
| Dundee, Fraction, George, Tip Top | 6253 | 1008 | Rocky | Sec. 22 T27S R11W |

### Copper Ranch

| AJL (John Bogdanich) Lease Patented Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description |
|---|---|---|---|---|
| Jewel | 5476 | 36623 | Rocky | Sec. 22 T27S R11W |
| Marguerite #15 | 5476 | 36624 | Rocky | Sec. 22 T27S R11W |

| Unpatented Claims | | | | |
|---|---|---|---|---|
| Serial No | Claim Name/Number | Mc Lead Case Ser Nr | Claim Type | Disposition |
| UMC355012 | ROCKY # 58 | UMC354981 | LODE | ACTIVE |
| UMC355013 | ROCKY # 59 | UMC354981 | LODE | ACTIVE |
| UMC355014 | ROCKY # 61 | UMC354981 | LODE | ACTIVE |
| UMC355015 | ROCKY # 62 | UMC354981 | LODE | ACTIVE |
| UMC355016 | ROCKY # 63 | UMC354981 | LODE | ACTIVE |

| State Lease | | | | |
|---|---|---|---|---|
| SITLA Lease # | County | Twp./Range/Sec. | Legal Description | Status |
| ML-49556 | Beaver | T27S R11W Sec. 16 | LOT 1(35.33), N2, NE4SW4, S2SW4, SE4, S16 (ALL) | Active |

4.   The Project bank account for deposits and expenditures associated with the Project and Project Budget, as required pursuant to the Noble Loan Agreement;

5.   The Cathode Agreement, the Concentrate Agreement and all rights, entitlements and receivables of the Borrower thereunder;

A-2

6.   All properties and assets purchased with proceeds of the Noble Loan or with amounts required hereby to be deposited in the Project Account and applied to pay Project Costs pursuant to the Noble Loan Agreement; and

7.   All proceeds of the foregoing items 1-6 (subject to the sharing required as described under item 3 above as to the collateral described in item 3 above).

DAVID L. PINKSTON (#6630)
KEITH A. CALL (#6708)
P. MATTHEW COX (#9879)
ROBERT T. DENNY (#13687)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145-5000
Telephone: (801) 521-9000
Fax: (801) 363-0400

*Counsel for Defendant David J. Richards, LLC d/b/a Western US Mineral Investors, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re<br><br>CS MINING, LLC,<br><br>    Debtor, | Bankruptcy Case No. 16-24818<br><br>(Chapter 11)<br><br>Judge William T. Thurman |
| CS MINING, LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>v.<br><br>DAVID J. RICHARDS, LLC, d/b/a WESTERN US MINERAL INVESTORS, LLC, SKYE MINERAL INVESTORS, LLC, an Ohio limited liability company;<br><br>    Defendants. | Adv. Proc. No.: 17-02024<br><br><br>**ANSWER OF DAVID J. RICHARDS, LLC d/b/a WESTERN US MINERAL INVESTORS, LLC** |

Defendant David J. Richards, LLC d/b/a Western US Mineral Investors, LLC ("WUMI")

answers the Complaint and admits, denies and alleges as follows:

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

WUMI answers the specific allegations of the Complaint as follows:

1. Paragraph 1 contains no factual allegations and do not require a response.

Nevertheless, WUMI denies the allegations contained in paragraph 1.

2. WUMI admits the allegations contained in paragraph 2 of the Complaint

3. WUMI admits that it is a pre-petition lender to the company. WUMI denies the

remaining allegations contained in paragraph 3 of the Complaint.

4. The allegations contained in paragraph 4 are legal conclusions that to not require

a response.

5. The allegations contained in paragraph 5 are legal conclusions that to not require

a response. WUMI consents to the entry of a final judgment.

6. The allegations contained in paragraph 6 are legal conclusions that do not require

a response.

7. WUMI admits the allegations contained in paragraph 7 of the Complaint.

8. The Operating Agreement of the Debtor speaks for itself and WUMI denies the

allegations of this paragraph to the extent they are inconsistent with the Operating Agreement

and any other applicable governing document of the company.

9.      The agreements referenced in paragraph 9 speak for themselves. WUMI denies the allegations of this paragraph to the extent they are inconsistent with the Operating Agreement and any other applicable governing document of the company.

10.      WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 10 of the Complaint and therefore denies the same .

11.      WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 11 of the Complaint and therefore denies the same.

12.      WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 12 of the Complaint and therefore denies the same.

13.      WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 13 of the Complaint and therefore denies the same.

14.      WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 14 of the Complaint and therefore denies the same.

15.      WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 15 of the Complaint and therefore denies the same.

16.      WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 16 of the Complaint and therefore denies the same.

17.      The allegations contained in paragraph 17 are legal conclusions that do not require a response. To the extent a response is required, WUMI lacks sufficient knowledge or information regarding the truth of the allegations contained in paragraph 17 of the Complaint and therefore denies the same.

18.      WUMI admits the allegations contained in paragraph 18 of the Complaint.

19.     The allegations contained in paragraph 19 are legal conclusions that do not require a response. To the extent a response is required, WUMI denies the same.

20.     WUMI denies that Exhibit C is a true and correct copy of the WUMI Loan Agreement. WUMI admits the remaining allegations of paragraph 20.

21.     WUMI denies the allegations contained in paragraph 21 of the Complaint.

22.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 22 of the Complaint and therefore denies the same.

23.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 23 of the Complaint and therefore denies the same.

24.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 24 of the Complaint and therefore denies the same.

25.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 25 of the Complaint and therefore denies the same.

26.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 26 of the Complaint and therefore denies the same.

27.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 27 of the Complaint and therefore denies the same.

28.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 28 of the Complaint and therefore denies the same.

29.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 29 of the Complaint and therefore denies the same.

30.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 30 of the Complaint and therefore denies the same.

31.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 31 of the Complaint and therefore denies the same.

32.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 32 of the Complaint and therefore denies the same.

33.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 33 of the Complaint and therefore denies the same.

34.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 34 of the Complaint and therefore denies the same.

35.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 35 of the Complaint and therefore denies the same.

36.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 36 of the Complaint and therefore denies the same.

37.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 37 of the Complaint and therefore denies the same.

38.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 38 of the Complaint and therefore denies the same.

39.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 39 of the Complaint and therefore denies the same.

40.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 40 of the Complaint and therefore denies the same.

41.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations that the money was used to "fund operations and/or make capital investments" and therefore denies the same.  WUMI admits the remaining allegations contained in paragraph 41 of the Complaint.

42.    WUMI admits the allegations contained in paragraph 42 of the Complaint.

43.    WUMI admits the allegations contained in paragraph 43 of the Complaint.

44.    WUMI admits the allegations contained in paragraph 44 of the Complaint.

45.    WUMI admits the allegations contained in paragraph 45 of the Complaint.

46.    The Fourth Amendments speaks for itself.  WUMI specifically denies that the Fourth Amendment gave WUMI rights that are normally granted only to stockholders.  WUMI specifically denies the last sentence of paragraph 46 of the Complaint. WUMI also denies all other allegations of this paragraph to the extent that they are inconsistent with the Fourth Amendment.

47.    The Fifth Amendment speaks for itself.  WUMI denies all allegations of this paragraph to the extent they are inconsistent with the Fifth Amendment.

48.    The Sixth Amendment speaks for itself.  WUMI denies all allegations of this paragraph to the extent they are inconsistent with the Sixth Amendment.

49.    The Loan Conversion Agreement, the WUMI Loan Agreement, and the Fourth Amendment speak for themselves. WUMI denies any allegations of this paragraph to the extent they are inconsistent with the agreements.

50.     The Sixth Amendment speaks for itself. WUMI specifically denies the last sentence of paragraph 50. WUMI also denies all other allegations of this paragraph to the extent they are inconsistent with the terms of the Sixth Amendment.

51.     The Seventh, Eighth and Ninth Amendments speak for themselves. WUMI denies the allegations of this paragraph to the extent they are inconsistent with these amendments.

52.     WUMI admits that on or about March 10, 2015, WUMI and CS Mining's CEO, acting on behalf of CS Mining, executed a Tenth Amendment to the WUMI Loan Agreement. The Tenth Amendment speaks for itself. WUMI denies the allegations of this paragraph to the extent they are inconsistent with the Tenth Amendment.

53.     WUMI admits the allegations contained in paragraph 53 of the Complaint.

54.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 54 of the Complaint and therefore denies the same.

55.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 55 of the Complaint and therefore denies the same.

56.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 55 of the Complaint and therefore denies the same.

57.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 57 of the Complaint and therefore denies the same.

58.     The Intercreditor Agreement speaks for itself. WUMI denies the allegations of this paragraph to the extent they are inconsistent with the Intercreditor Agreement.

59.     The Intercreditor Agreement speaks for itself. WUMI denies the allegations of this paragraph to the extent they are inconsistent with the Intercreditor Agreement.  WUMI affirmatively states that it was and is not require to convert its debt into equity under certain conditions that came into existence.

60.     The Intercreditor Agreement speaks for itself. WUMI denies the allegations of this paragraph to the extent they are inconsistent with the Intercreditor Agreement.

61.     WUMI denies the allegations contained in paragraph 61 of the Complaint.

62.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 62 of the Complaint and therefore denies the same.

63.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 63 of the Complaint and therefore denies the same.

64.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 64 of the Complaint and therefore denies the same.

65.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 65 of the Complaint and therefore denies the same.

66.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 66 of the Complaint and therefore denies the same.

67.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 67 of the Complaint and therefore denies the same.

68.    WUMI admits the allegations contained in paragraph 68 of the Complaint.

69.    WUMI admits the allegations contained in paragraph 69 of the Complaint.

70.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 70 of the Complaint and therefore denies the same.

71.    WUMI admits the allegations contained in paragraph 71 of the Complaint.

72.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 72 of the Complaint and therefore denies the same.

73.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 73 of the Complaint and therefore denies the same.

74.    WUMI denies the allegations contained in paragraph 74 of the Complaint.

75.    WUMI denies the allegations contained in paragraph 75 of the Complaint.

76.    WUMI admits that has not converted its debt to equity and denies any obligation to do so.  WUMI denies the remaining contained in paragraph 76 of the Complaint.

77.     WUMI admits that a letter was sent on February 11, 2016 and the letter speaks for itself. WUMI denies the remaining allegations of this paragraph. WUMI specifically alleges that WUMI is not required to convert the WUMI Loan. WUMI all other allegations contained in paragraph 77 of the Complaint.

78.     WUMI admits the allegations contained in paragraph 78 of the Complaint.

79.     WUMI admits the allegations contained in paragraph 79 of the Complaint.

80.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 80 of the Complaint and therefore denies the same.

81.     WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 81 of the Complaint and therefore denies the same.

82.     WUMI denies the allegations contained in paragraph 82 of the Complaint.

83.     WUMI denies the allegations contained in paragraph 83 of the Complaint.

84.     WUMI admits the allegations contained in paragraph 84 of the Complaint.

85.     WUMI admits the allegations contained in paragraph 85 of the Complaint.

86.     WUMI admits the allegations contained in paragraph 86 of the Complaint.

87.     WUMI admits that Waterloo and PacNet brought suit against WUMI and others. The allegations of that lawsuit speak for themselves. WUMI denies the allegations contained in paragraph 87 of the Complaint to the extent they are inconsistent with the allegations of the lawsuit, and specifically denies the allegations of wrongdoing in that lawsuit. WUMI denies any other allegations of paragraph 87.

88.   WUMI admits the allegations contained in paragraph 88 of the Complaint.

89.   WUMI repeats and realleges each response as if fully set forth herein.

90.   WUMI denies the allegations contained in paragraph 90 of the Complaint.

91.   WUMI denies the allegations contained in paragraph 91 of the Complaint.

92.   WUMI denies the allegations contained in paragraph 92 of the Complaint.

93.   WUMI denies the allegations contained in paragraph 93 of the Complaint.

94.   WUMI denies the allegations contained in paragraph 94 of the Complaint.

95.   WUMI denies the allegations contained in paragraph 95 of the Complaint.

96.   WUMI repeats and realleges each preceding response as if set forth herein.

97.   WUMI denies the allegations contained in paragraph 97 of the Complaint.

98.   WUMI denies the allegations contained in paragraph 98 of the Complaint.

99.   WUMI denies the allegations contained in paragraph 99 of the Complaint.

100.  WUMI denies the allegations contained in paragraph 100 of the Complaint.

101.  WUMI denies the allegations contained in paragraph 101 of the Complaint.

102.  WUMI denies the allegations contained in paragraph 102 of the Complaint.

103.  WUMI denies the allegations contained in paragraph 103 of the Complaint.

104.  WUMI denies the allegations contained in paragraph 104 of the Complaint.

105.  WUMI repeats and realleges each preceding response as if set forth herein.

106.  WUMI admits the allegations contained in paragraph 106 of the Complaint.

107.  WUMI denies the allegations contained in paragraph 107 of the Complaint.

108.  WUMI denies the allegations contained in paragraph 108 of the Complaint.

109.  WUMI denies the allegations contained in paragraph 109 of the Complaint.

110.    WUMI denies the allegations contained in paragraph 110 of the Complaint.

111.    WUMI repeats and realleges each preceding response as if fully set forth herein.

112.    WUMI admits the allegations contained in paragraph 112 of the Complaint.

113.    The Intercreditor Agreement speaks for itself. WUMI denies any allegations inconsistent with the Intercreditor Agreement.

114.    WUMI is without knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 114 of the Complaint and therefore denies the same.

115.    WUMI denies the allegations contained in paragraph 115 of the Complaint.

116.    WUMI admits that it has refused to convert its loan to equity or release its liens. WUMI denies any obligation to do so.  WUMI denies the remaining allegations contained in paragraph 116 of the Complaint.

117.    WUMI denies the allegations contained in paragraph 117 of the Complaint.

118.    WUMI denies the allegations contained in paragraph 118 of the Complaint.

119.    WUMI repeats and realleges each preceding response as though fully set forth herein.

120.    WUMI denies the allegations contained in paragraph 120 of the Complaint.

121.    WUMI denies the allegations contained in paragraph 121 of the Complaint.

122.    WUMI denies the allegations contained in paragraph 122 of the Complaint.

123.    WUMI denies the allegations contained in paragraph 123 of the Complaint.

124.    WUMI denies the allegations contained in paragraph 124 of the Complaint.

125.    WUMI denies the allegations contained in paragraph 125 of the Complaint.

126.   WUMI denies the allegations contained in paragraph 126 of the Complaint.

127.   WUMI denies the allegations contained in paragraph 127 of the Complaint.

128.   WUMI denies any allegation of the Complaint not specifically admitted herein.

### THIRD DEFENSE

The Debtor's claims are barred, in whole or in part, by the failure of at least one condition precedent set forth under Section 5.2 of the Intercreditor Agreement, as follows:

a.  WUMI, CS Mining, and Noble entered into the Intercreditor Agreement on August 12, 2014.  Waterloo has stepped into the shoes of Noble with regard to the Intercreditor Agreement.

b.  Pursuant to Section 5.2 of the Intercreditor Agreement, WUMI is only obligated to convert CS Mining's debt into an equity interest only if "the Project Completion Date (as defined in the Noble Loan Agreement[ ]) occurs or Noble [purportedly succeeded here by Waterloo] loans the Borrower the Full Facility Amount pursuant to the Noble Loan Agreement, and there are no existing defaults under the Noble Loan Agreement or that occur in connection with lending the Full Facility Amount . . . ."

c.  Under Section 5.2 of the Intercreditor Agreement, if a single default exists under either the Noble Loan Agreement or in connection with lending the Full Facility Amount, as defined in the Noble Loan Agreement, WUMI is not required to convert its interest to equity.

d.  Several such defaults presently exist and existed at the relevant times, including but not limited to:

i.    CS Mining drew down more than $29,750,000 of the Noble/Waterloo Loan pursuant to the Noble Loan Agreement without notifying WUMI and obtaining the reasonable approval of WUMI, in violation of Section 2 of the Tenth Amendment to the Loan Agreement.

ii.   The breach identified immediately above in d.i. constitutes an Event of Default under the WUMI Loan Agreement and occurred in connection with Plaintiff Waterloo lending CS Mining the Full Facility Amount.

iii.  CS Mining has failed to pay WUMI amortizing payments when due pursuant to the Loan Agreement, as amended, commencing on January 1, 2016, and continuing on the first day of each month thereafter.  This failure constitutes an Event of Default as defined in the WUMI Loan Agreement pursuant to Section 7.1(b); this failure also constitutes a Cross Default under the Noble Loan Agreement pursuant to Section 8.01(e) thereof, and CS Mining thus is also in default pursuant to the Noble Loan Agreement on this basis.

iv.   Upon information and belief, CS Mining has failed to pay the full amount of its obligations to WUMI under the WUMI Loan Agreement pursuant to the demand made by WUMI in the Acceleration Letter, dated February 29, 2016. This failure constitutes an Event of Default as defined in the WUMI Loan Agreement pursuant to Section 7.1(b); this failure also constitutes a Cross Default under the Noble Loan Agreement pursuant to Section 8.01(e) thereof, and CS Mining thus is also in default pursuant to the Noble Loan Agreement on this basis.

    v.    CS Mining has failed to pay Waterloo amortizing payments when due pursuant to the Noble Loan Agreement, as amended, commencing at least as early as November 1, 2015, and continuing on the first day of each month thereafter; this failure constitutes an Event of Default as defined in the Loan Agreement pursuant to Section 7.1(b).

    vi.    Upon information and belief, CS Mining has failed to maintain the Collateral as required pursuant to Section 3.1.7 of the Loan Agreement.

    vii.    CS Mining has incurred claims and litigation involving the Collateral due to the lawsuit filed by Waterloo against WUMI, captioned *Waterloo Street Limited v. David J. Richards, LLC d/b/a Western US Mineral Investors, LLC*, Index No. 650741/2016, filed on February 12, 2016, in the County of New York, Supreme Court of the State of New York (the "New York lawsuit"), in violation of Section 3.1.8 of the Loan Agreement.

    viii.    Upon information and belief, CS Mining has failed to obtain agreement or approval of use of proceeds for all funding on or after July 9, 2013, in accordance with CS Mining's business plan presented to WUMI, in violation of Section 2(c)(i) of the Fifth Amendment to the Loan Agreement, made as of July 9, 2013, between David J. Richards, LLC, and CS Mining (the "Fifth Amendment to the Loan Agreement").

    ix.    CS Mining decided to make capital expenditures on a consolidated basis, or enter into contractual obligation in excess, on a consolidated basis, of one-hundred-twenty percent (120%) of the budget approved by the Board of

Managers, in violation of Section 2(c)(v) of the Fifth Amendment to the Loan
Agreement.

x.    Upon information and belief, CS Mining decided to adopt an annual budget or
modify a previously approved budget, in each case that exceeds the previous
annual budget or previously approved annual budget by one-hundred-twenty
percent (120%), in violation of Section 2(c)(vi) of the Fifth Amendment to the
Loan Agreement.

xi.   CS Mining failed to provide WUMI with the right to an Observer to, or notice
of, any meetings of CS Mining's Board of Managers, in violation of Section
2(d)(i) of the Fifth Amendment to the Loan Agreement.

xii.  Upon information and belief, CS Mining failed to provide notice of material
actions of the Board of Managers of CS Mining.

e.  The above-listed defaults constitute defaults under the Noble Loan Agreement
pursuant to the Cross-Default provision, Section 8.01(e), of that agreement, and/or
constitute defaults that occurred in connection with lending the Full Facility Amount
under Section 5.2 of the Intercreditor Agreement.

f.  Because these are conditions precedent to the mandatory-conversion provision
contained in Section 5.2 of the Intercreditor Agreement that have not been satisfied,
WUMI was never obligated and remains not obligated to convert its debt into equity.

g.  The foregoing is not an exhaustive list of defaults under the various agreements
between the parties.  Through discovery WUMI reserves the right to assert additional
events of default as the facts develop.

17

### FOURTH DEFENSE

Debtor's claims for relief are barred, in whole or in part, under principles of equity including, but not limited to, laches, waiver, estoppel, unjust enrichment and/or unclean hands.

### FIFTH DEFENSE

To the extent damages are alleged, any damages suffered by Debtor are a result of Debtor's own actions or omissions.

### SIXTH DEFENSE

Any alleged damages suffered by Debtor should not be awarded because Debtor has failed to mitigate their alleged damages.

### SEVENTH DEFENSE

The Debtor's claims are barred based on Debtor's breach of the applicable loan agreements and the Intercreditor Agreement.  Debtor, as the party in breach, cannot maintain a breach of contract action.

### EIGHTH DEFENSE

The Debtor's claims are barred because the Debtor has breached the implied covenant of good faith and fair dealing, specifically related to the Tenth Amendment and the Intercreditor Agreement.

### NINTH DEFENSE

Debtor's claim of promissory estoppel is barred because there is a written contract governing the relationship and transactions between the parties to this case and other parties in the pending bankruptcy actions.

### TENTH DEFENSE

WUMI is claim is allowable under Section 502 of the bankruptcy code.  WUMI is a valid creditor, with a valid and enforceable debt, as described in the proof of claim filed by WUMI and the Debtor's acknowledgement of the loans made by WUMI to the Debtor.

### ELEVENTH DEFENSE

Under applicable law, recharacterization and disallowance are separate and distinct inquires for the Court to determine as explained by the Tenth Circuit.

### ELEVENTH DEFENSE

Under applicable law, recharacterization is inappropriate because it would be unequitable under the circumstances to recharacterize the debt of WUMI.  Specifically, the WUMI Loan Agreement is a written loan, with the presence of due dates, with the right to enforce payment of principal and interest, with similar rights of other creditors of CS Mining, fully intended by the parties to be debt, CS Mining was at all times and still is adequately capitalized, CS Mining had the ability to obtain loans from other lenders; the funds were not solely used to acquire capital assets; and the enforcement by WUMI of the obligations after default by WUMI.

### TWELFTH DEFENSE

Debtor's cause of action for breach of contract is barred in that WUMI has not breached any agreement with the Debtor, specifically the Intercreditor Agreement and the WUMI Loan Agreements.

### THIRTEENTH DEFENSE

Debtor's claims are barred in whole or in part by the doctrine of the parol evidence rule.

## FOURTEENTH DEFENSE

Discovery is ongoing in this matter and other matter pending before the Court.  WUMI reserves the right to amend, supplement, or add additional defenses as discovery proceeds.

WHEREFORE, Defendant WUMI prays that the relief requested in Plaintiff's Complaint be denied, that the Complaint be dismissed with prejudice, that WUMI be awarded legal costs, including reasonable attorney's fees incurred in defending this adversary proceeding, and for such other and further relief that the Court deems just and proper.

DATED this 20th day of March, 2017

SNOW, CHRISTENSEN & MARTINEAU

/s/ P. Matthew Cox
David L. Pinkston
Keith A. Call
P. Matthew Cox
Robert T. Denny
*Attorneys for David J. Richards, LLC d/b/a*
*Western US Mineral Investors, LLC*

## CERTIFICATE OF MAILING

I, P. Matthew Cox, attorney for David J. Richards, LLC d/b/a Western US Mineral

Investors, LLC, hereby certify that on the 20th day of March, 2017, I caused to be served a true

and correct copy of the foregoing **ANSWER**, Adversary Proceeding No. 17-02024, which was

filed electronically, and electronically served upon the parties in the manner indicated:

David Leta                                      (via ECF)
Troy Aramburu
Jeff Tuttle
SNELL & WILMER, L.L.P.
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101

Donald J. Detweiler                             (via ECF)
Francis J. Lawall
Joanna J. Cline
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19899-1709


/s/ P. Matthew Cox

4824-1996-6789, v. 1

# EXHIBIT F

David L. Pinkston (#6630)
P. Matthew Cox (#9879)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145-5000
Telephone: (801) 521-9000
Fax: (801) 363-0400
Email: dlp@scmlaw.com
       pmc@scmlaw.com

Ronald J. Silverman (*pro hac vice*)
John D. Beck (*pro hac vice*)
Vivian Ban (*pro hac vice*)
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Email: ronald.silverman@hoganlovells.com
       john.beck@hoganlovells.com
       vivian.ban@hoganlovells.com

Andrew C. Lillie (*pro hac vice*)
Jessica Black Livingston (*pro hac vice*)
HOGAN LOVELLS US LLP
1200 17th Street, Suite 1500
Denver, Colorado 80202
Telephone: (303) 899-7300
Facsimile: (303) 899-7333
Email: andrew.lillie@hoganlovells.com
       jessica.livingston@hoganlovells.com

*Counsel for Defendant David J. Richards, LLC d/b/a Western US Mineral Investors, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re CS Mining, LLC, <br><br> Debtor, | Chapter 11 Case No. 16-24818-WTT <br><br> Adv. No.: 16-02118 |
| WATERLOO STREET LIMITED, a British Virgin Islands limited company, and PACNET CAPITAL (U.S.), LIMITED, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID RICHARDS, LLC, an Ohio limited liability company d/b/a WESTERN US | **ANSWER AND COUNTERCLAIMS OF DEFENDANT DAVID J. RICHARDS, LLC, an Ohio limited liability company d/b/a WESTERN US MINERAL INVESTORS, LLC** |

\\DH - 045904/00001 - 1267472 v1

| MINERAL INVESTORS, LLC, SKYE MINERAL INVESTORS, LLC, an Ohio limited liability company; DAVID J. RICHARDS, individually; CLARITY COPPER, LLC, a California limited liability company; CLINTON C. WALKER, individually; and DAVID C. MCMULLIN, individually, | |
| Defendants. | |

     Defendant David J. Richards, LLC, d/b/a Western US Mineral Investors, LLC ("WUMI" or "Defendant"), by and through its undersigned counsel respectfully files this Answer and Counterclaims (the "Answer") in response to the Complaint filed by Plaintiffs Waterloo Street Limited ("Waterloo") and PacNet Capital (U.S.), Limited ("PacNet") in the above-captioned case (the "Complaint"). Except as expressly admitted below, Defendant denies each and every allegation set forth in the Complaint. Any factual allegation admitted below is admitted only as to the specific admitted facts, and not as to any purported conclusions, characterizations, implications, or speculations that might follow from the admitted facts. WUMI responds to the numbered paragraphs of the Complaint and in support of this Answer, respectfully states as follows:

## INTRODUCTION[1]

    1.    For the better part of a year, the Defendants have manipulated their majority position in CS Mining, LLC ("CS Mining") in order to artificially preserve their purported secured loan to CS Mining, a company that owns and operates a copper mine in Beaver County,

---

[1] For ease of reference, WUMI repeats the headings set forth in the Complaint to simplify comparison of the Complaint and this Answer. However, by doing so, WUMI makes no admissions regarding the substance of the headings or any other allegations of the Complaint. Unless otherwise stated, to the extent that a particular heading can be construed as an allegation, WUMI specifically denies all such allegations.

Utah. Richards LLC, which is controlled by Richards and Walker, extended a loan facility of

$20.5 million to CS Mining, which it secured with liens against CS Mining's assets.

ANSWER: WUMI admits that CS Mining, LLC ("CS Mining" or "Debtor") owns and

operates a copper mine in Beaver County, Utah. WUMI admits that a Loan and Security

Agreement (as amended, the "Loan Agreement") was entered into as of August 10, 2012, by and

between CS Mining and David J. Richards, LLC, an Ohio limited liability company that also

does business as WUMI. WUMI denies the remaining allegations in this paragraph.

2.    CS Mining subsequently required additional financing in order to build a new

processing facility, and Richards LLC entered into an intercreditor agreement (the "Intercreditor

Agreement") with CS Mining's new lender, Noble Americas Corporation ("Noble"). That

Intercreditor Agreement obligated Richards LLC to convert its loan to equity and to release its

liens once CS Mining drew down the full amount of the Noble Loan.

ANSWER: The allegations refer to the contents of specific documents that speak for

themselves. To the extent a response is required, WUMI admits that the Intercreditor Agreement

contains provisions that, if and only if all conditions precedent therein are satisfied, may force a

conversion of the debt CS Mining owes WUMI into equity in CS Mining's parent company,

Skye Mineral Partners, LLC ("Skye"), and force the release of liens WUMI holds over certain

collateral. WUMI denies that it has any obligation to convert its debt interest in CS Mining into

equity in Skye. WUMI lacks sufficient knowledge or information to form a belief about the

remaining allegations in this Paragraph and therefore denies them.

3.    In February, 2016, CS Mining drew down the final installment of the Noble Loan.

Richards LLC, however, has refused to convert its debt to equity. Instead, the Defendants have

3

engaged in a concerted effort to shield Richards LLC from complying with its obligation to

convert its debt to equity. Richards and Walker entered into an illicit side agreement with CS

Mining's CEO, David McMullin, to avoid drawing down the final installment of the Noble Loan

so that the conversion obligation would not be triggered. Richards and Walker also tried to create

an artificial default under the Noble Loan to relieve Richards LLC from its conversion obligation

under the Intercreditor Agreement.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about CS

Mining's intentions or abilities to draw down the Noble Loan Agreement in February 2016.

WUMI affirmatively states that, pursuant to the terms of and conditions precedent set forth in the

Intercreditor Agreement, it was and is not required to convert its debt into equity, and therefore it

has not done so. WUMI denies the remaining allegations in this Paragraph.

4.      The Plaintiffs have been harmed by the Defendants' scheme. Waterloo is a

secured creditor – it purchased the loan previously extended to CS Mining by Noble. The Noble

Loan, now fully drawn, places Waterloo in a senior secured status, with a first priority lien in and

to all of CS Mining's assets. Richards LLC, with the assistance of Richards, Walker, McMullin,

and the other defendants, has refused to convert its loan, jeopardizing Waterloo's probability of a

full recovery. The blatant attempts by the Defendants to manipulate Richards LLC's position, as

described more fully below, warrants the equitable subordination of the Richards Loan to any

and all amounts due under the Noble Loan or, alternatively, the recharacterization of the

Richards Loan to equity.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about

Waterloo's transactions with CS Mining and Noble. WUMI denies that, at any time, it had an

obligation to convert its debt interest in CS Mining into equity. Additionally, the allegations in this Paragraph constitute a legal conclusion to which no response is required. To the extent a response is required, WUMI denies the remaining allegations in this Paragraph.

5.   PacNet has been similarly harmed. In addition to holding a membership interest in the parent company to CS Mining, PacNet loaned CS Mining $5 million on an unsecured basis when CS Mining faced an additional liquidity crisis. At the time PacNet made its loan, CS Mining was in serious financial difficulty, and PacNet was the only creditor willing to lend money to the company. PacNet fully expected that Richards LLC would honor its obligation to convert its loan to equity, which would have meant that PacNet would stand to recover the $4.825 million that has been drawn down from the $5 million loan. The Defendants have continued to manipulate their position to avoid conversion, and now with CS Mining in bankruptcy, PacNet's ability to recover its loan is in serious jeopardy. As a result, the Richards Loan should be either subordinated to any and all amounts due under the PacNet loan or recharacterized as equity.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about PacNet's financial condition or expectations. WUMI denies that, at any time, it had an obligation to convert its debt interest in CS Mining into equity, or that it in any way "manipulated" its position as a secured creditor of CS Mining. Additionally, the allegations in this Paragraph constitute a legal conclusion to which no response is required. WUMI denies the remaining allegations in this Paragraph.

WDE - 045904/000001 - 1267872 v1

## JURISDICTION AND VENUE

6.    This adversary proceeding arises out of the proceedings currently pending before this Court in Case No. 16-24818-WTT.

ANSWER:  Admitted.

7.    This Court has jurisdiction pursuant to 11 U.S.C. § 510 and 28 U.S.C. § 1334.

ANSWER:  Admitted.

8.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

ANSWER:  Admitted.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1409.

ANSWER:  Admitted.

## THE PARTIES

10.    Plaintiff Waterloo is a British Virgin Islands limited company. Waterloo is a secured creditor of CS Mining through its acquisition of a loan made to CS Mining by Noble.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

11.    Plaintiff PacNet is a Delaware limited liability company.  PacNet is a member of Skye Mineral Partners, LLC ("Skye Partners") and is also an unsecured creditor of CS Mining.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

12.    Defendant Richards LLC is an Ohio limited liability company.  Richards LLC purports to be a secured creditor of CS Mining.

\\DE - 045904/000001 - 1267472 v1

ANSWER: WUMI is a secured creditor of CS Mining. WUMI admits the remaining allegations in this Paragraph.

13.    Defendant Skye Investors is an Ohio limited liability company. Skye Investors is a member of Skye Partners.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

14.    Defendant Richards is a citizen of Ohio. Richards is a member of both CS Mining's and Skye Partners' Board of Managers. Richards controls Defendants Skye Investors and Richards LLC.

ANSWER: WUMI affirmatively states that Richards does not control WUMI. WUMI otherwise lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

15.    Defendant Clarity Copper is a Delaware limited liability company. Clarity Copper is a member of Skye Partners.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

16.    Defendant Walker is a citizen of California. Walker is a member of both CS Mining's and Skye Partners' Board of Managers. Walker controls Defendants Clarity Copper and Richards LLC.

ANSWER: WUMI affirmatively states that Walker does not control WUMI. WUMI otherwise lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

\DE - 045904/000001 - 1367472 v1

17.     Defendant McMullin is a citizen of Utah.  McMullin is CS Mining's President
and Chief Executive Officer.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the
truth of the allegations in this Paragraph and therefore denies them.

## FACTUAL ALLEGATIONS

A.     **CS Mining and Skye Partners**

18.     In 2011, Richards and Walker formed Skye Partners and CS Mining.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the
truth of the allegations in this Paragraph and therefore denies them.

19.     CS Mining owns and operates a copper mine in Milford, Utah.

ANSWER:  Admitted.

20.     Skye Partners is a limited liability company that owns an approximately 98%
majority interest in CS Mining.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the
truth of the allegations in this Paragraph and therefore denies them.

21.     Skye Investors and Clarity Copper are members of Skye Partners.  Through their
respective control of Skye Investors and Clarity Copper, Richards and Walker control 71.94% of
Skye Partners' voting interest.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the
truth of the allegations in this Paragraph and therefore denies them.

8

B.    **Richards and Walker Solicit Investments in CS Mining**

22.    In 2011, Richards and Walker solicited investors to invest in CS Mining's operations in Utah.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

23.    As a result of Richards's and Walker's solicitation, PacNet and an affiliate, DXS Capital (U.S.), Limited ("DXS"), invested in Skye Partners. DXS invested $11.97 million in November 2011, and PacNet made aggregate equity investments of approximately $20 million from 2012 through 2015.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

24.    As a result of their investments, DXS and PacNet together hold a 28.06% voting interest in Skye Partners.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

C.    **Richards and Walker Lend $20.5 Million to CS Mining Through Richards LLC**

25.    In addition to their controlling interest in Skye Partners, Richards and Walker control a majority stake of Richards LLC.

ANSWER: Denied.

26.    On or about August, 10, 2012, CS Mining entered into a Loan and Security Agreement with Richards LLC (the "Richards Loan"). The Richards Loan provided for Richards LLC to lend money to CS Mining to fund operations and/or make capital investments. The

\\DE - 045908/00000 - 1267472 v1

Richards Loan also gave Richards LLC a senior lien over substantially all of CS Mining's real estate, mining and other assets.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI admits that the Loan Agreement was entered into as of August 10, 2012, by and between CS Mining and WUMI. WUMI denies the remaining allegations in this Paragraph.

27.    Initially, Richards LLC loaned $3.5 million to CS Mining. Between 2012 and 2014, Richards LLC continuously increased the amount lent and borrowed under the Richards Loan. Upon information and belief, Richards LLC lent CS Mining an aggregate amount of $20.5 million.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. WUMI admits that, pursuant to the Loan Agreement, WUMI committed to loan CS Mining $3.5 million in multiple tranches as a capital expenditure and made an initial loan in the amount of $1.0 million. WUMI denies that it continuously increased the amount lent and borrowed under the Loan Agreement. WUMI admits that subsequent to the execution of the Loan Agreement, it loaned CS Mining additional sums, totaling approximately $20.5 million. WUMI denies the remaining allegations in this Paragraph.

28.    On or about May 14, 2013, Richards LLC obtained the right to convert the debt owed under the Richards Loan, including any accrued interest, into equity of Skye Partners, pursuant to a the Fourth Amendment to the Richards Loan.

ANSWER: WUMI admits that it obtained the right to, at its option, convert the debt CS Mining owes WUMI under the Loan Agreement into equity of Skye pursuant to the Fourth

\\DE - 045904/000001 - 1267872.v1

Amendment to the Loan Agreement, made as of May 14, 2013, and effective May 1, 2013,

between David J. Richards, LLC and CS Mining (the "Fourth Amendment to the Loan

Agreement"). WUMI denies the remaining allegations in this Paragraph.

### D.  Noble Agrees to Lend CS Mining $30 Million as Long as Richards LLC Converts Its Debt to Equity and Releases Its Liens on CS Mining's Assets.

29.    In mid-2014, CS Mining determined that it needed to build a new ore processing

facility in order to more efficiently process the metal ore generated by its mining operations.

The projected cost of this new processing facility was at least $45 million.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the

truth of the allegations in this Paragraph and therefore denies them.

30.    As part of its efforts to raise the capital necessary to construct the new processing

facility, CS Mining was introduced to Noble.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the

truth of the allegations in this Paragraph and therefore denies them.

31.    Noble was interested in lending CS Mining approximately $30 million, but the

senior lien held by Richards LLC on CS Mining's assets under the Richards Loan was an

obstacle to Noble lending CS Mining these funds.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the

truth of the allegations in this Paragraph and therefore denies them.

32.    To address Noble's concerns and as a material inducement to get Noble to lend,

Richards LLC agreed to subordinate certain of the liens it held against CS Mining's assets to the

liens that Noble would acquire in connection with its loan to CS Mining.

RLF1 - 045904/000001 - 1267472 v1

ANSWER: WUMI admits that it agreed to subordinate certain of the liens it held against CS Mining's assets to the liens that Noble would acquire in connection with a loan it was making to CS Mining. WUMI denies the remaining allegations in this Paragraph.

33.    In addition, Richards LLC agreed that once Noble advanced the $30 million, Richards LLC would convert its debt into equity in Skye Partners, thus freeing CS Mining's assets from all of Richards LLC's liens and leaving Noble as CS Mining's senior secured creditor. On or about August 12, 2014, CS Mining, Richards LLC, and Noble memorialized this understanding and its obligations in the Loan and Security Agreement between CS Mining and Noble (the "Noble Loan"), and in the Intercreditor Agreement between CS Mining, Richards LLC and Noble.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI admits that the Intercreditor Agreement contains provisions that, if and only if all conditions precedent are satisfied, may force a conversion of the debt CS Mining owes WUMI into equity in Skye, and force the release of liens WUMI holds over certain collateral. WUMI denies the remaining allegations in this Paragraph.

34.    The Noble Loan provides that Noble would lend $15 million to CS Mining initially, and an additional $15 million (for a total of $30 million) if and when CS Mining was able to raise $15 million in matching equity financing. The Noble Loan and the proposed equity financing together would raise the $45 million projected as needed for the new processing facility.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI denies the allegations in this Paragraph.

12

\DE - 045904/000001 - 1267472 \1

35.    Because substantially all of CS Mining's assets had been pledged to secure the earlier Richards Loan, the Intercreditor Agreement provides that Richards LLC would subordinate liens it held on CS Mining's assets to the liens that Noble was to acquire under the Noble Loan, while retaining a senior lien on other assets.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI admits that it agreed to subordinate certain of the liens it held against CS Mining's assets to the liens that Noble would acquire in connection with the loan it was making to CS Mining. WUMI denies the remaining allegations in this Paragraph.

36.    The Intercreditor Agreement also provides that in the event that Noble lends to CS Mining the full $30 million pursuant to the Noble Loan, Richards LLC agrees to "promptly (but in any event within 5 business days) convert" the Richards Loan in full into the equity of Skye Partners and to release all liens held by Richards LLC in and against CS Mining's assets.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI admits that the Intercreditor Agreement contains provisions that, if and only if all conditions precedent are satisfied, may force a conversion of the debt CS Mining owes WUMI into equity in Skye, and force the release of liens WUMI holds over certain collateral. WUMI denies the remaining allegations in this Paragraph.

E.    **Richards and Walker Concoct Their Scheme to Avoid Converting the Richards Loan to Equity.**

37.    Noble lent the initial $15 million to CS Mining on or about August 12, 2014.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

13

38. CS Mining then attempted to secure the $15 million in matching equity financing that would trigger its ability to draw down the second $15 million from Noble. Drawing that final $15 million from Noble would trigger, in turn, Richards LLC's mandatory obligation under the Intercreditor Agreement to convert its debt to equity and release its liens.

ANSWER: WUMI denies that, at any time, it had an obligation to convert its debt interest in CS Mining into equity. WUMI lacks sufficient knowledge or information to form a belief about the remaining allegations in this Paragraph and therefore denies them.

39. In April 2015, PacNet, Clarity Copper, and Skye Investors agreed to contribute additional equity to Skye Partners in the aggregate amount of $15 million (the "Equity Financing").

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

40. By June 2015, the Equity Financing was complete, and CS Mining now had the ability to draw down the remaining $15 million under the Noble Loan to proceed with the construction of the new processing facility.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

41. Richards and Walker, however, were determined to circumvent the conversion of their debt to equity in order to maintain the secured and senior position of the Richards Loan.

ANSWER: WUMI denies that, at any time, it had an obligation to convert debt CS Mining owed to WUMI into equity. WUMI lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this Paragraph, and therefore denies them.

WDM - 045904/000001 - 1267872 v1

1.    **Richards and Walker Purposely Delay Construction of the New Processing
Facility to Avoid Converting the Richards Loan to Equity**

42.    After the parties completed the Equity Financing, it became evident that CS

Mining would need more than the $45 million that had been budgeted to complete the new

processing facility.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the

truth of the allegations in this Paragraph and therefore denies them.

43.    As early as July 2015, CS Mining's management informed the Board of

Managers, including Richards and Walker, that there would be a significant budget shortfall,

and that CS Mining would require substantial additional cash to complete construction of the

new processing facility. By August 2015, CS Mining's management had warned Richards and

Walker repeatedly that $10 million was urgently needed to avoid a substantial delay in

construction of the new processing facility.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the

truth of the allegations in this Paragraph and therefore denies them.

44.    Not only would such a delay have serious adverse consequences on CS Mining's

revenues, as the new processing facility was necessary for CS Mining to become profitable, but

it also would have significant consequences under the terms of the Noble Loan. Two covenants

in the Noble Loan agreement required that: (i) CS Mining complete the new processing facility

by November 30, 2015; and (ii) CS Mining begin making payments on the Noble Loan starting

in October, 2015. If CS Mining was unable to meet these deadlines, it would be in violation of

these covenants and in default under the terms of the Noble Loan.

\\DE - 045904/000001 - 1267472 v1

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

45.    Richards and Walker knew that if CS Mining defaulted under the Noble Loan, it would relieve Richards LLC of its obligation to convert its debt to equity.  Richards and Walker therefore proceeded to obstruct CS Mining from raising the capital necessary to complete the new processing facility prior to the deadlines in the Noble Loan.  They did this in order to protect the secured, senior position Richards LLC held on CS Mining's assets.

ANSWER:  WUMI denies that, at any time, it had an obligation to convert debt CS Mining owed to WUMI into equity in Skye.  WUMI lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this Paragraph and therefore denies them.

46.    Indeed, after learning of CS Mining's budget shortfall and the need to raise additional capital, PacNet repeatedly offered to make additional funding available to CS Mining that could be used to complete the new processing facility.  It was Richards's and Walker's goal to obstruct and delay any such capital infusion until after the Noble Loan had gone into default in order to prevent the Richards Loan from converting to equity.  To this end, they used their position as members of the board of Skye Partners controlling over 70% of its voting interests to block any funding proposals until after the relevant deadlines under the Noble Loan had passed.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

47.    First, on or about September 13, 2015, PacNet sent Richards and Walker a written proposal offering to make an additional equity investment of up to $8 million in Skye Partners

16

that would be used to complete construction of the new processing facility. Richards and Walker rejected this offer.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

48.     Next, on or about October 8, 2015, PacNet sent Richards and Walker a written offer to make an additional equity investment of $2.6 million and to make another $6 million in financing available in the form of a secured loan. Richards and Walker rejected this offer.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

49.     Finally, on or about October 29, 2015, PacNet sent Richards and Walker a written proposal to make an additional equity investment of $22.4 million and to make another $10 million available in the form of an unsecured loan. PacNet proposed that this additional capital be used to pay off the Richards Loan and that the remainder of the funds be used to complete the new processing facility. Richards and Walker rejected this offer.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

50.     Notwithstanding Richards's and Walkers' intransigence, PacNet continued to put forth proposals for financing. For example, on November 5, 2015, PacNet offered to invest $9.75 million in Skye Partners which would be used to complete the new processing facility. Although Richards and Walker ultimately agreed to terms for financing in late November 2015, they continued to delay the financing so that it would not occur until after the Noble Loan deadlines had passed. As a result, financing was not completed until December 11, 2015.

WDE:-045904/000001 - 1267472 v1

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

51.     While Richards and Walker were blocking the needed funding, CS Mining's financial and operational capacities continued to degrade.  By preventing PacNet from making the proposed investments, however, Richards and Walker attempted to guarantee that the new processing facility would not be completed on time and, as a result, Richards LLC would not be required to convert its loan to equity.

ANSWER: WUMI denies that, at any time, it had an obligation to convert debt CS Mining owed to WUMI into equity.  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

2.     **Richards and Walker Enter into a Secret Agreement with McMullin to Avoid Drawing Down the Noble Loan in Order to Avoid Converting the Richards Loan to Equity.**

52.     Unbeknownst to PacNet, Richards and Walker entered into a side-agreement with CS Mining's CEO, McMullin.  Under this agreement, McMullin agreed not to draw down the full $30 million available under the Noble Loan until he obtained Richards LLC's consent to do so. Richards LLC withheld that consent until certain events of default under the Noble Loan had accrued.  As discussed above, if the Noble Loan was fully drawn down while CS Mining was in default, it might relieve Richards LLC of its obligation to convert its debt to equity.

ANSWER: WUMI denies that it entered into any "side agreement" with CS Mining's CEO.  WUMI admits that the Tenth Amendment to the Loan Agreement made as of March 10, 2015, between David J. Richards LLC, and CS Mining (the "Tenth Amendment to the Loan Agreement") contains a provision wherein CS Mining agreed not to draw down more than

$29,750,000 of the Noble/Waterloo Loan pursuant to the Noble Loan Agreement without first notifying WUMI and obtaining WUMI's consent and approval. WUMI denies that it has or ever had any obligation to convert debt CS Mining owed to WUMI into equity. WUMI denies the remaining allegations in this Paragraph.

53.    Richards, Walker, and McMullin hid this unauthorized side agreement from PacNet's representative to the CS Mining and Skye Partners boards.

ANSWER: WUMI denies that it entered into any "side agreement" with CS Mining. WUMI denies the remaining allegations in this Paragraph.

54.    In furtherance of this scheme, McMullin caused CS Mining to draw down up to $29.75 million of the $30 million Noble Loan facility, but he left $250,000 untapped – despite the fact that CS Mining's financial position was increasingly bleak, the company needed to move forward with construction of the new processing facility, and the Richards Loan continued to accrue interest at a high rate. Richards and Walker, with the assistance of McMullin, engaged in this scheme to maintain the substantial economic advantages Richards LLC enjoyed through its senior lien on CS Mining's assets, thereby injuring Waterloo and PacNet.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about CS Mining's financial position. WUMI denies that it participated in any "scheme" with CS Mining's CEO. WUMI denies the remaining allegations in this Paragraph.

**3.    Richards and Walker Renege on the Modification of the Noble Loan.**

55.    Because Richards and Walker blocked PacNet's supplemental round of funding until after the original deadlines in the Noble Loan had passed, CS Mining was in default on its obligations under the Noble Loan.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI denies the allegations in this Paragraph.

56.     To remedy that default, on December 4, 2015, CS Mining and Noble amended the Noble Loan to extend the deadlines to complete construction of the new processing facility and to begin repaying the Noble Loan. As a result of this amendment, the Noble Loan was no longer in default.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI denies the allegations in this Paragraph.

57.     Prior to this, Noble had decided to exit from the mining sector in the United States. As part of that strategy, Noble solicited third parties to purchase the Noble Loan and Intercreditor Agreement. Both Richards and Waterloo, an affiliate of PacNet and DXS, were involved in a competitive bidding process for the Noble Loan, as Walker informed CS Mining's Board of Managers. Richards also separately confirmed that he had made an offer to purchase the Noble Loan.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

58.     On or about December 31, 2015, Waterloo executed a Purchase and Sale Agreement with Noble under which Waterloo acquired Noble's interests and obligations under the Noble Loan and the Intercreditor Agreement. At the time it purchased the Noble Loan, Waterloo knew that CS Mining and Noble had remedied CS Mining's default, and Waterloo reasonably expected that the terms of the Noble Loan and the Intercreditor Agreement would be honored and that it would become CS Mining's senior secured creditor.

WDB - 045004/000001 - 1267872 v1

ANSWER: The allegations in this Paragraph refer to the contents of specific documents that speak for themselves. Additionally, WUMI lacks sufficient knowledge or information to form a belief about the allegations in this Paragraph. To the extent a response is required, WUMI denies the allegations in this Paragraph.

59.    Realizing that the Noble Loan was no longer in default and that Waterloo, not Richards, was the successful bidder for the Noble Loan, Richards and Walker informed the CS Mining Board of Managers that they "withdrew" their consent to the December 4, 2015 amendment to the Noble Loan, hoping that this would somehow place the Noble Loan back in default.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the allegations in this Paragraph. To the extent a response is required, WUMI denies the allegations in this Paragraph.

60.    Richards and Walker claimed that they sought to "withdraw" their consent because they had just learned that Noble was going to sell the Noble Loan to Waterloo. Richards, however, had bid for the Noble Loan, and Walker had informed CS Mining's Board of Managers of that fact. Richards's and Walker's excuse was nothing more than a pretext for their attempt to manufacture after-the-fact protection for Richards LLC's secured position against CS Mining.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the allegations in this Paragraph. To the extent a response is required, WUMI denies the allegations in this Paragraph.

WDB - 045904/0000001 - 3267472 v1

**F.    CS Mining's Situation Worsens, and PacNet Lends the Company $5 Million on an Unsecured Basis.**

61.    Because no other member or third party was willing to invest or lend money to CS Mining, PacNet agreed to lend CS Mining $5 million on an unsecured basis. On January 20, 2016, CS Mining and PacNet entered into a loan agreement for $2 million. On January 29, 2016, Skye Partners' and CS Mining's Boards of Members approved a second loan agreement for an additional $3 million.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

62.    At the time PacNet made its loans, it anticipated that because of CS Mining's deteriorating liquidity, CS Mining would have to draw down the remaining $250,000 of the Noble Loan shortly thereafter, as that was one of the only remaining sources of financing available to the company. Once that occurred, CS Mining's debt burden would be reduced by over $20.5 million, leaving PacNet in a much better position if CS Mining's financial situation did not stabilize.

ANSWER: WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

**G.    CS Mining Draws Down the Remaining Amount of the Noble Loan, but Richards LLC Refuses to Acknowledge Conversion of Its Debt to Equity and to Release Its Liens.**

63.    On February 3, 2016, Waterloo sent a letter to CS Mining informing the company that, to the extent any defaults existed under the Noble Loan, Waterloo had waived them.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. WUMI denies the remaining allegations in this Paragraph. WUMI avers that

22

Waterloo purported to improperly waive existing defaults under the Noble Loan Agreement in an effort to force WUMI to convert its debt into equity.

64.    On or about February 4, 2016, CS Mining drew down the last $250,000 in principal available to it under the Noble Loan, bringing the total amount borrowed to $30 million.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about the truth of the allegations in this Paragraph and therefore denies them.

65.    Under the Intercreditor Agreement, Richards LLC was then obligated to convert its loan to equity and to release its liens on CS Mining's assets.  Richards LLC, however, has refused to do either, claiming that Richards's and Walker's purported "withdrawal" of their approval of the Noble Loan amendment revived CS Mining's defaults under the Noble Loan – defaults which Richards and Walker themselves manufactured – and thereby excused Richards LLC from its mandatory obligations to convert to equity.

ANSWER:  The allegations refer to the contents of specific documents that speak for themselves.  To the extent a response is required, WUMI denies that it has or had, as of February 4, 2016, any obligation to convert its debt interest in CS Mining into equity in Skye.  WUMI denies the remaining allegations in this Paragraph.

66.    Richards LLC then declared the entire Richards Loan due and owing, and initiated foreclosure on its purported liens against CS Mining.

ANSWER:  The allegations refer to the contents of documents that speak for themselves. To the extent a response is required, WUMI admits that it initiated foreclosure proceedings on its liens against CS Mining.  WUMI denies the remaining allegations in this Paragraph.

SDE - 045904/00001 - 1267432 v1

## COUNT I
## EQUITABLE SUBORDINATION
## (ALL DEFENDANTS)

67.     Plaintiffs incorporate the allegations in paragraphs 1-66 as if fully set forth herein.

ANSWER:  WUMI incorporates by reference its answers in Paragraphs 1–66 above.
WUMI denies the allegations in this Paragraph.

68.     Richards and Walker are members of Skye Partners' and CS Mining's Board of
Managers, and they also hold more than 20% of the voting power of Skye Partners.  Richards
and Walker also control Richards LLC.  Richards LLC is therefore an "insider" of CS Mining.

ANSWER:  WUMI lacks sufficient knowledge or information to form a belief about
Skye Partners' and CS Mining's Board of Managers or the allocation of voting power within
those companies.  WUMI denies the remainder of the allegations in the Paragraph.

69.     Richards LLC purports to be a secured creditor of CS Mining holding liens
against CS Mining's assets.  Those assets are part of CS Mining's bankruptcy estate.

ANSWER:  WUMI admits that it is a secured creditor that maintains valid liens over CS
Mining's assets.  WUMI admits it holds liens against assets that are part of CS Mining's
bankruptcy estate.

70.     Richards, Walker, McMullin, Skye Investors, Clarity Copper and Richards LLC
engaged in unfair and inequitable conduct intended to benefit Richards LLC, including, but not
limited to, the following:

> a) Richards and Walker entered into an unauthorized and undisclosed side
> agreement with McMullin to prevent CS Mining from drawing down on the entire
> $30 million available under the Noble Loan so that Richards LLC could avoid its

\\DE - 045904/00001 - 1267472 V1

obligation to convert its debt to equity and release its liens against CS Mining's assets;

b) Richards, Walker, and Richards LLC refused to convert the Richards Loan debt to equity and to release its liens against CS Mining's assets as required by the Intercreditor Agreement;

c) Richards, Walker and Richards LLC affirmatively sought to enforce invalid liens on CS Mining's assets;

d) Richards and Walker used Skye Investors and Clarity Copper to obstruct PacNet's efforts to provide necessary equity contributions to CS Mining so that CS Mining would default under the Noble Loan and thereby relieve Richards LLC of its obligation to convert its debt to equity and release its liens against CS Mining's assets; and

e) Richards and Walker used Skye Investors and Clarity Copper to purportedly withdraw consent to the amendment to the Noble Loan in an attempt to place CS Mining back in default so that Richards LLC would not have to convert its debt to equity and release its liens against CS Mining's assets.

ANSWER: WUMI denies that it has engaged in unfair or inequitable conduct. WUMI denies that, at any time, it had an obligation to convert its debt interest in CS Mining into equity. WUMI lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in this Paragraph and therefore denies them. WUMI avers that, pursuant to the terms of and conditions precedent set forth in the Intercreditor Agreement, it is not required

WDE - 045904/000001 - [267472 v4]

to convert its debt, and therefore it has not done so. WUMI denies the remainder of the allegations in the Paragraph.

71.    The Defendants engaged in this activity in an effort to artificially and improperly maintain Richards LLC as a secured senior creditor of CS Mining and to obtain an unfair advantage over Waterloo and PacNet. Waterloo purchased the Noble Loan and PacNet lent money to CS Mining on the reasonable expectation that Richards LLC would convert its debt to equity and release its liens against CS Mining's assets. Neither would have done so if they knew that the Defendants would engage in a scheme to avoid Richards LLC's obligations under the Intercreditor Agreement.

ANSWER:  WUMI denies that it engaged in any improper activity or participated in any "scheme." WUMI lacks sufficient knowledge or information to form a belief about Waterloo's and PacNet's dealings and their related expectations. WUMI denies the remaining allegations in this Paragraph.

72.    Pursuant to §§ 510(c) and 105(a) of the Bankruptcy Code:

a) Richards LLC's claims against CS Mining should be subordinated to Waterloo's and PacNet's claims as such is consistent with the provisions of the Bankruptcy Code, which authorizes subordination of claims where there is unfair or inequitable conduct on the part of a claimant; and

b) to the extent that Richards, Walker, Skye Investors, Clarity Copper or McMullin have claims against CS Mining, those claims should be subordinated to Waterloo's and PacNet's claims as such is consistent with the provisions of the

Bankruptcy Code, which authorizes subordination of claims where there is unfair
or inequitable conduct on the part of a claimant.

ANSWER:  The allegations in this Paragraph constitute a legal conclusion to which no
response is required.  To the extent a response is required, WUMI denies the allegations in this
Paragraph.

73.     Waterloo and PacNet request entry of a judgment subordinating the Defendants'
claims to Waterloo's and PacNet's claims and awarding such other relief as the Court deems just
and proper.

ANSWER:  The allegations in this Paragraph constitute a legal conclusion to which no
response is required.  To the extent a response is required, WUMI denies the allegations in this
Paragraph.

### COUNT II
### RECHARACTERIZATION OF DEBT AS EQUITY
### (RICHARDS LLC)

74.     Plaintiffs incorporate the allegations in paragraphs 1-73 as if fully set forth herein.

ANSWER:  WUMI incorporates by reference its answers in Paragraphs 1–73 above.
WUMI denies the allegations in this Paragraph.

75.     This Court has the authority to determine whether a claim characterized as debt is
more properly characterized as equity.

ANSWER:  The allegations in this Paragraph constitute a legal conclusion to which no
response is required.

76.     On or about August 10, 2012, CS Mining and Richards LLC executed the
Richards Loan agreement, which provided for Richards LLC to lend money to CS Mining to

27

fund operations and make capital investments. The Richards Loan also gave Richards LLC a senior lien over substantially all of CS Mining's assets.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI admits that the Loan Agreement was entered into as of August 10, 2012, by and between CS Mining and David J. Richards, LLC, an Ohio limited liability company that also does business as WUMI. WUMI denies the remaining allegations in this paragraph.

77.    On or about August 12, 2014, CS Mining, Richards LLC and Noble entered into the Intercreditor Agreement, which affirmatively mandates conversion of Richards LLC's debt to equity in Skye Partners and release of its liens against CS Mining's assets when one of two conditions occur: (i) CS Mining drew down the entire $30 million of credit available under the Noble Loan agreement; or (ii) Project Completion (as defined in the Noble Loan agreement) is reached.

ANSWER: The allegations refer to the contents of specific documents that speak for themselves. To the extent a response is required, WUMI admits that the Intercreditor Agreement contains provisions that, if and only if all conditions precedent are satisfied, may force a conversion of the debt that CS Mining owes WUMI into equity in Skye, and the release of liens that WUMI holds over certain collateral. WUMI denies the remaining allegations in this Paragraph.

78.    On or about February 4, 2016, CS Mining drew down on the final $250,000 under the Noble Loan, thereby satisfying one of the conditions of the Intercreditor Agreement and triggering Richards LLC's obligation to convert its debt to equity and release its liens.

28

ANSWER: WUMI admits that on or about February 3, 2016, CS Mining breached the Tenth Amendment to the Loan Agreement by drawing down more than $29,750,000 of the Noble Loan pursuant to the Noble Loan Agreement without first notifying WUMI and obtaining WUMI's consent and approval. WUMI denies that it has or had, as of February 4, 2016, any obligation to convert its debt interest in CS Mining into equity in Skye. WUMI denies the remaining allegations in this Paragraph.

79.    Richards LLC refuses to comply with the clear and unambiguous requirements of the Intercreditor Agreement.

ANSWER: WUMI denies that it violated the Intercreditor Agreement at any time.

80.    Consistent with the intent of all parties to the Intercreditor Agreement, the debt owed by CS Mining to Richards LLC should be recharacterized as an equity interest in the company.

ANSWER: The allegations in this Paragraph constitute a legal conclusion to which no response is required. To the extent a response is required, WUMI denies the allegations in this Paragraph.

81.    Waterloo and PacNet request entry of a judgment recharacterizing Richards LLC's debt as equity and awarding such other relief the Court deems just and proper.

ANSWER: The allegations in this Paragraph constitute a legal conclusion to which no response is required. To the extent a response is required, WUMI denies the allegations in this Paragraph.

WOE-045904/00001 - 1287472 v1

**COUNT III**
**TORTIOUS INTERFERENCE**
**(RICHARDS, WALKER, SKYE INVESTORS, CLARITY COPPER, AND MCMULLIN)**

82.    Plaintiff Waterloo incorporates the allegations in paragraphs 1-81 as if fully set forth herein.

ANSWER:  WUMI incorporates by reference its answers in Paragraphs 1–81 above. WUMI denies the allegations in this Paragraph.

83–100.        WUMI affirmatively states that the allegations in Paragraphs 83 through 100 relate to Count III, which Plaintiffs do not assert against WUMI.  WUMI therefore does not repeat them here.

ANSWER:  Count Three is not asserted against WUMI.  Therefore, WUMI does not answer the allegations contained in Count III because no response is required.  To the extent a response is required, WUMI denies all of the allegations in Count III, Paragraphs 82–100.

**WHEREFORE,** Plaintiffs request entry of judgment as follows:

(a)    On Count I, entry of a judgment subordinating the Defendants' claims to Waterloo's and PacNet's claims, and awarding such other relief as the Court deems just and proper;

(b)    On Count II, entry of a judgment recharacterizing Richards LLC's debt as equity and awarding such other relief the Court deems just and proper; and

(c)    On Count III, entry of a judgment awarding damages, prejudgment and postjudgment interest, and such other relief this Court deems just and proper.

ANSWER:  The above Paragraph that immediately follows Paragraph 100 of Plaintiffs' Complaint constitutes a request for entry of judgment to which no response is required.  To the

30

extent that the request is construed to require a response, WUMI denies that Plaintiffs are entitled
to any relief in this action, as requested or otherwise. Therefore, WUMI denies the allegations
contained in the request for entry of judgment.

## WUMI'S AFFIRMATIVE DEFENSES

WUMI reserves the right to amend its Answer to add additional Affirmative Defenses,
including allegations of inequitable conduct, consistent with the facts discovered in the case.
Subject to that limitation, WUMI asserts the following affirmative defenses, without assuming
the burden of proof when such burden would otherwise be on Plaintiffs.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Complaint fails to state facts sufficient to constitute a claim upon which relief
can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the failure of at least one condition
precedent set forth under Section 5.2 of the Intercreditor Agreement, as follows:

a.  WUMI, CS Mining, and Noble entered into the Intercreditor Agreement on August
    12, 2014. Plaintiffs allege that Waterloo has stepped into the shoes of Noble with
    regard to the Intercreditor Agreement.

b.  Pursuant to Section 5.2 of the Intercreditor Agreement, WUMI is obligated to convert
    CS Mining's debt into an equity interest only if "the Project Completion Date (as
    defined in the Noble Loan Agreement[ ]) occurs or Noble [purportedly succeeded
    here by Waterloo] loans the Borrower the Full Facility Amount pursuant to the Noble

31

Loan Agreement, and there are no existing defaults under the Noble Loan Agreement or that occur in connection with lending the Full Facility Amount . . . ."

c.  Under Section 5.2 of the Intercreditor Agreement, if a single default exists under either the Noble Loan Agreement or in connection with lending the Full Facility Amount, as defined in the Noble Loan Agreement, WUMI is not required to convert its interest to equity.

d.  Several such defaults presently exist, including but not limited to:

   i.  CS Mining drew down more than $29,750,000 of the Noble/Waterloo Loan pursuant to the Noble Loan Agreement without notifying WUMI and obtaining the reasonable approval of WUMI, in violation of Section 2 of the Tenth Amendment to the Loan Agreement.

   ii.  The breach identified immediately above in d.i. constitutes an Event of Default under the Loan Agreement and occurred in connection with Plaintiff Waterloo lending CS Mining the Full Facility Amount.

   iii.  CS Mining has failed to pay WUMI amortizing payments when due pursuant to the Loan Agreement, as amended, commencing on January 1, 2016, and continuing on the first day of each month thereafter.  This failure constitutes an Event of Default as defined in the Loan Agreement pursuant to Section 7.1(b); this failure also constitutes a Cross Default under the Noble Loan Agreement pursuant to Section 8.01(e) thereof, and CS Mining thus is also in default pursuant to the Noble Loan Agreement on this basis.

\\DE ~ 045904/000001 ~ 1267472 v1

iv.    Upon information and belief, CS Mining has failed to pay the full amount of

its obligations to WUMI under the Loan Agreement pursuant to the demand

made by WUMI in the Acceleration Letter, dated February 29, 2016.  This

failure constitutes an Event of Default as defined in the Loan Agreement

pursuant to Section 7.1(b); this failure also constitutes a Cross Default under

the Noble Loan Agreement pursuant to Section 8.01(e) thereof, and

CS Mining thus is also in default pursuant to the Noble Loan Agreement on

this basis.

v.    CS Mining has failed to pay Waterloo amortizing payments when due

pursuant to the Noble Loan Agreement, as amended, commencing at least as

early as November 1, 2016, and continuing on the first day of each month

thereafter; this failure constitutes an Event of Default as defined in the Loan

Agreement pursuant to Section 7.1(b).

vi.    Upon information and belief, CS Mining has failed to maintain the Collateral

as required pursuant to Section 3.1.7 of the Loan Agreement.

vii.    CS Mining has incurred claims and litigation involving the Collateral due to

the lawsuit filed by Waterloo against WUMI, captioned *Waterloo Street*

*Limited v. David J. Richards, LLC d/b/a Western US Mineral Investors, LLC*,

Index No. 650741/2016, filed on February 12, 2016, in the County of New

York, Supreme Court of the State of New York (the "New York lawsuit"), in

violation of Section 3.1.8 of the Loan Agreement.

\\DE - 045904/00001 - 1267472 v1

viii.   Upon information and belief, CS Mining has failed to obtain agreement or approval of use of proceeds for all funding on or after July 9, 2013, in accordance with CS Mining's business plan presented to WUMI, in violation of Section 2(c)(i) of the Fifth Amendment to the Loan Agreement, made as of July 9, 2013, between David J. Richards, LLC, and CS Mining (the "Fifth Amendment to the Loan Agreement").

ix.    CS Mining decided to make capital expenditures on a consolidated basis, or enter into contractual obligation in excess, on a consolidated basis, of one-hundred-twenty percent (120%) of the budget approved by the Board of Managers, in violation of Section 2(c)(v) of the Fifth Amendment to the Loan Agreement.

x.     Upon information and belief, CS Mining decided to adopt an annual budget or modify a previously approved budget, in each case that exceeds the previous annual budget or previously approved annual budget by one-hundred-twenty percent (120%), in violation of Section 2(c)(vi) of the Fifth Amendment to the Loan Agreement.

xi.    CS Mining failed to provide WUMI with the right to an Observer to, or notice of, any meetings of CS Mining's Board of Managers, in violation of Section 2(d)(i) of the Fifth Amendment to the Loan Agreement.

xii.   Upon information and belief, CS Mining failed to provide notice of material actions of the Board of Managers of CS Mining.

\DE = 045904/000001 - 1267472 v1

e.  The above-listed defaults constitute defaults under the Noble Loan Agreement

pursuant to the Cross-Default provision, Section 8.01(e), of that agreement, and/or

constitute defaults that occurred in connection with lending the Full Facility Amount

under Section 5.2 of the Intercreditor Agreement.

f.  Because these are conditions precedent to the mandatory-conversion provision

contained in Section 5.2 of the Intercreditor Agreement that have not been satisfied,

WUMI was never obligated and remains not obligated to convert its debt into equity.

### THIRD AFFIRMATIVE DEFENSE

On information and belief, Waterloo lacks standing to bring this action against WUMI at

least because it never properly or legally acquired Noble's rights and interests under either the

Noble Loan Agreement or the Intercreditor Agreement.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs are not entitled to injunctive relief at least because any injuries to Plaintiffs are

not immediate or irreparable, and Plaintiffs have an adequate remedy at law for their allegations.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims for relief are barred, in whole or in part, under principles of equity

including, but not limited to, laches, waiver, estoppel, and/or unclean hands.

### SIXTH AFFIRMATIVE DEFENSE

Any damages suffered by Plaintiffs are a result of Plaintiffs' own actions or omissions.

### SEVENTH AFFIRMATIVE DEFENSE

Any damages suffered by Plaintiffs should not be awarded because Plaintiffs have failed

to mitigate their alleged damages.

WDB : 045904/00001 - 1267473 v1

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff Waterloo's claims are barred because Plaintiff Waterloo has breached the implied covenant of good faith and fair dealing. This Affirmative Defense is alleged in the alternative with respect to WUMI's third Affirmative Defense.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because Plaintiffs have intentionally interfered with WUMI's contracts.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff Waterloo's claims are barred because Plaintiff Waterloo has, and had at all relevant times, actual knowledge of the Tenth Amendment and received consideration, directly or indirectly, in recognition of the Tenth Amendment.

## WUMI'S COUNTERCLAIMS

WUMI incorporates by reference all above responses as if fully set forth herein and asserts the following counterclaims against Plaintiffs.

## PARTIES, JURISDICTION, AND VENUE

1.      David J. Richards, LLC is an Ohio limited liability company that does business as Western US Mineral Investors, LLC ("WUMI"). WUMI's principal place of business is located at 500 S. Front Street, Suite 1200, Columbus, Ohio.

2.      Upon information and belief, Plaintiff Waterloo Street Limited ("Waterloo") is a British Virgin Islands limited company. Waterloo's principal place of business is located at Room 2302-3, Tower One, Lippo Centre, 89 Queensway, Hong Kong.

\\DE - 04590A/000001 - 1267472 v1

3.       Upon information and belief, Plaintiff PacNet Capital (U.S.), Limited ("PacNet")
is a Delaware limited liability company and a member of Skye Mineral Partners, LLC ("Skye").

4.       Upon information and belief, Skye owns greater than 98% of the Debtor and is
the Debtor's managing and majority member.

5.       Upon information and belief, Skye is comprised of four members, with PacNet
and DXS Capital (U.S.), Limited ("DXS") combined owning approximately 28.07% of Skye.

6.       Upon information and belief, Plaintiffs, along with DXS, are affiliates of and
either owned or controlled by Lippo China Resources Limited ("Lippo"), a multi-billion-dollar
conglomerate based in Hong Kong.

7.       This adversary proceeding arises out of the proceedings currently pending before
this Court in Case No. 16-24818-WTT.

8.       This Court has jurisdiction pursuant to 11 U.S.C. § 510 and 28 U.S.C. § 1334.

9.       This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1409.

11.      Waterloo asserts in its Complaint that it stands in Noble Americas Corporation's
("Noble") shoes with respect to the Noble Loan Agreement and Intercreditor Agreement.

### FACTUAL BACKGROUND AND ALLEGATIONS FOR COUNTERCLAIMS

12.      During numerous extended periods from July 2015 through February 2016,
Plaintiffs' employees or agents spent time at CS Mining LLC's ("CS Mining") copper-mining
properties (the "Mine"), which are part of the Milford Mineral Belt in Beaver County, Utah.

13.      While at the Mine, Plaintiffs' employees or agents spent significant time with and
engaged in conversations with CS Mining employees.  The conversations focused in detail on,

\\DE - 045904/000001 - 1267472 v1

among other things, operational and business affairs of the Mine; Waterloo's investments in the Mine as they relate to Skye, CS Mining, and WUMI; and WUMI's investments in the Mine as they relate to Skye, CS Mining, and Waterloo.

14.     At all relevant times as related to the following Counterclaims, Plaintiffs' employees or agents knew of the agreements at issue in this matter, including the Loan and Security Agreement entered into as of August 10, 2012, by and between CS Mining and David J. Richards, LLC (as amended, the "Loan Agreement"); the Tenth Amendment to the Loan Agreement entered into as of March 10, 2015, between David J. Richards, LLC and CS Mining (the "Tenth Amendment to the Loan Agreement"); the Noble Loan Agreement; the Intercreditor Agreement; and the relevant terms of those agreements.

15.     While engaged in the conversations described in Counterclaim Paragraph 13, Plaintiffs' employees or agents communicated to CS Mining how CS Mining should make certain business decisions, including but not limited to whether to make certain payments to certain entities to which CS Mining was obligated to pay monies.

16.     Specifically, Plaintiffs' employees or agents instructed or otherwise communicated to CS Mining that CS Mining should not make at least one, and possibly other, monthly payments to WUMI under the Loan Agreement.

17.     Plaintiffs' employees or agents also instructed or otherwise communicated to CS Mining that CS Mining should draw down more than $29,750,000 of the Noble/Waterloo Loan pursuant to the Noble Loan Agreement, without first notifying WUMI and obtaining WUMI's consent and approval to do so.

WDB - 045904/000001 - 1267672 V1

18.    Waterloo, through its attorneys, has filed lawsuits and threatened to interfere with WUMI's right to enforce defaults under its Loan Agreement by (a) bringing legal action against WUMI to prevent a foreclosure, (b) asserting claims of intentional torts, and (c) seeking punitive and treble damages, all without legal justification and in an effort to force WUMI to take a legal position it is not obligated to take.

19.    Plaintiffs' employees' or agents' communications constitute unwarranted, intentional, and illegal influence over CS Mining and interference with CS Mining's contractual relationship with and obligations to WUMI.

20.    Waterloo's employees' or agents' communications also constitute a breach of Waterloo's implied covenant of good faith and fair dealing with WUMI.

### COUNTERCLAIM 1:
### EQUITABLE SUBORDINATION
### (WATERLOO)

21.    WUMI repeats and realleges the preceding allegations contained in Paragraphs 1 through 20 of its Counterclaims as if set forth fully herein.

22.    Upon information and belief, Plaintiffs, along with DXS, are affiliates of and either owned or controlled by Lippo.

23.    Upon information and belief, PacNet and DXS combined own approximately 28.07% of Skye.

24.    Upon information and belief, Skye owns 98% of CS Mining.  Plaintiffs are therefore "insiders" of CS Mining.

25.    Plaintiffs have a history of engaging in unfair and inequitable conduct.  Prior to the above-captioned bankruptcy case, Waterloo improperly acquired the Noble Loan and was

\DB - 045908/000001 - 1267472 v1

accused of fraud with respect to the attempted transfer of the Noble Loan. Waterloo, together with its affiliates, subsequently engaged in a campaign to disrupt and destroy CS Mining's business with the ultimate goal of seizing CS Mining's assets.

26.    Throughout the bankruptcy case, Plaintiffs have attempted to gain control over CS Mining and force it into a quick sale process to benefit Plaintiffs. When CS Mining tried to move forward with its bankruptcy case, PacNet and its affiliates used a corporate governance dispute to try to displace CS Mining as debtor-in-possession and caused a major impasse in this bankruptcy case by refusing to provide necessary consents to approve potential business plans and budgets. To further its own interests, PacNet helped to artificially create an impasse at the Debtor's membership level, potentially in violation of its fiduciary duties under the relevant corporate documents.

27.    Waterloo has consistently targeted WUMI and other prepetition secured claimholders, even at the expense of CS Mining. Waterloo initiated several proceedings in different venues to argue that WUMI's debt should be converted. If the proceedings continue, this would force the important parties in the bankruptcy case to divide their time and resources.

28.    Further, Waterloo has been unwilling to compromise on the terms of the proposed debtor-in-possession financing and has attempted to negotiate overly broad protection for itself that would not be offered to prepetition secured lenders.

29.    All of Plaintiffs' inequitable actions and conduct would serve to enrich them if they are able to assert their claims at the same priority as other secured claims.

\\DE - 045904/000001 - 1267472 v4

30.     Based on the foregoing, Plaintiffs' actions and conduct has harmed WUMI, and WUMI will suffer further harm if Waterloo's claims are allowed at the same priority, which would be unfair and inequitable.

31.     Equitable subordination of Waterloo's claims is consistent with the Bankruptcy Code.

### COUNTERCLAIM 2:
### INTENTIONAL INTERFERENCE WITH CONTRACT
### (LOAN AGREEMENT)
### (WATERLOO AND PACNET)

32.     WUMI repeats and realleges the preceding allegations contained in Paragraphs 1 through 31 of its Counterclaims as if set forth fully herein.

33.     The Loan Agreement between WUMI and CS Mining, including its various amendments, is a valid contract, enforceable by WUMI and CS Mining.

34.     Plaintiffs have, at all times relevant to this claim, had actual knowledge of the existence of, and the terms of, the Loan Agreement, including its various amendments, including but not limited to the Tenth Amendment.

35.     Upon information and belief, Plaintiffs intentionally induced CS Mining to breach the Loan Agreement by instructing CS Mining to pay certain of its debts and obligations and not to meet other contractual obligations, specifically CS Mining's obligation to make monthly payments to WUMI under the Loan Agreement.

36.     Plaintiffs' intentional conduct—instructing CS Mining not to live up to its obligations to WUMI under the Loan Agreement—was intentional, without justification, and without cause.

\\DE - 043904/00000 - 1267472 v1

37.      CS Mining's failure to pay WUMI the monthly payments WUMI is owed under

the Loan Agreement, at Plaintiffs' instruction, constitutes Events of Default under the Loan

Agreement.

38.      WUMI has been damaged by Plaintiffs' inducement of CS Mining to breach the

Loan Agreement, including but not limited to lost monthly payments, in an amount to be proven

at trial.

## COUNTERCLAIM 3:
## INTENTIONAL INTERFERENCE WITH CONTRACT
## (TENTH AMENDMENT TO LOAN AGREEMENT)
## (WATERLOO AND PACNET)

39.      WUMI repeats and realleges the preceding allegations contained in Paragraphs 1

through 38 of its Counterclaims as if set forth fully herein.

40.      The Tenth Amendment to the Loan Agreement between WUMI and CS Mining is

a valid contract, enforceable by WUMI and CS Mining.

41.      Upon information and belief, Plaintiffs have actual knowledge of the existence of,

and the terms of, the Tenth Amendment to the Loan Agreement.

42.      Upon information and belief, Plaintiffs intentionally induced CS Mining to breach

the Tenth Amendment to the Loan Agreement by instructing CS Mining to draw down more than

$29,750,000 of the Noble/Waterloo Loan pursuant to the Noble Loan Agreement without first

notifying WUMI and obtaining WUMI's consent and approval to do so.

43.      Plaintiffs' intentional conduct—instructing CS Mining to draw down the full

facility payment pursuant to the Noble Loan Agreement without first notifying WUMI and

obtaining WUMI's consent and approval to do so—was intentional, without justification, and

without cause.

WOE - 045994/209001 - 1207472 V1

44.    Upon information and belief, at Plaintiffs' instruction, CS Mining breached the

Tenth Amendment to the Loan Agreement by drawing down more than $29,750,000 of the

Noble/Waterloo Loan pursuant to the Noble Loan Agreement without first notifying WUMI and

obtaining WUMI's consent and approval.  CS Mining's breach constitutes an Event of Default

under the terms of the Loan Agreement.

45.    WUMI has been damaged by Plaintiffs' inducement of CS Mining to breach the

Tenth Amendment to the Loan Agreement in an amount to be proven at trial.

**COUNTERCLAIM 4:**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(WATERLOO)**

46.    WUMI repeats and realleges the preceding allegations contained in Paragraphs 1

through 45 of its Counterclaims, as if set forth fully herein.

47.    This Counterclaim is alleged in the alternative with respect to WUMI's third

affirmative defense.  WUMI, CS Mining, and Noble entered into the Intercreditor Agreement on

August 12, 2014.

48.    Plaintiff Waterloo alleges that it has stepped into the shoes of Noble with regard

to the Intercreditor Agreement.  If so, Waterloo owes WUMI a duty to act in good faith and deal

fairly with WUMI under the Intercreditor Agreement.

49.    Pursuant to Section 5.2 of the Intercreditor Agreement, WUMI is obligated to

convert CS Mining's debt into an equity interest **_only if_** "the Project Completion Date (as defined

in the Noble Loan Agreement[ ]) occurs or Noble [succeeded here by Waterloo] loans the

Borrower the Full Facility Amount pursuant to the Noble Loan Agreement, **_and_** there are no

existing defaults under the Noble Loan Agreement or that occur in connection with lending the

Full Facility Amount . . . ." (Emphasis added).

50.    In violation of its implied duty of good faith and fair dealing, Waterloo instructed

CS Mining to draw down more than $29,750,000 of the Noble/Waterloo Loan pursuant to the

Noble Loan Agreement without first notifying WUMI and obtaining WUMI's consent and

approval.  Waterloo so instructed CS Mining in an attempt to trigger the mandatory-conversion

provision of Section 5.2 of the Intercreditor Agreement.

51.    Under Section 5.2 of the Intercreditor Agreement, if a single default exists under

either the Noble Loan Agreement or in connection with lending the Full Facility Amount, as

defined in the Noble Loan Agreement, WUMI is not required to convert its interest to equity.

52.    Several such defaults presently exist, including but not limited to:

a.    CS Mining drew down more than $29,750,000 of the Noble/Waterloo Loan

pursuant to the Noble Loan Agreement without notifying WUMI and obtaining

the reasonable approval of WUMI, in violation of Section 2 of the Tenth

Amendment to the Loan Agreement.

b.    The breach identified immediately above in Counterclaim Paragraph 52(a)

constitutes an Event of Default under the Loan Agreement and occurred in

connection with Waterloo lending CS Mining the Full Facility Amount.

c.    CS Mining has failed to pay WUMI amortizing payments when due pursuant to

the Loan Agreement, as amended, commencing on January 1, 2016, and

continuing on the first day of each month thereafter.  This failure constitutes an

Event of Default as defined in the Loan Agreement pursuant to Section 7.1(b);

44

this failure also constitutes a Cross Default under the Noble Loan Agreement pursuant to Section 8.01(e) thereof, and CS Mining thus is also in default pursuant to the Noble Loan Agreement on this basis.

d.  CS Mining has failed to pay the full amount of its obligations to WUMI under the Loan Agreement pursuant to the demand made by WUMI in the Acceleration Letter, dated February 29, 2016.  This failure constitutes an Event of Default as defined in the Loan Agreement pursuant to Section 7.1(b); this failure also constitutes a Cross Default under the Noble Loan Agreement pursuant to Section 8.01(e) thereof, and CS Mining thus is also in default pursuant to the Noble Loan Agreement on this basis.

e.  CS Mining has failed to pay Waterloo amortizing payments when due pursuant to the Noble Loan Agreement, as amended, commencing at least as early as November 1, 2016, and continuing on the first day of each month thereafter; this failure constitutes an Event of Default as defined in the Loan Agreement pursuant to Section 7.1(b).

f.  Upon information and belief, CS Mining has failed to maintain the Collateral as required pursuant to Section 3.1.7 of the Loan Agreement.

g.  CS Mining has incurred claims and litigation involving the Collateral due to the New York lawsuit, filed by Waterloo against WUMI, in violation of Section 3.1.8 of the Loan Agreement.

h.  Upon information and belief, CS Mining has failed to obtain agreement or approval of use of proceeds for all funding on or after July 9, 2013, in accordance

with CS Mining's business plan presented to WUMI, in violation of Section 2(c)(i) of the Fifth Amendment to the Loan Agreement.

i.  CS Mining decided to make capital expenditures on a consolidated basis, or enter into contractual obligation in excess, on a consolidated basis, of one-hundred-twenty percent (120%) of the budget approved by the Board of Managers, in violation of Section 2(c)(v) of the Fifth Amendment to the Loan Agreement.

j.  Upon information and belief, CS Mining decided to adopt an annual budget or modify a previously approved budget, in each case that exceeds the previous annual budget or previously approved annual budget by one-hundred-twenty percent (120%), in violation of Section 2(c)(vi) of the Fifth Amendment to the Loan Agreement.

k.  CS Mining failed to provide WUMI with the right to an Observer to, or notice of, any meetings of CS Mining's Board of Managers, in violation of Section 2(d)(i) of the Fifth Amendment to the Loan Agreement.

l.  Upon information and belief, CS Mining failed to provide notice of material actions of the Board of Managers of CS Mining.

53.     The above-listed defaults constitute defaults under the Noble Loan Agreement pursuant to the Cross-Default provision, Section 8.01(e), of that agreement, and/or constitute defaults that occurred in connection with lending the Full Facility Amount under Section 5.2 of the Intercreditor Agreement.   Because these are conditions precedent to the mandatory-conversion provision contained in Section 5.2 of the Intercreditor Agreement that have not been satisfied, WUMI was never obligated and remains not obligated to convert its debt into equity.

\\DE - 045904/000001 - 1267672 v1

54.     Nevertheless, in violation of its implied duty of good faith and fair dealing,

Waterloo has attempted to waive any default under the Noble Loan Agreement so as to trigger

WUMI's obligation to convert its debt into equity in Skye.  Specifically, on February 3, 2016,

Waterloo informed CS Mining that it was waiving all defaults under the Noble Loan Agreement.

That same day, Waterloo sent a letter to WUMI informing WUMI that the mandatory-conversion

provision of the Intercreditor Agreement had been triggered and insisting that WUMI convert its

debt to equity.

55.     Upon information and belief, Waterloo (i) instructed CS Mining to draw down

more than $29,750,000 of the Noble/Waterloo Loan pursuant to the Noble Loan Agreement

without first notifying WUMI and obtaining WUMI's consent and approval, and (ii) purported to

waive all existing defaults under the Noble Loan Agreement, all in an effort to force WUMI to

convert its debt into equity, which would eliminate WUMI's debt interest in CS Mining, thereby

making Waterloo a sole debt-holder with the controlling security interest.

56.     Waterloo's actions were inconsistent with its implied duties under the

Intercreditor Agreement and destroyed and injured WUMI's right to receive the fruits of the

Intercreditor Agreement.

57.     Waterloo's breaches of its duty of good faith and fair dealing under the

Intercreditor Agreement damaged WUMI in an amount to be proven at trial.

### COUNTERCLAIM 5
### RECHARACTERIZATION
### (WATERLOO)

58.     WUMI repeats and realleges the preceding allegations contained in Paragraphs 1

through 57 of its Counterclaims, as if set forth fully herein.

47

\\DE - 045904/00001 - 1267472 v1

59.    To the extent that the Noble Loan was properly transferred to Waterloo, Plaintiff Waterloo's debt should be recharacterized to equity under the Bankruptcy Code.

60.    Waterloo alleges that it stepped into the shoes of Noble by acquiring the Noble Loan.

61.    Upon information and belief, Waterloo purchased the Noble Loan to protect the equity of its affiliates, PacNet and DXS, in CS Mining.

62.    Upon information and belief, on or about February 4, 2016, CS Mining drew an additional $250,000 under the Noble Loan.

63.    Upon information and belief, the $250,000 CS Mining drew down after Waterloo's purported acquisition of the Noble Loan was orchestrated by Waterloo's affiliates, DXS and PacNet, in order to protect their equity in CS Mining by attempting to trigger the conversion provisions of the Intercreditor Agreement to convert WUMI's debt to equity in Skye.

64.    The purchase of the Noble Loan and the funding of the additional $250,000 was not a true loan but, rather, functioned as equity and should be recharacterized as such.

65.    Thus, WUMI requests entry of a judgment recharacterizing Plaintiff Waterloo's debt as an equity interest and awarding such other relief the Court deems just and proper.

### COUNTERCLAIM 6:
### DECLARATORY JUDGMENT
### (WATERLOO)

66.    WUMI repeats and realleges the preceding allegations contained in Paragraphs 1 through 65 of its Counterclaims, as if set forth fully herein.

{\DE - 045904/00000} - 1267672 v}

67.    WUMI, CS Mining, and Noble entered into the Intercreditor Agreement on
August 12, 2014. Plaintiff Waterloo alleges that it has stepped into the shoes of Noble with
regard to the Intercreditor Agreement.

68.    Pursuant to Section 5.2 of the Intercreditor Agreement, WUMI is obligated to
convert CS Mining's debt into an equity interest ***only if*** "the Project Completion Date (as defined
in the Noble Loan Agreement[ ]) occurs or Noble [succeeded here by Waterloo] loans the
Borrower the Full Facility Amount pursuant to the Noble Loan Agreement, ***and*** there are no
existing defaults under the Noble Loan Agreement or that occur in connection with lending the
Full Facility Amount . . . ." (Emphasis added).

69.    CS Mining drew down more than $29,750,000 of the Noble/Waterloo Loan
pursuant to the Noble Loan Agreement without first notifying WUMI and obtaining WUMI's
consent and approval.

70.    Prior to drawing down more than $29,750,00 of the Noble/Waterloo Loan,
CS Mining neither notified WUMI nor obtained WUMI's consent and approval, in violation of
Section 2 of the Tenth Amendment to the Loan Agreement.

71.    CS Mining's breach of the Tenth Amendment to the Loan Agreement constitutes
an Event of Default under the Loan Agreement and occurred in connection with Waterloo
lending CS Mining the Full Facility Amount, the condition precedent to WUMI's mandatory
conversion requirement set forth in Section 5.2 of the Intercreditor Agreement.

72.    WUMI has no obligation to convert its debt to equity because all of the conditions
that are precedent to application of the mandatory-conversion provision of the Intercreditor
Agreement have not been met.

\\DE - 045904/00000 1 – 1267432 v1

73.     Although WUMI has no obligation to convert its debt to equity, Plaintiff Waterloo has insisted in writing that it do so on at least three occasions, by letter of January 13, 2016, February 5, 2016, and March 7, 2016.

74.     As a result of Plaintiffs' refusal to accept that the conditions precedent to the mandatory-conversion provision of the Intercreditor Agreement have not been met, and due to Plaintiffs' insistence that WUMI convert its debt to equity nevertheless, and the actions Plaintiffs have taken to effectuate their belief (including filing the New York lawsuit), WUMI has been and continues to be irreparably harmed and an actual and judiciable controversy has arisen with respect to the rights of the parties under the Intercreditor Agreement.

75.     WUMI seeks a judgment resolving this actual controversy by declaring that the conditions that are precedent to the mandatory-conversion provision of the Intercreditor Agreement have not been met and that WUMI has no obligation to convert its debt to equity.

76.     In the alternative, WUMI seeks a judgment resolving this actual controversy by declaring that it would be improper to recharacterize its debt as equity.

### COUNTERCLAIM 7:
### BREACH OF CONTRACT
### (INTERCREDITOR AGREEMENT)
### (WATERLOO)

77.     WUMI repeats and realleges the preceding allegations contained in Paragraphs 1 through 76 of its Counterclaims as if set forth fully herein.

78.     WUMI, CS Mining, and Noble entered into the Intercreditor Agreement on August 12, 2014.  Plaintiff Waterloo alleges that it has stepped into the shoes of Noble with regard to the Intercreditor Agreement.

50

79.    Upon information and belief, Waterloo has actual knowledge of the existence of, and the terms of, the Intercreditor Agreement.

80.    At all relevant times, WUMI performed all of the terms, conditions and obligations required of WUMI under the Intercreditor Agreement.

81.    Waterloo is a proposed lender for the debtor-in-possession financing for CS Mining, which was approved on an interim basis, and is subject to final approval by the Bankruptcy Court.

82.    Under the motion seeking approval of the debtor-in-possession financing on a final basis, the proposed financing would prime WUMI's senior lien.

83.    By agreeing to take part in the debtor-in-possession financing, Plaintiff Waterloo has breached Sections 2.2 and 7 of the Intercreditor Agreement.

84.    Under the Intercreditor Agreement, Plaintiff Waterloo is barred from participating in the debtor-in-possession financing that would prime WUMI's senior lien. Further, the Intercreditor Agreement provides that Plaintiff Waterloo cannot contest, among other things, the priority of WUMI's lien or take any action that would interfere, hinder, or delay WUMI's disposition of its collateral.

85.    In contravention of the Intercreditor Agreement, Plaintiff Waterloo is attempting to obtain a lien on a final basis that would be senior to WUMI's senior lien in the WUMI Priority Collateral and that clearly interferes, hinders and/or delays WUMI's disposition of its collateral. Plaintiff Waterloo is aware of these prohibitions; yet Waterloo has repeatedly ignored its contractual obligations.

WDB - 045904/00000 1 - 1267472 v1

86.     As a direct result of Waterloo's breach, if the debtor-in-possession financing is approved on a final basis, WUMI would suffer damages in an amount to be proven at trial.

### COUNTERCLAIM 8:
### DISALLOWANCE OF CLAIM
### (WATERLOO)

87.     WUMI repeats and realleges the preceding allegations contained in Paragraphs 1 through 86 of its Counterclaims as if set forth fully herein.

88.     In its Notice of Chapter 11 Bankruptcy Case, the Bankruptcy Court notified creditors that the deadline to file general proofs of claim in this case is December 8, 2016.

89.     Waterloo has yet to file a formal proof of claim, but has asserted in numerous pleadings that it holds a secured claim against the Debtor in the amount of $30,000,000 plus interest and other costs.  Further, the Debtor's Schedule D lists Waterloo as holding a secured claim against the Debtor in an amount totaling $34,755,133.23.  [Dkt. No. 230.]

90.     Upon information and belief, Noble was not permitted under the Noble Loan to assign the Noble Loan to Waterloo.  Accordingly, Waterloo was not a rightful assignee and the transfer of the Noble Loan to Waterloo was void.

91.     Because the purported transfer was void, Waterloo is not the proper holder of a "claim" against the Debtor as provided for in Bankruptcy Code § 101(5) and its purported claim should be disallowed in full.

### COUNTERCLAIM 9:
### DISALLOWANCE OF CLAIM
### (WATERLOO)

92.     WUMI repeats and realleges the preceding allegations contained in Paragraphs 1 through 91 of its Counterclaims as if set forth fully herein.

\\DE - 045904/00001 - 1267472 \1

93.    Alternatively, if Waterloo does have a claim against the Debtor arising out of its acquisition of the Noble Loan, Waterloo's prepetition debt includes embedded original issue discount ("OID"), part of which represents interest that has not matured and is therefore not recoverable under Bankruptcy Code § 502(b)(2).

94.    Upon information and belief, CS Mining issued warrants to Noble in connection with the Noble Loan. At the time of issuance, the warrants were of a value yet to be determined and some of the cash advanced by Noble to the Debtor necessarily constituted the purchase price of the warrants. The treatment of the purchase price of the warrants, such price which is effectively payable at maturity of the Noble Loan, is a form of OID. Accordingly, future OID, i.e., that which would have accrued after CS Mining's principal is paid off, is interest that has not matured.

95.    To the extent that the debt owed by CS Mining to Waterloo includes amounts that are actually interest that has not matured, these amounts must be disallowed.

### WUMI'S PRAYER FOR RELIEF

WHEREFORE, WUMI respectfully requests judgment be entered in its favor and against Plaintiffs and for the Court to enter an Order as follows:

A.    Entry of a judgment subordinating Plaintiff Waterloo's claims to WUMI's claims;

B.    Entry of a judgment recharacterizing Plaintiff Waterloo's debt to equity of CS Mining;

C.    Entry of a judgment disallowing Plaintiff Waterloo's claim in its entirety or, alternatively, disallowing Plaintiff Waterloo's claim to the extent it contains interest that is not mature;

WDE~045904/008001 : 1267473 V1

D.    Entry of a declaratory judgment that WUMI has no obligation to convert the debt

CS Mining owes WUMI into equity, and that the debt CS Mining owes WUMI

may not properly be recharacterized as equity;

E.    Awarding WUMI actual damages and punitive damages in amounts to be proven

at trial;

F.    Declaring that Plaintiff Waterloo is in breach of the Intercreditor Agreement;

G.    Permanently enjoining and restraining Plaintiffs and any agents acting on their

behalf from taking any steps to interfere with WUMI's enforcement of its rights regarding and

liens over CS Mining's assets;

H.    Awarding attorneys' fees, legal costs, and other expenses incurred by WUMI in

connection with this action;

I.    Awarding such other relief as this Court deems just and proper.

WDB - 045904/00000 - 1267473.v1

Respectfully submitted this 8th day of September, 2016.

HOGAN LOVELLS US LLP

s/ Andrew C. Lillie
Andrew C. Lillie (*pro hac vice*)
Jessica Black Livingston (*pro hac vice*)
1601 Wewatta Street, Suite 900
Denver, CO 80202
Telephone: (303) 899-7300
Facsimile: (303) 899-7333
Email: andrew.lillie@hoganlovells.com
        jessica.livingston@hoganlovells.com

Ronald J. Silverman (*pro hac vice*)
John D. Beck (*pro hac vice*)
Vivian Ban (*pro hac vice*)
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Email: ronald.silverman@hoganlovells.com
        john.beck@hoganlovells.com
        vivian.ban@hoganlovells.com

and

David L. Pinkston (#6630)
P. Matthew Cox (#9879)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor    ·
Post Office Box 45000
Salt Lake City, Utah  84145-5000
Telephone: (801) 521-9000
Fax: (801) 363-0400
Email: dlp@scmlaw.com
        pmc@scmlaw.com

*Attorneys for David J. Richards, LLC d/b/a*
*Western US Mineral Investors, LLC*

## CERTIFICATE OF MAILING

I, P. Matthew Cox, attorney for David J. Richards, LLC d/b/a Western US Mineral Investors,

LLC, hereby certify that on the 8th day of September, 2016, I caused to be served a true and correct copy

of the foregoing **ANSWER AND COUNTERCLAIMS OF DEFENDANT DAVID J.**

**RICHARDS, LLC, an Ohio limited liability company d/b/a WESTERN US MINERAL**

**INVESTORS, LLC**, Adversary Proceeding No. 16-02118, which was filed electronically, and

electronically served upon the parties in the manner indicated:

      Adelaide Maudsley                      (via ECF)
      KIRTON McCONKIE
      50 East South Temple, Suite 400
      Salt Lake City, Utah 84111

                                      /s/ P. Matthew Cox

\\DE - 045904/000001 - 1267472.v1

# EXHIBIT G

## ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF MANAGERS OF
## CS MINING, LLC

May 3, 2017

The undersigned managers of CS Mining, LLC (the "**Company**"), constituting all of the Managers on the Board of Managers (the "**Board**") of the Company, resolve as follows, effective as of the date written above:

**WHEREAS,** the Company is a debtor-in-possession in the chapter 11 case pending in the United States Bankruptcy Court for the District of Utah, Central Division, Case Number: 16-24818 (the "**Bankruptcy Case**").

**WHEREAS,** on August 24, 2016, David Beckman, Michael Buenzow, and Randy Davenport of FTI Consulting, Inc. (the "**CROs**") were appointed in the Bankruptcy Case as the Chief Restructuring Officers of the Company.

**WHEREAS,** the Company has filed two separate adversary actions in the Bankruptcy Case seeking a determination of the nature, extent, validity, and priority of the liens and claims of the Company's prepetition lenders: (i) *CS Mining, LLC v. Waterloo Street Limited, et. al.,* Adv. Case No. 17-02025; and (ii) *CS Mining, LLC . Western US Mineral Investors, LLC,* Adv. Case No. 17-02024 (collectively, the "**Lender Adversary Cases**").

**WHEREAS,** at a meeting of the Board on April 25, 2017, David J. Richards and Clint W. Walker, approved and adopted the resolution (the "**Resolution**") attached as **Exhibt A** hereto.

**WHEREAS,** at a meeting of the Board on May 2, 2017, the Chair of the Board, Marshall Cooper, requested that the "Settlement Authority as to Waterloo" section of the Resolution be amended, by replacing the language in that section with the following language – "the amount of any proposed settlement with Waterloo Street Limited ("**Waterloo**") in the Lender Adversary Cases does not exceed the principal amount of money loaned by Noble Americas Corporation ("**Noble**") to the Company ($30,000,000) plus twenty percent (20%) of the principal amount loaned by Noble to the Company, and the settlement is in the best interests of the Company and its bankruptcy estate."

**WHEREAS,** the Board believes it is in the best interest of the Company and the Company's bankruptcy estate to expand the powers of the CROs by authorizing the CROs to analyze, evaluate, negotiate, propose, and otherwise authorize and approve, on behalf of the Company and the Company's bankruptcy estate, any and all settlement discussions and settlements with the respective defendants in the Lender Adversary Cases.

**WHEREAS,** the Board resolves and approves the following resolution, which shall amend, modify and supersede the Resolution:

**NOW, THEREFORE, BE IT RESOLVED**, the Board hereby authorizes and approves that the CROs be hereby authorized and appointed to analyze, evaluate, negotiate, propose, and otherwise authorize and approve, on behalf of the Company and the Company's bankruptcy estate, any and all settlement discussions, settlement term sheets, and final settlements with the respective defendants in the Lender Adversary Cases, provided that:

> (i) **Settlement Authority as to WUMI** - the amount of any proposed settlement with David J. Richards, LLC d/b/a Western US Mineral Investors, LLC ("**WUMI**") in the Lender Adversary Cases does not exceed the principal amount of money loaned by WUMI to the Company ($20,500,000 million) plus twenty percent (20%) of the principal amount of the money loaned by WUMI to the Company (*i.e.*, $4,100,000), and the settlement is in the best interests of the Company and its bankruptcy estate;

> (ii) **Settlement Authority as to Waterloo** - the amount of any proposed settlement with Waterloo Street Limited ("**Waterloo**") in the Lender Adversary Cases does not exceed the principal amount of money loaned by Noble Americas Corporation ("**Noble**") to the Company ($30,000,000) plus twenty percent (20%) of the principal amount loaned by Noble to the Company (i.e. $6,000,000) and the settlement is in the best interests of the Company and its bankruptcy estate; and

> (iii) **Settlements Subject to Bankruptcy Court Approval** - any and all settlements shall be subject to final review and approval, after notice and motion, of the United States Bankruptcy Court for the District of Utah in the Bankruptcy Case Number 16-24818.

**BE IT FURTHER RESOLVED,** that the CROs shall, to the extent necessary, amend their retention application in the bankruptcy case accordingly.

<u>**CS MINING BOARD**</u>:

Marshall Cooper

David J. Richards                              Clinton W. Walker

# EXHIBIT H

## Detweiler, Donald J.

| | |
|---|---|
| **From:** | Detweiler, Donald J. |
| **Sent:** | Tuesday, May 23, 2017 1:23 PM |
| **To:** | 'Marsh Cooper (mcooperind@icloud.com)'; 'David J. Richards (djr@n8medical.com)'; 'drichards@empireadvisorsllc.com'; 'Clint Walker (CW@claritypartners.net)'; 'd.v.richards@csmining.com'; 'David McMullin (dmcmullin@csmining.com)' |
| **Cc:** | Lawall, Fran; 'Leta, David <dleta@swlaw.com> (dleta@swlaw.com)'; Cline, Joanna J.; 'Tuttle, Jeff (jtuttle@swlaw.com)'; 'Brosious, Dan (dbrosio@FTIConsulting.com)'; 'dave.beckman@fticonsulting.com' |
| **Subject:** | CS Mining - Draft Form of Notice of Special Meeting |
| **Attachments:** | CS Mining - Notice of June 1, 2017 Special Meeting.DOCX |

Dear Members of the Board:

Attached, in draft form, is a proposed Notice of the June 1, 2017 Special Meeting of the Board of Directors of CS Mining, LLC.

Please provide your comments and edits to the proposal at your earliest convenience so that we may get the Notice out to all of the Board Members.

Don

## NOTICE OF SPECIAL MEETING OF THE
## BOARD OF DIRECTORS OF CS MINING, LLC

**NOTICE IS HEREBY GIVEN THAT** a Special Meeting of the Board of Managers (the "**Board**") of CS Mining, LLC (the "**Company**") will be held on Thursday, June 1, 2017 at 5:00 p.m. Eastern. The meeting will be held telephonically using the "Call-In" numbers identified below. At the meeting the Board will be asked to approve the following resolutions:

**I.**   **Resolutions proposed by Clint Walker:**

**NOW, THEREFORE, BE IT RESOLVED**, the Board hereby authorizes and approves on behalf of the Company and the Company's bankruptcy estate: (i) the Confidential Settlement Proposal to Western US Mineral Investors, LLC attached hereto as **Exhibit A** (the "**Settlement Proposal**"); and (ii) the Settlement Agreement By and Between CS Mining, LLC and David J. Richards, LLC D/B/A Western US Mineral Investors, LLC attached hereto as **Exhibit B** (the "**Settlement Agreement**").

**BE IT FURTHER RESOLVED**, the Settlement Proposal and Settlement Agreement shall be subject to final review and approval, after notice and motion, of the United States Bankruptcy Court for the District of Utah in the Bankruptcy Case Number 16-24818.

**II.**   **Resolutions proposed by Marshall Cooper:**

[Insert Cooper's resolutions if any]

**III.**   **Resolutions proposed by David J. Richards:**

[Insert Richards' resolutions if any]

The "Dial-In" number for the Special Meeting shall be:

|  |  |
| --- | --- |
| **Conference Number:** | **866 499 5343** |
| **Passcode:** | **302 777 6524 #** |

This Notice is approved and acknowledged by the members of the Board.


_____          _____          _____

**Marshall Cooper**          **Clint Walker**          **David J. Richards**

# EXHIBIT I

## Detweiler, Donald J.

| | |
|---|---|
| **From:** | Detweiler, Donald J. |
| **Sent:** | Wednesday, May 31, 2017 4:19 PM |
| **To:** | 'Marsh Cooper (mcooperind@icloud.com)'; 'David J. Richards (djr@n8medical.com)'; 'drichards@empireadvisorsllc.com'; Cline, Joanna J. |
| **Cc:** | 'David McMullin (dmcmullin@csmining.com)'; 'd.v.richards@csmining.com'; Lawall, Fran; Cline, Joanna J.; 'Leta, David <dleta@swlaw.com> (dleta@swlaw.com)'; 'Tuttle, Jeff (jtuttle@swlaw.com)'; 'Brosious, Dan (dbrosio@FTIConsulting.com)'; 'dave.beckman@fticonsulting.com' |
| **Subject:** | CS Mining - Notice of Special Meeting of the Board of Directors of CS Mining LLC |
| **Attachments:** | CS Mining - Notice of June 1, 2017 Special Meeting.DOCX |
| | |
| **Importance:** | High |

Dear Board:

Attached is the Notice of Special Meeting of the Board of Directors of CS Mining LLC, which meeting has been scheduled for June 14, 2017 at 10:00 a.m. Eastern.

The Notice provides an additional WHEREAS clause (the 3rd paragraph) which provides:

> **WHEREAS**, no Special Meeting of the Board will be held on June 1, 2017.

Don

**Donald J. Detweiler**
Partner

# Pepper Hamilton LLP
Attorneys at Law

Hercules Plaza, Suite 5100 | 1313 N. Market Street | P.O. Box 1709
Wilmington, Delaware 19899-1709
p: 302.777.6524 | f: .800.343.6137 | bio

6/14/2017
Mtg Notice

## RE-NOTICE OF SPECIAL MEETING OF THE
## BOARD OF DIRECTORS OF CS MINING, LLC
## MEETING RESCHEDULED FROM JUNE 1, 2017 to JUNE 14, 2017

**WHEREAS,** on May 23, 2017, a Special Meeting (the "**Proposed Special Meeting**") of the Board of Managers (the "**Board**") of CS Mining, LLC (the "**Company**") was scheduled by the Board to be held on Thursday, June 1, 2017.

**WHEREAS,** on Friday, May 26, 2017, Board Member Marshall Cooper withdrew, by correspondence dated May 25, 2017, his waiver of the "10 business day notice" requirement set forth in Section 5.1(e) of the Company's Third Amended and Restated Limited Liability Company Agreement of Skye Mineral Partners, LLC.

**WHEREAS,** no Special Meeting of the Board will be held on June 1, 2017.

**WHEREAS,** on Tuesday, May 30, 2017, Board Member Clint Walker requested that the proposed Special Meeting be rescheduled by the Board.

**WHEREAS,** the Proposed Special Meeting has been rescheduled for **Wednesday, June 14, 2017 at 10:00 a.m. Eastern Time**. The meeting will be held telephonically using the "Call-In" numbers identified below. At the meeting the Board will be asked to approve the following resolutions:

I.      **Resolutions proposed by Clint Walker:**

   **NOW, THEREFORE, BE IT RESOLVED**, the Board hereby authorizes and approves on behalf of the Company and the Company's bankruptcy estate: (i) the Confidential Settlement Proposal to Western US Mineral Investors, LLC attached hereto as **Exhibit A** (the "**Settlement Proposal**"); and (ii) the Settlement Agreement By and Between CS Mining, LLC and David J. Richards, LLC D/B/A Western US Mineral Investors, LLC attached hereto as **Exhibit B** (the "**Settlement Agreement**").

   **BE IT FURTHER RESOLVED**, the Settlement Proposal and Settlement Agreement shall be subject to final review and approval, after notice and motion, of the United States Bankruptcy Court for the District of Utah in the Bankruptcy Case Number 16-24818.

II.     **Resolutions proposed by Marshall Cooper:**

   [Insert Cooper's resolutions if any]

III.    **Resolutions proposed by David J. Richards:**

   [Insert Richards' resolutions if any]

   The "Dial-In" number for the Special Meeting shall be:

   **Conference Number:          866 499 5343**

**Passcode:**          302 777 6524 #

This Notice is approved and acknowledged by the members of the Board.

_____          _____          _____

**Marshall Cooper**          **Clint Walker**          **David J. Richards**

# EXHIBIT J

## Detweiler, Donald J.

| | |
|---|---|
| **From:** | Detweiler, Donald J. <detweild@pepperlaw.com> |
| **Sent:** | Wednesday, May 31, 2017 6:24 PM |
| **To:** | 'Marsh Cooper (mcooperind@icloud.com)'; 'David J. Richards (djr@n8medical.com)'; 'drichards@empireadvisorsllc.com'; 'Clint Walker (CW@claritypartners.net)' |
| **Cc:** | Lawall, Fran; 'Leta, David <dleta@swlaw.com> (dleta@swlaw.com)'; Cline, Joanna J.; 'Tuttle, Jeff (jtuttle@swlaw.com)'; Brosious, Dan; Beckman, David |
| **Subject:** | CS Mining - Notice of Additional Proposed Special Meeting for June 16, 2017 |
| **Attachments:** | CS Mining - Notice of June 16, 2017 special meeting notice.DOCX |
| **Importance:** | High |

Dear Members of the Board:

Clint Walker has requested the following Notice of Additional Proposed Special Meeting be circulated to the Board.  The Additional Proposed Special Meeting will be held on **June 16, 2017 at 10:00 a.m.**

Don

**Donald J. Detweiler**
Partner

# Pepper Hamilton LLP
### Attorneys at Law

Hercules Plaza, Suite 5100 | 1313 N. Market Street | P.O. Box 1709
Wilmington, Delaware 19899-1709
p: 302.777.6524 | f: .800.343.6137 | bio

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this email without the author's prior permission. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses. The information contained in this communication may be confidential and may be subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic messages from us in the future then please respond to the sender to this effect.

**NOTICE OF SPECIAL MEETING OF THE
BOARD OF DIRECTORS OF CS MINING, LLC
MEETING SCHEDULED FOR JUNE 16, 2017**

**WHEREAS,** a Special Meeting (the "**Proposed Special Meeting**") of the Board of Managers (the "**Board**") of CS Mining, LLC (the "**Company**") has been scheduled to be held on Wednesday, June 14, 2017 at 10:00 a.m. Eastern.

**WHEREAS,** in the event a quorum for purposes of transaction of business by the Board of Managers **shall not** exist at the June 14, 2017 Proposed Special Meeting, Board Member Clint Walker has requested that a second Special Meeting of the Board be scheduled for **Friday, June 16, 2017 at 10:00 a.m. Eastern** (the "Additional Proposed Special Meeting").

**WHEREAS,** the Additional Proposed Special Meeting to be held on **Friday, June 16, 2017 at 10:00 a.m. Eastern Time** will be held telephonically using the "Call-In" numbers identified below. At the Additional Proposed Special Meeting, the Board will be asked to approve, subject to whether a quorum existed the June 14, 2017 Proposed Special Meeting, the following resolutions:

I.    **Resolutions proposed by Clint Walker:**

**NOW, THEREFORE, BE IT RESOLVED,** the Board hereby authorizes and approves on behalf of the Company and the Company's bankruptcy estate: (i) the Confidential Settlement Proposal to Western US Mineral Investors, LLC attached hereto as **Exhibit A** (the "**Settlement Proposal**"); and (ii) the Settlement Agreement By and Between CS Mining, LLC and David J. Richards, LLC D/B/A Western US Mineral Investors, LLC attached hereto as **Exhibit B** (the "**Settlement Agreement**").

**BE IT FURTHER RESOLVED,** the Settlement Proposal and Settlement Agreement shall be subject to final review and approval, after notice and motion, of the United States Bankruptcy Court for the District of Utah in the Bankruptcy Case Number 16-24818.

II.   **Resolutions proposed by Marshall Cooper:**

[Insert Cooper's resolutions if any]

III.  **Resolutions proposed by David J. Richards:**

[Insert Richards' resolutions if any]

The "Dial-In" number for the Special Meeting shall be:

| | |
|---|---|
| **Conference Number:** | 866 499 5343 |
| **Passcode:** | 302 777 6524 # |

This Notice is approved and acknowledged by the members of the Board.

_____        _____        _____

**Marshall Cooper**            **Clint Walker**               **David J. Richards**

# EXHIBIT K

## Detweiler, Donald J.

| | |
|---|---|
| **From:** | Clint Walker <CW@claritypartners.net> |
| **Sent:** | Thursday, June 01, 2017 1:05 PM |
| **To:** | Detweiler, Donald J.; David Richards; Marshall Cooper |
| **Cc:** | Lawall, Fran; David McMullin |
| **Subject:** | New SMP and CS Board Member |

Don – please find the email below which outlines steps that Clarity Copper, LLC (Clarity Copper) is taking to respond to your comments made to the full CS board on this past Tuesday. You stated that all of the current directors of CS Mining, LLC (CSM) are conflicted as it relates voting on the resolution that I recently put to the full board related to the WUMI settlement which was negotiated and presented to the bankruptcy court between the CRO and WUMI (i.e. DJR, LLC).

According to Section 5.1 (b) (i) and (ii) of the Skye Mineral Partners, LLC (SMP) Operating Agreement (As Amended by the Fourth Amendment on April 25, 2015), Clarity Copper hereby appoints Mr. John Bryan as an additional Manager effective immediately.

Also according to Section 5.1 (a) of the CSM Operating Agreement "The Company's Board of Managers will consist of the members of the Majority Members Board of Managers as constituted under the terms of its Operating Agreement from time-to-time". Please welcome Mr. Bryan to the Board of Managers of CSM as the second nominee of Clarity Copper.

Mr. Bryan is the Chief Executive Officer of the Watley Group, a Los Angeles based firm which specializes in corporate restructuring and financial advisory services. In addition, Mr. Bryan has substantial relevant experience including transactions with HCA, Gulfstream, Enron, Sears, GNC, and numerous other smaller transactions. Mr. Bryan has specific and substantial experience in front of Judge Thurman during his tenure as CRO of Copper King Mining Corporation and of its wholly-owned subsidiary Western Utah Copper Company in 2011, 2012 and 2013. In addition, Mr. Bryan has negotiated and completed numerous Rule 9019 settlements during his career and is knowledgeable on the various key bankruptcy provisions of such transactions.

To my knowledge, there has been no direct or in-direct economic transactions between Clarity Copper (or any affiliated entity) or WUMI and Mr. Bryan at any time since the creation of CSM in November 2011. In addition, to my knowledge, there have been no direct or in-direct ownership positions, investments, transaction payments, etc between Mr. Bryan and any of the Clarity related funds and/or principals.

Starting today, I will review various key items filed in the CSM bankruptcy case (including the proposed WUMI settlement) with Mr. Bryan, provide him with an update on the current capital structure, status of depositions, and key upcoming dates. Given his substantial experience in this specific arena, Mr. Bryan has kindly offered to lead the work of reviewing the settlement agreement as negotiated by the CRO and to consider the proposed consent at the next board meeting of CSM along with any other non-conflicted directors.

Thank you.

Clint Walker

This email may contain material that is confidential and for the sole use of the intended recipient(s). Any review, reliance, distribution, or other use by others without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

# EXHIBIT L

## Detweiler, Donald J.

| | |
|---|---|
| **From:** | David J. Richards <djr@empireadvisorsllc.com> |
| **Sent:** | Friday, June 02, 2017 12:46 PM |
| **To:** | Clint Walker; Detweiler, Donald J.; Marshall Cooper |
| **Cc:** | Lawall, Fran; David McMullin |
| **Subject:** | RE: New SMP and CS Board Member |

I appoint Sturges Karban for the same reasons explained by Clint. Mr. Karban, a Harvard educated finance professional with a multi industry experience, including current work in natural resource and hard rock mining, is well equipped to act as a non conflicted director and help the board act appropriately.

David J. Richards
President and Managing Partner

EMPIRE ADVISORS, LLC
500 South Front St., Suite 1200 ▪ Columbus, Ohio 43215
M: 614.378.5900 ▪ O: 614.887.7118 ▪ F: 888.846.2353 djr@empireadvisorsllc.com

-----Original Message-----
From: Clint Walker [mailto:CW@claritypartners.net]
Sent: Thursday, June 01, 2017 1:05 PM
To: Donald Detweiler <detweild@pepperlaw.com>; David J. Richards <djr@empireadvisorsllc.com>; Marshall Cooper <mcooperind@icloud.com>
Cc: Lawall, Fran <LAWALLF@pepperlaw.com>; David McMullin <dmcmullin@csmining.com>
Subject: New SMP and CS Board Member

Don – please find the email below which outlines steps that Clarity Copper, LLC (Clarity Copper) is taking to respond to your comments made to the full CS board on this past Tuesday. You stated that all of the current directors of CS Mining, LLC (CSM) are conflicted as it relates voting on the resolution that I recently put to the full board related to the WUMI settlement which was negotiated and presented to the bankruptcy court between the CRO and WUMI (i.e. DJR, LLC).

According to Section 5.1 (b) (i) and (ii) of the Skye Mineral Partners, LLC (SMP) Operating Agreement (as Amended by the Fourth Amendment on April 25, 2015), Clarity Copper hereby appoints Mr. John Bryan as an additional Manager effective immediately.

Also according to Section 5.1 (a) of the CSM Operating Agreement "The Company's Board of Managers will consist of the members of the Majority Members Board of Managers as constituted under the terms of its Operating Agreement from time-to-time". Please welcome Mr. Bryan to the Board of Managers of CSM as the second nominee of Clarity Copper.

Mr. Bryan is the Chief Executive Officer of the Watley Group, a Los Angeles based firm which specializes in corporate restructuring and financial advisory services. In addition, Mr. Bryan has substantial relevant experience including transactions with HCA, Gulfstream, Enron, Sears, GNC, and numerous other smaller transactions. Mr. Bryan has specific and substantial experience in front of Judge Thurman during his tenure as CRO of Copper King Mining Corporation and of its wholly-owned subsidiary Western Utah Copper Company in 2011, 2012 and 2013. In addition, Mr. Bryan has negotiated and completed numerous Rule 9019 settlements during his career and is knowledgeable on the various key bankruptcy provisions of such transactions.

To my knowledge, there has been no direct or in-direct economic transactions between Clarity Copper (or any affiliated entity) or WUMI and Mr. Bryan at any time since the creation of CSM in November 2011.  In addition, to my knowledge, there have been no direct or in-direct ownership positions, investments, transaction payments, etc between Mr. Bryan and any of the Clarity related funds and/or principals.

Starting today, I will review various key items filed in the CSM bankruptcy case (including the proposed WUMI settlement) with Mr. Bryan, provide him with an update on the current capital structure, status of depositions, and key upcoming dates.  Given his substantial experience in this specific arena, Mr. Bryan has kindly offered to lead the work of reviewing the settlement agreement as negotiated by the CRO and to consider the proposed consent at the next board meeting of CSM along with any other non-conflicted directors.

Thank you.

Clint Walker

This email may contain material that is confidential and for the sole use of the intended recipient(s). Any review, reliance, distribution, or other use by others without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

# EXHIBIT M

## Detweiler, Donald J.

| | |
|---|---|
| **From:** | Marsh Cooper <mcooperind@icloud.com> |
| **Sent:** | Tuesday, June 13, 2017 11:10 AM |
| **To:** | Detweiler, Donald J.; Lawall, Fran; Dan Brosious; David Beckman; David Leta; David J. Richards; Clint Walker; David McMullin |
| **Subject:** | CSM // Draft Notice of Appointment and Absence |

Dear all,

I write to inform the Board of Managers with respect to two matters. First, pursuant to section 5.1(b)(ii) of the Third Amended and Restated Operating Agreement of Skye Mineral Partners ("SMP Operating Agreement") as amended by the the Fourth Amendment to the SMP Operating Agreement. DXS and PacNet hereby appoint Thomas K. Reilly as an additional Manager of SMP effective immediately.

Mr. Reilly has extensive experience in operating, managing, and growing natural resource and energy businesses. He currently serves on the board of directors of OceanConnect Holdings, Inc. Prior to this, Mr. Reilly served as chief executive officer and board member to Chemoil Energy Limited. Mr. Reilly also served as chief executive officer of OceanConnect.com, a technology-based fuel brokering business, for thirteen years during which he successfully branched the company into the diversified energy and trading business.

To my, DXS, and PacNet's knowledge, Waterloo has never had any direct or in-direct economic transactions with Mr. Reilly. Additionally, Mr. Reilly has no direct or indirect ownership positions or investments with Waterloo or any of its related entities or principals. In connection with Mr. Reilly's appointment we ask that the Company added him to its D&O policy immediately. Please join me in welcoming M. Reilly to the Board of Managers.

Second, would like to inform the Board of Managers that a conflict has come up and I will not be able to attend the special meeting scheduled for Wednesday, June 14, 2017. However, I plan to attend the meeting scheduled for Friday, June 16, 2017. Additionally, given that Mr. Reilly's was only very recently appointed, he is not able to attend the June 14th meeting.

I would like to remind the Board that as a result of our absences, the Board cannot take any action at the June 14th meeting. Pursuant to section 5.1(d) of the SMP Operating Agreement (as amended by the Fourth Amendment thereto), a quorum will not exist at any first duly noticed meeting if a DXS Designee is not present. The June 14 meeting is the first duly noticed meeting and neither myself, nor Mr. Reilly will be present. As a result, the Board will not be able to make any decisions or approve the proposed resolutions.

To be clear, this reminder should not be interpreted, in any way, as a position on whether or not the matter on the agenda is properly before the board or whether the Managers can vote on the agenda item. In fact, nothing in this email should be interpreted in a manner that would limit or waive any rights DXS and PacNet may have.

Regards


Marsh

# EXHIBIT N

# JONES DAY

600 BRICKELL AVENUE · BRICKELL WORLD PLAZA · SUITE 3300 · MIAMI, FLORIDA 33131
TELEPHONE: +1.305.714.9700 · FACSIMILE: +1.305.714.9799

DIRECT NUMBER: (305) 714-9701
PJIMENEZ@JONESDAY.COM

June 15, 2017

VIA E-MAIL

**Board of Managers of CS Mining**
Clinton W. Walker (cw@claritypartners.net)
David J. Richards (djr@empireadvisorsllc.com)
Marshall Cooper (mcooperind@icloud.com)
Thomas Reilly (tomreilly158@gmail.com)
A. John A. Bryan, Jr. (jbryan@watley.com)
Sturges Karban (sturges@meridmedia.com)

> Re:    **Special Meeting of the Board of Managers of CS Mining, LLC
> (the "Company") Noticed for June 16, 2017**

Dear Board of Managers,

We represent and write on behalf DXS Capital (U.S.) Limited ("DXS") and PacNet Capital (U.S.) Limited ("PacNet," and together with DXS, "DXS/PacNet") to communicate serious concerns with the matters to be heard in connection with the upcoming special meeting of the Board of Managers of the Company scheduled for June 16, 2017. In particular, the Notice of Special Meeting received by the DXS/PacNet board designee, Marshall Cooper, sets forth one item for approval—a resolution submitted by Clinton Walker (the "Clinton Resolution") to approve a purported settlement agreement between the Company and David J. Richards LLC, d/b/a Western US Mineral Investors ("WUMI" and such proposed agreement referred to as the "Proposed Agreement").[1]

The Proposed Agreement attempts to, among other things, (i) settle the Company's litigation against WUMI (the "WUMI Adversary"), (ii) allow WUMI's alleged $23 million claim against the Company in its pending chapter 11 case (the "WUMI Claim") currently before the United States Bankruptcy Court for the District of Utah, Case No. 16-24818 (the "Bankruptcy Case"), and (iii) treat the WUMI Claim as a secured claim, collateralized by a first position security interest in certain property of the Company. As described more fully below, the

---

[1]    While DXS/PacNet has not seen the "Exhibit A" referenced in the agenda for the June 16 meeting, it is believed that the contents of the Proposed Agreement are substantially similar, if not identical, to a prior settlement agreement between the Company and WUMI that was previously filed with the Bankruptcy Court for approval [ECF No. 625], but soon after withdrawn [ECF No. 639].

ALKHOBAR · AMSTERDAM · ATLANTA · BEIJING · BOSTON · BRUSSELS · CHICAGO · CLEVELAND · COLUMBUS · DALLAS
DUBAI · DÜSSELDORF · FRANKFURT · HONG KONG · HOUSTON · IRVINE · JEDDAH · LONDON · LOS ANGELES · MADRID
MEXICO CITY · MIAMI · MILAN · MOSCOW · MUNICH · NEW YORK · PARIS · PERTH · PITTSBURGH · RIYADH · SAN DIEGO
SAN FRANCISCO · SÃO PAULO · SHANGHAI · SILICON VALLEY · SINGAPORE · SYDNEY · TAIPEI · TOKYO · WASHINGTON

**JONES DAY**

Board of Managers of CS Mining
June 15, 2017
Page 2

Proposed Agreement, an insider transaction[2] designed to benefit certain members of the Board of Managers, as well as related entities and persons, can only be approved with the consent of DXS.[3]

### I.   The Clinton Resolution and Proposed Agreement require DXS's express consent, which has not been sought.

The Clinton Resolution ignores the express language of the Third Amended and Restated Operating Agreement of SMP, the sole controlling member of the Company (such agreement, including any amendments thereto, referred to as the "Operating Agreement"), which governs the conduct of the Company's business activities, including the matters covered by the Proposed Agreement.[4]  The Operating Agreement provides in section 5.1 (Management of the Company by the Board of Managers) that the Board of Manager's authority to manage the Company is expressly limited by the Member consent rights contained in section 4.6 (Voting Rights) of the Operating Agreement.[5]  Stated simply, when it comes to items listed in section 4.6(b) of the Operating Agreement, it is the Members, and not the Board of Managers, who have approval authority.

The Proposed Agreement is an action that falls squarely within section 4.6(b) and, more specifically, subsections 4.6(b)(ii)(7) and (12), which are actions that the Company cannot take without DXS's express consent.[6]  Subsection (ii)(7) refers to "entering into any transaction,

---

[2]   The Proposed Agreement is an insider transaction because it purports to have the Company enter into an agreement with a related party of a Member of Skye Mineral Partners, LLC ("SMP"), Clarity Copper, LLC ("Clarity"), and a Manager of the Company, Clinton Walker.

[3]   The Proposed Agreement also purports to vitiate direct claims and causes of action that PacNet (and its affiliate, Waterloo Street Limited) have against WUMI, as set forth more fully in the Objection to Proof of Claim of David J. Richards, LLC d/b/a Western US Mineral Investors, LLC, filed on May 22, 2017 [ECF No. 637], and the adversary proceeding brought by PacNet and Waterloo against WUMI that challenges the extent, validity, and priority of the WUMI Claim (the "PacNet Adversary").

[4]   The amendment to the Limited Liability Company Agreement of CS Mining, LLC ("CSM Operating Agreement") dated August 24, 2015 states: "[CS Mining] is governed by that certain Limited Liability Company Agreement of Skye Mineral Partners, LLC by and among the Members, as amended by subsequent amendment thereto.... ."

[5]   Operating Agreement § 5.1 (Management of the Company by the Board of Managers) states "*Except as otherwise provided in this Agreement (including without limitation Section 4.6 hereof)* or by the Act, the business and affairs of the Company will be managed and all Company powers will be exercised by or under the direction of the Board of Managers." (emphasis added).

[6]   Operating Agreement § 4.6(b)(ii) states "Notwithstanding any provision in this Agreement to the contrary, for as long as DXS continues to hold at least fifty percent (50%) of the Class A Units held by DXS as of the Effective Date, *neither the Company nor any Subsidiary shall undertake any of the following without the prior written approval of DXS*, provided that DXS must provide its consent or disapproval of such matter within ten (10) Business Days after such consent is requested, in writing, by the Company...." (emphasis added).

JONES DAY

Board of Managers of CS Mining
June 15, 2017
Page 3

agreement or commitment with any Member, or any Related Party of any Member, other than as
expressly provided for in this Agreement."  Subsection (ii)(12) refers to "commencement or
settlement of any claim, demand or litigation resulting in projected costs and expenses or
benefits in an amount greater than $3,000,000, or which is otherwise material in the context of
the business of Skye or any subsidiary."  The Proposed Agreement is an agreement between the
Company and WUMI—a Related Party to another Member, Clarity[7]—that has the effect of
settling the WUMI Adversary—litigation that is undoubtedly "material" to the Company.  As a
result, the Company cannot enter into the Proposed Agreement without the express written
consent of DXS.

## II.    Based on the information currently available to DXS, DXS does not consent to the Proposed Agreement.

To date, the Company has not solicited DXS's consent, nor has the Company provided
DXS/PacNet with any information regarding the propriety of the Proposed Agreement.
However, based on the facts that DXS/PacNet has been able to ascertain, DXS/PacNet seriously
doubts that the Proposed Agreement is in the best interests of the Company.

The Company commenced the WUMI Adversary on February 17, 2017—more than six
months after the PacNet Adversary, but seeks very similar relief as the PacNet Adversary,
including equitable subordination and recharacterization of the WUMI Claim as equity.
Presumably, at such time, the Company and its advisors believed there was a valid basis for
commencing litigation against WUMI, litigation that would effectively wipe out certain liens
WUMI has on property and delever the Company's capital structure by over $25 million.[8]
Nevertheless, without having taken a single deposition, the Company and its advisors
improperly attempted to enter into the Proposed Agreement that will settle all litigation against
WUMI and give WUMI an allowed secured claim in exchange for a potential payment of $1
million to the estate.[9]  On this record, DXS/PacNet cannot understand how the Company and its
advisors can seek to change course on claims that they both believed were meritorious.
Therefore, while fully reserving all rights, DXS cannot consent to the Proposed Agreement.

---

[7]  Clarity holds an equity interest in WUMI and a financial stake in the WUMI Claim.  Pursuant to the
Operating Agreement, "Related Party" means with respect to any [individual, partnership, limited
partnership, limited liability company… or any other entity], any Affiliate, officer, director, supervisory
board member, employee, or holder of any equity of such Person or any Subsidiary of such Person, and any
Affiliate of the foregoing."  See Operating Agreement § 1 (Definitions).

[8]  Similarly, the WUMI and Waterloo priority rights as to certain collateral would be reset – the very subject of
the PacNet Adversary.

[9]  To make matters worse, the $1 million payment is illusory as the estate would only receive $1 million to the
extent WUMI receives a recovery from sale proceeds on account of the WUMI Claim.

JONES DAY

Board of Managers of CS Mining
June 15, 2017
Page 4

### III.  The CRO lacks authority to negotiate the Proposed Agreement.

Nor does DXS believe that the Proposed Agreement can be properly considered at this time as the CRO has no authority to negotiate or settle litigation on behalf of the Company.  The Company's counsel has admitted on various occasions that the CRO was without authority to negotiate any settlements of the litigation, which was the reason why the Company withdrew the motion to approve the Proposed Agreement.

DXS/PacNet reserve all of their rights and remedies under the Operating Agreement and applicable law should the Company and/or Board of Managers ignore DXS's consent rights and proceed to consider the Clinton Resolution.  Any purported action by the Board of Managers would not only contravene the Operating Agreement, but ignores the fundamental and deep conflicts that managers Richards and Walker have with regards to the Proposed Agreement. Here, it is beyond dispute that both Richards and Walker, and/or companies or individuals they own or control directly or indirectly, stand to gain from approval of the Clinton Resolution.

Very truly yours,

Pedro A. Jimenez
Counsel to DXS Capital (U.S.) Limited and
PacNet Capital (U.S.) Limited

cc:

**Pepper Hamilton**
c/o Donald Detweiler (detweild@pepperlaw.com)
c/o Fran Lawall (lawallf@pepperlaw.com)

**Chief Restructuring Officers c/o FTI Consulting**
Dan Brosious (dbrosio@fticonsulting.com )
David Beckman (dave.beckman@fticonsulting.com )